FILED

2010 Feb-26  PM 08:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **LAURA FAUGHT and STEVEN FAUGHT, on behalf of themselves and all others similarly situated,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No.: 2:07-CV-1928-RDP** |
| **AMERICAN HOME SHIELD CORPORATION,** | ) ) ) | |
| **Defendant.** | ) ) | |

## DEFENDANT'S BRIEF IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Pursuant to Federal Rule of Civil Procedure 23(e), Defendant American Home Shield Corporation ("AHS") submits this memorandum in support of final approval of the class settlement herein. Except as otherwise defined, capitalized words and phrases have the same meanings ascribed to them in the parties' Stipulation of Settlement (the "Settlement"). Doc. 37 Ex.1.

## I.    INTRODUCTION.

On October 20, 2009, the Court preliminarily approved the Settlement, conditionally certified the Class for purposes of settlement only, approved a form of notice to be given to the Class Members, and ordered that the notice be distributed under certain conditions and deadlines. Doc. 37. Thereafter, AHS sent

the Notice individually to the nearly five million Class Members (Doc. 85) and to appropriate state and federal authorities pursuant to the requirements of the Class Action Fairness Act, 28 U.S.C. § 1715 ("CAFA").   Rachel Niewoehner Decl. (appended hereto as Ex. A), ¶ 2 and Exs. A and B thereto.  The Notice, along with the Settlement, the Court's preliminary approval order, and other relevant materials were published on a readily locatable internet website: www.faughtclassaction.com. *Id.*  Ledbetter Decl. (appended hereto as Ex. B), ¶ 2. The Notice summarized the key terms of the Settlement, explained the nature of the Action, explained where and how additional information could be obtained by Class Members, set forth the terms of the Release, and disclosed the rights and procedures for any Class Members to object to the Settlement's terms or opt out of the Settlement by February 8, 2010.  Doc. 37 Ex.2.  In response to the individual notice program, 23 Class Members (0.00049 percent of the Class) objected to the Settlement, and a maximum of 1,543 Class Members (constituting well less than one-tenth of one percent of the Class) opted out of the Settlement.[1]   Lindsay

---

[1] It is likely that not all 1,543 persons in fact validly opted out.  37 of the total neither used the Exclusion Request Form nor otherwise indicated any intent to be excluded; another 30 did send in written communications of one kind or another but did not to do by the deadline.  Singletary Decl., ¶¶ 2-4.  The undersigned continues to receive sporadic exclusion requests; and intends to seek the Court's direction at the Fairness Hearing as to the calculation the total number of opt outs.

Singletary Decl. (appended hereto as Ex. C), ¶ 2.  Additionally, the Texas Attorney General objected to the Settlement, purportedly as an amicus curiae.[2]

More than 90 of the Class Members who requested exclusion clearly did so for reasons unrelated to the merits of the Settlement, as their comments – some of which are quoted below - express satisfaction with the service they have received from AHS:

- "AHS has served us well"
- "I have no complaints, only compliments"
- "We could not ask for more and been more satisfied by the service we have received."
- "We find their service to be exemplary."
- "AHS always sent reputable service contractors who efficiently and accurately repaired plumbing leaks, new water heater, and many other issues."
- "We were never given the impression we were less than highly valued customers."
- "The AHS response was very adequate and as advertised."
- "AHS has met their obligations in an ethical, honest manner."
- "They acted in good faith in every dealing that came up."

Singletary Decl., ¶ 6 and Exh. thereto.

---

[2] As will be discussed *infra*, the Texas Attorney General is not AHS's regulator within the State of Texas, and lacks authority under CAFA to object to the settlement.  AHS's Texas regulator, the Texas Real Estate Commission, received notice of the Settlement pursuant to CAFA (Niewoehner Dec. Ex. B) but has not objected to the Settlement.

The United States took the position that its rights could not be affected by the Settlement. Doc. Nos. 70, 71. While AHS has no information that the United States is a member of the Class, both plaintiffs and AHS believe that the United States' communication, because it contains no objection to the settlement, should be taken by the Court as a request for exclusion.

The favorable reaction of the Class to the Settlement is not surprising, because the Settlement—the product of protracted and contentious negotiations between the parties, overseen by the mediation efforts of George M. Van Tassel, Jr., a member of the Court's Panel of Neutrals—offers the same sort of broad relief that was sought on behalf of the Class through litigation. The Settlement's relief provisions, if finally approved, will require AHS to retrospectively review previous denials of claims resubmitted by Settlement Class Members, going back nearly nine years, and prospectively adopt new procedures to handle claims under its Home Service Contracts on a go-forward basis. *See* Doc. 37 Ex.1 Part V.[3] Specifically, under the Settlement each Settlement Class Member will have the opportunity to resubmit any claim denied during the Class Period for review again, under circumstances where AHS has strong economic disincentives not to wrongfully deny claims. *See id.* ¶5.2. Settlement Class Members dissatisfied with the Review Desk's decisions are not bound by them; instead, they may bring their claims individually in court, and if they recover more than the Review Desk offered, subject AHS to penalties beyond the amount of the claim itself. *Id.*

---

[3] In addition to changes already contemplated under the Stipulation of Settlement, AHS expects to provide the Court, either prior to or at the fairness hearing, additional specific examples of actual and proposed changes to its Home Service Contracts and claims handling policies and procedures.

The Settlement offers such relief even though it is far from certain that the Class could even prevail on the merits on any claim, and there is substantial doubt whether any litigation class could be certified under Rule 23. The relief offered by the Settlement, measured against the deep uncertainty of success for the Class, coupled with other risks, costs, and delays inherent in certifying and pursuing the claims at issue, amply satisfy the criteria for final approval. Continued litigation would be a costly, burdensome, and uncertain process for all concerned and would, in all likelihood, never provide the Class with the comprehensive relief that the Settlement offers. The Court should finalize certification of the Settlement Class and finally approve the Settlement.

## II. THE SETTLEMENT BEFORE THE COURT.

### A. Nature of the Case.

AHS issues, administers and sells home service contracts. Home service contracts (sometimes called "home warranty contracts") are one-year service contracts for certain appliances and systems in residential homes. A Home Service Contract obliges AHS, in exchange for a fee, to arrange for service technicians to provide repair and replacement services for covered home systems and appliances under circumstances explained in the particular contract.

Plaintiffs Laura and Steven Faught (the "Faughts") filed their original complaint against AHS on October 22, 2007, and amended the complaint on

October 6, 2009. *See* Doc. 1; Doc. 34. The original and amended complaints

challenge broadly AHS's policies and practices relating to the adjustment of claims

submitted under its Home Service Contracts. Plaintiffs allege that AHS has

engaged in a broad nationwide pattern of improperly (1) denying claims for

coverage of appliances or their components that were inadequately maintained

and/or cleaned; (2) deliberately breaching express provisions of its Home Service

Contracts; and (3) relying upon service diagnoses from service providers

nationwide who stand to gain financially if the appliance at issue is denied

coverage under the Home Service Contract, as they may then charge more to repair

or replace the appliance than they could under the terms of their service

agreements with AHS. Doc. 1 at 2–7; Doc. 34 at 2–7. Plaintiffs assert claims for

breach of contract and bad faith, and seek money damages (both compensatory and

punitive) for themselves and the proposed nationwide class, as well as wide-

ranging declaratory and/or injunctive relief. Doc. 1 at 10–11; Doc. 34 at 10–12.

The Action seeks certification of a putative nationwide class, defined as

follows:

> All persons who have held a residential home warranty
> contract from AHS applicable to a house within the
> United States at any time since June 21, 2001. Excluded
> from this class are the defendant, any subsidiary or
> affiliate of the defendant, and any judge, arbitrator, or
> mediator who may adjudicate, arbitrate, or mediate this
> action.

6

Doc. 34 ¶20.

The Action has been both vigorously contested and subject to significant discovery. AHS filed and briefed a substantial motion to dismiss early in the case (which Plaintiffs opposed and the Court denied by Order dated December 20, 2007). *See* Docs. 4, 7, 8, 10, 11, 12. AHS answered the complaint on January 29, 2008, denying all material allegations. Doc. 16. The parties engaged in written discovery, and AHS produced tens of thousands of pages of responsive documents. Additionally, Plaintiffs deposed four AHS employees concerning merits and class certification issues. *See* Doc. 22 at 1–2. Plaintiffs filed their first motion for class certification on September 11, 2008, supported by a voluminous evidentiary submission and a brief, and renewed that motion on October 31, 2008. *See* Docs. 24, 26, 27; 10/24/09 Order. The Court suspended consideration of that motion while the parties pursued Court-ordered settlement discussions. Doc. 29. Throughout the course of the litigation, AHS has vigorously denied, and continues to deny, all liability with respect to any and all facts or claims alleged in the Action.

**B.     Related Litigation.**

In July 2007, Karon and Chip Edleson filed a similar putative nationwide class action against AHS in state court in California. Over a year later, in late September 2008, the parties to the *Edleson* class action reached a tentative

settlement in California. Doc. 39 Ex.3. The settlement would have covered "all Persons in the United States who purchased or who were issued any [AHS] Home Warranty Contract during the Class Period." *Id.* ¶2.8. The California state court preliminarily approved the settlement on December 31, 2008, but the court (via a different judge) denied final approval of the *Edleson* settlement on July 8, 2009. Doc. 39 Ex.6.[4] Under the terms of the *Edleson* settlement agreement, termination left the settlement "void *ab initio*," the parties returned to their pre-settlement positions, and the Edlesons agreed not to offer any "negotiations, statements, proceedings, and documents prepared in connection" with the settlement "for any purpose whatsoever in any Suit" adverse to AHS. Doc. 39 Ex.3 ¶11.3. Further, the Edlesons themselves in substance acknowledged termination of that settlement by filing a motion for preliminary injunctive relief against AHS in the California case after denial of the settlement (*id.* Ex. 7), which would have been contrary to the settlement had it in fact remained in place.

## C. The Parties' Settlement Negotiations.

Both before and after the *Edleson* settlement, the parties here engaged in extensive settlement negotiations. This Court ordered the parties to mediation in July 2008, two months before the *Edleson* settlement was reached. Doc. 23. The

---

[4] While the state court's order had the obvious effect of terminating the *Edleson* settlement, AHS also sent a formal notice of termination on or about October 9, 2009. Doc. 40 Ex.B.

parties reached an initial settlement in January 2009, months before the final fairness hearing in *Edleson*. *Id.* ¶6. The original settlement covered a subset of the *Edleson* class, and offered such class members additional relief supplementing the relief in *Edleson*. *Id.* The parties agreed, with this Court's concurrence, to postpone presenting the initial settlement to the Court pending final resolution of the *Edleson* settlement. *Id.* ¶7 & Ex.D. After the California court denied final approval of the *Edleson* settlement, the parties promptly notified this Court, and provided it a copy of the California court's order in late July 2009. *Id.* ¶7.

After the *Edleson* settlement failed, the parties recommenced settlement negotiations, which lasted over three months, to craft a new settlement. Doc. 39 Ex.2 ¶7; Doc. 66 Ex.B ¶4. After several mediation sessions, the parties reached agreement, which they presented to this Court on October 6, 2009. Doc. 35. All told, the parties negotiated over 15 months. The Settlement was executed in early October 2009. *Id.* In the interim, AHS and Class Counsel participated in at least 16 formal mediations sessions, all with the knowledge of the Court. Doc. 39 Ex.2 ¶¶4–8 & Exs.B–E, as well as numerous informal settlement discussions. In fact, the Court commended the mediator for his tenacity in producing the Settlement after nearly 30 formal and informal sessions. Doc. 38 at 9–10.

The settlement negotiations were prolonged and sometimes contentious. Doc. 66 Ex.A ¶9; *id.* Ex.B ¶¶2–3. On at least three occasions, Class Counsel

walked out on mediation sessions, convinced that the parties were at an impasse and that further negotiations would be pointless. Doc. 66 Ex.A ¶9. At one point, negotiations devolved to the point that Class Counsel terminated the mediation and filed an adversarial motion for class certification. *Id.* The motion was withdrawn and negotiations resumed only after the parties were able to reach agreement on the disputed issue. *Id.*

The Court preliminarily approved the Settlement on October 20, 2009, finding the Settlement "appears to be fair, reasonable, and adequate with respect to the Class" and also "appears to be free of collusion to the detriment of Class Members." Doc. 37 at 8. The Court found that the Settlement "resulted from extensive arm's-length negotiations and was concluded only after Class Counsel had (1) conducted numerous and exhaustive mediations sessions with a member of the Court's Panel of Neutrals; (2) conducted an independent investigation before and throughout the litigation; and (3) satisfied themselves about the fairness, reasonableness, and adequacy of the Settlement." *Id.*

**D.     Improvements on the *Edleson* settlement.**

The Settlement provides much broader relief than the failed *Edleson* settlement. After reviewing the respective terms of the two settlements, this Court found the Settlement's terms here are "substantially more advantageous to the Class Members than the settlement which was proposed and ultimately rejected by

10

the California state court in *Edleson*." Doc. 43 at 6. The Court specifically found these added benefits in the Settlement:

- Settlement Class Members need not wait 120 days from submission to the Review Desk to file suit.

- AHS does not have a built-in opportunity to sell additional contracts.

- The settlement contains additional safeguards to ensure notice goes to appropriate addresses.

- Review Desk staff must have minimum of three years' experience.

- AHS must add staff to the Review Desk if submissions are not processed timely.

- AHS must meet specific deadlines on submissions to the Review Desk.

- Review Desk employees must follow explicit instructions in deciding submissions.

- Review Desk decisions may be appealed.

- Settlement Class Members who reject offers, file suit, and recover more than the amount offered by the Review Desk become entitled to attorney's fees equivalent to three times the difference or $5000, or a $1000 lump sum.

Doc. 43 at 6.    The Settlement also provides for specific communications from AHS to Settlement Class Members regarding their Submissions within specified periods of time, a further benefit not included in the *Edleson* settlement   *Id.* ¶5.2.H–I.

11

The Court found "[t]hese are all valuable aspects of the proposed settlement that were not present in respect to the *Edleson* settlement." *Id.* The Court thus found there is "no factual basis" for the contention that the "settlement in this matter is essentially the same as the one previously agreed to [in *Edleson*] but rejected by the California court." Doc. 57 at 2.

### E.   The Primary Terms of the Settlement.

#### 1.   The Settlement calls for the certification of the Class to effectuate its purpose.

The Settlement seeks certification of a class, for settlement purposes only, defined as follows:

> All persons in the United States who purchased or were issued any Home Service Contract during the Class Period. Excluded from the Class are the Defendant, its parents, subsidiaries, affiliates, officers, directors, and employees; and any judge, mediator, or arbitrator who has jurisdiction over or will serve in connection with this matter now or in the future, and any member of the family of such judge, mediator, or arbitrator.

Doc. 37 Ex.1 ¶2.7.  This Court conditionally certified the Class on October 20, 2009. Doc. 37 at 2–8.

#### 2.   The Settlement offers a combination of relief matching that primarily sought on behalf of the Class through litigation.

The Settlement offers a combination of relief designed to retrospectively review the Settlement Class Members' denied claims and to prospectively revise AHS's business practices as they relate to Home Service Contracts. The Settlement

12

provides relief for each claim asserted in the amended complaint. The Settlement establishes a new Review Desk, which will be staffed with experienced customer service representatives specially trained to address Submissions made by Settlement Class Members. Doc. 37 Ex.1 ¶5.2. The Review Desk will conduct a fresh re-review of any Denied Claim that is submitted by a Settlement Class Member for reconsideration. *Id.* ¶5.2.H. If a Settlement Class Member is not satisfied with the relief offered in the Review Desk process, he or she retains the right to bring an individual suit against AHS for AHS's alleged breach of contract, so long as such claim is individualized and does not turn on allegations of generalized AHS policies or practices. *Id.* ¶5.2.Q. (Class Members even retain the right to bring such suits even if they do not elect to participate in the Review Desk process. *Id.*¶ 5.2.P.) If a Settlement Class Member recovers more via a lawsuit than he or she was offered through the Review Desk, the Settlement provides a payment of three times the difference or $5,000, whichever is higher, or a $1,000 lump-sum payment, depending on whether or not the Settlement Class Member made a claim concerning an HVAC system that was denied for lack of maintenance during the first year of the Settlement Class Member's contract. *Id.* ¶¶5.2.R–S. These "litigation kickers" create powerful economic incentives for AHS to consider carefully and in good faith all claims submitted to the Review

13

Desk. These provisions were not part of the *Edleson* settlement, and broaden the benefits to the Settlement Class Members encompassed by this Settlement.

Establishing and operating the Review Desk will require, among other things, the additional training of existing and future AHS employees, development and implementation of new processes by AHS to deal with call flows, preparation of potentially vast amounts of correspondence with Settlement Class Members, significant amounts of research regarding what may well be very old files, and preparation and maintenance of extensive logs. Lynn Schroeder Decl. (appended hereto as Ex. D), ¶ 7.

The Settlement also provides that AHS will make certain prospective changes to its business practices. Doc. 37 Ex.1 ¶ 5.3. AHS will, within four months of the Effective Date, distribute written training materials to the Contractor Network conveying the importance AHS places on honoring the terms of coverage and other terms of its Home Service Contracts and the important role that contractors play in this effort. *Id.* ¶ 5.3.B. AHS will continue to monitor its business practices, and may solicit the input of Class Counsel in this regard, and will, no later than sixteen months after the Effective Date, make another distribution to its Contractor Network of written training materials to address and resolve any material issues that AHS determines require further training or revision. *Id.* ¶ 5.3.C.

The business practice changes that AHS will undertake (specific examples of which will be provided to the Court at or prior to the Fairness Hearing) include changes to its Home Service Contracts and changes to its claims-handling procedures, both in ways beneficial to the Class. As regards contract changes, and as detailed in the Declaration of Joleen Wadlington, revising AHS's Home Service Contracts, having the changes regulatorily approved, and converting AHS customers to the new contracts is a detailed process, both internal and external to AHS, that takes approximately two years. Joleen Wadlington Decl. (appended hereto as Ex. E), ¶¶ 2-9.

These primary benefits of the Settlement successfully address Plaintiffs' claims for breach of contract and bad faith failure to pay an insurance claim.[5] Additionally, these benefits provide prospective relief designed to eliminate allegedly problematic business practices or policies relating to the manner in which contractors diagnose claims for repair or replacement pursuant to the Home Service Contracts.

> 3. The Settlement calls for AHS to verify compliance with the Settlement's terms.

---

[5] In addition to denying the specific allegations in the Action, AHS contends that it issues a home service contact, not an insurance policy, and thus it is not subject to a claim for bad faith failure to pay an insurance claim. *See* Doc. 16 Thirteenth Defense; ALA. CODE § 8-32-2(13) (providing that service contracts are not policies of insurance under Alabama law).

The Settlement also requires AHS to verify compliance with the Settlement. AHS must process claims through the Review Desk in a timely manner and then assess the effectiveness of the relief provided to Settlement Class Members. Doc. 37 Ex.1 ¶5.2.H. AHS must also provide Class Counsel quarterly reports summarizing the activity of the Review Desk, breaking out the number of Submissions by appliance or system, the amount claimed, and the relief offered. *Id.* ¶11.2.[6] In these reports, AHS must also provide a separate breakout as to HVAC claims that were denied outright solely for lack of maintenance during the first year of the contract. *Id.* During the period of these reports and thereafter, the Court has continuing jurisdiction over the Settlement.

### 4. The Settlement provides for the release of certain claims by the Class.

In return for the above relief and consideration, the Settlement provides that Settlement Class Members will be bound by a class-wide Release. Doc. 37 Ex.1 ¶2.35. The Release contains a Settlement Class–wide release of all claims against AHS and the other Released Parties. *Id.* Part 10. Specifically, the Release discharges AHS and the Released Parties from liability for any claims arising from

---

[6] AHS observes that Class Counsel's duties under the Settlement, while including responding to questions from and assisting Settlement Class Members, do not extend to encouraging Settlement Class Members to make submissions. Doc. 66-2, p.6. The Settlement in fact requires both defense counsel and class counsel to avoid "initiat[ing] any action whatsoever that is reasonably designed to affect any Settlement Class Member's decision-making process regarding whether or not to make a Submission to the Review Desk." Doc. 37-2 ¶ 7.12.

Home Service Contracts concluded and events occurring during the Class Period **and** related to AHS's policies, procedures, and/or practices during the Class Period as alleged in, or reasonably related to those alleged in, the Action, including (i) Contractor Relations Practices; and (ii) AHS's policies, procedures and/or practices respecting: the timing or promptness of responding to customer problems and situations, including expediting such responses; the diagnosis of customer problems and situations; authorizing repairs or replacements in response to customer requests; choosing between offering repairs and offering replacements; offering or requiring the acceptance of cash in lieu of repairs or replacements; denying claims (in part or in their entirety); applying contract limitations and exclusions; applying business rules for emergencies; responding to customer inquiries or escalating the attention given to such inquiries; or otherwise making decisions regarding either the application of the terms and conditions of Home Service Contracts, or the authorization of repair and replacement services pursuant to Home Service Contracts. *Id.* ¶10.1.[7]  Significantly, however, Settlement Class Members all retain the right to bring claims against AHS for breach of a Home Service Contract to the extent such claims are individualized and do not turn on allegations of generalized AHS polices or practices, assuming such claims are not resolved through the Review Desk process. *Id.* ¶¶10.1–10.3.  Even if Settlement

---

[7] Thus, the Release is not confined to claims brought as collective or class actions.

Class Members do not make submissions to the Review Desk, their ability to pursue individualized remedies against AHS not involving AHS's generalized business practices remains unimpaired by the settlement. Importantly, the details and scope of the Release were included in the notice provided to Class Members. Doc. 37 Ex.2 at 9–11.

The Settlement also provides that the Court will retain continuing jurisdiction as necessary or appropriate to effectuate the terms, administration, purposes and intent of the Settlement. *Id.* ¶7.11.

> 5.   The Settlement provides that certain Attorneys' Fees will be paid by AHS directly.

The parties have agreed that Class Counsel may submit, and AHS will not oppose, an application for an award of Attorneys' Fees in an amount not to exceed $1.5 million, to be paid directly by AHS to Class Counsel. Doc. 37 Ex.2 at 8. Class Counsel's fee petition may also include a percentage, not to exceed 25%, of the cash paid to Settlement Class Members under the Review Desk. *Id.* Any fee award is subject to approval by the Court. *Id.*

## III.   THE PARTIES FULFILLED THEIR DUTIES TO PROVIDE NOTICE.

Federal Rule of Civil Procedure 23(e) prohibits the settlement of any class action unless notice "is given to all members of the class in such manner as the court directs." Moreover, CAFA requires a settling defendant to provide

appropriate state and federal regulators with notice of the action, the proposed settlement, and the proposed form of notice to be given to class members. 28 U.S.C. § 1715. Among other things, these requirements ensure that the Due Process rights of absentee class members are protected. *See, e.g., Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 812 (1985); *Pearson v. Ecological Sci. Corp.,* 522 F.2d 171, 176–77 (5th Cir. 1977) (the purpose of Rule 23(e) "is to ensure that any person whose rights would be affected by a dismissal or compromise has the opportunity to contest the proposed action") (citations omitted).

The Court previously approved the Class Notice, finding that "the mailing and distribution of the Class Notice in the manner and form set forth in ¶ 7.4 of the Agreement meets the requirements of Federal Rule of Civil Procedure 23 and due process, and is the best notice practicable under the circumstances." Doc. 37 at 9. Specifically, the Court found the Class Notice (Doc. 37 Ex. 2), "clearly and concisely states in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(e)(3)." *Id.* In other

words, the Court found that the Class Notice satisfied the requirements of Rules 23(c)(2)(B) and 23(e).

AHS has separately submitted a verification of compliance with the Court's notice requirements. Doc. 85. AHS timely mailed the Class Notice—in the form approved earlier by the Court—to the readily identifiable members of the Class. *Compare* Doc. 37 at 10 *with* Doc. 85 at 2. AHS also fully complied with the Court's procedures for identifying the addresses of Class Members to whom the Class Notice was returned by the U.S. Postal System as undeliverable. *Compare* Doc. 37 at 10 *with* Doc. 85 at 1. AHS also, consistent with the Court's requirements, made available on the settlement website a copy of the Class Notice, the Settlement, and a copy of the Court's preliminary approval order, as well as other relevant documents. Ledbetter Decl., ¶ 2.

AHS has also submitted evidence of its compliance with CAFA's notice requirements. CAFA requires that a settling defendant serve a copy of a settlement notice "upon the appropriate State official of each State in which a class member resides and the appropriate Federal official," most commonly the Attorney General of the United States. 28 U.S.C. § 1715(b). AHS timely sent notice to the Attorney General of the United States, as well as to the appropriate regulators for all of the

states covered by the geographic scope of the Settlement. Niewoehner Decl., Exs. A and B.[8]

Accordingly, because AHS has complied with the Court's directives concerning the distribution of notice to the Class, with the requirements of Due Process and Rule 23 concerning the provision of notice, and with CAFA's requirements concerning notice to appropriate state and federal regulators, the Court should find that AHS fully and adequately discharged the duties imposed upon it by the Court's October 20, 2009, Order and by 28 U.S.C. § 1715, to provide notice to the Class Members and appropriate federal and state regulators.

## IV. THE CLASS SHOULD BE FINALLY CERTIFIED FOR PURPOSES OF THE SETTLEMENT

The parties stipulated to the certification of the Class for purposes of settlement only. Doc. 37 Ex.1 Part VI. The Court has preliminarily so certified the Class.    Doc. 37 at 4–8. Rule 23 requires that the Class satisfy the four requirements of Rule 23(a), and the criteria set forth in Rule 23(b)(3). The four requirements of Rule 23(a) are (A) the class be "so numerous that joinder of all members is impracticable," (B) there be "questions of law or fact common to the class;" (C) the claims of the named representative be "typical of the claims . . . of

---

[8] As will be discussed *infra*, AHS's regulator in the State of Texas is the Texas Real Estate Commission ("TREC"), to whom AHS sent CAFA notice. Niewoehner Decl. While TREC has interposed no objection to the Settlement, the State of Texas – AHS's adversary in litigation in Texas – has made a "special appearance" and filed an objection, purportedly as an amicus. Doc. 71.

the class;" and (D) the representative parties be in a position to "fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a).  Rule 23(b)(3) requires the court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). The matters pertinent to these findings include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Id.*

It should be noted that Rule 23(b)(3)'s manageability requirement is not a factor in assessing whether a class should be certified for settlement purposes, however.  Numerous courts have noted that, if the varying laws of the 50 states apply in a nationwide class action, then (for example) instructing the jury becomes unmanageable. *See, e.g., In re Am. Med. Sys.*, 75 F.3d 1069, 1085 (6th Cir. 1996); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001).  The Eleventh Circuit has likewise decertified classes due to legal and factual variations that would come into play in a litigation context. *Andrews v. American Tel. & Tel. Co.*, 95 F.3d 1014 (11th Cir. 1996); *Jackson v. Motel 6 Multipurpose, Inc.*, 130

22

F.3d 999 (11th Cir. 1997). Supreme Court precedent clarifies that such concerns does not apply to class certification for settlement purposes, as distinct from litigation purposes. In *Amchem Products, Inc. v. Windsor,* 521 U.S. 591 (1997), the Court noted that the manageability of a nationwide class, such as manageability issues arising from legal and factual variation, is not implicated in the settlement context, and need not be considered, because "the proposal is that there be no trial." *Id.* at 620.

In connection with seeking preliminary approval of the Settlement, the parties demonstrated that their stipulations concerning certification, and the Class proposed thereby, satisfied all of these requirements and criteria. Doc. 36. The Court did not take the parties' stipulations and arguments as the end of the matter; instead, the Court conducted its own rigorous analysis of the record, ultimately ordering the conditional certification of the Class based on a number of factual findings and conclusions of law. The Court's analysis and conclusions were correct at the preliminary approval stage and remain so now; class certification is proper for purposes of this settlement.

## V.     THE SETTLEMENT SHOULD BE GIVEN FINAL APPROVAL.

### A.     <u>The Standards for Judicial Approval of Class Action Settlements.</u>

"Settlement is generally favored as a means of resolving class-action

lawsuits." *Williams v. Nat. Sec. Ins. Co.*, 237 F.R.D. 685, 694 (M.D. Ala. 2006) (*citing Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984)).[9] Nevertheless, a class action may "not be dismissed or compromised without the approval of the court." Fed. R. Civ. P. 23(e). In determining whether to give its approval to a settlement, a court must determine whether "the settlement is fair, adequate and reasonable." *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279 (7th Cir. 2002) (quoting *Joel A. v. Giuliani*, 218 F.3d 132, 138–39 (2nd Cir. 2000)).[10]

Determining whether a settlement is fair, adequate, and reasonable requires consideration of the following factors:

---

[9] *See also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2nd Cir. 2005) (noting "strong judicial policy in favor of settlements, particularly in the class action context") (citation omitted); *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("courts naturally favor the settlement of class action litigation") (citing cases); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3rd Cir. 1995); *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) ("Public policy strongly favors the pretrial settlement of class action lawsuits"); *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977); *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976).

[10] *See also In re Chicken Antitrust Litig. American Poultry,* 669 F.2d 228, 238 5th Cir. Unit B 1982) ("to approve  a settlement, the district court must find that it is fair, adequate and reasonable"); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d at 785; *Akkala v. Lake Shore, Inc.,* 82 F.3d 417, 1996 WL 166736, at *1 (6th Cir. Apr. 9, 1996) (unpublished opinion) (review of class action settlement is "done under a universally applied standard to determine whether the settlement is fundamentally fair, adequate and reasonable"); *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975).

> (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the factual and legal obstacles to the plaintiffs prevailing on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and the substance and amount of opposition to the settlement.

*United States v. Alabama,* 271 Fed. Appx. 896, 900 (11th Cir. 2008); *Leverso v. Lieberman,* 18 F.3d 1527, 1530 n.6 (11th Cir. 1994); *see also Bennett,* 737 F.2d at 986. All of these factors need not weigh in favor of the settlement; courts are to weigh the totality of these factors in light of the particular circumstances of the case. *D'Amato v. Deutsche Bank,* 236 F.3d 78, 86 (2nd Cir. 2001)..

Courts should not convert settlement hearings into trials on the merits or mini-trials. *See United States v. Ala.,* 271 Fed. Appx. at 902 ("It cannot be overemphasized that neither the trial court in approving the settlement nor this Court in reviewing that approval have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of a dispute.") (quoting *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir. 1977)): *Ohio Pub. Interest Campaign v. Fisher Foods, Inc.,* 546 F. Supp. 1, 6 (N.D. Ohio 1982) ("While proponents of the settlement bear the burden of proving that the proposal should be approved, they should not be required to stage a mini-trial on the merits, the event which settlement aims to preclude") (internal citation omitted) (quoting *In re Armored Car Antitrust Litig.,* 472 F. Supp. 1357, 1367 (N.D. Ga. 1979), *aff'd*

*in part, rev'd in part on other grounds,* 645 F.2d 488 (5th Cir. 1981)).  The very

purpose of a settlement is to avoid the need to determine sharply contested issues

and to dispense with wasteful and expensive litigation and discovery.  *Carson v.*

*American Brands, Inc.,* 450 U.S. 79, 88 n. 14 (1981) (in considering whether to

approve a class action settlement, courts "do not decide the merits of the case or

resolve unsettled legal questions").[11]  As explained by one court:

> Voluntary out of court settlement of disputes is highly favored in the
> law . . .  The court will not, therefore, substitute its own judgment for
> the good faith negotiations of experienced counsel. . . .  The Court
> should not turn the settlement hearing into a trial on the merits. . . .
> Thus, the trial court has a limited scope of review for determining
> fairness.  The very purpose of settlement is to avoid trial of sharply
> disputed issues and the cost of protracted litigation. . . .  The Court
> may limit its fairness proceeding to whatever is necessary to aid it in
> reaching a just and informed decision. . . .  ***An evidentiary hearing is***
> ***not required.***

*In re Agent Orange Prod. Liab. Litig.,* 597 F. Supp. 740, 758–60 (E.D.N.Y. 1984)

(emphasis added), *aff'd,* 818 F.2d 145 (2nd Cir. 1987); *see also In re Corrugated*

*Container Antitrust Litig.,* 643 F.2d 195, 212 (5th Cir. 1981) ("The very

---

[11] *In re Corrugated Container Antitrust Litig.,* 556 F. Supp. 1117, 1157 (S.D.
Tex. 1982), *aff'd,* 687 F.2d 52 (5th Cir. 1982) ("The compromise of complex
litigation is favored both by strong judicial policy and public policy.  Due to their
uncertainty, difficulty of proof, and length, and in the interest of judicial economy,
class action [lawsuits] should be settled whenever possible, as soon as possible.")
(citing *In re Corrugated Container Antitrust Litig.,* 659 F.2d at 1325); *Pfizer, Inc.*
*v. Lord,* 456 F.2d 532 (8th Cir. 1972)); *see also* Fed. R. Civ. P. 1 ("These rules …
should be construed and administered to secure the just, speedy, and inexpensive
determination of every action and proceeding.").

uncertainty of outcome in litigation, as well as the avoidance of wasteful litigation and expense, lay behind the congressional infusion of a power to compromise. This is in recognition of the policy of the law generally to encourage settlements. This could hardly be achieved if the test on hearing for approval meant establishing success or failure to a certainty.").

Thus, the dispositive inquiry is the fairness of the class settlement itself:

> A settlement hearing is not a substitute for a trial, and the Court's function does not encompass determining the controversy on the merits. *United States v. Allegheny-Ludlum Industries*, 517 F.2d 826, 845 (5th Cir. 1975). Rather, the court must be satisfied that the parties acted prudently in achieving the specific advantages gained through compromising the litigation and in eliminating the risks attendant upon the trial on the merits. . . . The court must evaluate the terms of the settlement to determine their fairness, wisdom, reasonableness and adequacy . . .; *and the mere fact that some members of the class oppose the settlement does not necessarily render it unfair or unreasonable . . . .*

*Am. Basketball Ass'n Players Ass'n v. Nat'l Basketball Ass'n*, 72 F.R.D. 594, 598 (S.D.N.Y. 1976) (emphasis added).   And in evaluating the fairness of the settlement, the inquiry is a narrow one:

> While the Court is called upon to exercise an independent judgment in evaluating the settlement terms, the settlement hearing should not be transformed into an abbreviated trial. The court must guard against substituting its judgment for that of the parties who presumably arrived at a good faith compromise after arms length bargaining.

*Voege v. Ackerman*, 67 F.R.D. 432, 435–36 (S.D.N.Y. 1975).

Quite properly, then, courts have refused to transform the settlement process into a trial over what relief *might* have been gained but for the settlement:

> Neither should it be forgotten that compromise is the essence of a settlement. The trial court should not make a proponent of a proposed settlement justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes.

*Cotton*, 559 F.2d at 1331; *accord Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 154 (S.D. Ohio 1992); *Bennett*, 737 F.2d at 986; *Luevano v. Campbell*, 93 F.R.D. 68, 87 (D.D.C. 1981) ("Where plaintiffs are confronted with all of the uncertainties of litigation, it is proper for class counsel and the class representatives to compromise in their demands for relief in order to obtain substantial assured relief for the class."). In short, if the court finds that the settlement is "fair, adequate, reasonable, and not the product of collusion," then approval of the settlement is warranted. *Leverso*, 18 F.3d at 1530. "The role of the Court is 'to consider and weigh the nature of the claim, the possible defenses, the situation of the parties, and exercise business judgment in determining whether the proposed settlement is reasonable." *Lyons v. Scitex Corp.*, 987 F. Supp. 271, 276 (S.D.N.Y. 1997) (quoting *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 595 (S.D.N.Y. 1992)).

The amount of discretion a trial judge has to consider the fairness of a settlement is great, and will not be disturbed absent a clear abuse of discretion.

*See, e.g., Bennett,* 737 F.2d at 986; *Madison Co. Jail Inmates v. Thompson,* 773 F.2d 834, 845 (7th Cir. 1985); *Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d 799, 801 (3d Cir. 1974); *Ohio Pub. Interest Campaign,* 546 F. Supp. at 6.

**B.      The Settlement Satisfies the Standards for Judicial Approval**

1.      The Settlement is the product of arm's-length, non-collusive negotiations.

To warrant final approval, the terms of the settlement should reveal that it is "the product of serious, informed, non-collusive negotiations." *In re NASDAQ Market-Makers Antitrust Litig.,* 176 F.R.D. 99, 102 (S.D.N.Y. 1997). In making this determination, courts begin with a presumption of good faith in the negotiating process. *See, e.g., Granada Invs., Inc. v. DWG Corp.,* 962 F.2d 1203, 1205 (6th Cir. 1992) ("Absent evidence of fraud or collusion, such settlements are not to be trifled with").

The record here amply supports the procedural fairness of the Settlement. The parties were separately represented by able and experienced counsel in class action and complex litigation. Doc 37 at 6 (finding that "Plaintiffs' counsel are experienced class action attorneys who have represented to the court that they have litigated more than fifty (50) class actions"). *Cf.* Doc. 66 Ex.A at 2–9 (Norris Decl.). Through the course of this Action, the parties' counsel compiled an extensive evidentiary record through discovery (*see, e.g.,* Doc. 37 at 2–3), which

afforded them with far more than an "adequate appreciation of the merits of the case." *In re Prudential Ins. Co. Am. Sales Practices Litig.*, 148 F.3d 283, 319 (3d Cir. 1998).

Further, Class Counsel have opined as to the informed, fair and arm's-length nature of their negotiations with AHS (Doc. 66 Ex.A at 4–5 (Norris Decl.)), and the Court is entitled to rely upon their opinions. *Cotton*, 559 F.2d at 1330; *see also Williams v. Vukovich*, 720 F.2d 909, 922–23 (6th Cir. 1983); *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975).

Finally, the parties' negotiations over the substantive terms of the Settlement were overseen by a neutral third-party. Negotiations began in the context of mediation conducted by George M. Van Tassel, Jr., a respected attorney, civil mediator, and member of this Court's Panel of Neutrals. Mr. Van Tassel has himself opined as to the arm's-length, yet contentious and prolonged, nature of the parties' negotiations. Doc. 66 Ex.B at 11–13 (Van Tassel Decl.) The parties' negotiations were bifurcated, such that an agreement on the substantive terms of the Settlement was reached before the issue of fees was resolved by the parties. *Id.* at 12–13; *see also* Doc. 66 Ex.1 at 4–5 & n.1 (Norris Decl.). The participation of such a respected neutral as Mr. Van Tassel, in such a bifurcated negotiation process, should give the Court "confidence that [the negotiations] were conducted

in an arm's-length, non-collusive manner." *In re AMF Bowling*, 334 F. Supp. 2d 462, 465 (S.D.N.Y. 2004).[12]

For these reasons, there can be little doubt regarding the informed and good-faith basis of the Settlement presently before the Court.    *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 280–81 (S.D.N.Y. 1999) ("[A] presumption of fairness, adequacy and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.") (citation omitted).

    2. <u>The risks, complexity, expense, and likely duration of continued litigation favor the Settlement's final approval.</u>

The risks, costs, complexity, and delays inherent in certifying and proving the claims at issue strongly favor final approval of the Settlement.  Consideration of these factors "is intended to capture the probable costs, in both time and money, of continued litigation," *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 812 (3rd Cir. 1995) (citations omitted), as "[a]voiding wasteful litigation and expense are factors which lay behind the Congressional infusion of power to compromise" class litigation, *In re Milken & Assocs. Sec. Litig.*, 150 F.R.D. 46, 55 (S.D.N.Y. 1993).  Courts favor the settlement of class

---

  [12] *See also Carnegie v. Mut. Sav. Life Ins. Co.*, 2004 WL 3715446, at *18 (N.D. Ala. Nov. 23, 2004); *In re WorldCom, Inc. ERISA Litig.*, 2004 WL 2338151, at *6 (S.D.N.Y. 2004).

actions due to their inherent complexity; their settlement avoids the costs, delays and multitude of other problems associated with them. *Cotton,* 559 F.2d at 1331 (recognizing that class actions "have a well deserved reputation as being most complex"); *In re NASDAQ Mkt.-Makers Antitrust Litig.,* 187 F.R.D. 465, 477 (S.D.N.Y. 1998) (same).

The risks to the Class attendant to proceeding with litigation here are significant. First, while both parties did not brief whether the proposed class of all persons in the United States who made a claim under a Home Service Contract during the eight-year Class Period could be certified for trial, Plaintiffs would clearly face an uphill battle attempting to certify the class for purposes of litigation. *See generally Taft v. Ackermans*, No. 02 Civ. 7951(PKL), 2007 WL 414493, at *6 (S.D.N.Y. Jan. 31, 2007) (fact that defendants would challenge class certification absent settlement was one factor favoring approval of the settlement).

The unique factual circumstances of each homeowner's case could result in the need to conduct hundreds of thousands of "mini-trials." The factual circumstances surrounding each homeowner's warranty claim would need to be assessed on an individualized basis in order to ascertain whether each allegedly wrongful denial was in fact wrongful. Successful adjudication of the named Plaintiffs' claims thus would not establish a right to recovery on behalf of the absent class members.

Individual issues of state law would also threaten to overwhelm common issues of law at trial. This is because the class members reside in different states across the country, requiring the application of different states' contract and bad faith law at both the summary judgment and trial stage. *See Andrews*, 95 F.3d 1014 (decertification of class action involving the use of 900 numbers to facilitate programs offering credit, due to variations in laws of 50 states). Even if a class were certified at the outset, the Court would be faced with the totally unmanageable task of instructing the jury on the applicability of the laws of all 50 states with regard to a host of issues, including contract construction and ambiguity, bad faith and damages. In addition to the management issues presented by inevitable legal variations, the class would be required to prove highly factually individualized breach of contract and bad faith claims. Both the legal and factual variations would provide clear grounds for decertification prior to trial.[13] Put simply, the significant risk that Plaintiffs could not maintain this case as a class action through trial is a factor strongly weighing in favor of the proposed Settlement.

Comparable risks attend the merits. As this Court has recognized, at issue is whether AHS engaged in a "broad nationwide pattern of (1) denying claims for coverage of appliances or their components that display signs of being

---

[13] As discussed *supra* at pages 22-23, these manageability issues are not implicated in connection with certification of settlement classes.

inadequately maintained and/or cleaned; (2) deliberately breaching express provisions of its Home Services Contracts; and (3) replying upon a service diagnosis from service providers nationwide who [purportedly] stand to gain financially if the appliance at issue is denied covered under the Home Service Contract." Doc. 37 at 2. · AHS has hotly contested each such issue throughout this litigation, and has produced witnesses which it believes undermine plaintiffs' factual contentions. In addition, AHS has asserted a number of legal defenses to Plaintiffs' claims, which could prove dispositive at summary judgment or trial. *See, e.g.,* ALA. CODE § 8-32-2(13) (providing that service contracts are not policies of insurance under Alabama law).

In the absence of settlement, the palpable uncertainty of outcome is mirrored by the absolute certainty of additional significant expense to both sides, in the form of class certification motion practice, summary judgment practice, trial and appeal. Contested certification proceedings would certainly be costly and protracted for the parties, and any class certification determination rendered on a contested basis would likely result in a petition to appeal under Rule 23(f) by one or both of the parties. The same would hold true with respect to any summary judgment proceedings advanced in a litigated context. Before the Action could be presented to a jury, the Court would likely be required to resolve several complex legal issues, including without limitation (A) whether a home service contract

constitutes a policy of insurance under the laws of each of the fifty states,; (B) whether AHS did, in fact, adopt a broad nationwide pattern of denying claims for coverage of appliances or their components that displayed signs of being inadequately maintained and/or cleaned and, if so, whether that alleged pattern of conduct globally gives rise to a cause of action independent of the individualized facts and circumstances associated with a particular claim. The fact that continued litigation "would present the Court with [such] complex legal issues upon which the Court would be required to rule" in advance of trial weighs in favor of the final approval of the Settlement. *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 174 (S.D.N.Y. 2000), *aff'd sub nom. D'amato v. Deutsche Bank*, 236 F.3d 78 (2nd Cir. 2001) . That the trial would involve the testimony of dozens of fact witnesses, numerous experts, and the presentation of substantial amounts of data and documentary evidence is yet another factor weighing in favor of the Settlement's final approval. *In re Sterling Foster & Co., Inc. Sec. Litig.*, 238 F. Supp. 2d 480, 484-85 (E.D.N.Y. 2002) (settlement preferable to the risks, confusion and costs of competing experts at trial). Whatever the results of trial, appeals would be virtually assured.

Fortunately, the litigation of such complex questions of law and fact, to an uncertain result and only following the expenditure of significant resources and time by the parties, is unnecessary here. The Settlement negotiated by the parties

offers a combination of prospective relief to those holding a Home Service Contract with AHS, and relief to those who have had claims denied by AHS in the past, by allowing those persons to ask that their claims be reviewed under the revised procedures established by the Settlement, with the right to protest AHS's decision through an individual action in which they may recover not only their actual damages, but also an additional penalty that would be unavailable but for the Settlement. In light of the relief offered by the Settlement, measured against the relief sought through the complaint, further litigation would likely be neither efficient nor economical for the Plaintiffs, the Settlement Class Members, or AHS. Accordingly, consideration of the risks, complexity, high costs, and lengthy duration of the continued litigation of this matter supports the Settlement's final approval. *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d at 318 (settlement was favored where "the trial of this class action would be a long, arduous process requiring great expenditures of time and money on behalf of both the parties and the court"); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 254 (D. Del. 2002) (fact that continued litigation would require "additional discovery, extensive pretrial motions addressing complex factual and legal questions, ... [and] a complicated, lengthy trial [which would] likely be subject to post trial motions and appeals" weighed in favor of settlement's approval), *aff'd*, 391 F.3d 516 (3rd Cir. 2004).

3.   The stage of this Action and the discovery conducted by the parties favors final approval.

Consideration of the discovery and litigation that has occurred in this Action—conducted both before and during the lengthy course of the parties' negotiations—also warrants final approval of the Settlement.   In determining the fairness, adequacy, and reasonableness of a settlement, courts should consider the stage of the proceedings at which the compromise was achieved and the amount of discovery which had been conducted. *Leverso,* 18 F.3d at 1530 n.6.  The purpose of such inquiry is to ensure that the parties obtained "an adequate appreciation of the merits of the case" before negotiating the settlement. *In re Prudential Ins. Co of Am. Sales Practices Litig.,* 148 F.3d at 319 (citations omitted).  There is, of course, "no precise yardstick to measure the amount of litigation that the parties should conduct before settling." *In re Rio Hair Naturalizer Prods. Liab. Litig.,* 1996 WL 780512, at *13 (E.D. Mich. 1996).  Instead, courts should focus on whether the parties engaged in sufficient discovery and investigation to afford them an "adequate appreciation of the merits of the case," *In re Prudential,* 148 F.3d at 319, such that they were not "groping in the darkness," *Cotton,* 559 F.2d at 1332, when negotiating the settlement.   A court should be satisfied—before granting final approval—that the settlement before it is not "the product of uneducated guesswork." *In re Corrugated Container,* 643 F.2d at 211.

The Court has already recognized that the parties conducted extensive discovery, and engaged in significant litigation, in this Action. Doc. 37 at 2–3. Much of this was done before the parties were directed to mediation by the Court on July 29, 2008. *See* Doc. 22 at 1–2; Doc. 23. The record developed by the parties is materially comprehensive, and relates to the core factual issues underlying the claims and defenses in this Action. The evidentiary and legal record developed in this Action afforded all the parties a detailed basis upon which to assess the merits of this case and their chances of success, both before and throughout the negotiations which led to the Settlement.

In sum, the Settlement was the result of an arm's-length bargaining process among experienced counsel who were well informed regarding the merits of this case through the extensive proceedings which occurred in this Action. There is no question that the parties had sufficient information to properly evaluate this Action, and to negotiate a fair, adequate, and reasonable compromise without the substantial expense, risk, and uncertainty of continued litigation. Consideration of this factor favors the Settlement's final approval.

        4.    <u>The relief offered by the Settlement favorably compares with the relief available from the continued litigation of this Action to an uncertain result.</u>

The next two factors "ask whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial."

38

*In re Prudential Ins. Co. of Am. Sales Practies Litig.*, 148 F.3d at 322; *see also Leverso*, 18 F.3d at 1530 n.6. It is not the value or nature of the settlement relief itself that is decisive, but whether that relief is reasonable when compared "with the [relief] plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing." MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.42. Accordingly, the relevant inquiry is "whether the recovery falls within that range of reasonableness, [and] not whether it is the most favorable possible result of litigation." *Lazy Oil Co. v. Wotco Corp.*, 95 F. Supp. 2d 290, 338 (W.D. Pa. 1997), *aff'd*, 166 F.3d 581 (3d Cir. 1999) (citations omitted).[14]

In performing this analysis, a court "should not reach any ultimate conclusions with respect to issues of fact or law involved in the case" for "[s]ettlements could hardly be achieved if the test on hearing for approval meant

---

[14] *See also Williams*, 720 F.2d at 922 ("A court may not withhold approval simply because the benefits accrued from the [settlement] are not what a successful plaintiff would have received in a fully litigated case.") (citations omitted); *In re Chicken Antitrust Litig.*, 669 F.2d at 238 ("a just result is often no more than an arbitrary point between competing notions of reasonableness"); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 534 (D.N.J. 1997), *aff'd.*, 148 F.3d 283 (3rd Cir. 1998) ("the issue is whether the settlement is adequate and reasonable, not whether one could conceive of a better result," because, "after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution") (citations omitted); *In re Agent Orange Product Liab. Litig.*, 597 F. Supp. at 762 ("Dollar amounts are judged not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case") (citations omitted).

establishing success or failure to a certainty." *Knight v. Alabama,* 469 F. Supp. 2d 1016, 1033 (N.D. Ala. 2006), *aff'd.,* 271 Fed. Appx. 896 (11th Cir. 2008). Instead, courts should rely on the assessments of these risks provided by counsel involved in the action, and "be hesitant to substitute its own judgment" regarding such risks and uncertainties. *In re In re Domestic Air Transp. Antitrust Litig.,* 148 F.R.D. 297, 315 (N.D. Ga. 1993) (citations omitted); *see also Lachance v. Harrington,* 965 F. Supp. 630, 638–39 (E.D. Pa. 1997) ("[T]he court must, to a certain extent, give credence to the estimation of the probability of success proffered by class counsel, who are experienced with the underlying case, and the possible defenses which may be raised to their causes of action.").[15]  And in determining what may be the "best possible recovery . . . if the case went to trial," the class members' claims for punitive damages should not be considered. *Mangone v. First USA Bank,* 206 F.R.D. 222, 229–30 (S.D. Ill. 2001) ("Punitive damages are generally

---

[15] *See also Lake v. First Nationwide Bank,* 900 F. Supp. 726, 732 (E.D. Pa. 1995) ("Significant weight should be attributed 'to the belief of experienced counsel that settlement is in the best interest of the class.'") (quoting *Austin v. Penn. Dep't of Corrections,* 876 F. Supp. 1437, 1472 (E.D. Pa. 1995)); *In re Michael Milken & Assocs. Sec. Litig.,* 150 F.R.D. 46, 54 (S.D.N.Y. 1993) ("In appraising the fairness of a proposed settlement, the view of experienced counsel favoring the settlement is entitled to a great weight." (internal quotation marks omitted)); *Hammon v. Barry,* 752 F. Supp. 1087, 1093 (D.D.C. 1990) ("It is well established that a court deciding whether to approve a class action settlement should not substitute its judgment for that of the proponents of the settlement . . .").

not appropriate in measuring the fairness of a proposed class action settlement").[16]

With these principles in mind, final approval of the Settlement is warranted because the relief offered by the Settlement compares favorably with the relief the Class might obtain through continued litigation. Perhaps most fundamentally, the Class Action Complaint seeks damages on Settlement Class Members' behalf for claims previously submitted and allegedly not properly paid by AHS. The Settlement provides for the prospect of just such relief through the Review Desk process (at little or no cost to Settlement Class Members, and with the possibility of severe penalties for AHS if its re-review of claims are subsequently found to be inadequate by a court). The Eleventh Circuit recently affirmed a nationwide class settlement that included retrospective relief by a "claim review team" that

---

[16] *See also Carnegie v. Mutual Sav. Life Ins. Co.*, 2004 WL 3715446, at * 21 (N.D. Ala. Nov. 23, 2004) (refusing to consider punitive damages when evaluating the reasonableness of class action settlement); *In re Dennis Greenman Sec. Litig.*, 622 F. Supp. 1430, 1436 (S.D. Fla. 1985), *rev'd on other grounds*, 829 F.2d 1539 (11th Cir. 1987) ("Potential treble recovery (or, for the same reason, punitive recovery) should not be superimposed as a yardstick for measuring the adequacy of a settlement, lest the settlement negotiation process be derailed before leaving the station"); *In re American Family Enterprises*, 256 B.R. 377, 424–25 (D.N.J. 2000); *In re N.M. Natural Gas Antitrust Litig.*, 607 F.Supp. 1491, 1506 (D. Colo. 1984) (in rejecting notion that punitive or treble damages should be considered when evaluating a class action settlement's adequacy, noting that such damages are "a penalty for grossly improper conduct [and,] as a general matter, settlement discussions should not begin with a figure that includes the penalty, as settlement represents an attempt to resolve the litigation without determining fault"). This law is particularly appropriate in the context of this case, in which it is highly questionable whether the only claim that could conceivably support a request for punitive damages—bad faith—even applies to Home Service Contracts.

individually reviewed previous insurance claim denials that the district court found was fair, adequate, and reasonable. *See Adams v. Southern Farm Bureau Life Ins.*, 493 F.3d 1276, 1281–82 (11th Cir. 2007).  Such "review desk" procedures are a common feature of class action settlements in cases such as this. *See, e.g., Trew v. Volvo Cars of N. Am.*, 2007 WL 2239210, *3–*4 & n.2 (E.D. Cal. 2007); *Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. 54, 66, 69–70, 72 (D. Mass. 1997), *declined to follow on other grounds by Rosario Ortega v. Star-Kist Foods*, 370 F.3d 124 (1st Cir. 2004). *Cf. Kortebein v. Am. Mut. Life. Ins. Co.*, 49 S.W.3d 79, 83, 89 (Tex. Ct. App. 2001) (enforcing injunction against class members who participated in review desk process and then filed suit collaterally attacking results of process).  Furthermore, the Review Desk process, should Settlement Class Members avail themselves of it, holds out the prospect of relief for the Class that would likely otherwise be unavailable:  as previously noted, it is highly questionable whether a class could properly be certified for litigation purposes in this case; and individual litigation (in the absence of the settlement) would plainly be pointless as to some Settlement Class Members, as their claims would be barred by applicable statutes of limitation.  But the Review Desk will provide them with the possibility for relief, regardless of far back within the Class Period their claims arose.

The potential penalties for AHS in the event of a re-review subsequently found to be erroneous are an important component of the settlement structure. The average repair and replacement costs for various common home appliances and systems range from $88 (repair) and $509 (replacement) for a clothes washer, to $270 (repair) and $2,671 (replacement) for a furnace. Josh Sanderson Decl (appended as Ex. F hereto), Ex. (listing average repair and replacement costs for nine separate items that may be covered under AHS Home Service Contracts). These claim values clearly make a $1,000 penalty, or an award of attorney's fees that could exceed $5,000 or more for certain Settlement Class Members, substantial relief. Given that the vast majority of such suits could easily be prosecuted in small claims court – in all states without an attorney, and in some states (including California, Arizona and Virginia) in which a party is not allowed an attorney, *see* Peter Shaw Decl. (appended as Ex. G hereto) – the relief proposed in the Settlement compares favorably to the relief a Class Member could hope to obtain on his or her own.

The Settlement also provides for prospective relief in the form of revisions to AHS's business practices, including dedicated distribution of written training materials to the AHS Contractor Network conveying the importance of honoring terms of coverage and other terms of Home Service Contracts. AHS contemplates additional business practice changes (touching on both the terms of its Home

43

Service Contracts and its claims-handling practices) that it intends to present to the Court at or prior to the final fairness hearing to demonstrate its commitment to business practices revision.

The fact is that "[i]t is neither required, nor is it possible for a court to determine that the settlement is the fairest possible resolution of the claims of every individual class member; rather, the settlement, *taken as a whole,* must be fair, adequate and reasonable." *Shy v. Navistar Intern. Corp.,*1993 WL 1318607, at *2 (S.D. Ohio May 27, 1993) (citations omitted, emphasis in original). In consideration of the risks and uncertainties from the continued litigation of this matter, and considering that the relief offered by the Settlement closely parallels that sought on behalf of the Class through litigation, the Settlement merits final approval. The very purpose of settlement is to avoid the need for parties to litigate sharply contested issues such as those presented by this Action to an uncertain result. *Carson,* 450 U.S. at 88 n.14. As such, the Settlement is inherently a fair, adequate and reasonable compromise of the claims at issue, and should be given final approval by the Court.

>    5.    The reaction of the Class to the Settlement, and the opinions of
>          Class Counsel, favor the Settlement's final approval.

The final factor in assessing a class action settlement's fairness, adequacy and reasonableness is consideration of the opinions of Class Counsel, *Leverso,* 18 F.3d at 1530 n.6, and "any opposition to the proposed settlement," *Steiner v.*

*Fruehauf Corp.*, 121 F.R.D. 304, 306 (E.D. Mich. 1988), *aff'd,* 883 F.2d 438 (6th

Cir. 1989). It is well established that courts are entitled to rely on the opinions of

experienced and informed counsel in evaluating the fairness, adequacy and

reasonableness of a settlement. *In re Auto. Refinishing Paint Antitrust Litig.*, 617

F. Supp. 2d 336, 341 (E.D. Pa. 2007) ("Giving substantial weight to the

recommendations of experienced attorneys, who have engaged in arms-length

settlement negotiations, is appropriate . . .").[17]   In fact, where the parties to a

settlement engaged in significant discovery both before and during their

negotiations, courts typically "defer to the judgment of experienced trial counsel

who has evaluated the strength of his case." *Thompson v. Midwest Found. Ind.*

*Physicians Ass'n*, 124 F.R.D. 154, 159 (S.D. Ohio 1988). In this Action, Class

Counsel, who are well-experienced in class action litigation and who engaged in

significant discovery and analysis before entering into settlement negotiations with

AHS, have opined as to the fairness, adequacy and reasonableness of the

---

[17] *See also In re BankAmerica Corp. Sec. Litig.*, 210 F.R.D. 694, 702 (E.D. Mo. 2002) ("Although the Court is not bound by counsel's opinion, their opinion nevertheless is entitled to great weight.") (citations omitted); *In re Michael Milken and Assoc. Sec. Litig.*, 150 F.R.D. 57, 66 (S.D.N.Y. 1993) ("In appraising the fairness of a proposed settlement, the view of experienced counsel favoring the settlement is entitled to great weight.") (quotation omitted); *In re Dun & Bradstreet Credit Serv. Customer Litig.*, 130 F.R.D. 366, 372 (S.D. Ohio 1990) ("[c]ounsel in this matter have extensive experience in complex class action litigation. The Court pays particular attention to the opinion of all counsel that the proposed settlement agreement is fair, adequate and reasonable").

Settlement. Doc 66-2, p. 4.    Counsel for AHS confirms its view that this settlement is a fair, adequate and reasonable one.

Equally influential is the overwhelmingly favorable reaction of the Settlement Class Members. At most, a mere 1,543 members of a Class numbering more than 4.7 million elected to exclude themselves, Singletary Decl. (a number, incidentally, that is fewer than half the number of opt-outs from the rejected *Edleson* settlement. Doc. 40, p. 4 and Ex. A (reciting approximately 5,000 *Edleson* opt outs). This amounts to a trace percentage of the Class; and in fact more than 90 of the opt-outs, who express satisfaction with their AHS service, are opting out for reasons unrelated to the Settlement. Singletary Decl. ¶ 6 and Ex.

"[I]t would be extremely unusual not to encounter objections" of some sort or number in a class action settlement. *In re Nasdaq Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 478 (S.D.N.Y. 1998) (citation omitted).    Here, a mere 23 Settlement Class Members objected to the Settlement,[18] a staggeringly low number for a class of this size.    Such a near-total absence of objection should be found by the Court to weigh heavily in favor of granting final approval to the Settlement. *Wyatt By and Through Rawlins v. Horsley,* 793 F. Supp. 1053, 1056 (M.D. Ala. 1991) ("a court may properly interpret the absence of objections from a majority of the plaintiff class as indicating support for the proposed modification or

---

[18] The vast majority of objectors are either represented by the Edlesons' counsel, or by counsel who also objected in *Edleson.*

settlement"); *see also In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 933 (8th Cir. 2005) ("[T]he amount of opposition to the settlement is miniscule. The district court concluded that only .00068% of the class objected to the settlement and only .0024% of the class opted out."); *Wal-Mart Stores v. VISA U.S.A.*, 396 F.3d 96, 118 (2nd Cir. 2005) (settlement is fair where "[o]nly eighteen class members out of five million objected to the Settlement"); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 86–87 (2nd Cir. 2001); (finding 18 objections out of 27,883 notices weighed in favor of the settlement); *Petrovic v. Amoco Oil*, 200 F.3d 1140, 1152 (8th Cir. 1999) (noting that "fewer than 4 percent of the class members objected to the settlement, significantly fewer than the number of objectors to other settlements that have been approved"); *In re Prudential Ins., Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 318 (3d Cir.1998) (finding 19,000 optouts and 300 objections out of 8 million claims favored settlement);.*Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004) ("It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members."); *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d at 175 (where "only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement").

The clearly positive reaction of the Class to the Settlement counsels strongly that it is adequate and reasonable, and should be approved. Nevertheless, AHS will address the handful of objections that have been made, below.

a. Class notice was proper.

AHS has demonstrated its full compliance with the Court's directives concerning the distribution of notice to the Class, and with CAFA's requirements concerning notice to appropriate state and federal regulators. The fact that AHS complied with CAFA's requirements belies the objection of class members Robert and Luz Shepard, Vivian Johnson, Janet Tzendzalian, Merlyn Lind, Rosalyn Urbanek and Donald Leach (represented by Johnson Bottini) in this regard. Doc 73 at 8. The evidence submitted by AHS concerning its compliance with CAFA's requirements also resolves any doubts concerning the State of Texas' vague assertions concerning notice to it. As the State of Texas admits, notice was sent to the Texas Real Estate Commission which, although it may be "a relatively small regulatory agency" (Doc 71 at 2, n.2), is the agency with primary regulatory or supervisory responsibility with respect to" AHS, 28 U.S.C. § 1715(a)(2). The State of Texas does not contest this fact. In any event, AHS provided the Texas Attorney General substantive notice of the Settlement, and a copy of this Court's preliminary approval order at the time it was entered. Email from David Beck to

Paul Carmona, Oct. 20, 2009 (appended hereto as Exhibit H) (attachment omitted).

Two groups of the objectors complain that the Class Notice, although approved by the Court before it was sent, was insufficient because it failed to adequately describe the status of the *Edeson* litigation in California. Doc. 73 at 6–7; Doc. 77 at 2. These objections lack legal and factual merit. As an initial matter, there is simply no requirement that a class notice include information about parallel proceedings. *See, e.g., Bell Atl. Corp. v. Bolger,* 2 F.3d 1304, 1317–18 (3d Cir. 1993) (notice need not describe parallel state court litigation or its relative merit); *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 962 F. Supp. 450, 529 (D.N.J. 1997) (same), *aff'd,* 148 F.3d 283 (3rd Cir. 1998). Moreover, even if such a requirement existed (and it does not), AHS has fully satisfied it. On December 14, 2009, AHS established a website with the URL faughtclassaction.com. That website provided a link to frequently asked questions about the website. Ledbetter Dec. ¶ 2. The ninth question specifically states as follows:

> **Is this notice different from the one I received last year?**  Yes. Although there are some similarities between the two, the notice you received last year was for a proposed settlement in the Edeson case. That settlement has since been terminated by the court in California and is no longer in effect.

Ledbetter Decl. Ex. at ¶ 9.[19]    There is thus no legal or factual basis for the assertion that AHS did not advise the Class Members about the disposition of the *Edleson* settlement.

Several objectors claim that the Class notice failed to provide sufficient information to determine if they should remain in the Class or opt out. Doc. 69 at 7; Doc. 73 at 7–8; Doc. 74 at 5; Doc. 76 at 5. However, a notice is designed to be only a summary of, and not a complete recitation regarding, the proposed settlement. *In re Cement & Concrete Antitrust Litig.,* 817 F.2d 1435, 1440 (9th Cir. 1987), *rev'd on other grounds by California v. ARC Am. Corp.,* 490 U.S. 93 (1989) (notice need only generally describe the terms of the settlement so as to alert class members "with adverse viewpoints to investigate and to come forward and be heard"); *Grunin v. Int'l House of Pancakes,* 513 F.2d 114, 122 (8th Cir. 1975) ("Class Members are not expected to rely upon the notices as a complete source of settlement information"). The notice need not be unduly specific, or reference and explain every term of the proposed settlement. *Grunin,* 513 F.2d at 122; *DeBoer v. Mellon Mortg. Co.,* 64 F.3d 1171, 1176 (8th Cir. 1995); *Handschu v. Special Servs. Div.,* 787 F.2d 828, 833 (2nd Cir. 1986); *Maher v. Zapata Corp.,* 714 F.2d 436, 452 (5th Cir. 1983); *Weinberger v. Kendrick,* 698 F.2d 61, 70 (2nd Cir. 1982); *In re Gypsum Antitrust Cases,* 565 F.2d 1123, 1125 n.1 (9th Cir. 1977).

---

[19] The record of the proceedings in *Edleson,* including the order denying the settlement there, is of course publicly available.

Here, the Class Notice plainly stated that it was a summary of the Settlement, and that additional information could be obtained from the settlement website, or from Class Counsel. Doc. 37 Ex.2. Therefore, these objections lack merit because the Class Notice approved by the Court accomplished what was required—to "assure that any person whose rights would be affected by a dismissal or compromise has the opportunity to contest the proposed action." *Pearson v. Ecological Science Corp.,* 522 F.2d 171, 176–77 (5th Cir. 1975). Moreover, contrary to the objection of three Settlement Class Members (Doc. 75 at 2), the Class Notice was not insufficient because it failed to satisfy their want of information concerning the total value of the Settlement, *DeHoyos v. Allstate Corp.,* 240 F.R.D. 269, 301 (W.D. Tex. 2007) (collecting cases).

b.    Class certification-related objections lack merit.

Two Settlement Class Members have objected to the certification of Class on the ground that because the Settlement contemplates that a class representative award of up to $5,000 each may be sought by the Plaintiffs, along with a predetermined compensatory damage payment of $8,000, the Plaintiffs are somehow rendered inadequate representatives of the Class. Doc. 69 at 5–6. Although the Settlement does contemplate such awards, and the same have been sought by Class Counsel (Docs. 64–65), whether they will be approved or not (or in what amount) is ultimately a decision for the Court to make at the Fairness

51

Hearing. The Settlement is not made in any way contingent upon any such awards being granted. No showing has been made, nor has any argument been advanced, that Plaintiffs have not fulfilled their responsibilities as representatives of the Class, nor that their interests are in any way antagonistic to those of the Settlement Class Members. Whatever decision the Court makes with regard to an incentive award, the same would not constitute grounds for non-approval of the Settlement.

The same Settlement Class Members also allege that because a fee award is being sought, somehow Class Counsel are rendered inadequate representatives of the Class. Doc. 69 at 6–7. This argument lacks merit, because "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." FED. R. CIV. P. 23(h). Class Counsel have separately applied for Attorneys' Fees (Docs. 64–65), showing in their application why they believe the requested award is reasonable in nature and amount. The Settlement is not made contingent on any Attorneys' Fees being approved by the Court. Instead, the Court has a "supervisory role and ultimately must calculate and set the attorneys' fee award up to a maximum of the [negotiated] cap" agreed to by the parties, and the involvement of the Court in this process ensures that Class Counsel are not rendered inadequate representatives of the Class simply because they have sought to be compensated for their time and efforts. *Dikeman v. Progressive Exp. Ins. Co.,* 312 Fed. Appx. 168, 172 n.3 (11th

Cir. 2008).

The final objection to certification, raised by the State of Texas, is that Class Counsel are somehow inadequate representatives of the Class because they have another class action pending against AHS, and because Class Counsel were members of a firm (Burr & Forman) some seven years ago, which currently lists Terminix, an affiliated corporation of AHS, as a client. Doc. 71 at 6. The fact that Class Counsel have a separate action against AHS, pending before the Court, for alleged Real Estate Settlement Procedures Act ("RESPA") violations, does not call into question their adequacy to serve as counsel for the Class here. The Release of the Settlement on its face does not extend to RESPA claims or other claims related to the mechanism by which the Home Service Contracts were initially sold, and therefore the Settlement has no effect upon the other action. Moreover, Class Counsel have submitted (or will today submit) evidence that they left Burr & Forman at the beginning of 2003, and while there they never performed work for AHS or Terminix. Declarations of John E. Norris and D. Frank Davis, filed February 26, 2009.

c. The State of Texas's remaining objections are invalid.

As an initial matter, the Texas Attorney General lacks standing to object to the Settlement. It does not claim to be a member of the Class, or even claim to be the "appropriate State official" under CAFA with "primary regulatory authority or

supervisory responsibility with respect to" AHS. 28 U.S.C. § 1715(a)(1)(2). In fact, the Texas Attorney General makes clear that by objecting to the Settlement (in hopes of derailing it in favor of its own litigation against AHS), it "is not submitting to the Court's jurisdiction." Doc. 71 at 1 n.1. Consequently, the Texas Attorney General has not established that it has standing to object to the terms of the Settlement. *See, e.g., Feder v. Elec. Data Sys. Corp.*, 248 Fed. Appx. 579, 580 (5th Cir. 2007) ("The text of Fed.R.Civ.P. 23(e) is clear in its grant to class members of the ability to object to a proposed settlement. But only class members have an interest in the settlement funds, and therefore only class members have standing to object to a settlement. Anyone else lacks the requisite proof of injury necessary to establish the 'irreducible minimum' of standing."); *Heller v. Quovadx, Inc.*, 245 Fed. Appx. 839, 842 (10th Cir. 2007); *Tennessee Ass'n of Health Maint. Orgs., Inc. v. Grier*, 262 F.3d 559, 566 (6th Cir. 2001) ("The plain language of the Rule 23(e) clearly contemplates allowing only class members to object to a lack of notice. Thus, under Rule 23(e), non-class members have no standing to object to a lack of notice. ") (citations omitted); *Gould v. Alleco, Inc.*, 883 F.2d 281, 284 (4th Cir. 1989) ("Beginning from the unassailable premise that settlements are to be encouraged, it follows that to routinely allow non-class members to inject their concerns via objection at the settlement stage would tend to frustrate this goal.").[20]

---

[20] The fact that AHS properly notified the proper Texas regulatory body, TREC,

Even assuming that Texas does have standing to object -which it does not - its remaining objections[21] likewise do not withstand scrutiny. Texas contends, first, that the Court should "defer to the lawsuit that the Texas Attorney General has filed in Harris County, Texas, involving the same Defendant and many of the same issues as the *Faught* case." Doc. 71 at 2. While it may be true that Texas may wish to continue to litigate claims against AHS indirectly on behalf of Texas consumers, the *Pullman* and *Younger* abstention doctrines that Texas half-heartedly attempts to invoke do not apply to this Court's consideration of this Settlement. *Railroad Co. v. Pullman Co.,* 312 U.S. 496 (1941), counsels federal courts to avoid reaching constitutional questions if they can do so by deferring to state tribunals to resolve questions of unclear state law. The Settlement before the Court involves neither constitutional questions nor unclear state law. Texas's reliance on *Younger v. Harris*, 401 U.S. 37 (1971), is equally strange. The abstention doctrine under *Younger* holds that "a federal court should not enjoin a state criminal prosecution prior to the institution of the federal suit except in very unusual circumstances, where necessary to prevent irreparable injury." *Samuels v. Mackell*, 401 U.S. 66, 69 (1971). Texas's suit against AHS is not a criminal

---

means that Texas consumers "may not refuse to comply with or to be bound by" the Settlement. 28 U.S.C. § 1715(e)(2).

[21] AHS has previously addressed Texas' objections relating to notice and class certification, *supra*.

prosecution and no one is seeking to have it enjoined.   In fact, the Settlement explicitly carves out any action that the Attorney General brings on behalf of the State of Texas itself.   Doc. 37 Ex.1 ¶ 10.5.   Abstention, in sum, is not an appropriate basis to object to a class action settlement. *See Pa. Ass'n for Retarded Children v. Pa.*, 343 F. Supp. 279, 298–300 (E.D. Pa. 1972).

Texas finally suggests that the Review Desk has no value because it does not guarantee payment of monetary compensation to Class Members, and that it is the equivalent of a "coupon settlement."   Doc. 71, 3-4.   This objection founders, however, for a host of factual and legal reasons, including most prominently:  (1) powerful incentives exist for AHS to carefully and properly review Settlement Class Member submissions (which can, if AHS errs in reviewing a submission, result in a **greater** payment than the Class Member could receive under the Texas AG's suit); (2) Class Counsel will be receiving quarterly reports as to all Review Desk activity and the Court will retain continuing jurisdiction over the Settlement; and (3) many courts, including the Eleventh Circuit, have upheld class action settlements with similar claims review processes (*see* pp. 42-43, *supra*).   The objection likewise ignores the patent reality (discussed at length at pp. 32-34 *supra*) of the difficulties of prosecuting this case successfully going forward, both procedurally and substantively.   If Texas believes it has a "strong case" against AHS, Doc. 71, pp. 4-5, it should prosecute that case for statutory penalties – as it

has every right to do both under Texas law and the Settlement – rather than appear in this case and present unfounded objections.

Texas's objection that 'consumers have a strong case" against AHS is not only unsubstantiated – not to mention vehemently denied by AHS – it is not relevant. The question rather is whether the proposed settlement is fair and reasonable. The record before the Court answers that question affirmatively, and is in no way disturbed by the unproven allegations of an agency looking to protect its "turf."[22]

    d.    <u>The objections of Francis A. Bottini, Jr. and Johnson Bottini on behalf of Settlement Class Members Sheppards, Johnson, Tzendzalian, Lind, Urbanek, and Leach are without substance.</u>

Francis Bottini, Jr and the firm of Johnson Bottini —who separately represent opt-out Class Members Karon and Chip Edleson (*see* Doc. 72 at 7)— have lodged several objections to the Settlement on behalf of Settlement Class Members Robert and Luz Shephard, Vivian F. Johnson, Janet Tzendzalian, Merlyn D. Lind, Rosalyn Urbanek, and Donald P. Leach. *See* Docs. 72–73. Echoing arguments they have made on behalf of the Edlesons, Johnson Bottini (in addition to their objection to the Class Notice, dealt with above) contends (1) that the

---

[22] Texas's arguments concerning the waiver of Texas residents' rights, Doc. 71, at 5, are hollow as well. Texas consumers do not waive the right to restitution through the Settlement; they instead will obtain it, if they submit a claim that AHS improperly denied (and will do so without months if not years of continued litigation).

Settlement is void and unenforceable because it violates a side letter to the *Edleson*

settlement and (2) the Court should deny Class Counsel's fee request because the

Settlement is identical to the Edleson settlement that Johnson Bottini negotiated

and because there is insufficient evidence to support the fee request. Doc. 73 at 2–

6, 9–16.

The objection that the Settlement violates a side letter to the *Edleson*

settlement lacks any foundation in fact. This argument rests on a misinterpretation

of the terms of the side letter and the *Edleson* settlement. The side letter was

necessary because AHS was concurrently mediating the *Faught* case at the time of

the settlement in *Edleson*. Johnson Bottini would not agree to include language in

the *Edleson* settlement acknowledging AHS's obligation to mediate here. *See* Doc.

39 Ex.4, Ex.A (proposed language).   AHS's counsel accordingly signed a side

agreement with Johnson Bottini to cover one possible settlement arrangement of

both *Edleson* and this case. Doc. 39 Ex.4.  If AHS desired to settle this case on an

Alabama-only basis, Johnson Bottini agreed to approve such a settlement, provided

Class Counsel agreed not to object to the *Edleson* settlement or seek appointment

as class counsel in *Edleson*. *Id.*

The terms of the letter make this narrow contingency plain:

It is our mutual understanding that, *should it prove necessary in order
to satisfy a desire on [AHS's] part* to settle the *Faught* litigation
pending in Alabama, [*Edleson*] Class Counsel will approve a written
request by counsel for [AHS] to amend the Stipulation of Settlement

58

in our California case to effectuate a carve out of an *Alabama-only* putative class that is made in writing and presented in accordance with paragraph 12.2 of the Stipulation of Settlement. If [AHS] choose[s] to settle or carve out the Alabama case, [AHS] must obtain the agreement of the plaintiffs in the Alabama case neither to (i) object to any portion of the settlement in the California case (including but not limited to any award of attorneys fees, expenses, costs, and incentive payments) nor (ii) seek to be appointed Class Counsel in the California case . . . .

Doc. 39 Ex.4 (emphasis added). Thus, the side letter did not require AHS to present an Alabama-only settlement in this case; it simply required Johnson Bottini to approve an Alabama-only settlement if AHS chose to present such a settlement. Further, Class Counsel here did not object to the *Edleson* settlement and did not seek to be appointed class counsel in *Edleson*. Doc. 39 Ex.2 ¶11. So, to the extent the side letter is relevant, AHS fully complied with any obligations thereunder.

Additionally, both the California court's rejection of the *Edleson* settlement and AHS's formal termination of the settlement terminated the side letter. Paragraph 11.3 of the *Edleson* settlement provides, "In the event of such termination, all parties to this Action shall stand in the same position as if this Agreement had not been negotiated, signed, or filed with the Court, except as expressly provided in this paragraph." Doc. 39 Ex.3 ¶11.3. More important, paragraph 11.3 also requires that in the event of termination of the settlement "this Agreement and all negotiations, statements, proceedings, and *documents prepared in connection herewith* . . . shall not be deemed or construed to be an admission or

confession by any party of any fact, matter, or proposition of law and *shall not be offered by anyone adverse to [AHS] for any purpose whatsoever in any Suit*." *Id.* (emphasis added). Thus, because the *Edleson* settlement failed, Johnson Bottini cannot rely on the terms of the side letter to attack the Settlement. Moreover, by filing their motion for injunctive relief in California, the Edlesons showed that they believed the *Edleson* settlement had been terminated. The *Edleson* settlement explicitly released claims "for prospective injunctive relief to mandate, cease, reform, or otherwise modify in any way [AHS's] business practices." Doc. 39 Ex.3 ¶10.1. The Edlesons and Johnson Bottini could hardly have been pursuing such claims in court had they been parties to an existing settlement.

This Court has also rejected the factual basis for this argument. *See* Doc. 43 at 7–8; Doc. 57 at 2–3. The Court has already rightly found that Johnson Bottini lacked the exclusive authority to settle any class action with AHS. *Id.* The side letter was part of the *Edleson* settlement rejected by the California court; it was nullified when the California court refused to finally approve the *Edleson* settlement. *Id.* The Court thus found that "there is not a sufficient showing" under the side letter that "the settlement of [*Faught*] was invalid." *Id. See also* Doc. 57 at 2 (finding "no factual basis" for the Edlesons' assertion "that their California counsel have the exclusive authority to settle any class action with AHS" because "the California court had already rejected the settlement preliminarily approved in

[*Edleson*], thus effectively vacating the order appointing them Lead Class Counsel").

Finally, the terms of the *Edleson* settlement prevent these objectors from relying on the side letter to challenge the Settlement. Upon termination of the *Edleson* settlement, the parties returned to their respective positions prior to the settlement agreement. Doc. 39 Ex.3 ¶11.3. Also, the "documents prepared in connection" with the *Edleson* settlement—including the side letter—cannot "be offered by anyone adverse to [AHS] for any purpose whatsoever in any Suit." *Id.* That prohibition survives termination of the *Edleson* settlement (*id.*), applies explicitly to the side letter, and prevents the objectors from using it to attack the Settlement.

The objection concerning Class Counsel's fee petition also do not undermine the Settlement. First and foremost, the Settlement is not contingent on any fee award. Paragraph 8.2 of the Settlement make this plain. It provides:

> Any award of Attorneys' Fees, in any and all amounts, shall be subject to the Court's review and approval. The parties recognize that the Court has ultimate authority to approve or disapprove any award of Attorneys' Fees. Because this Settlement is for the benefit of the Settlement Class, however, the parties further agree that any downward adjustment in Attorneys' Fees that may be ordered by the Court or the amount of Attorneys' Fees ultimately awarded to Named Plaintiffs' Counsel **will not be a basis or reason for terminating the Settlement under any provision hereof.**

Doc. 37 Ex.1 ¶8.2 (emphasis added).   Johnson Bottini's objections concerning

Class Counsel's fee petition thus have no bearing on whether the Settlement should

be finally approved.  To the extent Johnson Bottini and its clients want to complain

about the fee petition, they can join issue with Class Counsel on their pending

petition. Docs. 64–65.

Johnson Bottini also contends it is entitled to a share of the Class Counsel

fee in this case. Doc. 73 at 11. Specifically, it claims the Settlement is the same as

the *Edleson* settlement it negotiated and, because "the Edlesons procured 90% of

the settlements' benefits," it deserves "90% of the attorneys' fee award." *Id.*  This

Court has already correctly rejected the argument that the Settlement duplicates the

*Edleson* settlement. Doc. 43 at 6. Johnson Bottini has offered nothing new to alter

the Court's specific finding that there is "no factual basis" for the contention that

the "settlement in this matter is essentially the same as the one previously agreed to

[in *Edleson*] but rejected by the California court." Doc. 57 at 2.  It is also odd that

Johnson Bottini asserts that it is entitled to recover 90 percent of the Attorneys'

Fee under the Settlement when all it has done in this Court is attack the Settlement.

It is unclear whether Johnson Bottini wants the Court to protect its personal

interests by awarding it a large fee under the Settlement, or whether it wants to

further its clients' interests by having the Court "reject the settlement." Doc. 73 at

16.  Regardless, Johnson Bottini's arguments concerning the fee do not undermine the Settlement.

e.      The objections to the Release lack merit.

At least two objectors contend that the Release contemplated by the Settlement is somehow overbroad.  The State of Texas claims the Release is overbroad because it would preclude it from recovering restitutionary damages in its own pending lawsuit against AHS, and would waive claims of Texas residents of the Class under Texas's Deceptive Trade Practices Act and to bring class litigation.  Doc 71 at 4–5.  Even if the State of Texas has standing to assert such an objection (something that is far from certain here), its objection is without merit, because broad releases are not only permissible, but commonplace, in class litigation.  *Stephenson v. Dow Chem. Co.,* 273 F.3d 249, 254 (2nd Cir. 2001), *aff'd in part and vacated in part,* 539 U.S. 111 (2003) ("class action settlements simply will not occur if the parties cannot set definitive limits on defendants' liability").  Parties may release not only those claims raised in the complaint, but also claims not presented in the action (even claims which could not have been presented) so long as they arise from the same factual predicate as the claims asserted in the action.  *Matsushita Elec. Inds. Co., Ltd. v. Epstein,* 516 U.S. 367, 376–77 (1996); *In re Corrugated Container Antitrust Litig.,* 643 F.2d at 221 ("a court may release not only those claims alleged in the complaint and before the court, but also claims

which could have been alleged by reason of, or in connection with, any matter or fact set forth or referred to in the complaint"). *See also Adams*, 493 F.3d at 1290 (barring claims that arose from same "broad nucleus of operative fact" encompassed by class action settlement). The parties may even release persons or entities not named as defendants in the action, again so long as the release "is based on the same underlying factual predicate as the claims asserted against the parties to the action being settled." *Wal-Mart Stores, Inc. v. Visa USA, Inc.*, 396 F.3d 96, 109 (2nd Cir. 2005) (citations omitted). This is because a settlement is designed to be what its name implies—a final and complete resolution of the issues at hand. Therefore is neither improper nor overreaching to include within the Settlement a broad Release of the claims asserted in this Action, along with other claims that arise from, relate to, or which are based upon the same factual predicate of the claims at issue. In other words, the Release is not overbroad, and not improper, because it is designed to bring finality to the disputes between AHS, the Plaintiffs, and those members of the Class who did not elect to opt-out of the Settlement, being given in return for the relief the Settlement offers the members of the Class. After all, this is the purpose of a release. It should come as no surprise, then, that the Release would extend to restitutionary damage or disgorgement claims that the State of Texas may have asserted on behalf of others in separate proceedings. Allowing such a recovery, based on the same factual

64

predicate as this Action, would afford the Texas residents of the Class a double form of recovery through this Action and the State of Texas's own action.

Notably, the Release expressly does *not* extend to "any claims that have been brought, or may in the future be brought through amendments to pleadings filed by any State, insofar as such claims seek statutory penalties, civil fines, or other relief sought on behalf of and payable exclusively to and for the benefit of the State or any office acting exclusively in an official capacity or political subdivision thereof." Doc. 37, Ex.1 ¶ 10.5. Therefore, although the Release will bar the State of Texas from seeking damages on behalf of those of its citizens who are members of the Class, final approval of the Settlement will not bar or prohibit the State from maintaining whatever statutory, civil or criminal claims it may have directly against AHS.

Together, Settlement Class Members Todd Pettitt, Sharon Lee, and John and Connie Pentz also challenge the Release, claiming the Release is impermissibly overbroad because it purportedly releases the rights of Settlement Class Members to bring a class action based on AHS's *future* conduct. Doc. 77 at 4–5. This represents a flawed reading of the Release. The Release does not waive the rights of Settlement Class Members to assert claims (on a class or individual basis) based on AHS's future conduct. Instead, the Release applies to claims based on AHS's conduct during the Class Period. The Release does, however, also contemplate

entry of a two year "standstill agreement," under which Settlement Class Members will be prohibited from initiating new claims (including class claims), outside of the Action, based on AHS's conduct during that time period, but under terms which toll the limitations periods associated with such claims.  Doc. 37  Ex.1 ¶10.3.   This of course is not a release of any sort, but instead a necessary mechanism designed to foster and protect the Court's continuing jurisdiction over AHS's compliance with the injunctive and prospective components of the Settlement's relief provisions.  As previously noted, many of the business practice changes to be undertaken by AHS will require two years for their full implementation.  *See* Wadlington Decl.  If Settlement Class Members believe that AHS's conduct during the two-year period following the Effective Date violates the Settlement's terms, the proper remedy—which is available to them under the Settlement—is to seek relief from this Court, under its continuing jurisdiction over the case, and not before other courts, or in other lawsuits.  But, in any event, if the Settlement Class Member chooses not to bring such a claim to the Court, he or she will retain their claims (and not release them) under the express provisions of the "standstill" provisions of the Settlement.  *Id.*  Therefore, this objection has no merit because it is premised on an entirely false reading of the Settlements' Release provisions.

f.     The objections to the Submittal Form requirement should
       be rejected.

At least four of the objectors complaint that the Settlement is somehow

unfair because Settlement Class Members must complete a three-page Submittal

Form in order to have their previously denied claims reviewed under the Review

Desk process.  Doc 68 at 2; Doc. 69 at 4; Doc. 76 at 3; Doc. 79 at 2.  However,

there is nothing cumbersome or burdensome about the Submittal Form.  It simply

requires a Settlement Class Member to (A) provide his or her current contact

information; (B) indicate how the Settlement Class Member wishes AHS to

communicate with him or her; (C) state basic facts concerning his or her earlier

claim including, if the information is available, the Home Service Contract number

and approximate date of the denial of the Settlement Class Member's earlier claim,

along with a description of why the Settlement Class Member believes his or her

claim should be reviewed and the previous decision overturned or revised.  Doc. 37

Ex.1, Ex.E (the Submittal Form).

A requirement that a Submittal Form be completed by a Settlement Class

Member to claim the relief offered by the Settlement is hardly unfair.  To the

contrary, use of a "claim form" or "proof of claim" is commonplace in class action

settlements.  MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.47, at 246 ("Class

members are usually required to file claim forms providing details about their

claims and other information needed to administer the settlement").[23]  In, fact the

Federal Judicial Center's sample claim form requires a class member to identify

the specific transactions for which relief is sought. *Id.* § 41.44 at 495–97.  The

record also discloses that the information requested in the Submittal Form is

necessary for AHS to locate the Settlement Class Member, identify the relevant

claim(s) for re-review, and communicate with the Settlement Class Member. *See*

Schroeder Decl.   AHS also will endeavor to respond to a Submission using

whatever information the Settlement Class Member does supply. *Id.*

Because the Submittal Form is not a requirement unique to the class

settlement process, and requests basic information required of any claim (and less

information than would be necessary to advance an individual lawsuit), the

objections to the Submittal Form requirement are without merit.

---

[23] *See, e.g., Perez v. Asurion Corp.,* 501 F. Supp. 2d 1360 (S.D. Fla. 2007) (granting final approval to class action settlement requiring the submission of a claim form by class members); *Williams v. Nat. Sec. Ins. Co.,* 237 F.R.D. 685 (M.D. Ala. 2006) (same); *Carnegie v. Mutual Sav. Life Ins. Co.,* No. Civ.A.CV-99S3292NE, 2004 WL 3715446 (N.D. Ala. 2004) (same); *Thompson v. Metropolitan Life Ins. Co.,* 216 F.R.D. 55, 67 (S.D.N.Y. 2003) (finding "no reason to conclude that the claim procedure is unfair because of the certain steps absent class members must take to obtain settlement benefits"); *In re Austrian & German Bank Holocaust Litig.,* 80 F. Supp. 2d at 176 (approving settlement requiring submission of claim form by class members); *In re Ikon Office Solutions, Inc., Sec. Litig.,* 194 F.R.D. 166 (E.D. Pa. 2000); *In re Motorsports Merch. Antitrust Litig,* 112 F. Supp. 2d 1329 (N.D. Ga. 2000) (same).

g.    None of the miscellaneous remaining objections
      have merit.

Several of the objectors erroneously claim that the Settlement is an "end

run" around the failed *Edleson* settlement. Doc. 68 at 2; Doc. 69 at 2-3; Doc. 74 at

3; Doc. 76 at 6. This objection has no merit for the reasons stated in Part II.D

above and the Court's previous orders. Doc. 43 at 6, Doc. 57 at 2.

A number of objectors contend that the relief offered in the Settlement is

illusory, because AHS allegedly controls the Review Desk process without

oversight. These objections ignore, however, the protections built into the

Settlement to ensure that AHS reviews Submissions carefully and properly: the

penalties to be exacted on AHS should it err in its Review Desk functions; the

freedom of Settlement Class Members to pursue individualized remedies (with or

without first utilizing the Review Desk); the reporting of Review Desk activity to

Class Counsel; and the continuing jurisdiction of the Court (among others). These

constraints are a valuable benefit to the Class, and warrant the overruling of this

objection.

## VI.    CONCLUSION

For at least the foregoing reasons, AHS respectfully requests that the Court

finally approve the Settlement, and enter a Final Order and Judgment reflecting the

final approval of the Settlement and final certification of the Class. To do so

would clearly serve the best interests of the Settlement Class Members as a whole,

and would be fully consistent with the strong public policy favoring the settlement

of class litigation.


/s/   John E. Goodman
One of the Attorneys for Defendant
American Home Shield Corporation

OF COUNSEL:

BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

## CERTIFICATE OF SERVICE


I hereby certify that on February 26, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

D. Frank Davis, Esq.
John E. Norris, Esq.
Wesley W. Barnett, Esq.
Davis & Norris LLP
2154 Highland Avenue
Birmingham, AL 35205
fdavis@davisnorris.com
jnorris@davisnorris.com
wbarnett@davisnorris.com
*Attorneys for Plaintiffs: Laura Faught and Steven Faught*

Lea Bone, Esq.
Bates & Bone LLP
2154 Highland Avenue
Birmingham, AL 35205
lbone@batesbone.com
*Attorney for Plaintiffs: Laura Faught and Steven Faught*

Kirkland E. Reid, Esq.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre, L.L.P.
Post Office Box 46
Mobile, Alabama  36601
kreid@joneswalker.com
*Attorney for L.B. Chip Edleson and Karon Edleson*

John W. Davis
Law Office of John W. Davis
501 W. Broadway, Suite 800
San Diego, CA 92101
john@johnwdavis.com
*Attorney for Intervenors: John Chapon and Miriam Chapon*

R. Stephen Griffis
R. Stephen Griffis PC
2100 Riverhaven Drive, Suite 1
Hoover, AL 35244-2532
rsglaw@bellsouth.net
*Attorney for Intervenors: John Chapon and Miriam Chapon*

Charles M. Thompson
Charles M. Thompson PC
5615 Canongate Lane
Birmingham, AL 35242
mchapmanlaw@bellsouth.net
*Attorney for Intervenor: Charles M. Thompson*

Kearney D. Hutsler
Hutsler Law Firm
2700 Highway 280, Suite 320W
Birmingham, AL 35223
kdhlaw@hutslerlawfirm.com
*Attorney for Objectors: Connie Pentz, John Pentz, Sharon Lee,*
*Thomas Arrington and Todd Pettitt*

and I hereby certify that I have served by U.S. Mail the document to the following non-CM/ECF participants:

Francis A. Bottini, Jr., Esq.
Brett M. Weaver, Esq.
JOHNSON BOTTINI, LLP
501 W. Broadway, Suite 1720
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 238-0622
*Attorneys for Karon Edleson and L.B. Chip Edleson;*
*Objectors: Vivian F. Johnson, Janet Tzendzalian, Rosalyn Urbanek,*
*Merlyn D. Ling, Donald P. Leach, Robert W. Shepard, and Luz A.*
*Shepard*

David J. Worley, Esq.
Page Perry LLC
1040 Crown Pointe Parkway
Suite 1050
Atlanta, Georgia 30338
Telephone: (770) 673-0047
Facsimile: (770) 673-0120
*Attorney for Karon and L.B. Chip Edleson*

Edward D. Chapman, Esq.
CHAPIN WHEELER LLP
550 West "C" Street, Suite 2000
San Diego, California 92101
Telephone: (619) 241-4810
Facsimile: (619) 955-5318
*Attorney for Karon and L.B. Chip Edleson*

Frank H. Tomlinson, Esq.
15 North 21st Street, Suite 302
Birmingham, AL 35203
Telephone: (205) 326-6626
Facsimile: (205) 328-2889
*Attorney for Objectors: John Howe, Jenny Hill, Jennifer Deachin,*
*Michael McKerley, Kenneth R. Behrend, Pamela Behrend, Jeff*
*Williams, Sabrina Williams f/k/a Sabrina Habib, and Janet K. Wood*


/s/ John E. Goodman
John E. Goodman