FILED
2010 Mar-08  AM 11:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A

P17

For Official Governmental Use Only - Do Not Disseminate to the Public: 26928071 - Page 1 of 17

## CAUSE NO. 2006-21887



| | | |
|---|---|---|
| AMERICAN HOME SHIELD OF TEXAS, INC., | § § § | IN THE DISTRICT COURT OF |
| Plaintiff | § § | |
| v. | § § | HARRIS COUNTY, TEXAS |
| STATE OF TEXAS, | § § | |
| Defendant. | § | 295TH JUDICIAL DISTRICT |

### STATE OF TEXAS' THIRD AMENDED ORIGINAL COUNTERCLAIM AND PETITION AND APPLICATION FOR PERMANENT INJUNCTION

**TO THE HONORABLE JUDGE OF SAID COURT:**

Defendant and Counter-Plaintiff the STATE OF TEXAS (hereinafter "Plaintiff"), acting by and through the Attorney General of Texas, GREG ABBOTT, complains of Plaintiff and Counter-Defendant AMERICAN HOME SHIELD OF TEXAS, INC. (hereinafter "Defendant"), and complains of Counter-Defendant THE SERVICEMASTER COMPANY, CORPORATION (hereinafter "Defendant") and Counter-Defendant AMERICAN HOME SHIELD CORPORATION (hereinafter "Defendant"), and for cause of action would respectfully show the following:

### I. DISCOVERY PLAN

1.1    Pursuant to Tex. R. Civ. P. 190.4, discovery is intended to be Level 3.

### II. JURISDICTION

2.1    This action is brought by Attorney General Greg Abbott, through his Consumer Protection Division, in the name of the STATE OF TEXAS and in the public interest under the authority granted to him by section 17.47, Texas Deceptive Trade Practices – Consumer

1



RECEIVED
02/28/07

Protection Act, Tex. Bus. & Com. Code Ann. §17.41, *et seq.* ("DTPA") permitting the Consumer Protection Division of the Attorney General's office to bring an action to restrain by injunction, the use of any method, act or practice declared to be unlawful by Tex. Bus. & Com. Code Ann. §17.46(a)-(b), when such proceedings are in the public interest. The Attorney General files this suit against Defendants on the grounds that:

A.       Defendant American Home Shield of Texas, Inc. ("AHS-T"), Defendant The ServiceMaster Company, Corporation ("SVM"), and Defendant American Home Shield Corporation ("AHS-C") have engaged in false, misleading and deceptive acts and practices in the course of trade and commerce as defined herein and as declared unlawful pursuant to the Texas Deceptive Trade Practices--Consumer Protection Act, TEX. BUS. & COM. CODE § 17.41 *et seq.*

B.       This action is brought against Defendants for by the STATE OF TEXAS, seeking injunctive relief, actual damages, restitution and/or restoration of money and/or other property to identifiable persons, civil penalties, costs, and attorney's fees as a result of Defendants' violations of the DTPA.

### III. DEFENDANTS

3.1       Defendant **AMERICAN HOME SHIELD OF TEXAS, INC.** is a Texas corporation, with its principal place of business located at 860 Ridge Lake Boulevard, Memphis, Tennessee, 38120. AHS-T has been served and has answered.

3.2       Defendant **THE SERVICEMASTER COMPANY** is a foreign corporation (Delaware) with its principal place of business and/or home office at **ONE SERVICEMASTER WAY, DOWNERS GROVE, ILLINOIS 60515**. THE SERVICEMASTER COMPANY is no

2

For Official Governmental Use Only - Do Not Disseminate to the Public: 26928071 - Page 2 of 17

longer registered to do business in the State of Texas.  SVM has been served.

**3.3**     Defendant **AMERICAN HOME SHIELD CORPORATION** is a foreign corporation, with

its principal place of business located at 889 Ridge Lake Boulevard, Memphis, Tennessee,

38120.  AMERICAN HOME SHIELD CORPORATION is registered to do business in

Texas.  AHS-C has been served and has answered.

## IV.  VENUE

**4.1**     Venue of this suit lies in Harris County, Texas for the following reason:

**A.**     Under the DTPA § 17.47(b), venue is proper because Defendants have done business

in Harris County, Texas.

## V.  PUBLIC INTEREST

**5.1**     The State of Texas has reason to believe that Defendants have engaged in, and will continue

to engage in, the unlawful practices set forth below.  The State of Texas has reason to believe

Defendants have caused, and will continue to cause, irreparable injury, loss and damage

directly or indirectly affecting the people of this State.  Therefore, the Consumer Protection

Division of the Office of the Attorney General of the State of Texas considers these

proceedings in the public interest.

## VI.  TRADE AND COMMERCE

**6.1**     Defendants have at all times described herein, engaged in conduct which constitutes "trade"

and "commerce" as those terms are defined by DTPA § 17.45(6).

## VII.  PRE-SUIT NOTICE

**7.1**     At least seven days prior to filing this suit, the Consumer Protection Division of the Office

of the Attorney General informed Defendants of the alleged unlawful conduct by the State's

3

For Official Governmental Use Only - Do Not Disseminate to the Public: 26928071 - Page 3 of 17

communications and Civil Investigative Demands.

## VIII.  ACTION OF AGENTS

8.1     Whenever in this Petition it is alleged that Defendants did any act, it is meant that:

    **A.**     Defendants performed or participated in the act; and/or

    **B.**     Defendants' officers, agents or employees performed or participated in the act on

    behalf of and under the authority of Defendants.

## IX.   DIRECT AND DERIVATIVE LIABILITY

9.1     Defendants AHS-T, AHS-C and SVM are doing business in the State of Texas.

9.2     Defendants AHS-T, AHS-C and/or SVM are "inextricably intertwined" and/or connected in

the transactions and/or acts alleged in this Petition.  By way of example and not limitation:

- SVM contractually guaranteed the performance of AHS-T and AHS-C, thereby facilitating the transactions and/or acts alleged in this Petition.

- AHS-T and AHS-C routinely included SVM, by name, as a protected party in its contracts with third-parties.

- SVM allowed the use of its mark in Defendants' marketing and/or advertising, referring to American Home Shield as one of the "ServiceMaster Family of Brands."

9.3     Defendants AHS-T, AHS-C and/or SVM sought to benefit from the transactions and/or acts

alleged in this Petition.  By way of example and not limitation:

- AHS-T, AHS-C and SVM profited from the transactions and/or acts alleged in this Petition.

9.4     Defendants AHS-T, AHS-C, and SVM were engaged in a "single business enterprise."

## X.  FACTS

### A.  General.

10.1    Defendants are in the home warranty business (a/k/a/ "residential service contracts").  They

4

For Official Governmental Use Only - Do Not Disseminate to the Public: 26928071 - Page 4 of 17

For Official Governmental Use Only - Do Not Disseminate to the Public: 26928071 - Page 5 of 17

promise to repair or replace appliances and systems such as air-conditioners, garbage disposals, plumbing, trash compactors, dishwashers, heating, ranges/ovens, duct work, water heaters, cook tops, electrical systems, built-in microwaves, garage door openers, clothes washers, dryers, and refrigerators.

10.2   Defendants develop, market and sell these warranties to Texas consumers, directly and indirectly through banks and real estate brokers who receive a financial incentive to promote, market and sell Defendants' warranties. These incentives are not disclosed prior to the consumer's purchase or acquisition of the warranty.

10.3   Defendants state that the warranties will save consumers money by protecting major home systems and appliances regardless of age, make, or model. Defendants advertise that the warranties provide coverage so long as the appliances or systems are "in good working order" at the time the warranty is purchased; no pre-warranty inspection is required; and breakdowns due to "normal wear and tear" are covered. Indeed, Defendants stress that their warranties are the consumers' answer to the costly problem of repairing or replacing an expensive older system or appliance that breaks down.

10.4   Defendants define the phrases "in good working order" and "normal wear and tear" differently from common or normal meaning and to their advantage–to defeat coverage. These definitions are not disclosed prior to the consumer's purchase or acquisition of the warranty.

10.5   When an appliance or system cannot be repaired, Defendants represent that they will replace it or give the consumer sufficient cash to replace it. Defendants define "replace" and "repair" differently from common or normal meaning and to their advantage, often replacing or

5

For Official Governmental Use Only - Do Not Disseminate to the Public: 26928071 - Page 6 of 17

repairing the consumer's appliance or system part with an inferior appliance or part. Defendants also offer inadequate cash to the consumer to replace the appliance or system. Again, no disclosure of these facts is made to the consumer prior to the purchase or acquisition of the warranty.

**10.6.** Defendants' acts and omissions violate DTPA §§ 17.46(a), 17.46(b)(2), 17.46(b)(5), 17.46(b)(7), 17.46(b)(9), 17.46(b)(12), 17.46(b)(13), 17.46(b)(20), and/or 17.46(b)(24).

### B. HVAC Claims.

**10.7** Defendants charge extra for warranties that include coverage for HVAC systems. However, when consumers request repair of an HVAC system (often involving condenser units, heat pumps, evaporator coils, and compressors), Defendants routinely and arbitrarily deny these more expensive repairs or replacements.

**10.8** In addition to using undisclosed, uncommon, and abnormal definitions of the terms and phrases "in good working order," "normal wear and tear," "replace," and "repair," Defendants deny HVAC claims using the following reasons:

    (1) failure to maintain the system;

    (2) chemical or sedimentary buildup;

    (3) rust or collapsed duct found within 30 days after the purchase of the warranty;

    (4) rust present in the coils;

    (5) lack of capacity or tonnage;

    (6) system needs upgrades;

    (7) part or parts missing;

    (8) no proper permit issued;

6

For Official Governmental Use Only - Do Not Disseminate to the Public: 26928071 - Page 7 of 17

(9) poorly designed system;

(10) code violations;

(11) structural changes exist;

(12) known existing defects;

(13) part or all of system installed improperly;

(14) system contains commercial equipment or parts;

(15) cosmetic defects;

(16) fire or freeze damage;

(17) pet or pest damage; and

(18) secondary damage.

10.9   These additional bases for denial are not disclosed to the consumer prior to the purchase or acquisition of the warranty. Consumers would likely decline to purchase the warranty if they were made aware of the litany of reasons for which their HVAC repair request may be denied.

10.10   Defendants use these reasons to deny coverage regardless of whether the reason has any relationship or causal nexus to the malfunction or breakdown of the consumer's system.

10.11   Defendants' conduct violates DTPA §§ 17.46(a), 17.46(b)(2), 17.46(b)(5), 17.46(b)(7), 17.46(b)(9), 17.46(b)(12), 17.46(b)(13), 17.46(b)(20), and/or 17.46(b)(24).

**C. Plumbing Claims.**

10.12   Defendants represent that their warranties provide for the repair or replacement of plumbing. However, in small, inconspicuous print that no consumer is likely to see or read, almost every conceivable type of plumbing repair is excluded from coverage.   For instance,

7

For Official Governmental Use Only - Do Not Disseminate to the Public: 26928071 - Page 8 of 17

Defendants will not repair leaks or replace lines damaged by freezing or roots; will not repair or replace faucets, fixtures, bathtubs, showers, sinks, septic tanks; will not correct inadequate or excessive water pressure and flow restrictions caused by rust, corrosion or chemical deposits. In effect, the exclusions swallow any possible inclusions, so consumers are not protected against any plumbing problems.

10.13   Even if consumers were able and inclined to decipher the tiny print describing exclusions, they are frequently not provided with a copy of the written warranties prior to their purchase or acquisition.

10.14   The illusory nature of Defendants' promises relating to plumbing repairs or replacement is unconscionable, misleading and deceptive under DTPA §§ 17.46(a), 17.46(b)(5), 17.46(b)(7), 17.46(b)(9), 17.46(b)(12), 17.46(b)(20), and/or 17.46(b)(24).

**D. Undisclosed Relationships.**

10.15   Defendants AHS-T and AHS-C are subsidiaries or otherwise affiliated entities of Defendant SVM. American Residential Services, Inc. ("ARS") was likewise a subsidiary or otherwise affiliated entity of Defendant SVM.

10.16   Defendants primarily used ARS to perform warranty-related work.

10.17   Defendants represented that they would provide "independent" and qualified technicians to perform warranty-related work.

10.18   Prior to acquiring or purchasing Defendants' warranties, consumers were not informed that ARS was likely to be chosen as the contractor to provide warranty work and that ARS was an affiliated entity of Defendant SVM.

8

For Official Governmental Use Only - Do Not Disseminate to the Public: 26928071 - Page 9 of 17

**10.19**   The contractors often provided the information that Defendants used to determine whether the consumer's requested repair should be covered under the warranty. Defendants kept track of the percentages of repair denials with respect to each contractor. These facts were not disclosed to consumers.

**10.20**   Defendants maintained a VOID list of contractors which included those contractors whose percentages of repair denials were low. Defendants avoided using these contractors for future warranty repair work. ARS consistently maintained the highest percentage of repair denials. These facts were not disclosed to consumers.

**10.21**   Consumers would likely decline to purchase the warranty if they were made aware of the relationship between Defendants and ARS, the existence and use of the VOID list, and/or ARS's high percentage of repair denials. Further, consumers would be more likely to challenge the denial of their repair requests if they were made aware of these facts.

**10.22**   Defendants' failure to disclose these facts violates DTPA §§17.46(a), 17.46(b)(1), 17.46(b)(2), 17.46(b)(3), 17.46(b)(5), 17.46(b)(7), 17.46(b)(9), 17.46(b)(12), 17.46(b)(20), and/or 17.46(b)(24).

## XI.  CAUSE OF ACTION

### Texas Deceptive Trade Practices Act ("DTPA")

**11.1**   Plaintiff hereby incorporates the preceding paragraphs.

**11.2**   Plaintiff alleges that Defendants have in the course of trade and commerce engaged in false, misleading or deceptive acts and practices declared unlawful in DTPA §§17.46(a), 17.46(b). Such acts include:

9

For Official Governmental Use Only - Do Not Disseminate to the Public: 26928071 - Page 10 of 17

A.   Engaging in false, misleading or deceptive acts or practices in the conduct of trade or commerce, in violation of DTPA §17.46(a);

B.   Causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services, in violation of DTPA §17.46(b)(2);

C.   Causing confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another, in violation of DTPA §17.46(b)(3);

D.   Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities which they do not have, in violation of DTPA §17.46(b)(5);

E.   Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another, in violation of DTPA §17.46(b)(7);

F.   Advertising goods or services with the intent not to sell them as advertised, in violation of DTPA §17.46(b)(9);

G.   Representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law, in violation of DTPA §17.46(b)(12);

H.   Knowingly making false, or misleading statements of fact concerning the need for parts, replacement or repair service, in violation of DTPA §17.46(b)(13);

I.   Representing that a guarantee or warranty confers or involves rights or remedies which it does not have or involve, in violation of DTPA §17.46(b)(20);

J.   Failing to disclose information concerning goods or services which was known at the

10

For Official Governmental Use Only - Do Not Disseminate to the Public: 26928071 - Page 11 of 17

time of the transaction with the intent to induce the consumer into a transaction he

or she would not have otherwise entered into, in violation of DTPA §17.46(b)(24).

## XII. TRIAL BY JURY

12.1    Plaintiff requests a jury trial and tenders the jury fee pursuant to Tex. R. Civ.P. 216 and Tex.

Gov't Code Ann.§51.604.

## XIII. APPLICATION FOR PERMANENT INJUNCTION

13.1    Because Defendants have engaged in the unlawful acts and practices described above,

Defendants have violated and will continue to violate the law as alleged in this Petition.

Unless restrained by this Honorable Court, Defendants will continue to violate the laws of the

STATE OF TEXAS and cause irreparable injury, loss and damage to the people of this State.

Therefore Plaintiff requests a Permanent Injunction as indicated below.

## XIV. CONDITIONS PRECEDENT

14.1    All conditions precedent to Plaintiff's right to recover and Defendants' liability have occurred

or have been waived.

## XV. PRAYER

15.1    WHEREFORE, Plaintiff prays that Defendants be cited according to law to appear and

answer herein; and upon notice and hearing a Permanent Injunction be issued, restraining

and enjoining Defendants, Defendants' agents, servants, employees, parent companies,

affiliated companies, contracted third parties, attorneys, and any other persons in active

concert or participation with Defendants from engaging in the following acts or practices:

1.      Offering cash in lieu of repair or replacement, when the cash offered is:

      A.      at the sole determination or discretion of Defendants; and

11

For Official Governmental Use Only - Do Not Disseminate to the Public: 26928071 - Page 12 of 17

    **B.**    less than an amount at which the Consumer can replace the appliance or system in the consumer retail market in the consumer's area with the same or equivalent make and/or model;

**2.**    Representing, expressly or by implication, that the home warranties covers any plumbing repairs when, in fact, there are no significant plumbing repairs that are covered by the warranties;

**3.**    Refusing to repair or replace all or part of an HVAC system when Defendants represent coverage regardless of age, make or model, or as long as the system is in good working order at the time of the purchase of the warranty, unless:

    **A.**    Defendants conduct a pre-warranty inspection and specifically exclude (in writing to the consumer) all or specific parts of any HVAC system from warranty coverage prior to purchase, acquisition or renewal of the warranty; or

    **B.**    Defendants disclose to the consumer prior to purchase, acquisition, or renewal of the warranty, orally and in a separate written notice--to be signed by the purchaser and any person acquiring the warranty--in 13 Point Times New Roman Bold Font, each basic scenario[1] which may result in the denial of a repair to, or replacement of, an HVAC system, including, but not limited to the following:

---

[1] The term "scenario" includes, but is not limited to: all reasons promulgated through, or generated by, an application of the work wizard program or similar software, and all other criteria or categories upon which a refusal to repair or replace the item may be based.

12

For Official Governmental Use Only - Do Not Disseminate to the Public: 26928071 - Page 13 of 17

HVAC coverage can and very likely will be denied for: (1) failure to maintain the system; (2) chemical or sedimentary buildup; (3) rust or collapsed duct found within 30 days after the purchase of the warranty; (4) rust present in the coils; (5) lack of capacity or tonnage; (6) system needs upgrades; (7) part or parts missing; (8) no proper permit issued; (9) poorly designed system; (10) code violations; (11) structural changes exist; (12) known existing defects; (13) part or all of system installed improperly; (14) system contains commercial equipment or parts; (15) cosmetic defects; (16) fire or freeze damage; (17) pet or pest damage; and (18) secondary damage, <u>even though any of these reasons may not actually cause, or be the reason for, the breakdown or malfunction of the HVAC unit.</u>

4.    Refusing to repair or replace any part of an appliance or system when Defendants represent coverage regardless of age, make or model, or as long as the appliance or system is in good working order at the time of the purchase of the warranty, unless:

A.    Defendants conduct a pre-warranty inspection and specifically exclude (in

13

For Official Governmental Use Only - Do Not Disseminate to the Public: 26928071 - Page 14 of 17

writing to the consumer) all or specific parts of any appliance or system from warranty coverage prior to purchase, acquisition or renewal of the warranty; or

**B.**    Defendants disclose to the consumer prior to purchase, acquisition, or renewal of the warranty, orally and in a separate written notice--to be signed by the purchaser and any person acquiring the warranty--in 13 Point Times New Roman Bold Font, each basic scenario[2] which may result in the denial of a repair to, or replacement of, the appliance or system.

5.    Failing to disclose to each consumer, prior to their purchase, acquisition, or renewal of any warranty, the specific relationships among Defendants and ARS, the existence and use of the VOID list, as well as the likelihood of ARS being the chosen contractor to perform warranty related work. Such disclosures shall be made orally and in a separate written notice--to be signed by the purchaser and any person acquiring the warranty--in 13 Point Times New Roman Bold Font.

6.    Failing to disclose to each consumer, prior to their purchase, acquisition, or renewal of any warranty, the specific contractual relationships, the financial incentives, and the specific compensation paid, by, between, and among Defendants and those persons or entities marketing, promoting and/or selling Defendants' warranty agreements, including but not limited to: banks and real estate brokers. Such

---

[2]    The term "scenario" includes, but is not limited to: all reasons promulgated through, or generated by, application of the work wizard program, and all other criteria or categories for refusing to repair or replace the item.

14

disclosures shall be made orally and in a separate written notice--to be signed by the purchaser and any person acquiring the warranty--in 13 Point Times New Roman Bold Font.

**15.2**   In addition, Plaintiff STATE OF TEXAS respectfully prays that this Court will:

**A.**   Adjudge against Defendants, jointly and severally, civil penalties in favor of Plaintiff STATE OF TEXAS in the amount of Twenty-Thousand Dollars ($20,000) for each violation of the DTPA, pursuant to DTPA §17.47(c)(1);

**B.**   Adjudge against Defendants, jointly and severally, civil penalties in favor of Plaintiff STATE OF TEXAS in the amount of Two-Hundred Fifty-Thousand Dollars ($250,000) for acts or practices calculated to acquire or deprive money or other property from a consumer who was 65 years of age or older when the act or practice occurred, pursuant to DTPA §17.47(c)(2);

**C.**   Order Defendants, jointly and severally, to pay Plaintiff for its attorney fees, investigative costs, and costs of court pursuant to TEX. GOV'T CODE ANN. §402.006(c).

**D.**   Order Defendants, jointly and severally, to compensate identifiable persons by awarding them actual damages or restoring to such persons property or money that may have been acquired from them by means of any unlawful act or practice;

**E**   Order the return of all consumers' payments for Defendants' warranties from the time the false, misleading or deceptive acts or practices alleged herein began to the present.

**F.**   Plaintiff further prays that this Court grant all other relief to which the Plaintiff

15

For Official Governmental Use Only - Do Not Disseminate to the Public: 26928071 - Page 15 of 17

STATE OF TEXAS may show itself justly entitled.

Respectfully Submitted,

GREG ABBOTT
Attorney General of Texas

KENT C. SULLIVAN
First Assistant Attorney General

JEFF ROSE
Deputy First Assistant Attorney General

PAUL D. CARMONA
Chief, Consumer Protection & Public Health Division


_____

JANET D. DANN
State Bar No. 00792091
JOHN OWENS
State Bar No. 15379200
Assistant Attorney General
Consumer Protection & Public Health Division
808 Travis, Suite 300
Houston, TX 77002
Tel. 713- 223-5886 ext. 113
Fax 713- 223-5821

**ATTORNEYS FOR STATE OF TEXAS**

For Official Governmental Use Only - Do Not Disseminate to the Public: 2692807I - Page 16 of 17

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on the following attorneys via electronic and facsimile transmission on this the 23rd day of February, 2007.

David J. Beck
Jon Ben Blackburn
Beck, Redden & Secrest, L.L.P.
1221 McKinney St., Suite 4500
Houston, Texas 77010-2010
Fax 713-951-3720

**Attorneys for American
Home Shield of Texas, Inc.,
American Home Shield Corporation,
and The ServiceMaster Company.**

Janet D. Dann

For Official Governmental Use Only - Do Not Disseminate to the Public: 2692807I - Page 17 of 17

17



I, Loren Jackson, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date
Witness my official hand and seal of office
this  March 1, 2010

Certified Document Number:  26928071 Total Pages: 17

LOREN JACKSON, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

# EXHIBIT B

# SIDLEY

SIDLEY AUSTIN LLP

| | |
|---|---|
| SIDLEY AUSTIN LLP | |
| ONE SOUTH DEARBORN | |
| CHICAGO, IL 60603 | |
| (312) 853 7000 | |
| (312) 853 7036 FAX | |

| | |
|---|---|
| BEIJING | LOS ANGELES |
| BRUSSELS | NEW YORK |
| CHICAGO | SAN FRANCISCO |
| DALLAS | SHANGHAI |
| FRANKFURT | SINGAPORE |
| GENEVA | SYDNEY |
| HONG KONG | TOKYO |
| LONDON | WASHINGTON, D.C. |

rniewoehner@sidley.com
(312) 853-7588

FOUNDED 1866

October 19, 2009

**RECEIVED**
TEXAS REAL ESTATE COMMISSION

**OCT 20 2009**

CASHIER'S SECTION
OPERATOR 15

By Federal Express

Beverly Rabenberg
Texas Real Estate Commission
1101 Camino La Costa
Austin, TX 78752

Re:   Notice of Class Action Settlement Pursuant to 28 U.S.C. § 1715

Dear Ms. Rabenberg:

I write to notify you, pursuant to 28 U.S.C. § 1715, that a proposed Class Action Stipulation of Settlement in *Faught v. American Home Shield Corporation*, Case No. CV-07-P-1928-S (N.D. Ala.), was filed on October 9, 2009. The proposed Stipulation of Settlement is intended to fully resolve and settle any and all claims related to the subject matter of the above-named case between a class of plaintiffs, as represented by named plaintiffs Laura Faught and Steven Faught, and defendant American Home Shield Corporation ("AHS"), all as explained more fully in the Stipulation of Settlement.

Pursuant to 28 U.S.C. § 1715, the following documents are enclosed:

1. *Complaint, Amended Complaint, and Related Materials* (28 U.S.C. § 1715(b)(1))

   Copies of the Complaint and Amended Complaint, each with all exhibits, are attached as Exhibits 1 and 2.

2. *Notice of any Scheduled Judicial Hearing* (28 U.S.C. § 1715(b)(2))

   The Court has not yet scheduled the Fairness Hearing.

3. *Proposed Notification to Class Members* (28 U.S.C. § 1715(b)(3))

   The proposed notice to be provided to class members is Exhibit B to the Stipulation of Settlement, which is included herein as Exhibit 3.

**SIDLEY** | SIDLEY AUSTIN LLP

October 19, 2009
Page 2

4. *Proposed Class Action Settlement Agreement* (28 U.S.C. § 1715(b)(4))

A copy of the executed Stipulation of Settlement, with exhibits, is attached as Exhibit 3.

5. *Any Settlement or Other Agreement* (28 U.S.C. § 1715(b)(5))

There are no settlements or other agreements between class counsel and counsel for defendant other than the Stipulation of Settlement.

6. *Final Judgment* (28 U.S.C. § 1715(b)(6))

There has been no final judgment or notice of dismissal. However, the proposed Final Approval Order is Exhibit C to the Stipulation of Settlement, which is included herein as Exhibit 3.

7. *Estimate of Class Members in Each State* (28 U.S.C. § 1715(b)(7)(B))

It is not feasible to provide a complete list of class members residing in each state who may be encompassed within the proposed settlement. Therefore, a reasonable estimate of the number of class members residing in each State is attached as Exhibit 4.

8. *Judicial Opinions Related to the Settlement* (28 U.S.C. § 1715(b)(8))

There are no judicial opinions related to the settlement at this time.

Very truly yours,

Rachel B. Niewoehner

Enclosures

# EXHIBIT C

## Pauline Sisson - Fwd: New Director and Faught Class Action

| | |
|---|---|
| **From:** | <loretta.dehay@trec.state.tx.us> |
| **To:** | Pat Tulinski <pat.tulinski@oag.state.tx.us> |
| **Date:** | 3/4/2010 1:44 PM |
| **Subject:** | Fwd: New Director and Faught Class Action |
| **CC:** | Douglas Oldmixon <douglas.oldmixon@trec.state.tx.us> |
| **Attachments:** | Faught Class Action Settlement Notification 12 09.pdf; Faught. Final Preliminary Approval Order. 10-09.pdf; Faught. Final Preliminary Approval Order. part 2. 10-09. 1650_001.pdf |

Pat,

In response to your request, attached is the email we received from Mark Lightfoot requesting input from TREC on the Faught Class Action. See number 4 below.

When we met with Mark and the AHS attorneys via telephone conference call on February 10, 2010, Doug Oldmixon told them that since the OAG was representing the State of Texas in the AHS litigation, we would defer to the OAG on the Faught Class Action.

Let me know if you need additional information. I can also send you a letter on TREC letterhead if you prefer.

Regards,


Loretta DeHay
Deputy Administrator and General Counsel
Texas Real Estate Commission
521.465.3966




----- Forwarded Message -----
From: "Mark Lightfoot" <MLightfoot@ahslink.com>
To: "loretta.dehay@trec.state.tx.us" <loretta.dehay@trec.state.tx.us>
Sent: Tuesday, January 26, 2010 4:37:48 PM
Subject: New Director and Faught Class Action

Loretta,

Greetings from Memphis. I hope all is well with you and your family. I understand that you have a new Director – and that is a good thing for you.

On behalf of AHS, I am seeking a meeting or conference call regarding the following topics:
1) Meet the new Director
2) Update TREC on the Faught Class Action and TX AG matter
3) Walk you through the proposed Faught Class Action settlement (See attached Notice to Class Members and Preliminary Approval Order)
4) Upon your review and understanding the settlement and provided the agreement meets with your approval, we will respectfully ask TREC if it will submit a letter to the Court stating that from the perspective of TREC (AHS's

largest state regulator) the settlement is fair and adequate and provides adequate benefits to class members.
5) Welcome TREC input and feedback on AHS in general

My thought is to have a conference call where introductions can be made, AHS's outside local counsel handling the Faught matter – John Goodman of Bradley Arrant in Birmingham, AL – can provide an overview and answer any questions – and we can provide whatever additional information that you may need.  I can also have Brad Coffey of Beck Redden in Houston, Texas give a brief update on the Texas AG matter.

In any event, I plan to be in Austin on Feb 22 and 23 and would like to briefly meet in-person – and can follow-up on any questions/action items at that time, too.

Once you have the opportunity to review and consider the foregoing, let me know your thoughts.  My direct number is (901) 597-8020 and email is mlightfoot@ahslink.com.

Respectfully,

Mark Lightfoot
AHS of Texas, Inc.

CONFIDENTIALITY NOTICE:
The information contained in this e-mail, including any attachment(s), is confidential information that may be privileged and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or if you received this message in error, then any direct or indirect disclosure, distribution or copying of this message is strictly prohibited. If you have received this message in error, please notify the ServiceMaster Help Desk immediately by calling (866) 597-4321 and by sending a return e-mail; delete this message; and destroy all copies, including attachments.

Thank you.

# EXHIBIT D

# *Gulf States Plumbing & Mechanical, Inc.*

**Shipping & Physical Address**
12340 PALMSPRINGS DRIVE
HOUSTON, TX 77034
Telephone (713) 943-1035; Fax (713) 943-1344

December 30, 2009

John Owens
Assistant Attorney General
808 Travis, Suite 1520
Houston, Texas  77002

   Re: State of Texas vs. American Home Shield of Texas, Inc., et al.
      Pending in the 295th District Court of Harris County, Texas

Dear Mr. Owens:

   I am providing this report based upon the materials your office furnished me prior to providing this report.  I understand that additional materials will be furnished to me and I reserve the right to supplement, amend and modify my opinions and conclusions stated herein after reviewing such materials.

   I read the various American Home Shield ("AHS") Residential Service Contracts ("RSC") provided to me by the State of Texas.  In my opinion, the literature and promotional brochures produced by American Home Shield lead me to believe that if I purchased such a residential service agreement that all major systems in my home would be covered for repair or replacement if they break down or malfunction.  The AHS brochures and promotional materials state that these service agreements protect a homeowner from unexpected repair bills and provide the comfort and joy of owning a home without the surprises of such extra and expensive bills.  These marketing materials also state that a homeowner's security and investment is at risk if such a residential service agreement is not purchased.

   After thoroughly reading the fine print in the various residential service agreements provided to me (ie. Section "A" Coverage, items B, C & D), I determined that it would require a plumbing professional to fully interpret the meaning of terms such as "normal wear and tear", "good working order", and "properly installed", etc.  If one cannot see the pipes in the ground, how can they determine if they are "properly installed"?  Under Section "C-Coverage", if your pipes wear out or leak you are "covered", but you are NOT covered if anything *causes* the pipes to leak or wear out.  Pipes don't wear out or leak unless something causes them to wear out or leak.  Every conceivable reason a pipe can wear out or leak is excluded in the fine print, so in reality, if your pipes wear out or leak you are not covered.  The plumbing exclusions (which are found throughout the fine print) include, but are not limited to: freezing, roots, collapse, rust, corrosion, chemical deposits, sedimentary buildup, chemical buildup, structural

changes, mud and soil movement, inadequacy, lack of capacity, improper installation, previous repair or design, and modification of the system. If pipes become stopped up with foreign objects, there is no coverage. Everything that goes through a pipe is essentially a foreign object, including toilet paper. These exclusions and limitations of liability are so broad that the vast majority of plumbing claims can be denied by choosing one or more of them.

Other excluded items from plumbing coverage are leaky faucets, most of the valves which tend to break, toilet seats, bathtubs, shower and shower pans and the tanks contained in water heaters. The main failure of a gas water heater is a leaking holding tank, which is not covered. If a pilot light goes out on a gas water heater, AHS may fix that, but not if the heater has sediment in it or has not been clean or maintained according to AHS. Sediment is a leading cause of failures in a water heater tank. If your expensive "Kohler" toilet happens to have a crack in it, AHS will replace it with a $40 or $50 toilet as per the fine print embedded in the service agreement. Garbage disposals are covered unless it is stopped up or jammed or AHS felt it was not properly maintained. A sump pump is covered, but they rarely ever fail. The fine print also essentially excludes the amount of money and time it takes to locate a leak under the foundation. The amount of time it takes to access the sewer is excluded. The plumbing type items not covered in the various contracts I reviewed constitute about 90-95% of all plumbing problems people generally encounter in their homes. The plumbing "coverage" set forth in AHS's brochures and marketing materials is essentially illusory. For example, I have resided in my home for 12 years and have had the following plumbing issues—which would be excluded under an AHS service agreement:

1. Three sewer stoppages
2. Water leak in pipe cause by improper reaming of the pipe upon installation
3. Hose bib leak
4. Three Lawn irrigation leaks (one involving a valve and two involving a pipe)
5. Two Kitchen faucet leaks
6. Two Clothes Dryer vent stoppages
7. Bathtub leak
8. Ice-maker malfunction on my refrigerator
9. Gas stove clock timer malfunction

About the only plumbing issue I had in my house which would have been covered is a toilet tank gasket—which cost about around $3 to $8. Given the trade fee that is required to be paid by the homeowner for each service call, I doubt AHS would have had to pay anything for this toilet gasket claim.

I understand that AHS has modified its residential service contracts in Texas in the past few years and as soon as I review these contracts, I will supplement this report. I also understand that the contracts I reviewed were in place in Texas for years prior to 2007 when different contracts may have been promulgated.

There is no question however that the plumbing "coverage" set forth in the AHS RSC's I

reviewed is essentially illusory.

Sincerely,

Jerry N. Farmer, Sr.

# EXHIBIT E

**RODNEY H. LEWIS, PE**
**Consulting Engineer**
6150 Richmond Avenue, Suite 228
Houston, Texas 77057
713-975-0780 - 713-975-1327 fax

## PRELIMINARY REPORT
### STATE OF TEXAS VS. SERVICE MASTER AND AMERICAN HOME SHIELD ("AHS"), ET AL
### DECEMBER 31, 2009

I have been retained by the Attorney General of the State of Texas, to review certain issues on the above matter and offer my opinions. The basis of these opinions is founded in my over forty-five year experience in designing HVAC, plumbing, and electrical (MEP) systems for buildings. For this matter, my initial focus has been on the HVAC and plumbing aspects.

I have briefly reviewed the following documents:

Authorization Manuals: Chapters 1 and 2
CD and Hard Copy AHS/AG0062402

New Hire Manuals: Chapters 1 though 8
CD and Hard Copy AHS/AG0062401

Home Warranty: Hard Copy AHS/AG0062278-2283

AHS Marketing CD: AHS000001 – 001014

Service Master Detailed Process Map and Blowup 2AHS-00319

There are many discovery documents that I have not been provided. I expect that there will be many additional documents. I reserve the right to supplement and modify my opinions when additional information is provided. Also, if I uncover more issues in a more detailed review of the above documents I expect to supplement and/or modify my opinions.

As I understand it, these home warranties are sold without any site inspection or even a review of the real estate inspector's report, on the part of American Home Shield/Service Master. In the context of a real estate transaction, at the time of sale of the property to a new owner, the home warranty is usually conveyed and the cost of the warranty is usually paid by the seller. With many transactions, the operation of all systems and appliances are verified as operational at the time of sale by the purchaser and real estate inspector. However AHS does not do anything to verify existing conditions. Looking at the business model, verification costs will result in either disqualifying coverage or higher premiums. It is likely net profits will be substantially lower. Hence their current practice of limited coverage, which in my opinion is very unfairly presented to the customers, probably maximizes profits.

The promotional material and brochures by AHS indicate the new homeowner is covered against catastrophic failure of the HVAC, plumbing, electrical and appliances. In reality, from studying the fine print of the sample contracts, there are so many exclusions that can be involved, one could find one or more reasons to deny coverage on almost every conceivable claim. The contractors retained by AHS send technicians to the home to investigate a claim. They have a maximum authorized limit to make a repair. When a technician is dispatched the homeowner incurs a service charge of around $50.00 per item. For any repair cost above the authorized amount, the contractor is required to call in to AHS for authorization. A review of the Authorization Procedures Manual and the Training Manual for new employees are, in my opinion, focused on how to deny coverage. They have no incentive to find a reason to authorize a repair.

The contractors' service technicians are usually not licensed. The State HVAC License is for one individual per company. A registration for technicians was not required until 2007 where the State Legislature enacted a requirement that service technicians must undergo a background check and be registered with the State of Texas. HVAC technicians are required to get a certificate issued by the EPA, which allows them to purchase and handle refrigerants. Plumbing and electrical technicians are required to have journeyman licenses. However, these requirements are often ignored. Most of the service technicians of all trades are on a commission plan where they receive additional compensation based on their sales. The AHS system encourages contractors to assist in denying coverage and allows the technicians a free opportunity to promote upgrades that the homeowner may or may not need. This can result in unreasonably high charges if there are no competitive bids. AHS authorizers in the beginning have at most a three hundred dollar authorization limit. Above this amount they must call a supervisor. How long will the new hire last that calls the supervisor on every call above their authorization limit? There seems to be every reason and incentive to deny coverage. There appears to be little incentive to authorize a repair.

We do not know the experience or knowledge of the AHS authorizers. However, in reviewing the training manual, it is believed they have little or no experience with technical matters of MEP and appliances. Again in my opinion they are "programmed" to find reasons for denying coverage.

I now want to express my opinions as to the reasons coverage can be denied. First the reasons are extremely broad and can be used to allow AHS to deny most any claim. It is reasonable to expect that any item not working when the seller occupied the property would have been repaired prior to closing.

Certain exceptions are regular requirements of most jobs. For example:

1. Permits - These vary from city to city and if not in a city, there are no requirements. For Houston you need a permit for almost every component change out, both for HVAC and plumbing. These are usually between $25 and $100.00. According to AHS contracts, permits are always the homeowner's responsibility (not covered).

2. Code compliance – Appears to be generally excluded. There is a code change every three years. New work is usually required to comply with the current code. September 1, 2002 there was a new statewide energy code. This was further modified in 2004. The greatest impact was in the SEER (Seasonal Energy Efficiency Rating) of HVAC equipment. New condensing units and evaporator coils are most affected. Usually the new more energy efficient equipment is larger. Many existing pieces of equipment are small in comparison to today's replacements. Strict code enforcement requires compliance with manufacturer's instructions including clearances. Tight spaces may require relocation to another location in the yard or attic, which does not seem to be covered. The policy holder is again left to pay large unexpected costs.

3. Refrigerant - Every air conditioning system contains refrigerant. Any time a component is repaired or replaced, the EPA requires the refrigerant to be captured and recycled. This is excluded and usually amounts to a $50 to $100.00 charge to the homeowner. In recent years, typical refrigerants have changed. The old refrigerant is R-22 which is being phased out in 2010. Refrigerant R-410A is the typical new replacement. A new evaporator coil with an existing condensing unit is not automatically compatible. Expansion devices for R-22 may not work with R-410A. None of these issues appear to be covered. This will be more of a problem starting in 2010.

Many exclusions and limitations of liability can be used to deny coverage, even though they have little to do with the cause of the failure of the system, for example:

1. Sediment or debris in piping is not covered. Calcium carbonate is present in most potable water systems. This tends to plate out on heat exchangers with particularly hot surfaces like water heaters and hot water piping. Flushing of water heaters does little to mediate this problem. The primary solution is to install water softeners (which are also not covered). The failure to flush the water heater is a reason for exclusion, although, sand and sediment is seldom a reason for failure.

2. Sediment or debris in HVAC contributes to clogged drains and dirty cooling coils. It is reasonable to expect that the large majority of systems are fairly clean at the time of sale. It is also normal to find leaves and grass clippings in a condensing unit and occasionally dirty filters. Most of these instances do not constitute a reason for failure and hence a denial. However it seems that the warranty language can be frequently used to deny coverage.

3. Truly dirty filters are a sign of poor maintenance. Improper maintenance is an AHS reason for denial. However, just a visual observation of a filter and the technician making a subjective determination that the filter is dirty, may not be adequate in many cases, and is seldom the cause of a component failure.

4. Rust on coil frames. Except in cases where the evaporator coil is leaking refrigerant, this is not usually a cause of failure. Steel and galvanized steel eventually rusts. A claim based on rust is not normally the cause of the failure, and should not be denied.

Preliminary Report- The State of Texas vs. Service Master and American Home Shield, et al
December 31, 2009
Page 4

5. Mismatched equipment is also an AHS reason for denial.    Who is making this determination?  I as an engineer will frequently use a coil one size smaller than the condensing unit in humid climates.  This provides better dehumidification.  I will also select a furnace or fan-coil unit that matches the coil size.  This also promotes better dehumidification.  For dry climates like West Texas, there is nothing wrong with using larger evaporator coils to achieve another 1/3 to 1/2 ton of capacity.  I have seen technicians opine that these are not proper.  These technicians do not have sufficient knowledge in this area to offer that opinion.  Using mismatched equipment as a reason for denial is not proper.

6. Limitations on replacements when authorized do not seem fair.  Using Goodman HVAC equipment in-lieu of a high end product like Carrier, Trane or Lennox, when the unit that failed is a high end product it is not, in my opinion, fair to the homeowner.  Similarily, a covered plumbing fixture that failed might be a Kohler or American Standard product which is replaced with a no name builder's model; (builder's standard is used when replacement is necessary).

7. Soil movement where there are foundation movements sometimes causes pipes to break.  Pipe breakage is not covered.  Similarly, all of the causes of a pipe to leak, break or become stopped up are excluded.  For example, rust, debris, roots, freezing, and collapse of a pipe are excluded.

8. As far as plumbing is concerned, it appears that very few typical problems are covered.  There is very little coverage for plumbing.  Exclusions encompass most of the plumbing issues including "faucets and fixtures", "shower enclosures and base pans", "pressure regulators – inadequate or excessive water pressure", "septic tanks", etc.

9. Access: These contracts limit "covered" repairs to gain access to the item to $500.00 and further limits AHS to restoring surfaces only to a "rough finish".  This does not correspond to the promotional material, "We have you covered".

In conclusion, the actual contracts and the practices of AHS do not meet the promises of a warranty based on the marketing materials.  The normal homeowner does not understand the HVAC, plumbing and electrical systems, and cannot be expected to understand all the fine print of the AHS warranty, even if they read it.

Respectfully submitted,

*Rodney H. Lewis*

Rodney H. Lewis, PE
Texas PE #48701

Reference:
  AMERICAN HOME SHIELD
  OF TEXAS, INC.,
                    Plaintiff

  v.

  STATE OF TEXAS,
                    Defendant

  v.

  THE SERVICEMASTER COMPANY,
  CORPORATION & AMERICAN
  HOME SHIELD CORPORATION

## EXPERT WITNESS' ASSESSMENT PERTAINING TO
## AMERICAN HOME SHIELD OF TEXAS, INC.

The following is a preliminary report based on my retention as an expert witness for the Office of the Texas Attorney General. This report reviews the issues in the above referenced lawsuit and an offering of my preliminary assessment in the validity, methodologies and conclusions used by American Home Shield of Texas, Inc. ("AHS") in the approval process of the claims made by their customers for air conditioning repair as part of a home warranty.

The focal point of this report is based on my experience in the supervision and direct implementation of the design, installation and repair of residential cooling/heating (air conditioning) systems. In addition, my participation in reviewing, recommending and implementing revisions to the City of Houston Building Code allows me to incorporate my understanding of the intricacies in the various aspects necessary to provide homeowners with a safe, properly installed and efficiently operating air conditioning system.

I began my preliminary evaluation by interpreting the documents that are listed below:

● Authorization Manuals Bates ASH/AG0062402 Disc; hard copy Chapters 1 & 2

● New Hire Manuals – Bates ASH/AG0062401 Disc; hard copy of Chapters 1-8

● Home Warranty – Bates AHS/AG0062278 – AHS/AG0062283 hard copy

● ASH Marketing Materials – Bates AHS000001 – AHS001014 Disc

American Home Shield of Texas Preliminary Report
December 31, 2009
Page 2

• Bates 2AHS-000319 hard copy + blow up of information at bottom of the document

My review was initiated to ascertain the following points at issue:

1. What are the bases for the determination of denials for the repair of air conditioning systems?

2. Do the reasons for denials incorporate industry standards for source of failures?

3. Were there systematic denials that came about from the consumer's routine usage of their air conditioning systems?

4. Are listed exclusions inordinately vague and/or too broad?

5. Were exclusions used as a reason for denials of warranty coverage and are the exclusions generating an unwarranted number of denials?

6. Do the marketing materials clearly depict the limitations of coverage that might be invoked in the denial of a claim?

7. Is the general public capable of interpreting the limitations of coverage as stated in the marketing materials?

8. What affect do current federal regulations have in regard to
   a. Refrigerant management and use
   b. Equipment SEER (Seasonal Energy Efficiency Ratio) requirements

After reviewing American Home Shield marketing materials, residential service contracts (ie. warranties) and policies of guidance I can state the following:

1. Based on the information, the cost of claim appears to be a prevailing factor in determining if a claim will be approved for authorization for repair. The limitations of liability and exclusions are so numerous and broad that almost every conceivable air conditioning claim could be denied by AHS.

2. Numerous air conditioning repairs have undeterminable reasons for failure; it is unreasonable to use wide-ranging interpretations for causes of malfunctions. The exclusions and limitations of liability embedded in the AHS warranties do not properly take into consideration the reasons HVAC components and or their systems fail.

   Even in the case of a manufacturer's warranty claim, it has been my experience that until there are multiple failures of

American Home Shield of Texas Preliminary Report
December 31, 2009
Page 3

the same part, only then do the manufacturers begin to question the likelihood that a failure might be caused by an issue outside the normal operation of the air conditioning system.

3. Certainly the AHS warranty language allows claims to be denied based on insufficient data. The ability of the authorizer to deny claims, as set forth in the authorization manuals, appear to be unreasonable and arbitrary in that there is no standard for determining if the reason for the denial is the actual cause of failure of the component or system.

4. The reasons listed for denials are too broad and suggest a disproportionate number of failures being characterized as out of the ordinary.

5. Exclusions as listed in the authorization manual are defined so broadly that the exclusions can be applied in such an expansive manner that most warranty claims could be denied.

Many of the exclusions listed have minimal or no bearing on the failure of an air conditioning system. Using the example from the home warranty details (Form TXD103) Section C, item 11, Not Covered: - "Air conditioning system with mismatched condensing unit and evaporative coil per manufacturer's specifications."

The exclusion language listed in the above paragraph states "per manufacturer's specifications". Does this statement refer to the specifications of the manufacturer of the condensing unit or to the specifications of the manufacturer of the evaporator coil? Does this exclusion prohibit matching two different brands of said components? Does this language refer to failure issues or to efficiency issues?

Manufacturers of condensing units typically list their condensing units with their own manufactured evaporator coils (a matched system). Independent evaporator coil manufacturers have rated their coils with condensing units under the evaporator coil manufacturer's standards (a mismatched system).

My experience has found that in some cases the manufacturers of condensing units are unable to meet the goals of their marketing departments and will use independently manufactured coils to meet the criteria that can not be met with a matched system. An example of this would be meeting minimum efficiency requirements as established by the marketing department of a condensing unit manufacturer.

There are also certain situations wherein a matched system is

American Home Shield of Texas Preliminary Report
December 31, 2009
Page 4

not in the best interest of the homeowner. A case in point would be the required physical clearances for the equipment to be installed. In my 38 years of supervising and the servicing air conditioning equipment I have found that the majority of mismatched systems produce a result that the homeowner is satisfied with. In addition I have found that these mismatched systems usually do not contribute to the failure of parts or the associated equipment.

Another example of an exclusion that should be a limiting consideration for denial is code violations. Many code violations are based on safety and/or other issues and do not affect the operation of an air conditioning system. Though corrections of these code issues might be outside the warranty coverage the code violation should not necessarily be a contributing factor in denying warranty coverage.

The exclusions are so broad they could be used to arbitrarily deny any claim.

6. The marketing materials state that air conditioning systems are covered if "items are in good working condition on the effective date of your home warranty...no matter what breaks...how old it is". Most consumers are not aware of the outside influences that may contribute to the failure of an air conditioning system. There are a number of reasons for system failures. The cause for many failures is not determinable.

Even though there may be deficiencies within an air conditioning system, these deficiencies may not have contributed to the deterioration of any individual part or component of the air conditioning system. Many systems have a deficiency that might be considered to be detrimental to the operation of said system. However, many of these systems operate for a lifetime without negative incident.

For the most part air conditioning manufacturers have been able to produce equipment to withstand a large number of deficiencies in the system.

As stated in the marketing brochure: "Then when something needs service – no matter how often – you simply call one toll-free number to request service." I believe that consumers consider this statement to be like an insurance policy providing coverage when a repair is needed. AHS's exclusions as stated should be a minimal part of the rejection process.

7. Most homeowners are not aware of the numerous issues that can be associated with an air conditioning system. Most homeowners consider the air conditioning system to be an appliance. Just

American Home Shield of Texas Preliminary Report
December 31, 2009
Page 5

like refrigerators, consumers believe that minimum maintenance is required for an air conditioning system. And for the most part with minimal maintenance both refrigerators and air conditioning systems can work for years without any issues.

8. Government mandates have caused chaos in the industry. Most homeowners are not aware of the constraints placed on the air conditioning industry in regards to the replacement of any part or individual piece of equipment. The mandates to eliminate certain refrigerants and the requirement of manufacturers for the correct matching of individual refrigerant components have caused a significant misunderstanding in the mind of the public and in the public's ability to comprehend the necessity of updating individual components in their air conditioning system.

The repair or replacement of compressors and coils require refrigerant management. This management is part of the process to perform these replacements and repairs. This is a required process in these instances as is the evacuation of a refrigerant system when certain components are replaced or repaired. To exclude refrigerant management in the coverage process is paramount to not including replacement of the refrigerant.

With regard to SEER requirements, I will need to determine how AHS determines claims relating to the repair and replacement of air conditioning components.

Preliminary Conclusions

The review of the materials provided to date allow AHS to deny the vast majority of air conditioning system claims whether or not the reason for the denial is the actual reason the component or system failed or needed repair. Based on my experience of overseeing the activity of service technicians, I conclude that most service technicians are unable to recognize the actual cause of failure in the vast majority of requests for service. This conclusion is not meant to be a condemnation of HVAC service technicians. Their primary training is to determine that a component has failed and needs to be repaired or replaced.

There are a limited number of recognizable factors that an experienced technician should recognize as the cause of any failure. Some of these may have contributed to the breakdown of an air conditioning system. Determining whether or not failures occurred outside the "normal wear and tear" criteria is at best a guess that is based on the service technician's degree of experience, knowledge, and obtainable information.

I further conclude that an authorizer with limited or no field air

American Home Shield of Texas Preliminary Report
December 31, 2009
Page 6

conditioning experience can not make a reasonable decision as to the cause of failure of any part of the air conditioning system.

My examination of the materials reviewed lead me to conclude that AHS's exclusions and limitations of liability could be used subjectively and/or intentionally to deny most any air conditioning related claim.

These opinions are based on the information made available to me at this time. If additional information is made available, I reserve the right to amend and/or supplement my opinions.

Respectfully submitted,

Solomon H Eisenbaum

# EXHIBIT F

## EXPERT REPORT BY FRED HAGANS

### Initial Contact and Scope of Request

I was contacted by Patricia Tulinski with the Texas Attorney General's office to see if I would be willing to consult with the Attorney General's office and her regarding the legal implications of marketing agreements between American Home Shield ("AHS") and Texas real estate brokers. After determining that my firm had no conflicts, I agreed to consult with the Attorney General's office with respect to the subject marketing agreements.

### Materials Reviewed and Information Provided

The opinions expressed in this report are based upon (i) a sample marketing agreement between Ebby Halliday Real Estate, Inc. and AHS, (ii) additional factual information provided to me by the Attorney General's office and (iii) excerpts from a publication by The Texas Association of Realtors ("TAR") published an article in May, 2005 entitled, "The Real Estate Settlement Procedures Act: Do's and don'ts for real estate brokers and agents." I have also reviewed the following statutes or regulations:

- The Real Estate Settlement Procedures Act of 1974 (12 U.S.C. § 2601-2617) and its implementing regulations;

- Section 303.304 of the Texas Occupation Code

- Section 32.43 of the Texas Penal Code

- Various cases and other authorities addressing the above-referenced statutes; and

- Various Texas cases and other authorities addressing a real estate broker's fiduciary duties at common law

### Opinions

1. AHS's marketing agreement appears to contemplate the improper payment of a commission and thus violates Tex. Occ. Code §1303.304 because no payments are made under this marketing agreement unless a contract is sold and closed;

2. AHS's payments under the marketing agreement appear to be "kickbacks" paid in violation of the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. § 2601-2617) ("RESPA")

3. The amounts of AHS's improper "commissions" or "kickbacks" are not included in the total compensation paid to the broker reported in the HUD-1 Statements and lead to false HUD-1 Statements;

1

4.  A real estate broker's acceptance of the improper "commissions" or "kickbacks" is a violation of the real estate broker's common laws fiduciary duty owed to his or her clients; and

5.  The conduct encompassed in AHS's marketing agreement appears to be felonious conduct and violative of Section 32.43 of the Texas Penal Code for both the one offering the kickbacks to the fiduciary (AHS) and the one accepting the kickbacks (brokers).

## BASES FOR OPINIONS

AHS is a home warranty company that has a dominant position in the home warranty market in Texas. In Texas, home warranties contracts are not regulated as insurance contracts or policies. Home warranty companies are regulated by the Texas Real Estate Commission ("TREC"). AHS markets and sells its product, in part, through Texas real estate brokers.

I have been provided with and have reviewed a sample marketing agreement between AHS and Ebby Halliday Real Estate, Inc. Such agreement provides that (i) the real estate broker will promote and sell AHS's home warranty to the broker's clients (consumers with a home warranty as part of the purchase or sale of residential real estate) and (ii) AHS will pay the broker a flat fee of $90 per home warranty sold, with an additional $40 per contract, yearly upon each successive renewal of the warranty. The fee is "earned" only upon the sale of an AHS warranty ("fully paid, non-canceled closed transaction").

### TREC

The Texas Real Estate Commission ("TREC") regulates Texas real estate brokers and home warranty companies (referred to as "residential service companies"). Section 1303.304 of the Texas Occupation Code provides, in relevant part, as follows:

### CERTAIN PAYMENTS BY RESIDENTIAL SERVICE COMPANY PROHIBITED

(a)  A residential service company **may not directly or indirectly pay,** as an inducement or compensation for the issuance, purchase, or acquisition of a residential service contract, a **commission** or other consideration to an **agent,** representative, attorney, or employee of an owner or prospective owner of a residential property for which a residential service contract has been or will be issued.

(b)  Notwithstanding Subsection (a), a residential service company may pay a reasonable amount for the sale, advertising, inspection, or processing of a residential service contract.

In my opinion, the AHS marketing agreement appears to contemplate a commission in violation of this statute since no amount is paid unless a contract is sold and closed.

2

149957-1

## RESPA

The Real Estate Settlement Procedures Act of 1974 (12 U.S.C. § 2601-2617) ("RESPA") and its accompanying Regulation X were enacted to ensure that consumers of residential real estate were provided with information sufficient to allow them to understand the nature and costs of the settlement process and to protect consumers from abusive practices that artificially inflate settlement costs. See 12 U.S.C. §2601(a). Through RESPA, Congress intended that the consumer be given sufficient information at an early enough time to permit shopping in the marketplace for the best settlement services and costs. Specifically, RESPA provides more effective advance disclosure of settlement costs to home buyers and sellers and kickbacks or referral fees are eliminated form the settlement process. See 12 U.S.C. §2601(b)(1), (2).

RESPA applies to real estate agents and real estate brokers, as well as home warranty service providers. See 24 C.F.R. §3500.2 (Regulation X). Because it is a "settlement service," RESPA also applies to the provision of a home warranty during a real estate transaction. Id.

RESPA prohibits the following conduct:

No referral fees. No person shall give and no person shall accept any fee, kickback or other thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or part of a settlement service involving a federally related mortgage loan shall be referred to any person. Any referral of a settlement service is not a compensable service, except as set forth in Sec. 3500.14(g). A company may not pay any other company or the employees of any other company for the referral of a settlement service business.

C.F.R. §3500.14(b).

The exception to this prohibition involves services that are "actual, necessary and distinct" from the primary services that the person provides. See C.F.R. §3500.14(g). Since, any compensation paid to the broker must be in exchange for actual, necessary, and distinct services provided in connection with the sale of a home warranty, nominal services are not compensable. See C.F.R. §3500.14(f). Regulation X specifically states: "[a] charge by a person for which no or nominal services are performed . . . is an unearned fee and violates this section." 24 C.F.R. §3500.14(c). At best, nominal services are provided by a broker in connection with a consumer's purchase of a home warranty. Further, any arguably "more-than-nominal" services are not distinct from the primary services that brokers provide, particularly given the fact that many brokers view home warranties as a means to increase the probability of a home sale, for which they are already compensated, as well as protection for the broker in the event that a new home buyer is unhappy with a malfunctioning home system (allowing the broker to "pass the buck" to AHS when a home buyer is unhappy). In short, any "more-than-nominal" services are part and parcel of the services for which brokers are already compensated.

With regard to the renewal payments, it is my opinion that no "actual, necessary, and distinct" services are being performed.

Further, a "referral" under RESPA includes any action that has the effect of affirmatively influencing the selection of a home warranty company by the consumer. Something as simple as a brochure on the broker's desk would appear to constitute a "referral" under RESPA, if the broker was paid to have the brochure available to the consumer. See 24 C.F.R. §3500.14(f). In the context of a brochure, to avoid an "exclusive" arrangement, the brokers would theoretically have to offer all brochures from other home warranty companies equally to the consumer.

An exclusive relationship or a commission-based compensation system violates RESPA (12 U.S.C. §2601). Further, any payments between a home warranty company and a broker are likewise prohibited by RESPA because any services for which payment was made would constitute nothing more than nominal services.

This conclusion is bolstered by two occurrences. First, a nationwide class-action suit was filed in Alabama, claiming that AHS's payment of commissions to the brokers violates RESPA, seeking return of the kickbacks, penalties under RESPA, and attorney fees. Second, in August 2007, the "Risk Mitigation Group" in Arlington, Texas, wrote an opinion letter to HUD's General Counsel for the Southwest Region identifying the identical kickback situation here, concluding that the conduct violates RESPA. Subsequently, in February 2008, HUD agreed with the RM Group conclusion.

Further, The Texas Association of Realtors ("TAR") published an article in May, 2005 entitled, "The Real Estate Settlement Procedures Act: Dos and don'ts for real estate brokers and agents." Under the section"[p]ayments in return for goods provided or services performed," TAR stated:

> Also, the payments should not be "transactionally based." A payment for services rendered is transactionally based if the amount of the payment is determined by whether the real estate broker/agent's services resulted in a successful transaction. Payments may not be tied to the success of the real estate broker/agent's efforts, but must be a flat fee that represents fair market value.

http://texasrealtors.com/web/7/54/magazine/issues/05/0505/columns/legal

Incidentally, there is no "disclosure" around a RESPA violation, so it would not be possible for AHS or the brokers to disclose the payment of kickbacks to consumers to avoid liability, although at this time I am not aware of any evidence of disclosures being made to consumers. Further, any express self-serving statements made in an agreement do not control RESPA liability, if the fiction is only intended as a means to facilitate payments for the referral of business B it is the reality of the situation that controls, not the label attached to it.

Finally, and perhaps most importantly, AHS in 2006 started including an indemnity agreement in the marketing agreements that it "agrees to indemnify [broker] ... for" any violations of RESPA.

4

## HUD-1 Statement

The HUD-1 Statement is also known as the "settlement sheet" and must be given to the borrower at or before closing. It itemizes all closing costs -- all charges imposed upon the borrower and the seller by the lender and all sales commissions, whether to be paid at settlement or outside of settlement.

The HUD-1 includes an itemization of the sales commissions, one of which is typically a percentage of the selling price of the home, shown as an exact dollar amount of compensation paid to the real estate broker. Since the amount of the kickback or commission is not included in the total compensation paid to the broker, that amount is falsely reflected on the HUD-1. Further, by not including any disclosure of the kickback or commission payment to the broker, the HUD-1 does not itemize all closing costs and sales commissions whether paid at settlement or outside of settlement. Further, it is reasonable for the consumer to conclude that no kickback or commission was paid, when the sales commission as a percentage of the sales price does not include the kickback.

## Texas Common Law (Fiduciary Duty)

As a matter of law, a fiduciary relationship exists between a real estate agent/broker and client. *Anderson v. Griffith*, 501 S.W.2d 695, 699 (Tex. Civ. App. --Fort Worth 1973, writ ref'd n.r.e.). The fiduciary duty of real estate brokers arises by virtue of the common law interpretation of the relationship as one of principle and agent and by virtue of certain statutorily mandated duties that have been historically considered to be fiduciary in nature. *Chien v. Chein*, 759 S.W.2d 484 (Tex. App.--Austin 1988, no writ) (referring to the fiduciary duties imposed on real estate brokers by statute, Real Estate License Act, Tex. Rev. Civ. Stat. Ann. Art. 6573a § 15)

The fiduciary's duties include the duty of loyalty and utmost good faith (*Kinzback Tool Co. v. Corbettt-Wallace Corp.*, 160 S.W.2d 509, 512 (Tex. 1942)); the duty of candor (*Hawthorne v. Guenther*, 917 S.W.2d 924, 935 (Tex.App.--Beaumont 1996, writ denied)); the duty of full disclosure (*Chien v. Chein*, 759 S.W.2d 484 (Tex.App.--Austin 1988, no writ)); and to refrain from self-dealing (*Dearing, Inc. v. Spiller*, 824 S.W.2d 728, 733 (Tex.App.--Austin 1988, no writ)).

The duty of loyalty is the hallmark of a fiduciary relationship, and it requires sublimation of the most human of instincts, that of self-interest. *Slay v. Burnett Trust*, 187 S.W.2d 377 (Tex. 1945). This duty prohibits the fiduciary from using the advantage of his position to gain any benefit for himself at the expense of the beneficiary and prohibits him from even placing himself in any position in which his self-interest will or may conflict with his obligations as a fiduciary. Brokers or other fiduciaries violate the duty of loyalty if they receive or negotiate a secret commission or profit. *Kinzbach*, 160 S.W.2d at 514.

A fiduciary has much more than the traditional obligation not to make any material misrepresentations; the fiduciary has an affirmative duty to make a full and accurate confession of all his fiduciary activities, transaction, profits, and mistakes -- even when, and especially if, it hurts. *Montgomery v. Kennedy*, 669 S.W.2d 309, 312-13 (Tex. 1984). Proof of "full disclosure" is a subjective test requiring that the beneficiary have actual knowledge of all facts; proof of constructive

knowledge or a showing that the beneficiary was aware of the facts is not sufficient. *Gayneir v. Ginsberg*, 715 S.W.2d 749, 755 (Tex.App.--Dallas 1986, writ ref'd n.r.e.). The breach of the duty of full disclosure by a fiduciary is tantamount to fraudulent concealment. *Willis v. Maverick*, 760 S.W.2d 642, 642 (Tex. 1988).

A fiduciary must obtain actual consent of the principal to act on behalf of another party or to accept a commission from another party. *Daniel v. Falcon Interest Realty Corp.*, 190 S.W.3d 177, 185 (Tex.App.--Houston [1st Dist.] 2005, no pet.). Disclosure alone is not sufficient to avoid liability for breach of fiduciary duty. *Gayneir*, 715 S.W.2d at 757.

Any self-dealing by a fiduciary, such as making a side-profit or fee as a direct or indirect result of the fiduciary relationship, will give rise to a "presumption of unfairness." *Texas Bank and Trust Co. v. Moore*, 595 S.W.2d 502, 508-09 (Tex. 1980); *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 115, 122 (Tex.App.--Tyler 2000, pet. denied).

Texas courts recognize a cause of action for aiding and abetting a breach of fiduciary duty. *Mabrey v. SandStream, Inc.*, 124 S.W.3d 302, 316-17 (Tex.App.--Fort Worth 2003, no pet.); *Toles v. Toles*, 113 S.W.3d 899, 912 (Tex.App.--Dallas 2003, no pet.); *Elcor Chem Corp. v. Agro-Sul, Inc.*, 494 S.W.2d 204, 208-09 (Tex.Civ.App.--Dallas 1973, writ ref'd n.r.e.). There is also a cause of action available for civil conspiracy, as well as joint liability, when a fiduciary is involved with a non-fiduciary, and the non-fiduciary acts in furtherance of the conspiracy. *Paschal v. Great Western Drilling, Ltd.*, 215 S.W.3d 437, 444 (Tex.App.--Eastland 2006, pet. denied).

The canon of professional ethics adopted by TREC states that a real estate broker or salesperson, while acting as an agent for another, is a fiduciary. Special obligations are imposed when such fiduciary relationships are created. 22 Texas Administrative Code § 531.1. The rule states that the real estate agent must be "faithful and observant" of the client's trust and be "scrupulous and meticulous" in carrying out duties. Id. at § 531.1(2). The rule summarizes the duties of all fiduciaries and states that the real estate agent must place no personal interest above that of the client. Id. at 531.1(3). Finally, one of a real estate broker's duties as a fiduciary is to convey to the principal all information that the broker has knowledge of that may affect the principal's decision. Id. at 535.2(b).

Setting aside all other legal implications or theories, under a purely common law fiduciary duty analysis, the real estate brokers cannot accept a "commission" from AHS, because the brokers must satisfy their duty of loyalty and make full disclosure. This is an affirmative duty to make a full and accurate confession of all activities, transactions, and profits. If challenged, the fiduciary must prove that the client had actual subjective knowledge of all facts (activities, transactions, profits, and the like), not that the facts were simply disclosed.

Given the AHS marketing agreement, the fiduciary broker would have to disclose, at the very minimum the terms of the marketing agreement including the following: (1) I will get paid $XX by AHS as a commission on the sale of your AHS contract; (2) I am not telling you about the many other home warranty products that could be in your best interest to purchase because AHS is paying me not to tell you about them; (3) if I convince you to purchase AHS's contract, I will also get paid

6

$XX each year that you renew the contract; (4) I am being paid to tell you that AHS's product is better than the other competing products available to you, whether I believe it or not.

Not only would these types of explicit disclosures have to be made, but the fiduciary would have to prove that the consumer had actual knowledge of every factBnot that disclosure was madeBbut that the consumer had actual subjective knowledge and actually understood all the facts, relationships, and implications, yet still decided to go ahead with the purchase.

Of course, this scenario is limited to the breach of fiduciary duty, as RESPA and the other statutes do not recognize even the possibility of an adequate disclosure.

### Texas Commercial Bribery Statute

The Texas Commercial Bribery Statute provides:

a.    For purposes of this section:

(1)    "Beneficiary" means a person for whom a fiduciary is acting.

(2)    " Fiduciary" means:

    (A)    an agent or employee;

    (B)    a trustee, guardian, custodian, administrator, executor, conservator, receiver, or similar fiduciary;

    (C)    a lawyer, physician, accountant, appraiser, or other professional advisor; or

    (D)    an officer, director, partner, manager, or other participant in the direction of the affairs of a corporation or association.

(b)    A person who is a fiduciary commits an offense if, without the consent of his beneficiary, he intentionally or knowingly solicits, accepts, or agrees to accept any benefit from another person on agreement or understanding that the benefit will influence the conduct of the fiduciary in relation to the affairs of his beneficiary.

(c)    A person commits an offense if he offers, confers, or agrees to confer any benefit the acceptance of which is an offense under Subsection (b).

(d)    An offense under this section is a state jail felony.

7

(e)    In lieu of a fine that is authorized by Subsection (d), and in addition to the imprisonment that is authorized by that subsection, if the court finds that an individual who is a fiduciary gained a benefit through the commission of an offense under Subsection (b), the court may sentence the individual to pay a fine in an amount fixed by the court, not to exceed double the value of the benefit gained. This subsection does not affect the application of Section 12.51(c) to an offense under this section committed by a corporation or association.

Tex. Penal Code § 32.43.

In short, this statute appears to render the conduct encompassed in AHS's marketing agreement a felony, for both the one offering the kickbacks to the fiduciary (AHS) and the one accepting the kickbacks (brokers). Under this statute, there need only be a benefit offered to a fiduciary to induce or in any way alter the course of conduct of a fiduciary to a beneficiary. See *Jackson v. Radcliffe*, 795 F.Supp 197, 206 (S.D. Tex. 1992).

The fact that AHS attempts to indemnify the brokers from RESPA liability in the marketing agreements evidences its actual knowledge that the agreement may constitute an illegal kickback arrangement. It is fairly reasonable to conclude that AHS knows that the broker has a fiduciary relationship with the consumer and that AHS is asking the broker to violate that duty in exchange for a fee. In fact, when the Texas Attorney General explicitly described the marketing agreements as a violation of the broker's fiduciary duty to the consumer, AHS continued the marketing arrangements with the brokers nonetheless.

### Background and Qualifications

Attached hereto is a true and correct copy of my curriculum vitae.

### Reservation of Rights

The opinions set forth herein are preliminary and are based upon limited information. I reserve the right to amend, supplement or withdraw any opinion expressed herein if subsequent investigation, information or research changes any of my opinions set forth herein.

Very truly yours,

HAGANS BURDINE MONTGOMERY & RUSTAY, P.C.

Fred Hagans

Fred Hagans

FH/lc
Attachments

8

# EXHIBIT G

**T H E   R I G H T   C H O I C E   I N   H O M E   W A R R A N T I E S**

American Home Shield
1524 Hwy. 30 East
Carroll, IA 51401-0727

*[handwritten:] YL# 40596*
*Raj Acct # 04000*
*$90/40*

## MARKETING AGREEMENT

This Agreement is made and effective this ___/___ day of November, 2006, by and between AMERICAN HOME SHIELD CORPORATION, a Delaware corporation, having its principal place of business at 889 Ridge Lake Boulevard, Memphis, TN 38120 ("AHS"), and Ebby Halliday Real Estate, Inc., having its principal place of business at 4455 Sigma Road, Dallas, TX 75244 ("Halliday")

### RECITALS

A.  AHS is, among other things, engaged in the business of issuing contracts which provide for the repair or replacement of residential home heating, cooling, plumbing, electrical and water heating systems and appliances pursuant to applications submitted by or on behalf of buyers and/or sellers of residential properties ("Applications") and providing services pursuant thereto.  Such Contracts are referred to hereinafter as "the Contracts" and shall include those issued by AHS and its subsidiaries.

B.  Halliday is, among other things, engaged in the business of operating a real estate brokerage office.

C.  Inasmuch as AHS deems it far more efficient to market, promote and process the Contracts at the point of sale utilizing knowledgeable Halliday agents than for AHS to hire and train its own sales force, AHS desires to market the Contracts through Halliday utilizing Halliday's services.

D.  AHS desires Halliday to market the Contracts to its customers.

### AGREEMENT

In consideration of the premises and mutual covenants herein contained, the parties hereto agree as follows:

1.  **Appointment as Marketing Agent**.  AHS hereby appoints Halliday as its marketing agent for the Contracts in the City of Dallas, Texas and surrounding areas, and Halliday agrees to promote AHS's contracts.  AHS will have access to Halliday's agents, training/sales meetings, and AHS's home warranty materials shall be displayed in Halliday's offices.

2.  **Services to be Performed by Halliday**.  Halliday agrees to promote the Contracts to its customers as sellers or prospective purchasers of residential real estate, as set forth in Exhibit A of this Agreement, and exercise reasonable efforts to include an AHS home warranty contract application in each home buyer and seller packet ("Services") in furtherance of the marketing, promotion, processing and advertising of the Contracts.  Halliday agrees to provide and recommend such Services as are of a promotional and advertising nature whether or not they result in the issuance by AHS of Contracts, in recognition of the fact that the real estate consumer may elect not to purchase such protection as is afforded under the Contracts or may elect to acquire such protection offered by a competitor to AHS.

In addition, Halliday agrees to provide the following services for AHS:

  i.   offer AHS warranty plans to its buyers and sellers.

  ii.  permit AHS Account Executives to conduct warranty training at Halliday Office Assistants and Managers Meeting.

L-AHS-003090
Confidential
Discovery Material



AMERICAN
HOME SHIELD®
The **right choice** in home warranties."

A *ServiceMaster.*
COMPANY

**T H E   R I G H T   C H O I C E   I N   H O M E   W A R R A N T I E S**

American Home Shield
1524 Hwy. 30 East
Carroll, IA 51401-0727

iii.  exercise reasonable effort to include AHS contract information in all Halliday relocation kits at no cost to AHS, provided that AHS supplies all necessary marketing materials at its sole cost;

iv.  when provided by AHS Account Executive, managers are to share service cards at sales meetings.

v.  when provided by AHS Account Executives, managers are to share a faxed tip on home warranty in sales meetings and company newsletters.

vi.  Include in company's form of listing agreement an election by the owner to accept or waive an offer of a home warranty.

vii.  Communicate verbally to AHS a closed transaction percentage based on AHS's monthly communicated production figures.

viii.  Halliday and its managers who are made privy to the terms of this Agreement shall maintain confidentiality.

ix.  allow AHS Account Executive to attend at least two sales meetings per year per office.

x.  allow AHS Senior Management, District Sales Manager and/or Account Executive to participate in Halliday management meetings from time to time.

xi.  will provide (upon request) AHS a written testimonial endorsement of AHS by Halliday company.

xii.  work in conjunction with AHS Account Executive to promote AHS optional coverages to Halliday brokers, agents and customers.

xiii.  when available, allow Halliday sales associates to assist AHS in AHS contract market research.

xiv.  Encourage the practice of having Halliday office managers present AHS warranty repair cards and service fee checks/credit to their agents at Halliday meetings at each office location to reinforce the value of AHS home warranties.

L-AHS-003091
Confidential
Discovery Material

2





**T H E   R I G H T   C H O I C E   I N   H O M E   W A R R A N T I E S**

American Home Shield
1524 Hwy. 30 East
Carroll, IA 51401-0727

3. <u>Services to be Performed by AHS.</u>

   A. Provide Halliday service cost reports on revolving 12 month basis for managers to use at sales meetings to reinforce value of the AHS home warranty;

   B. Assist Halliday in tracking agent usage of Contracts on monthly basis via monthly sales reports provided by AHS;

   C. AHS will professionally work with Halliday and its staff to train and develop their skills to utilize the online ordering capabilities offered by AHS;

   D. AHS Account Executives will be available to teach new agent training classes on home warranties when appropriate.

4. <u>Service Fee to Halliday.</u> AHS agrees to pay to Halliday, subject to the terms and conditions of this Agreement, after the effective date of this Agreement and only while this Agreement is in effect and prior to its termination, a Service Fee (hereinafter "Service Fee") for services provided in Section 2 above. AHS shall pay Halliday a $90.00 Service Fee for each first-year, fully paid, non-canceled closed transaction.

The Service Fee is intended to provide Halliday consideration for the Services outlined in Section 2 and Exhibit A hereof, including describing the program to customers, and assisting in the presentation and transmission of the application information as well as for marketing, promoting and advertising the Contracts to the Halliday Brokerage Offices and the general public and represents a reasonable, good faith estimate of the value for Services rendered by Halliday in connection with the activities described in Section 2 and Exhibit A hereof,

AHS shall only pay Halliday the Service Fee mentioned above if Halliday is the first entity to procure and submit the Contract/Application with Halliday's Federal ID Number, or the number pre-approved by AHS on the Contract/Application. AHS shall only make one payment per contract/Application, and in no event shall Halliday be entitled to reimbursement if it is not the first entity to procure and submit the Contract/application with the required number to AHS.  The Service Fee is intended to provide Halliday consideration for its endorsement of AHS, the services outlined in Section 2 and Exhibit A hereof, including describing the program to customers, and assisting in the establishment and completion of the Contracts, as well as for marketing, promoting and advertising the Contracts to Halliday brokerage offices and the general public and represents a reasonable, good faith estimate of the value for services rendered by Halliday in connection with the activities described in Section 2 and Exhibit A hereof.

5. <u>Reservation of Rights.</u> AHS reserves the right, in its sole discretion, without liability to Halliday to disapprove or reject any Applications for Contracts submitted to it, or to alter or withdraw Contracts and to introduce new Contracts.

6. <u>AHS's Right to Withdraw.</u> AHS shall have the right to limit the area of solicitation of the Contracts by Halliday to Zip Codes where AHS conducts its home service contract business.

7. <u>Non-Competition.</u> Halliday agrees that during the term hereof and for a period of one (1) year subsequent to termination of this Agreement for any reason, it will not engage directly in the home warranty contract business in Texas; provided, however, that nothing in this Agreement shall prohibit Halliday from serving as a marketing agent for any AHS competitor after the termination of this Agreement.

8. <u>Marketing Materials.</u> AHS shall bear the cost of printing and distribution of marketing materials, including (but not limited to) Contracts, Applications, brochures and yard signs. No advertisements or written materials relating to the Contracts shall be developed, printed, distributed or utilized pursuant to this Agreement without

L–AHS-003092
Confidential
Discovery Material

3





THE RIGHT CHOICE IN HOME WARRANTIES

American Home Shield
1524 Hwy. 30 East
Carroll, IA 51401-0727

the prior written agreement and approval of AHS.  AHS acknowledges that it has no right to use any of the Halliday trademarks and commercial symbols as a consequence of this Agreement.

9.  Indemnification of Halliday.  AHS will indemnify and hold Halliday harmless against any actions, losses, claims, liabilities, damages or expenses (including reasonable attorneys' fees and expenses) incurred by Halliday in connection with AHS's acts or omissions to perform any obligation under this Agreement or any of the Contracts, except to the extent Halliday has, intentionally or through gross negligence, caused, contributed to or compounded such acts or omissions to act.  As long as Halliday has provided services as designated in this Agreement and a RESPA claim arises regarding Halliday's receipt of a service fee pursuant to this Agreement, AHS agrees to indemnify Halliday for any such RESPA claim including reasonable attorneys' fees and expenses.

Halliday will indemnify and hold AHS harmless against any actions, losses, claims, liabilities, damages or expenses (including reasonable attorneys' fees and expenses) incurred by AHS in connection with Halliday's acts or omissions to perform any obligation under this Agreement or any of the Contracts, except to the extent AHS has, intentionally or through gross negligence, caused, contributed to or compounded such acts or omissions to act.

10.  Parameters of AHS/Halliday Relationship.  Neither party is authorized to and agrees not to do any of the following:  (i) hold itself out as a partner, joint venturer, licensee or associate of the other party; (ii) hold itself out as an agent of the other party in any other manner, or for any other purpose than is specifically prescribed in this Agreement; (iii) issue or circulate any advertising materials, circular or pamphlet or make any oral or written statement relating to the other party or its products and services unless previously authorized and approved in writing by the other party; (iv) bind, obligate or subject the other party to any liability unless specifically authorized in writing by such party.

11.  Conduct of Business.  Halliday and AHS, each for itself and its agents, representatives and employees, agree to conduct any and all sales activities or other services to be performed under this Agreement in strict compliance with all applicable laws, rules and regulations of all governmental authorities consistent with the highest standard of fair trade, fair compensation and business ethics.  Halliday and all agents, representatives and employees shall comply with all such standards for advertising, promotional and training material to be used or distributed to customers as AHS may establish and as may be set forth in written directives distributed to Halliday from time to time.

Halliday shall obtain and continue to maintain and keep in full force and effect all real estate licenses and all corporation authorizations as may be required to be maintained in all jurisdictions in which Halliday and its officers, employees or agents conduct business under this Agreement.

12.  No Authority to Alter Marketing Materials.  Halliday shall have no authority to make, alter, modify, waive or change any of the terms, rates or conditions of the Contracts, Applications, advertisements or promotional materials pursuant to this Agreement in any respect without the prior written consent of AHS.

13.  Term of Agreement.  This Agreement shall remain in full force and effect for one year beginning the effective date of this Agreement and thereafter, the term of this Agreement shall be automatically renewed for successive one-year periods unless otherwise terminated pursuant to this Agreement.

14.  Termination.  Notwithstanding the provisions contained in Section 13, either party shall have the right to terminate this Agreement at any time and for any reason by giving written notice to the non-terminating party at least thirty (30) days prior to any such termination date or immediately, upon any breach of the Agreement by the non-terminating party.

L-AHS-003093
Confidential
Discovery Material

4


AMERICAN
HOME SHIELD®
The right choice in home warranties.™


ServiceMASTER.
COMPANY

**THE RIGHT CHOICE IN HOME WARRANTIES**

American Home Shield
1524 Hwy. 30 East
Carroll, IA 51401-0727

15. <u>No Partnership Created</u>. Neither this Agreement nor the relationship between the parties hereto constitutes a partnership or joint venture. Neither AHS nor Halliday shall make, alter, modify or discharge any Contract on behalf of the other.

16. <u>Consent to Use of Trademarks</u>. Except as otherwise provided in this Agreement, neither party shall use the trademarks, service marks, trade names, logotypes or other commercial symbols of the other party in any of its promotional materials or otherwise without the express written consent of the other party.

17. <u>No Waiver of Rights</u>. The forbearance or neglect of either party to insist upon strict compliance by the other party with any of the provisions of this Agreement whether continuing or not, shall not be construed as a waiver of any of the first party's rights or privileges hereunder. No waiver of any right or privilege of either party arising from any default or failure of performance by the other party shall affect the first party's rights or privileges in the event of a further default or failure of performance.

18. <u>Disclosure</u>. Halliday is hereby advised by AHS to disclose to purchasers of the AHS home warranty plan that Halliday is rendering services for AHS in promoting, selling, processing and advertising the AHS home warranty plan and is receiving payment of a service fee or other compensation for services rendered from AHS in accordance with applicable state and federal law (see Exhibit C, attached hereto).

19. <u>Confidential Information</u>.

   a) In connection with this Agreement, AHS may furnish Halliday with information that is non-public, confidential or proprietary in nature ("Confidential Information"). Confidential Information proprietary to AHS includes (and Halliday so acknowledges) information marked "Confidential" or "Trade Secret", and can include (but not be limited to) the following: information relating to contracts, products, methods, processes, improvements, designs and methods of administration and distribution of AHS which are not in the public domain; business plans, marketing plans, financial data, computer programs, systems formats and screen designs relating to AHS business; all manuals, materials, and information of AHS marked "Confidential" or "Trade Secret"; AHS's methods and formulas for calculating costs; information relating to AHS's contractors, clients, and customers (actual and potential); any and all AHS-generated reports, including (but not limited to) those relating to sales, marketing, finances, accounts and personnel; and the business and marketing strategies of AHS. Halliday shall maintain in confidence and not use for itself or others, in any form or manner, and not disclose, in whole or in part, to any party any Confidential Information received from AHS, except to its officers, directors, employees and agents, except as required by this Agreement or as may be required by law.

   b) In connection with this Agreement Halliday may, but is not obligated to, furnish AHS with Confidential Information. Confidential Information proprietary to Halliday includes (and AHS so acknowledges) information relating to marketing, sales and financial data; any and all Halliday-generated reports, including (but not limited to) those related to advertising, sales, marketing and financing; and business plans and strategies of Halliday. AHS shall maintain in confidence and not use for itself or others, in any form or manner, and not disclose, in whole or in part, to any party any Confidential Information received from Halliday, except to its officers, directors, employees and agents, and those of its subsidiaries, in connection with this Agreement, except as required by this Agreement or as may be required by law. AHS further agrees that it will not sell or cross-sell, or cause to be sold or cross-sold, any customer/client list(s) which AHS obtains from Halliday during the term of this Agreement.

   As used herein, Confidential Information does not include information: (i) that was publicly known, or otherwise known to the party disclosed, at the time of disclosure, (ii) that subsequently becomes publicly

L-AHS-003094
Confidential
Discovery Material

5



AMERICAN HOME SHIELD®
The right choice in home warranties.™



A **ServiceMASTER.** COMPANY

**THE RIGHT CHOICE IN HOME WARRANTIES**

American Home Shield
1524 Hwy. 30 East
Carroll, IA 51401-0727

known through no act or omission of the party disclosed, or (iii) that becomes known to one party other than through disclosure by the other party.

The provisions of this section shall be binding upon each of the parties and their respective parents and subsidiaries and shall apply during the term of this Agreement and for a period of two (2) years after the termination of this Agreement for any reason.

20. <u>Number and Gender</u>. Whenever required for proper interpretation of this Agreement, the singular number shall include the plural, the plural the singular, and the use of any gender shall include all genders.

21. <u>Settlement of Disputes</u>. Any controversy or claim arising out of or relating to the Agreement shall be settled by binding Arbitration conducted in Dallas, Texas before and in accordance with the commercial rules of arbitration of the American Arbitration Association, and judgment upon any award rendered in such arbitration shall be entered in any court having jurisdiction thereof. If one party fails to appear at any properly noticed arbitration proceeding, the arbitrator's award to the other party shall be enforceable despite such failure to appear. Nothing herein shall preclude or limit AHS from bringing any action in any court of competent jurisdiction for such injunctive or other provisional relief as AHS deems necessary to compel Halliday to comply with its obligations hereunder or to protect AHS's trademarks, or preclude or limit Halliday from bringing any action in any court of competent jurisdiction for such injunctive or other provisional relief as Halliday deems necessary to compel AHS to comply with its obligations hereunder or to protect Halliday's trademarks and other commercial symbols.

22. <u>Severability</u>. The invalidity or unenforceability of any provision of this Agreement as applied to a particular occurrence or circumstance or otherwise shall not affect the validity or enforceability or applicability of any other provision of this Agreement.

23. <u>Section Headings</u>. The headings of sections in this Agreement are included for convenience only and are not to be taken into consideration in construction or interpretation of this Agreement or any of its provisions.

24. <u>Entire Agreement; Amendments in Writing</u>. This Agreement, including Exhibits A, B and C constitutes the entire agreement between the parties concerning the subject matter hereof, and there are no representations, warranties, covenants or obligations with respect to same except as set forth herein. This Agreement may be amended only in writing executed by authorized officers of the parties.

25. <u>Assignment</u>. This Agreement shall not be assigned, in whole or in part, by either party without the prior written consent of the other party.

26. <u>Notices</u>. Any notice or other written communication required or permitted to be given shall be deemed given three (3) days after deposit in the United States Mail, postage prepaid, properly addressed to the party to receive the notice at the party's address set forth above, or as each party may advise the other in writing.

27. <u>Press Releases.</u> Halliday agrees that it will not publish, distribute, or otherwise disseminate any press release or other publication regarding AHS or The ServiceMaster Company or any of its affiliated companies including (but not limited to) their name, their products and service, or this Agreement, without the express written permission of AHS or ServiceMaster.

AHS agrees that it will not publish, distribute, or otherwise disseminate any press release or other publication regarding Halliday or any of its affiliated companies including (but not limited to) their name, their products and service, or this Agreement, without the express written permission of Halliday.

L-AHS-003095
Confidential
Discovery Material

6


AMERICAN
HOME SHIELD®
The right choice in home warranties.℠


A *ServiceMaster.*
COMPANY

**T H E   R I G H T   C H O I C E   I N   H O M E   W A R R A N T I E S**

American Home Shield
1524 Hwy. 30 East
Carroll, IA 51401-0727

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

AMERICAN HOME SHIELD CORPORATION

By: _____
David J. Crawford, President

Ebby Halliday Real Estate, Inc.

By: _____
Mary Frances Burleson, President

L-AHS-003096
Confidential
Discovery Material


The right choice in home warranties.™

A ServiceMASTER COMPANY

**THE RIGHT CHOICE IN HOME WARRANTIES**

American Home Shield
1524 Hwy. 30 East
Carroll, IA 51401-0727.

### *EXHIBIT A*

1. Promote the AHS Contracts and program in local prospecting and marketing materials, including displays, "Listing Presentation Packets", "Buyer Packets" and classified advertising at Halliday's discretion.

2. Present the program to potential customers by describing features, marketing the benefits and limitations of the program, including coverage and pricing options and refer customer to American Home Shield for questions regarding coverage.

3. Upon seller or buyer requesting coverage, a licensed property inspector should visually inspect the "covered systems and appliances" on the property to help determine whether items are in good working order and to help identify pre-existing conditions which may affect coverage and inform AHS, seller and buyer as necessary.

4. Whenever possible complete the AHS Application, including seller and property information and coverage options selected, and transmit the Application to AHS for processing, approval and Contract issuance.

5. Display AHS sign rider on property whenever possible.

6. When a purchase offer is accepted, provide AHS payment instructions to settlement provider.

7. Assist in resolving disputes between AHS and the seller when and if they occur during the initial coverage period (usually 90 days) and during the initial coverage period for the buyer (usually 1 year).

8. Display AHS marketing materials in all the Halliday Offices.  Competitor materials may not be prominently displayed but may be available if requested by a seller or buyer.

9. Include AHS marketing materials in all Halliday Offices' listing packets and buyer packets.

10. Establish home warranty usage goals by office and conduct regular status meetings between Halliday managers and AHS representatives to review results.

11. Insert line item for AHS Contract on both seller net sheets and buyer cost sheets.

L-AHS-003097
Confidential
Discovery Material

8





**THE RIGHT CHOICE IN HOME WARRANTIES**

American Home Shield
1524 Hwy. 30 East
Carroll, IA 51401-0727

## RENEWAL AGREEMENT

This Agreement is made and effective this _1_ day of November, 2006, by and between AMERICAN HOME SHIELD CORPORATION, a Delaware corporation, having its principal place of business at 889 Ridge Lake Boulevard, Memphis, TN 38120 ("AHS") and EBBY HALLIDAY REAL ESTATE, INC., having its principal place of business at 4455 Sigma Road, Dallas, TX 75244 ("Halliday").

### RECITALS

1. AHS is, among other things, engaged in the business of issuing contracts which provide for the repair or replacement of residential home heating, cooling, plumbing, electrical and water heating systems and appliances pursuant to applications submitted by or on behalf of buyers and/or sellers of residential properties ("Applications") and providing services pursuant thereto. Such Contracts are referred to hereinafter as "the Contracts" and shall include those issued by AHS and its subsidiaries. "Renewal contracts" as referred to herein will refer to any renewal contract from a first year home warranty contract purchased by a HALLIDAY home buyer or seller customer.

2. HALLIDAY is, among other things, engaged in the business of operating a real estate brokerage.

3. AHS desires HALLIDAY to assist in marketing renewal contracts to HALLIDAY customers.

### AGREEMENT

In consideration of the premises and mutual covenants herein contained, the parties hereto agree as follows:

1. **Appointment as Marketing Agent**. AHS hereby appoints HALLIDAY as its marketing agent for renewal contracts in the City of Dallas and surrounding areas. HALLIDAY agrees to promote to its customers the value of renewing AHS Contracts.

2. **Services to be Performed by HALLIDAY**. HALLIDAY agrees to assist in the marketing of AHS renewal contracts to each of its customers, as set forth in Exhibit A of this Agreement.

3. **Services to be Performed by AHS**. AHS agrees to provide the following services to HALLIDAY:

   a. Provide renewal contract coverage to HALLIDAY's customers at AHS's option.

   b. Provide HALLIDAY with quarterly reports relating to renewal numbers.

4. **Service Fee to HALLIDAY**. AHS agrees to pay to HALLIDAY, subject to the terms and conditions of this Agreement and only while this Agreement is in effect and prior to its termination, a Service Fee for services provided in Exhibit A. After the Effective Date of this Agreement, AHS will pay HALLIDAY a Renewal Service Fee of $40.00 for each renewal of any fully paid, non-canceled AHS contract sold through HALLIDAY after the effective date of this Agreement. The Service Fee is intended to provide HALLIDAY consideration for HALLIDAY's endorsement of AHS, the Services outlined in Exhibit A (attached hereto and incorporated by reference) and represents a reasonable, good faith estimate of the value for Services rendered by HALLIDAY in connection with the

L-AHS-003098
Confidential
Discovery Material



AMERICAN HOME SHIELD®
The right choice in home warranties.℠

A *ServiceMASTER* COMPANY

**THE RIGHT CHOICE IN HOME WARRANTIES**

American Home Shield
1524 Hwy. 30 East
Carroll, IA 51401-0727

activities described in Exhibit A hereof.   The parties may amend this Service Fee by amendment to this Agreement to reflect additional services to be provided by HALLIDAY.

5.      Reservation of Rights.  AHS reserves the right, in its sole discretion, without liability to HALLIDAY, to disapprove or reject any Applications for Contracts submitted to it, or to alter or withdraw Contracts and to introduce new Contracts.

6.      AHS's Right to limit area of solicitation.  AHS shall have the right to limit the area of solicitation of the Contracts by HALLIDAY to Zip Codes where AHS conducts its home service contract business.

7.      Marketing Materials.  AHS shall bear the cost of printing and distribution of marketing materials, including (but not limited to) Contracts, Applications, brochures and yard signs.  No advertisements or written materials relating to the Contracts shall be developed, printed, distributed or utilized pursuant to this Agreement without the prior written agreement and approval of AHS.  AHS acknowledges that it has no right to use any of the HALLIDAY trademarks and commercial symbols as a consequence of this Agreement.

8.      Indemnification of HALLIDAY.  AHS will indemnify and hold HALLIDAY harmless against any actions, losses, claims, liabilities, damages or expenses (including reasonable attorneys' fees and expenses) incurred by HALLIDAY in connection with AHS's acts or omissions to perform any obligation under this Agreement or any of the Contracts, except to the extent HALLIDAY has, intentionally or through gross negligence, caused, contributed to or compounded such acts or omissions to act.  As long as HALLIDAY has provided services as designated in this Agreement and a RESPA claim arises regarding HALLIDAY's receipt of a service fee pursuant to this Agreement, AHS agrees to indemnify HALLIDAY for any such RESPA claim including reasonable attorneys' fees and expenses.

HALLIDAY will indemnify and hold AHS harmless against any actions, losses, claims, liabilities, damages or expenses (including reasonable attorneys' fees and expenses) incurred by AHS in connection with HALLIDAY's acts or omissions to perform any obligation under this Agreement, except to the extent AHS has, intentionally or through gross negligence, caused, contributed to or compounded such acts or omissions to act.

9.      Parameters of AHS/HALLIDAY Relationship.  Neither party is authorized to and agrees not to do any of the following:  (i) hold itself out as a partner, joint venturer, licensee or associate of the other party; (ii) hold itself out as an agent of the other party in any other manner, or for any other purpose than is specifically prescribed in this Agreement; (iii) issue or circulate any advertising materials, circular or pamphlet or make any oral or written statement relating to the other party or its products and services unless previously authorized and approved in writing by the other party; (iv) bind, obligate or subject the other party to any liability unless specifically authorized in writing by such party.

10.     Conduct of Business.  HALLIDAY and AHS, each for itself and its agents, representatives and employees, agree to conduct any and all sales activities or other services to be performed under this Agreement in strict compliance with all applicable laws, rules and regulations of all governmental authorities consistent with the highest standard of fair trade, fair compensation and business ethics.  HALLIDAY and all agents, representatives and employees shall comply with all such standards for advertising, promotional and training material to be used or distributed to customers as AHS may establish and as may be set forth in written directives distributed to HALLIDAY from time to time.

HALLIDAY shall obtain and continue to maintain and keep in full force and effect all real estate licenses and all corporation authorizations as may be required to be maintained in all jurisdictions in which HALLIDAY and its officers, employees or agents conduct business under this Agreement.

L-AHS-003099
Confidential
Discovery Material

2


AMERICAN
HOME SHIELD®
"The right choice in home warranties."


A *ServiceMASTER.*
COMPANY

**T H E    R I G H T    C H O I C E    IN    H O M E    W A R R A N T I E S**

American Home Shield
1524 Hwy. 30 East
Carroll, IA 51401-0727

11.    No Authority to Alter Marketing Materials.  HALLIDAY shall have no authority to make, alter, modify, waive or change any of the terms, rates or conditions of the Contracts, Applications, advertisements or promotional materials pursuant to this Agreement in any respect without the prior written consent of AHS.

12.    Term of Agreement.  This Agreement shall remain in full force and effect for the period beginning on the Effective Date of this Agreement through December 31, 2007, unless otherwise terminated pursuant to Paragraph 13 of this Agreement.  This Agreement shall supersede all other agreements between the parties and this Agreement shall always have a December 31st anniversary date.

13.    Termination. Notwithstanding the provisions contained in Section 12, either party shall have the right to terminate this Agreement at any time and for any reason by giving written notice to the non-terminating party at least thirty (30) days prior to any such termination date.  After termination of the Agreement, AHS will no longer pay HALLIDAY for any Service Fees pursuant to this Agreement.

14.    No Partnership Created.  Neither this Agreement nor the relationship between the parties hereto constitutes a partnership or joint venture.  Neither AHS nor HALLIDAY shall make, alter, modify or discharge any Contract on behalf of the other.

15.    Consent to Use of Trademarks.  Each party retains exclusive ownership of their names, logos, registered trade and service marks, or other commercial symbols ("Marks").  Neither party shall use materials or otherwise without the express written consent of the other party. Notwithstanding anything herein to the contrary, AHS hereby represents and warrants to reproduce and use the Marks in strict compliance with the HALLIDAY's logo standards as the logo standards now exist or as they may hereafter be modified.  Upon the termination of this Agreement, all rights conveyed to the other party with respect to the use of the Marks shall cease, and all such rights shall revert to the HALLIDAY or AHS as the case may be.

16.    No Waiver of Rights.  The forbearance or neglect of either party to insist upon strict compliance by the other party with any of the provisions of this Agreement, whether continuing or not, shall not be construed as a waiver of any of the first party's rights or privileges hereunder.  No waiver of any right or privilege of either party arising from any default or failure of performance by the other party shall affect the first party's rights or privileges in the event of a further default or failure of performance.

17.    Confidential Information.

A.  In connection with this Agreement, AHS may furnish HALLIDAY with information that is non-public, confidential or proprietary in nature ("Confidential Information").  Confidential Information proprietary to AHS includes (and HALLIDAY so acknowledges) information marked "Confidential" or "Trade Secret", and can include (but not be limited to) the following:  information relating to contracts, products, methods, processes, improvements, designs and methods of administration and distribution of AHS which are not in the public domain; business plans, marketing plans, financial data, computer programs, systems formats and screen designs relating to AHS business; all manuals, materials, and information of AHS marked "Confidential" or "Trade Secret"; AHS's methods and formulas for calculating costs; information relating to AHS's contractors, clients, and customers (actual and potential); any and all AHS-generated reports, including (but not limited to) those relating to sales, marketing, finances, accounts and personnel; and the business and marketing strategies of AHS.  HALLIDAY shall maintain in confidence and not use for itself or others, in any form or manner, and not disclose, in whole or in part, to any party any Confidential Information received from AHS, except to its officers, directors, employees and agents, except as required by this Agreement or as may be required by law.

L-AHS-003100
Confidential
Discovery Material

3


AMERICAN
HOME SHIELD®
The right choice in home warranties.™


A ServiceMASTER.
COMPANY

**THE RIGHT CHOICE IN HOME WARRANTIES**

American Home Shield
1524 Hwy. 30 East
Carroll, IA 51401-0727

B. In connection with this Agreement, HALLIDAY may, but is not obligated to, furnish AHS with Confidential Information. Confidential Information proprietary to HALLIDAY includes (and AHS so acknowledges) information relating to marketing, sales and financial data; any and all HALLIDAY-generated reports, including (but not limited to) those related to advertising, sales, marketing and financing; and business plans and strategies of HALLIDAY. AHS shall maintain in confidence and not use for itself or others, in any form or manner, and not disclose, in whole or in part, to any party any Confidential Information received from HALLIDAY, except to its officers, directors, employees and agents, and those of its subsidiaries, in connection with this Agreement, except as required by this Agreement or as may be required by law. AHS further agrees that it will not sell or cross-sell, or cause to be sold or cross-sold, any customer/client list(s) which AHS obtains from HALLIDAY during the term of this Agreement.

As used herein, Confidential Information does not include information: (i) that was publicly known, or otherwise known to the party disclosed, at the time of disclosure, (ii) that subsequently becomes publicly known through no act or omission of the party disclosed, or (iii) that becomes known to one party other than through disclosure by the other party.

The provisions of this section shall be binding upon each of the parties and their respective parents and subsidiaries and shall apply during the term of this Agreement and for a period of two (2) years after the termination of this Agreement for any reason.

18.   **Number and Gender.** Whenever required for proper interpretation of this Agreement, the singular number shall include the plural, the plural the singular, and the use of any gender shall include all genders.

19.   **Settlement of Disputes.** Any controversy or claim arising out of or relating to the Agreement shall be settled by binding Arbitration conducted in Memphis, Tennessee, before and in accordance with the commercial rules of arbitration of the American Arbitration Association, and judgment upon any award rendered in such arbitration shall be entered in any court having jurisdiction thereof. If one party fails to appear at any properly noticed arbitration proceeding, the arbitrator's award to the other party shall be enforceable despite such failure to appear. Nothing herein shall preclude or limit AHS from bringing any action in any court of competent jurisdiction for such injunctive or other provisional relief as AHS deems necessary to compel HALLIDAY to comply with its obligations hereunder or to protect AHS's trademarks, or preclude or limit HALLIDAY from bringing any action in any court of competent jurisdiction for such injunctive or other provisional relief as HALLIDAY deems necessary to compel AHS to comply with its obligations hereunder or to protect HALLIDAY trademarks and other commercial symbols.

20.   **Severability.** The invalidity or unenforceability of any provision of this Agreement as applied to a particular occurrence or circumstance or otherwise shall not affect the validity or enforceability or applicability of any other provision of this Agreement.

21.   **Section Headings.** The headings of sections in this Agreement are included for convenience only and are not to be taken into consideration in construction or interpretation of this Agreement or any of its provisions.

22.   **Press Releases.** HALLIDAY agrees that it will not publish, distribute, or otherwise disseminate any press release or other publication regarding AHS or The ServiceMaster Company or any of its affiliated companies including (but not limited to) their name, their products and services, or this Agreement, without the express written permission of AHS or ServiceMaster.

23.   **Entire Agreement, Amendments in Writing, Supersedure.** This Agreement, including Exhibit A hereto, constitutes the entire agreement between the parties concerning the subject matter hereof, and there are no

L-AHS-003101
Confidential
Discovery Material

4


AMERICAN HOME SHIELD®
The right choice in home warranties."

A ServiceMASTER.
COMPANY

**T H E   R I G H T   C H O I C E   I N   H O M E   W A R R A N T I E S**

American Home Shield
1524 Hwy. 30 East
Carroll, IA 51401-0727

representations, warranties, covenants or obligations with respect to same except as set forth herein. This Agreement may be amended only in writing executed by authorized officers of the parties.

24.    Assignment. This Agreement shall not be assigned, in whole or in part, by either party without the prior written consent of the other party.

25.    Notices. Any notice or other written communication required or permitted to be given shall be deemed given three (3) days after deposit in the United States Mail, postage prepaid, properly addressed to the party to receive the notice at the party's address set forth above, or as each party may advise the other in writing. Notwithstanding anything herein to the contrary, HALLIDAY shall be entitled to assign or transfer this Agreement to any of its parent, subsidiary, sister or affiliate companies.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

AMERICAN HOME SHIELD CORPORATION

By: _____
        David J. Crawford, President

EBBY HALLIDAY REAL ESTATE, INC.

By: _____
        Mary Frances Burleson, President

L-AHS-003102
Confidential
Discovery Material

5



The **right choice** in home warranties.™

A ServiceMASTER. COMPANY

**T·H·E   R·I·G·H·T   C·H·O·I·C·E   I·N   H·O·M·E   W·A·R·R·A·N·T·I·E·S**

American Home Shield
1524 Hwy. 30 East
Carroll, IA 51401-0727

*EXHIBIT A*

1.  Send promotional materials/endorsements supplied by AHS to HALLIDAY customers that promote the renewal of their contracts and allow AHS use of HALLIDAY's name in such AHS promotions.

2.  Allow AHS to utilize HALLIDAY's name, logo, and service marks in appropriate AHS marketing materials subject to the prior written consent of HALLIDAY.

3.  Make calls on behalf of AHS to customers encouraging them to renew their warranties.

4.  Allow AHS to use HALLIDAY's name, logo and trademarks in any marketing pieces that promote the Contracts including materials regarding renewals.

L-AHS-003103
Confidential
Discovery Material


AMERICAN
HOME SHIELD®
*The right choice in home warranties.*™

ʌ *ServiceMASTER.*
COMPANY

# EXHIBIT H

# Marketing agreements on the brink

Marketing agreements between real estate service providers are growing increasingly unpopular with federal and state regulators, and HUD is reportedly taking a harder line on enforcement than ever before.

At the Real Estate Services Providers Council, Inc. (RESPRO) Fall Seminar in New Orleans on Nov. 5-7, the increasing regulatory distaste for real estate marketing agreements was made apparent by **Erin Toll**, Director of the Colorado Division of Real Estate, who said, "Real estate marketing agreements look a lot like captive reinsurance agreements which looked a lot like sham affiliated business arrangements."

The issue came to Toll's attention earlier this year by a lawsuit filed in Colorado court in which RE/MAX sued First American for allegedly backing out of a marketing agreement and failing to pay $693,000 owed for services under the agreement.

First American claims it terminated the marketing agreement because it was contacted by Colorado regulators in 2006 concerning the agreement and the potential illegal nature of such agreements. RE/MAX believes that no legal or regulatory action alleging a violation of RESPA had ever been commenced with respect to the marketing agreement, however, and wants First American to pay up.

As to the legality of the agreement itself, RE/MAX has said that "First American's payment was not tied to any real estate closings or title insurance sales, but rather constituted payment for the marketing rights and services provided by RE/MAX."

With her interest piqued, Toll subpoenaed a number of real estate firms, title and mortgage companies for information on their marketing practices.

## Red flags

In looking at a variety of marketing agreements, Toll said she has seen some red flags.

"First, the exclusivity spelled out in the agreements I have seen is very troubling," said Toll. "Next, the fluctuating fees based on monthly reports with capture rates sure looks like a referral fee."

> ## Marketing Agreement Red Flags
>
> 1) Exclusivity clauses
>
> 2) Secrecy and confidentiality
>
> 3) Access for other companies to market services in a similar fashion
>
> 4) Fluctuating fees based on volume and capture rates

Also concerning to Toll is the secrecy spelled out in many such documents, along with the very high fees paid — as much as $1 million per year.

"Each discrete piece of the marketing agreements real estate services companies are entering into may be legal," said Toll. "But that doesn't mean that the arrangement as a whole is legal."

"The bottom line is, I don't like these agreements," said Toll, "And HUD has authorized me to tell you today that they don't like them either."

Indeed, HUD's Office of the Inspector General recently released an audit report on First Magnus, in which HUD claimed the now-defunct lender paid marketing fees to builders and real estate companies on the basis of the number of loans closed and other factors not related to service provided, a RESPA violation. HUD also said First Magnus paid illegal non-compete fees to real estate companies, to ensure they did not engage in marketing arrangements with other lenders.

It's certainly no secret that HUD and Toll have been working together in looking at marketing agreements. Their focus in looking at the agreements is to determine their levels of exclusivity, confidentiality and access. The regulators believe that access is a short jump from affirmative influence, which is the core of a referral.

But Toll said that there are steps real estate companies can take in order to make sure their marketing agreements are legal.

"If participants were to get rid of the secrecy and eliminate the anti-competitive nature of these agreements, there might be a way to develop an agreement that does not violate RESPA," she said.

When questioned by a member of the audience as to why these agreements are illegal when many other industries utilize similar arrangements, Toll blamed RESPA.

"I get this question on a regular basis," said Toll. "The answer is, other industries aren't covered by RESPA. The real estate industry is."

# EXHIBIT I

**SUPERIOR COURT OF CALIFORNIA,**
**COUNTY OF SAN DIEGO**
**CENTRAL**

**MINUTE ORDER**

RECEIVED

Date: 07/08/2009                    Time: 11:00:00 AM         Dept: C-70

JUL 0 9 2009

Judicial Officer Presiding: Judge Jay M. Bloom
Clerk: Lynn Rockwell

Bailiff/Court Attendant:
ERM: Not Reported

Case Init. Date: 07/24/2007

Case No: 37-2007-00071725-CU-BT-CTL    Case Title: Edleson vs. American Home Shield of California,
                                       Inc

Case Category: Civil - Unlimited       Case Type: Business Tort

Event Type: Motion Hearing (Civil)

Causal Document & Date Filed:

**Appearances:**

The Court, having taken the above-entitled matter under submission on 07/02/2009 and having fully
considered the arguments of all parties, both written and oral, as well as the evidence presented, now
rules as follows:

**THE MOTION FOR FINAL APPROVAL OF THE CLASS ACTION SETTLEMENT IS DENIED.** ALL
EVIDENTIARY OBJECTIONS ARE OVERRULED.

The motion for final approval of the class action settlement is denied. While the court respects the views
of Justice Wiener and learned counsel in this case, the court cannot justify approval of the settlement.
Plaintiffs, other than the two lead plaintiffs, really get nothing more than a right to submit or resubmit
claims to a defendant that has allegedly not acted in good faith on prior occasions. There are no
guarantees claims will now be accepted or properly serviced, or that if improperly denied, plaintiffs have
any realistic remedy. They may have the right to sue in the future, but that is subject to the applicable
statute of limitations in each jurisdiction in the United States. The court has no information as to what the
applicable limitations are or what other limits may exist to preclude filing of a lawsuit.

The settlement also allows defendant to essentially sell more insurance to plaintiffs at an unspecified
price. This allows defendant to make additional money from the settlement rather than paying it out to
plaintiffs. The contractor relations initiative also does not provide plaintiffs with any realistic guarantees.
The entire settlement essentially asks plaintiffs to give up many viable and realistic rights in return for the
hope that defendant will act in good faith. Without more concrete guarantees, plaintiffs, other than the
lead plaintiffs, have gotten very little in return for a waiver of claims against defendant. In the face of this
illusory result for plaintiffs, counsel receive $2.75 million and defendants substantially limit their liability
for past conduct. The court cannot accept this result. Any settlement must give the plaintiff class some
tangible benefits or an unfettered right to bring legal claims against defendant.

**Plaintiffs' MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES is DENIED.**

Case No: 37-2007-00071725-CU-BT-CTL    Case Title: Edleson vs. American Home Shield of California, Inc

It is so ordered.

Jay M. Bloom

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**

Central
330 West Broadway
San Diego, CA 92101

SHORT TITLE: Edleson vs. American Home Shield of California, Inc

| CLERK'S CERTIFICATE OF SERVICE BY MAIL | CASE NUMBER:<br>37-2007-00071725-CU-BT-CTL |
| --- | --- |

I certify that I am not a party to this cause. I certify that a true copy of the attached was mailed following standard court practices in a sealed envelope with postage fully prepaid, addressed as indicated below. The mailing and this certification occurred at <u>San Diego</u>, California, on <u>07/09/2009</u>.

Clerk of the Court, by: _L. Rockwell_ _____, Deputy
                                                  L. Rockwell

Edward Chapin
550 WEST C STREET, SUITE 2000
SAN DIEGO, CA 92101

Robert R. Gasaway, I
Kirkland & Ellis, LLP
655 15th Street
Washington, DC 20005

Robert M. Stone
Sidley Austin LLP
555 W 5th St
Los Angeles, CA 90013

Francis A Bottini
Johnson Bottini LLP
655 West Broadway # 1400
San Diego, CA 92101

DAVID J NOONAN
Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300
SAN DIEGO, CA 92101

Joel S. Feldman, Rachel B. Niewoehner,
and Julie M. Weber
Sidley Austin LLP
One South Dearborn St.
Chicago IL 60603

Richard L Stone
Hogan & Hartson LLP
1999 Avenue of the stars Ste 1400
Los Angeles CA 90067

☐ Additional names and address attached.

CLERK'S CERTIFICATE OF SERVICE BY MAIL

Page: 1

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | FOR COURT USE ONLY |
|---|---|
| ☐ COUNTY COURTHOUSE, 220 W. BROADWAY, SAN DIEGO, CA 92101-3814<br>☒ HALL OF JUSTICE, 330 W. BROADWAY, SAN DIEGO, CA 92101-3827<br>☐ FAMILY COURT, 1555 6TH AVE, SAN DIEGO, CA 92101-3294<br>☐ MADGE BRADLEY BLDG., 1409 4TH AVE., SAN DIEGO, CA 92101-3105<br>☐ KEARNY MESA BRANCH, 8950 CLAIREMONT MESA BLVD., SAN DIEGO, CA 92123-1187<br>☐ NORTH COUNTY DIVISION, 325 S. MELROSE DR., VISTA, CA 92083-6643<br>☐ EAST COUNTY DIVISION, 250 E. MAIN ST., EL CAJON, CA 92020-3941<br>☐ RAMONA BRANCH, 1428 MONTECITO RD., RAMONA, CA 92065-5200<br>☐ SOUTH COUNTY DIVISION, 500 3RD AVE., CHULA VISTA, CA 91910-5649<br>☐ JUVENILE COURT, 2851 MEADOW LARK DR., SAN DIEGO, CA 92123-2792<br>☐ JUVENILE COURT, 325 S. MELROSE DR., VISTA, CA 92083-6634 | **F I L E D**<br>Clerk of the Superior Court<br><br>JUL 0 8 2009<br><br>By: L. ROCKWELL, Deputy |
| PLAINTIFF(S)/PETITIONER(S)<br><br>EDLESON | |
| DEFENDANT(S)/RESPONDENT(S)<br><br>AMERICAN HOME SHIELD OF CALIFORNIA, INC., et al. | JUDGE:    Jay M. Bloom<br><br>DEPT:    70 |
| **CLERK'S CERTIFICATE OF SERVICE BY MAIL**<br>**(CCP 1013a(4))** | CASE NUMBER<br><br>2007-71725 |

I, certify that: I am not a party to the above-entitled case; that on the date shown below, I served the following document(s):

    Ruling on Plaintiff's Motion for Final Approval of Class Action Settlement

on the parties shown below by placing a true copy in a separate envelope, addressed as shown below; each envelope was then sealed and, with postage thereon fully prepaid, deposited in the United States Postal Service at:   ☒ San Diego   ☐ Vista   ☐ El Cajon   ☐ Chula Vista   ☐ Ramona, California.

<div style="display:flex;">
<div>

**NAME & ADDRESS**

Jeffrey L. Weinstein, Esq.
Jeffrey L. Weinstein, P.C.
518 East Tyler Street
Athens, Texas 75751


Katherine Winn, Esq.
Law Office of Katherine Winn
2635 Camino Del Rio South, Suite 110
San Diego, California 92108

</div>
<div>

**NAME & ADDRESS**

Daniel Brown, Esq.
Law Offices of Daniel Brown
131 Lawnview Circle
Danville, California 94526-5107


J. Garrett Kendrick, Esq.
C. Benjamin Nutley, Esq.
Kendrick & Nutley
1055 E. Colorado Blvd., 5th Floor
Pasadena, CA 91106

</div>
</div>

John W. Davis,
LAW OFFICE OF JOHN W. DAVIS
501 W. Broadway, Suite 800
San Diego, CA 92101

<div style="text-align:center;">CLERK OF THE SUPERIOR COURT</div>

Date:   July 8, 2009     by     *L. Rockwell*    , Deputy
                                               L. Rockwell

SDSC CIV-286(Rev. 12-02)          CLERK'S CERTIFICATE OF SERVICE BY MAIL

# EXHIBIT J

Case 2:07-cv-01928-RDP Document 85 Filed 03/08/10   Page 73 of 97

**B U R R ••• F O R M A N** LLP
*results matter*

CLIENT LOGIN

- Firm Management
- Our Attorneys
- Office Locations
- Diversity
- In The Community

- Our Clients
- Contact Us

## News

Five Burr & Forman Attorneys Selected for Inclusion in 2010 Georgia Super Lawyers and Seven Included in 2010 Rising Stars List Mar 1 2010

Frederick Jones Reappointed to the Florida Realtor-Attorney Joint Committee by the Florida Bar Feb 19 2010

Burr & Forman Hosts Condo Association Seminar Feb 2 2010

Red Flags Rule Compliance Guide Now Available for Purchase Nov 18 2009

## Events

International Sign Association Sign Expo 2010 April 7-10

2010 DRI Diversity for Success Seminar (Chicago, IL) June 10-11

2010 AAHIM Annual Meeting May 5-7

Ron Flowers speaking at the Safety & Security HR Workshop Achievement Awards Program April 22

Cheri Gatlin to speak at ABA Forum on the Construction Industry April 22 - February 24

At Burr & Forman, our clients range across many industries. They come from across the South, across the country and around the world.

## Representative Client List

- 1st Franklin Financial Corporation
- 7-Eleven, Inc.
- Abelco Finance, LLC
- AdEfx
- Adisseo
- Adtran
- AEGON USA Realty Advisors, Inc.
- Affordable Housing Partnership, Inc.
- AIG Baker Shopping Center Properties, Inc.
- Albritton Communications Company
- Allegiant Physician Services, Inc.
- American Brands, Inc.
- American Cast Iron Pipe Company (> 15 yrs)
- American General Finance, Inc.
- American Honda Motor Co., Inc.
- American Medical Security, Inc.
- Ampco Systems Packaging Inc.
- Anivision, Inc
- Argo Building Co., Inc.
- Arlington Homes, LLC

- Arrow Trucking, Inc.
- ASI Sign Systems
- ATD Corporation
- Attorneys Insurance Mutual
- Attorneys' Title Insurance Fund, Inc.
- AutoBuilders General Contracting Services, Inc
- Avalon Associates of Delaware Limited Partnership
- Bank of America
- Bank United
- Bankers Life and Casualty Company
- Bankers Life Insurance Company
- Bankers National Life Insurance Co.
- Battle-Miller Construction Co., Inc.
- Beal Bank
- Beverly Enterprises, Inc.
- Bibb Factory Outlet
- Birmingham Realty, Inc.
- Birmingham Southern Railroad Company
- Birmingham Steel Corporation
- Black & Decker
- Blue Ridge Mountain Water, Inc.
- Breen Capital Services
- Brice Building Company, Inc.
- BridgeMill, LLC
- Brookwood Medical Center
- Building & Earth Sciences
- C&G Real Estate Group Inc.
- Cadence Bank
- Cahaba Maintenance & Construction, Inc.
- Cahaba Valley Builders, Inc.
- Capital Development Group Inc.
- Central Florida Educators Credit Union
- Central Supply Company
- Cerberus, Inc.
- CGH Insurance Group, Inc.
- Charles & Vinzant Construction Company, LLC
- Charter Communications
- Chase Home Finance, LLC
- Church of Jesus Christ of Latter-day Saints
- CIBA Vision Corp.
- Cincinnati, Inc.
- Cingular Wireless, Inc.
- CIT Group/ Business Credit, Inc.
- Citation Corporation
- Citigroup
- City Capital, Inc.
- ClaimsTalk.com
- CNLBank
- Colonial Bank
- Colonial Penn Life Insurance Company
- Colonial Properties Trust
- Columbus Bank and Trust Company
- Commonwealth Land Title Insurance Co.
- Community National Bank of the South
- Conseco Finance Serving Corporation
- Conseco Securities, Inc.
- Conseco Services, LLC

- Conseco, Inc.
- Corporate Billing, Inc.
- Coston General Contractors, Inc.
- Country Club of Mount Dora Homeowners Association
- Courtelis Company
- Cracker Barrel Old Country Store, Inc.
- CSX Transportation, Inc.
- Cuthill & Eddy LLC
- D. L. Acton Construction Co., Inc.
- D. R. Horton, Inc.
- Daikin America, Inc.
- DaimlerChrysler
- Dean Homes, Inc.
- Debis Financial Services
- Deseret Cattle & Citrus
- Disaster Relief Corporation
- Dow Chemical Co.
- Dreamland BBQ
- EBSCO Development Co.
- Eon Labs Manufacturing, Inc.
- Euramex Management, Inc.
- EverBank
- Fairwinds Credit Union
- Federal Trust Bank
- Ferguson Enterprises, Inc.
- Fidelity National Title Insurance Company
- First American Title Insurance Company
- First Commercial Bank of Florida
- First Horizon Construction Lending
- First National Bank of Central Florida
- First National Bank of Pennsylvania
- Fletcher Bright Company
- Florida Capital Real Estate Group Inc.
- Flournoy Construction Company LLC
- Flournoy Development Co.
- Focus Healthcare
- Ford Motor Company
- Fortis Insurance Company
- Fred Owen Construction, Inc.
- Futaba Corporation, Inc.
- G.E. Capital Corporation
- Gary C. Wyatt General Contractors, LLC
- General Nutrition Center, Inc.
- Geneva Pharmaceuticals, Inc.
- GMAC Mortgage Corporation
- GMAC-RFC-Homecomings
- GolfWeek
- Good Hope Contracting Co., Inc.
- Goodyear Tire and Rubber Company, Inc.
- Greenville Technology Incorporated
- Gulf Atlantic Capital Corporation
- H.J. Russell & Company
- Habersham Properties, Inc.
- Harbison Construction Company, Inc.
- Hickory Venture Capital Corporation
- Homecomings Financial Network, Inc.
- Homeside Lending, Inc.

- Honda Manufacturing of Alabama, LLC
- Hudak & Dawson Construction Co., Inc.
- Huntington Properties, LLC
- Hyundai Motor Company
- Icon Commercial Interests, LLC
- ILD Telecommunications
- Insulation Division, Inc.
- International Wines, Inc.

- Iteq, Inc.
- Itochu Corporation
- Johnson, Rast & Hayes Co. -
- JRC/ Towne Lake, Ltd.
- June Engineering Consultants
- Kamco Industries, Inc.
- Kelley Food of Alabama, Inc.
- Kia Motors
- KTH Parts Industries, Inc.
- LandAmerica Financial Group, Inc.
- Lawyers Title Insurance Corporation
- Lighthouse Financial
- Lighting Corporation of America
- M&I Bank
- M/I Homes of Lake County, LLC
- M/I Homes of Orlando, LLC
- M/I Homes, Inc.
- Mail & More
- Marathon General Contractors, Inc.
- Master Adhesives, Inc.
- McDonald Investments
- Mead Corporation
- Mercantile Bank
- Mercedes-Benz U.S. International, Inc. (> 15 yrs)
- Merritt & McKenzie Insurance Agency
- Mesa Solutions, Inc.
- Mid-America Apartment Communities, Inc.
- Mid-American Restaurants
- Mitsubishi Dealerships
- Morinda, Inc.
- Morrison Homes, Inc.
- National Cement Company
- Navistar Financial Corporation
- New Holland Credit Company
- New South FSB
- Northport Health Services, Inc.
- Office Furniture USA, Inc.
- Old Republic National Title Insurance Co.
- Orix Financial Services, Inc.
- Pacificare
- Patton Manufacturing, Inc.
- Peachtree National Bank
- Peoples First Community Bank
- Performance Matters Associates, Inc.
- Pfizer Inc.
- Pinnacle Steel, LLC
- Plumbing Distributors, Inc.
- Postal Annex+, Inc.

- PPG Industries, Inc.
- Precision Walls, Inc.
- Preston Health Services
- ProAssurance Corporation
- R & L Foods, LLC (Wendy's)
- Racetrac
- Rare Hospitality International, Inc.
- Rast Construction Company
- RBC Bank
- Regent Partners, Inc.
- Regions Bank
- Reliable Telephone Company, LLC
- Renasant Bank
- Resorts Development Group, LLC
- RG Crown Bank, FSB
- Robinson, Inc.
- Rod Cooke Construction, Inc.
- Royal Automotive Group, Inc.
- S & M Equipment Company, Inc.
- Saiia Construction Company
- Saiia Construction, LLC
- Saks, Inc.
- Sara Lee Corporation
- ScanAmerican Holdings Corporation
- Schneider National, Inc.
- School Nutrition Association
- Sears, Roebuck and Co.
- Seegers
- Shannon, Strobel & Weaver Constructors & Engineers Inc.
- Silvestri Investments of Florida, Inc.
- Skilled Services, Inc.
- Smithfield Foods, Inc.
- Smithfield Packing Company
- Southeastern Commercial Finance
- Southern Progress
- Sprint
- Starwood Hotels & Resort Worldwide
- State Farm Insurance Companies
- Sterne, Agee & Leach
- Stone Building Company, Inc.
- Summit Properties
- Sun Building Company, Inc.
- Sunrise Coal Company, LLC
- SunTrust Bank
- Surgical Information Systems
- Suttles Truck Leasing, Inc.
- Systems Atlanta
- Tacala, Inc. (Taco Bell)
- Talbots, Inc.
- Tarragon Corporation
- Teledyne Brown Engineering, Inc.
- Ten United
- Tenet Health Systems
- Terminix International, LLP
- Textron Financial Corporation
- The Ages Group
- The Barber Companies

- The Barber Companies, Inc.
- The British Group
- The Budd Group, Inc.
- The Earthgrains Company
- The Hardy Corporation
- The Lloyd Noland Foundation
- The Meadow Development Corporation
- The Paces Foundation, Inc.
- The Scott Partnership Architecture
- Thomas Enterprises
- Thompson Tractor Co., Inc.
- ThyssenKrupp Steel and Stainless USA
- Tillotson Health Care Corporation
- Timacuan Community Services Association
- Toyota Industries North America, Inc.
- Tractor & Equipment Company
- Transam Financial Group
- Triad Hospitals, Inc.
- TriFive Properties
- Trillion Digital Communications, Inc.
- Turnstile Publishing Co.
- TV Alabama, Inc.
- U.S. Industries, Inc.
- United Health Care
- United States Steel
- United Wisconsin Life Insurance Company
- UNUM Life Insurance Company of America
- Volvo Trucks North America, Inc.
- Vulcan Engineering Co.
- W. W. Dyar & Sons, Inc.
- Wachovia Bank
- Waffle House
- Washington National Insurance Company
- Waste Management Inc. of Florida
- Websusenet, Inc.
- Wells Fargo Bank, N.A.
- Zoe's Kitchen USA, LLC

# EXHIBIT K

|  | we are: | TruGreen | American Home Shield | Furniture Medic |
|--|--|--|--|--|
|  |  | TruGreen LandCare | ServiceMaster Clean | AmeriSpec |
|  |  | Terminix | Merry Maids | ServiceMaster Family of Brands |

the new servicemaster

| Home |  |
|--|--|
| Overview | Company Profile |
| Press Room | Objectives |
| Careers | Code of Conduct |
| Community Relations | Our Environment |
| Franchise Opportunity | Our History |
| International | Investor Information |
| Contact Us |  |



# overview

### Company Profile

### America's Service Brands for Home and Business

ServiceMaster currently serves residential and commercial customers through a network of over 5,500 company-owned locations and franchised licenses. The Company's brands include TruGreen, TruGreen LandCare, Terminix, American Home Shield, ServiceMaster Clean, Merry Maids, Furniture Medic, and AmeriSpec. The core services of the Company include lawn care and landscape maintenance, termite and pest control, home warranties, disaster response and reconstruction, cleaning and disaster restoration, house cleaning, furniture repair, and home inspection.

### Executive Officers

**George Tamke**
Chairman, Board of Directors ServiceMaster Global Holdings
**J. Patrick Spainhour**
CEO, ServiceMaster, and CEO of ServiceMaster Global Holdings
**Dan Marks**
Chief Information Officer
**Jim Kunihiro**
Senior Vice President of Corporate Strategy and Marketing, ServiceMaster
**David Martin**
SVP and Corporate Controller
**Steve Martin**
SVP and Chief Financial Officer
**Greer McMullen**
SVP and General Counsel
**Jed Norden**
Senior Vice President, Human Resources, ServiceMaster
**Mark Peterson**
SVP and Corporate Treasurer
**Pete Tosches**
Vice President, Corporate Communications

### Business Unit Leaders

**Rick Ascolese** - TruGreen LandCare
**Thomas G. Brackett** - Terminix
**David C. Crawford** - American Home Shield/AmeriSpec
**Laura Hendricks** - Merry Maids
**Mike Isakson** - ServiceMaster Clean/Furniture Medic
**Patrick Spainhour** - Interim President, TruGreen LawnCare

ServiceMaster Legal Notice | ServiceMaster Privacy Statement
© 2001–2010 The ServiceMaster Company. All Rights Reserved.

 **TERMINIX** ®
*Power over pests.*

Search    **1-866-224-4661**

MANAGE MY ACCOUNT
SIGN UP    FORGOT YOUR PASSWORD?

SIGN IN:  EMAIL    PASSWORD    »

TERMITE SOLUTIONS  |  PEST SOLUTIONS  |  LEARNING CENTER  |  CUSTOMER SERVICE  |  COMMERCIAL

## GUARANTEE YOU'RE PROTECTED RIGHT NOW.

 Get a quote

Schedule an Inspection

or Call

**1-866-224-4661**

Need commercial service? Go ⊠

*Got pests or termites?*
*We'll move fast to make sure*
*they get out. And stay out.*



## WE CAN HELP GET TO THEM BEFORE THEY GET TO YOU.

▶ Play to learn how

**CUSTOM TIPS AND ALERTS FOR TERMITES AND PESTS**

Enter your address for insights specific to your home.

Street Address

Ave ⊠

Zip

Go

**THE TERMINIX ULTIMATE PROTECTION® GUARANTEE**

Protect yourself with the strongest guarantee in the business.

Termite guarantee⊠

Pest guarantee⊠

**SAVE**
**10**%

**ON PEST SERVICES ONLINE**

Buy and schedule termite or pest protection online.

See your savings ⊠

**MANAGE MY ACCOUNT**

Terminix is the only pest control company to put you in **total control** of scheduling and much more.

**Learn More »**

CONTACT US  |  CAREERS  |  FRANCHISE OPPORTUNITIES  |  PEST CONTROL COMPANIES  |  ACCOUNT LOGIN  |  MEDIA AREA  |  SITE MAP

© 2009 The Terminix International Company Limited Partnership. All rights reserved. Site Map, Legal, Privacy.

Terminix is another ServiceMaster Solution. Visit these ServiceMaster links on the World Wide Web.

Jobs on the ServiceMaster Team | About ServiceMaster | ServiceMaster Home

Schedule and Purchase all your home's other services from one location.

Terminix® | Merry Maids® | TruGreen® | ServiceMaster Clean®
American Home Shield® | Furniture Medic® | AmeriSpec®

# EXHIBIT L

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| KATHIE AAMODT WARD, on behalf of herself and all others similarly situated,<br><br>               Plaintiff,<br>      v.<br><br>AMERICAN HOME SHIELD CORPORATION; AMERICAN HOME SHIELD OF CALIFORNIA, INC.,<br><br>             Defendants. | CASE NO. CV-07-01380 GW (PJWx)<br><br>The Hon. George H. Wu<br>The Hon. Patrick J. Walsh |

<u>**NOTICE OF CLASS ACTION AND SETTLEMENT**</u>

From the Honorable George H. Wu to:

> All persons who purchased a 13 SEER home warranty upgrade from American Home Shield Corporation or any of its subsidiaries.

This Notice is given to inform potential Class Members of a proposed settlement of claims. If you purchased a 13 SEER home warranty upgrade from American Home Shield or any of its subsidiaries ("AHS" or "American Home Shield"), you may be a Class Member and your rights may be affected.

**PLEASE READ THIS NOTICE CAREFULLY**
**THIS IS NOT A NOTICE OF A LAWSUIT AGAINST YOU**
**YOU MAY BE ENTITLED TO CERTAIN BENEFITS**

If you are a Class Member and you do not file a timely request to be excluded from participation in the proposed settlement ("Exclusion Request") then, if the Court grants final approval of the proposed settlement, you will be deemed a "Settlement Class Member." If the Settlement Agreement becomes effective, Settlement Class Members will be given certain rights in exchange for giving up their claims regarding AHS's conduct in allegedly misrepresenting federal regulations governing the fuel-efficiency of newly-manufactured air conditioners in order to sell upgrades to home warranty contracts. (AHS has vigorously denied and continues to deny any wrongdoing.) If you file an Exclusion Request in a timely manner, the terms of the Settlement will not bind you and you will not receive any benefits under it.

**Please read this notice carefully and in its entirety. If you are a**
**Class Member and the Court approves the Settlement Agreement, you**
**will be entitled to participate, unless you choose to file a timely request**
**to be excluded from participation.**

## I. FAIRNESS HEARING

Notice is hereby given that a hearing will be held at <u>8:30am</u> on <u>January 12, 2009</u>, before the Honorable George H. Wu, in the courtroom of the United States District Court for the Central District of California, Western Division, located at 312 N. Spring St., Los Angeles, California 90012. The purpose of the hearing ("Fairness Hearing") will be to determine: (i) whether the proposed settlement of certain claims against Defendants, as set forth in the Settlement Agreement is fair, reasonable, adequate, and in the best interests of Settlement Class Members; and (ii) whether a Judgment should be entered approving the Settlement Agreement and dismissing the pending claims against Defendants.

This Notice contains a summary of the terms of the Settlement Agreement between the Class Representative and Defendants. All terms not defined in this Notice will have the meaning given to them in the Settlement Agreement. For a more detailed statement of the matters involved in this lawsuit and the Settlement Agreement, you are referred to the pleadings, to the Settlement Agreement, and to other papers on file in the case, which may be inspected during regular business hours at United States District Court for the Central District of California, Western Division, located at 312 N. Spring St., Los Angeles, California 90012. You may also obtain a copy of the Settlement Agreement through the sources listed in Section VIII of this Notice.

## II. CLASS CERTIFICATION DETERMINATION

The parties have agreed to the certification of a class for settlement purposes only and the Court has entered an order certifying a settlement class. The Class Members are:

> All persons who purchased a 13 SEER home warranty upgrade from American Home Shield or any of its subsidiaries.

In its preliminary approval order, the Court named Plaintiff Kathie Aamodt Ward as the representative of the class (the "Class Representative"). The Court has named the following attorneys as Class Counsel:

**Gary S. Soter, Esq.**
PEARSON, SIMON, SOTER,
WARSHAW & PENNY, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California  94103

**Mark Chavez, Esq.**
Daniel B. Swerdlin, Esq.
CHAVEZ & GERTLER LLP
42 Miller Avenue
Mill Valley, California  94941

**Steven N. Berk, Esq.**
CHAVEZ & GERTLER LLP
1225 Fifteenth Street, N.W.
Washington, D.C.  20005

**Jonathan Shub, Esq.**
SEEGER WEISS LLP
1515 Market Street, Suite 1380
Philadelphia, Pennsylvania  19102

**Jonathan W. Cuneo, Esq.**
**Alexandra Warren, Esq.**
CUNEO, GILBERT & LADUCA, LLP
507 C Street, N.E.
Washington, D.C.  20002

The Court has not ruled on either the merits of the claims against AHS or AHS's defenses to those claims, nor has it made a final determination of the matters to be considered at the Fairness Hearing.

## III. BACKGROUND OF CLAIMS AND RESPECTIVE VIEWS OF LITIGATION

Defendants American Home Shield Corporation and American Home Shield of California, Inc. have been engaged in the business of selling certain consumer contracts, defined as home protection contracts in California and commonly known as residential service contracts, home service contracts, home protection contracts, and/or home warranty contracts throughout the United States.

The Action, *Kathie Aamodt Ward, on behalf of herself and all other similarly situated, v. American Home Shield Corporation and American Home Shield of California, Inc.*, No. 2:07-CV-07-01380-GHW-PJW (United States District Court for the Central District of California), was filed on March 1, 2007. The Action alleges that Defendants misrepresented to their customers federal regulations governing the fuel efficiency of newly-manufactured air conditioners in order to sell upgrades to home warranty contracts, and that Defendants' conduct violates California Business and Professions Code section 17200, *et seq.*, and California Business and Professions Code section 17500, *et seq.*, and constitutes negligent misrepresentation and breach of implied in law contract. Defendants have vigorously denied and continue to deny all liability with respect to any and all facts or claims alleged in the Action.

In addition to these class-wide allegations, Ms. Ward has inserted in the same Action allegations involving a dispute over the service of her home HVAC system. The parties reached a separate agreement to settle this dispute, and the terms of that confidential settlement have been provided to the Court for its review. In connection with this separate, individual settlement, Ms. Ward received a total payment of $29,688 for reimbursement of the charges she incurred in repairing her home HVAC system, and to cover the fees, expenses, and costs incurred in connection with discovery, briefing, and other efforts directed solely at litigating the separate dispute over the service of Ms. Ward's home HVAC system.

Substantial arm's length settlement negotiations have taken place between Class Counsel and counsel for Defendants. These negotiations, during which all parties vigorously maintained their respective positions on the merits of the suit, resulted in the Settlement Agreement.

Class Counsel have concluded that the proposed settlement is fair, reasonable, and adequate, and that it is in the best interests of the Class Members. Defendants have concluded that, while they continue to deny all liability of any kind, it is desirable to enter into the Settlement Agreement in order to settle the claims at issue and to avoid potential risk and further costs and delays, including the costs of litigation and attorneys' fees.

## IV. DESCRIPTION OF THE PROPOSED SETTLEMENT

The complete terms and conditions of the proposed settlement are contained in the Settlement Agreement. The parties' obligations under the Settlement Agreement do not become effective until final judicial approval, including the exhaustion of any appeals (the "Effective Date of Settlement").

Defendants have agreed to incur reasonable costs involved in implementing the settlement, including the costs of distributing notice to Class Members.

### A. Defendants' Obligations Under the Settlement Agreement

Defendants shall make available to all Settlement Class Members the following benefits (the "Class Benefits") as provided in the Settlement Agreement:

#### 1. Class Members Who Are Current American Home Shield Customers

Beginning on the Class Benefits Date (as defined in Section VII of this Notice) and continuing for a period of twelve (12) months thereafter, Class Members who are current AHS customers will receive a one-time $12.50 credit that will be applied upon any renewal of an AHS home warranty contract.

If, twelve (12) months after the Class Benefits Date, a Class Member who is a current AHS customer at the Class Benefits Date has not accepted a $12.50 credit upon any renewal of an AHS home warranty contract, or is otherwise not eligible to renew his or her AHS home warranty contract, the Class Member may claim a cash benefit. Class Members may claim a cash benefit by cashing a check in the amount of $7.00 that will be sent by Defendants no later than thirteen (13) months after the Class Benefits Date, via first class U.S. Mail, postage prepaid, to all Class Members who have not previously received either of the benefits described above. If a Class Member receives a check from American Home Shield, but does not cash the check within 90 days, the check will become void and the $7.00 will revert to American Home Shield.

#### 2. Class Members Who Are Not Current American Home Shield Customers

Class Members who are not current AHS customers may claim a cash benefit by cashing a check in the amount of $7.00 that will be sent by Defendants no later than forty-five (45) days after the Class Benefits Date, via first class U.S. Mail, postage prepaid. If a Class Member receives a check from American Home Shield, but does not cash the check within 90 days, the check will become void and the $7.00 will revert to American Home Shield.

### B. Preliminary Approval of Proposed Settlement

On September 12, 2008, the Court gave its preliminary approval of the Settlement Agreement, finding that its terms are within the range of reasonableness such that notice should be sent to Class Members. The Court has indicated that any claims by Class Members that would involve litigating claims made in this Action or claims resolved in this Settlement, during the period of time from now until the Settlement becomes final, should be brought before this Court.

### C. Attorney Fees

The parties have separately agreed to an award of attorney fees, costs, and expenses for Class Counsel in this Action in the amount of five hundred thousand dollars ($500,000), subject to approval by the Court. The amount of the attorney fees, costs, and expenses to be paid by Defendants to Class Counsel will not in any way affect or diminish the Class Benefits provided for in the Settlement Agreement. Plaintiff will prove that the fee request is reasonable and incurred in connection with the settled claims of the Class.

## V. FINAL JUDGMENT AND RELEASES

### A. Entry of Final Judgment

If the Court enters final approval of the proposed settlement as set forth in the Settlement Agreement (including any modifications or amendments agreed to by the Class Representative and Defendants), it will enter a Final Judgment. If the Court enters a Final Judgment, it will provide, among other things, for the following:

(i) final approval of the Settlement Agreement and a finding by the Court that the terms and conditions of the Settlement Agreement are fair, reasonable, adequate, and in the best interests of the Class;

(ii) a finding that the notice given to Class Members of the proposed settlement was the best notice practicable under the circumstances;

(iii) an award to Class Counsel of reasonable attorney fees, costs, and expenses;

(iv) the release of the Settlement Claims belonging to Settlement Class Members;

(v) dismissal on the merits, and with prejudice to refiling, of the claims against Defendants in this lawsuit;

(vi) a reservation of exclusive jurisdiction by the Court as to all matters related to the administration of the settlement and the Settlement Agreement.

### B. Release of Class Claims Belonging to Settlement Class Members

In consideration for the agreement by Defendants to provide the Class Benefits, Settlement Class Members will be deemed to release and discharge Defendants (as defined in Section VII of this Notice) from any liability for the "Settlement Claims." The "Settlement Claims" are:

Any and all claims that were brought or could have been brought by Plaintiff and/or the Settlement Class in this Court, in any other state or federal court, in or before any state or federal administrative agency, or in any other possible proceeding regarding claims that Defendants

- 5 -

misrepresented to their customers at any time the nature, effect, or consequences of federal regulations governing the energy efficiency of newly-manufactured air conditioners in connection with sales of home warranty contracts or sales of upgrades to home warranty contracts.

## VI. FAIRNESS HEARING AND CLASS MEMBERS' OPTIONS AS TO SETTLEMENT

The purpose of the Fairness Hearing to be held on January 12, 2009 is to determine (i) whether the Court should certify a class for settlement purposes; (ii) whether the Court should find that the proposed settlement with Defendants on the terms set forth in the Settlement Agreement is fair, reasonable, adequate, and in the best interests of Settlement Class Members, and whether it should be finally approved by the Court; and (iii) whether the Court should enter a Judgment approving the Settlement Agreement and dismissing the pending claims against Defendants with prejudice to refiling. The Hearing may be adjourned from time to time by the Court, without further prior notice.

### A. Participation in the Settlement as a Settlement Class Member

If you are a Class Member and do nothing at this time, then you will be treated as a Settlement Class Member. If the Court approves the proposed settlement, Settlement Class Members will be entitled to receive Class Benefits. In addition, any Settlement Claims that Settlement Class Members have against Defendants will be resolved by the settlement. Accordingly, if you are a Settlement Class Member and the proposed settlement is approved, then you will have the rights and responsibilities that result from the Court's Final Judgment.

### B. Exclusion Requests

A Class Member may elect to be excluded from the settlement. Any Class Member who elects to be excluded will not share in any Class Benefits or otherwise participate in the settlement, but he or she will not be barred by the Judgment from pursuing individual claims against Defendants in a separate lawsuit.

If you are a Class Member and you want to be excluded from the settlement, you must expressly state your request in a written Exclusion Request. (You may write your own Exclusion Request, containing the information outlined below, or you may fill out and sign the enclosed Exclusion Request form.) You must submit your Exclusion Request by hand-delivery, by mail, or by facsimile to:

> Steven N. Berk, Esq.
> CHAVEZ & GERTLER LLP
> 1225 Fifteenth Street, N.W.
> Washington, D.C.  20005
> Facsimile: (202) 232-7556

Alternatively, you may file your Exclusion Request with the Court and also send a copy of your Exclusion Request by hand-delivery, mail, or facsimile to both of the following attorneys:

- 6 -

Steven N. Berk, Esq.
CHAVEZ & GERTLER LLP
1225 Fifteenth Street, N.W.
Washington, D.C. 20005
Facsimile: (202) 232-7556

Martin R. Boles, Esq.
KIRKLAND & ELLIS LLP
777 South Figueroa Street
Los Angeles, California 90017
Facsimile: (213) 680-8500

Your Exclusion Request must be hand-delivered, post-marked, faxed, or filed no later than December 15, 2008, which is the date twenty-eight (28) days before the Fairness Hearing.

In order to be valid, the Exclusion Request must contain certain information. It must include: (i) your full name; (ii) your current mailing address; and (iii) your residential address at the time of purchase of a 13 SEER upgrade (or other information sufficient for AHS to confirm that the request is being made by a Class Member); (iv) your statement that you request exclusion from the settlement; and (v) your signature or that of your authorized representative. *If an Exclusion Request does not include all of the foregoing information or if it is not timely submitted, then it shall be deemed invalid. A Class Member submitting an invalid Exclusion Request shall be treated as if he or she did not submit any Exclusion Request at all, and shall be deemed to be a Settlement Class Member if the Court finally certifies a class and approves the Settlement Agreement*

### C. Appearances at the Fairness Hearing

A Settlement Class Member — that is, a Class Member who has not filed a timely Exclusion Request — may enter an appearance at the Fairness Hearing, in person or through counsel, and object to: (i) certification of the class action; (ii) the fairness, reasonableness, or adequacy of the settlement; (iii) the payment of attorney fees, costs, and expenses; and/or (iv) entry of the Judgment.

If you are a Class Member and you want to appear at the Fairness Hearing, you are encouraged, but not required, to file a written Statement of Appearance with the Court and also send a copy of the Statement of Appearance by hand-delivery, by mail, or by facsimile to both of the following attorneys:

Steven N. Berk, Esq.
CHAVEZ & GERTLER LLP
1225 Fifteenth Street, N.W.
Washington, D.C. 20005
Facsimile: (202) 232-7556

Martin R. Boles, Esq.
KIRKLAND & ELLIS LLP
777 South Figueroa Street
Los Angeles, California 90017
Facsimile: (213) 680-8500

You may write your own Statement of Appearance containing the information outlined below, or you may fill out and sign the attached Statement of Appearance form. In either event, the parties request that your Statement of Appearance, should you choose the option of submitting one, be filed and served no later than December 15, 2008, which is the date twenty-eight (28) days before the Fairness Hearing.

Any Statement of Appearance should contain the following information: (i) your full name; (ii) your current mailing address; (iii) your residential address at the time of purchase of a 13 SEER upgrade (or other information for AHS to

confirm that the request is being made by a Class Member); (iv) your telephone number; (v) your attorney's name and contact information (if applicable); (vi) a full explanation of all of your reasons for objecting to the settlement; (vii) copies of any papers, materials, or briefs in support of the statement of written objections; (viii) notice of your intent to appear at the Fairness Hearing; and (ix) your signature or that of your authorized representative.

### D. Written Objections

Instead of appearing at the Fairness Hearing, a Settlement Class Member — that is, a Class Member who has not filed a timely Exclusion Request — may object in writing to: (i) certification of the class action; (ii) the fairness, reasonableness, or adequacy of the settlement; (iii) the payment of attorney fees, costs, and expenses; and/or (iv) entry of the Judgment.

If you are a Class Member and you want to present written objections for consideration by the Court, you should file a written Statement of Objections with the Court and also send a copy of the Statement of Objections by hand-delivery, by mail, or by facsimile to both of the following attorneys:

**Steven N. Berk, Esq.**
CHAVEZ & GERTLER LLP
1225 Fifteenth Street, N.W.
Washington, D.C. 20005
Facsimile: (202) 232-7556

**Martin R. Boles, Esq.**
KIRKLAND & ELLIS LLP
777 South Figueroa Street
Los Angeles, California 90017
Facsimile: (213) 680-8500

(You may write your own Statement of Objections, containing the information outlined below, or you may fill out and sign the attached Objection form.) Your Statement of Objections should be filed and served no later than December 15, 2008, which is the date twenty-eight (28) days before the Fairness Hearing.

The Statement of Objections should contain the following information: (i) your name; (ii) your mailing address; (iii) your mailing address at the time of purchase of a 13 SEER upgrade or other information sufficient for American Home Shield to confirm that the request is being made by a Class Member; (iv) your attorney's name and contact information (if applicable); (v) a full explanation of all of your reasons for objecting to the Settlement; (vi) copies of any papers, materials, or briefs in support of the statement of written objections; and (viii) your signature or that of your authorized representative.

### VII. GENERAL DEFINITIONS

"Action" will mean and include, for purposes of this Notice, the litigation entitled *Kathie Aamodt Ward, on behalf of herself and all others similarly situated, v. American Home Shield Corporation and American Home Shield of California, Inc.*, No. 2:07-CV-07-01380-ghw-plw (United States District Court for the Central District of California).

"Class Benefits Date" will mean the date forty-five (45) days after the Effective Date of the Settlement Agreement. In the event the Class Benefits Date falls on a Saturday, Sunday, or federal holiday, "Class Benefits Date" will mean the first business day following such Saturday, Sunday, or federal holiday.

"Defendants" will mean and collectively refer to, for purposes of this Notice, American Home Shield Corporation and American Home Shield of California, Inc. The definition of "Defendants" shall also include, for purposes of this Notice, the present and former officers, directors, employees, principals, agents, attorneys, predecessors, successors, affiliates, parents, subsidiaries, divisions, partners, limited partners, and unincorporated associations of American Home Shield Corporation and American Home Shield of California, Inc., and/or any other entity for which any of these firms shall have a direct or indirect interest, or for which they have any responsibility.

## VIII. EXAMINATION OF SETTLEMENT AGREEMENT AND INQUIRIES BY CLASS MEMBERS

The above is only a summary of the terms of the settlement. You may obtain a copy of the Settlement Agreement, the Exclusion Request form, the Statement of Objections form, the Statement of Appearance form, and further information concerning the settlement, the Fairness Hearing, and Class Benefits by either logging on to www.wardclassaction.com or sending a written request to:

American Home Shield
W-C3-0082
P.O. Box 771469
Memphis, TN  38177-1469

All questions relating to the proposed settlement should be directed to Class Counsel. If you wish to communicate with Class Counsel, you may do so using the following addresses and telephone numbers:

Steven N. Berk, Esq.
CHAVEZ & GERTLER LLP
1225 Fifteenth Street, N.W.
Washington, D.C.  20005
Telephone: (202) 232-7550
Facsimile: (202) 232-7556

You may, of course, seek the advice and guidance of your attorney if you desire. **DO NOT TELEPHONE THE COURT OR THE COURT CLERK'S OFFICE FOR INFORMATION**.

Dated: September 12, 2008

/S/   Hon. George H. Wu
Honorable George H. Wu, U.S.D.J.

- 9 -

### REQUEST FOR EXCLUSION
### FROM CLASS ACTION SETTLEMENT

**DEADLINE FOR SUBMISSION:**
**MUST BE POSTMARKED, HAND-DELIVERED, OR FAXED**
**BY DECEMBER 15, 2008**

I hereby request to be excluded from the Class Action Settlement in *Ward v. American Home Shield Corp. and American Home Shield of California, Inc.*, Case No. CV-07-01380 GW (PJWx) (C.D. Cal.), and understand that, by excluding myself, I will forego any settlement benefits.

*Full Name: _____

*Current Address: _____

*Address at time of purchase of 13 SEER upgrade from American Home Shield, or other information sufficient to confirm that this request is being made by a Class Member: _____

_____

_____


Telephone Number: _____

Email Address: _____

AHS Contract Number: _____


_____        _____
Signature                                Date

Send this completed, signed opt-out form by mail, hand-delivery, or facsimile to Class Counsel at the following address:

> Steven N. Berk, Esq.
> CHAVEZ & GERTLER LLP
> 1225 Fifteenth Street, N.W.
> Washington, D.C. 20005
> Tel: (202) 232-7550
> Fax: (202) 232-7556

* Required information that must be included to be excluded from Class.

1    Martin R. Boles (State Bar No. 124159)                     **MADE JS-6**
     mboles@kirkland.com
2    KIRKLAND & ELLIS LLP
     777 South Figueroa Street
3    Los Angeles, California  90017
     Telephone: (213) 680-8400; Facsimile: (213) 680-8500
4
     Robert R. Gasaway (Pro Hac Vice)
5    rgasaway@kirkland.com
     Ashley C. Parrish (Pro Hac Vice)
6    aparrish@kirkland.com
     KIRKLAND & ELLIS LLP
7    655 Fifteenth Street, N.W., Suite 1200
     Washington, D.C.  20005
8    Telephone: (202) 879-5016; Facsimile: (202) 879-5200
9    Attorneys for Defendants
     AMERICAN HOME SHIELD CORPORATION,
10   AMERICAN HOME SHIELD OF CALIFORNIA, INC.
11   Gary S. Soter (Bar No. 67622)
     gsoter@psswplaw.com
12   PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
     15165 Ventura Boulevard, Suite 400
13   Sherman Oaks, California  91403
     Telephone: (818) 788-8300; Facsimile: (818) 788-8104
14
     Steven N. Berk
15   steven@chavezgertler.com
     CHAVEZ & GERTLER LLP
16   1225 Fifteenth Street, N.W.
     Washington, D.C.  20005
17   Telephone: (202) 232-7550; Facsimile: (202) 232-7556
18   Attorneys for Plaintiff
     KATHIE AAMODT WARD, on behalf of herself
19
     *Additional Counsel Listed on Signature Page*
20

21                **UNITED STATES DISTRICT COURT**
         **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**
22
     KATHIE AAMODT WARD, on behalf of )   CASE NO. CV-07-01380 GW (PJWx)
23   herself and all others similarly situated, )
                                              )   The Hon. George H. Wu
24              Plaintiff,                     )   The Hon. Patrick J. Walsh
                                              )
25          vs.                               )
                                              )
26   AMERICAN HOME SHIELD                      )   **FINAL ORDER AND JUDGMENT**
     CORPORATION; AMERICAN HOME               )
27   SHIELD OF CALIFORNIA, INC.,              )
                                              )
28              Defendants.                    )

1       Before the Court is the Parties' Joint Motion for Final Approval of the terms of

2    the Agreement of Class Action Settlement ("Agreement" or "Settlement Agreement")

3    between Plaintiff Kathie Aamodt Ward ("Plaintiff") and Defendants American Home

4    Shield Corporation and American Home Shield of California, Inc. ("Defendants").

5       Plaintiff and Defendants executed the Settlement Agreement on September 2,

6    2008. On September 16, 2008, this Court entered an Order (i) conditionally certifying

7    a Settlement Class consisting of all persons who purchased a 13 SEER home warranty

8    upgrade from Defendants; (ii) preliminarily approving the proposed Settlement as fair,

9    reasonable, and adequate; (iii) directing the parties to notify Class Members of the

10   contemplated settlement; and (iv) scheduling a Fairness Hearing to determine whether

11   the Settlement should be finally approved.   On October 30, 2008, counsel for

12   Defendants notified the Court that they had provided the required notice.   The

13   Fairness Hearing was held on January 12, 2009.

14      The Court, having heard all persons properly appearing and timely requesting to

15   be heard, having considered the Agreement and the papers submitted in support

16   thereof, and having considered the oral presentations of counsel and all applicable

17   law, concludes that the Settlement Agreement is fair, reasonable, and adequate, and

18   should be finally approved.

19      **IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:**

20      1.   The Court has subject matter jurisdiction to approve a settlement in this

21   Action.

22      2.   The Court has personal jurisdiction over all Parties to this Action and all

23   members of the Settlement Class.

24      3.   The proposed Settlement, as set forth by the Parties in their Agreement, is

25   in good faith and is approved as fair, reasonable, adequate, and in the best interests of

26   the Parties and the Class.  The Parties shall perform the Settlement in accordance with

27   the terms of the Agreement.

28      4.   The Notice of Class Action and Settlement ("Class Notice") fully, fairly,

1    and accurately informed all Class Members of the material elements of this Action

2    and the proposed Settlement, and constituted: (i) the best practicable notice; and

3    (ii) notice that was reasonably calculated, under the circumstances, to apprise

4    members of the Settlement Class of the pendency of this Action, their right to object

5    or exclude themselves from the proposed Settlement, and their right to appear at the

6    Fairness Hearing.

7         5.    The Court finds that the notice given by Defendants satisfies the

8    requirements of 28 U.S.C. § 1715(b), and that no objection was received from any

9    state or federal official.

10        6.    After proper notice to the Class, and after sufficient opportunity to object

11   to the proposed Settlement, no timely and valid objections were made that would

12   present any obstacle to approving the Settlement.   The comments and statements

13   submitted by Class Members have been duly considered by the Court, but none of

14   these comments and statements alters the Court's judgment that the Settlement should

15   be approved.

16        7.    All Class Members who failed to file a timely and valid objection to the

17   Settlement Agreement are deemed to have waived and forfeited any such objections

18   and are bound by all terms of the Agreement, including the Release and this Final

19   Order and Judgment.

20        8.    After proper notice to the Class, and after sufficient opportunity to

21   request exclusion from the Class, 1070 requests for exclusion from the Settlement

22   Agreement were made.

23        9.    All Class Members who failed to timely request exclusion from the

24   Settlement are bound by all terms of the Agreement, including the Release and this

25   Final Order and Judgment.

26        10.   By approval of the Settlement Agreement and entry of this Final

27   Judgment and Order, Plaintiff and Class Members will have:

28                  fully, unconditionally, and completely released, waived,

-3-

relinquished, and forever discharged all of the Defendants, as defined above, including but not limited to American Home Shield Corporation and American Home Shield of California, Inc., and any other entity in which any of these firms has a direct or indirect interest or which is or may be responsible for it or for which it is or may bear responsibility, including but not limited to all of their respective parents, affiliates and subsidiaries, and all of the aforementioned firms' and entities' present or former agents, present or former directors, present or former officers, and present or former employees, from any and all claims, demands, debts, rights, causes of action, damages, costs, compensation, liabilities, penalties, attorney fees, or losses in law or equity, of whatever kind or nature, whether known or unknown, suffered or sustained by any person or entity, as to and arising out of (i) any and all claims pled on behalf of the Class in Plaintiff's Third Amended Complaint filed in this Action; and (ii) any and all claims that could have or should have been pled regarding claims that Defendants misrepresented to their customers at any time federal regulations governing the fuel efficiency of newly-manufactured air conditioners in connection with sales of home warranty contracts, or in connection with sales of upgrades to home warranty contracts, including but not limited to any tort claims, contract claims, statutory claims, controversies, actions, causes of action, declaratory judgment actions, cross-claims, counterclaims, demands, debts, claims for damages, claims for liquidated damages, claims for punitive or exemplary damages, claims for injunctions, claims for restitution, rescission, or reimbursement, claims for other equitable relief, claims for costs, expenses, and/or attorney fees, or claims asserting other liabilities of any nature, regardless of whether or not any such Plaintiff and/or Class Member makes a claim for, or ultimately receives, any benefits under this Settlement Agreement. The provisions of this Release shall bar any personal right, cause of action, claim, or damage that Plaintiff and/or any Class Member may assert arising out of the same or causally related facts,

-4-

1  transactions, occurrences, or subject matters as
2  described in, or encompassed by, the Settlement Claims.

3     11.   The Parties' stipulation regarding an award of attorney fees, costs, and
4  expenses for Class Counsel is approved.  Class Counsel are awarded $500,000.00 as
5  attorney fees, costs, and expenses, to be paid by Defendants in the manner outlined in
6  the Agreement.

7     12.   This Action shall be dismissed with prejudice and on the merits.  Without
8  affecting the finality of this Final Judgment and Order, the Court reserves exclusive
9  jurisdiction as to all matters related to the administration of the Settlement and the
10 Settlement Agreement.

11    13.   Plaintiff, Class Members, and Defendants are denied all relief not
12 expressly granted by this Judgment.

13    14.   This Final Order and Judgment shall not be construed as a finding of the
14 Court concerning, or evidence of any admission by the Parties concerning:  (i) any
15 liability, fault, or wrongdoing by Defendants; (ii) the existence of any defense to
16 Plaintiff's claims or the claims of any Class Member; (iii) the appropriateness of any
17 measure of alleged damages; and (iv) the propriety of class certification, other than
18 certification for purposes of settlement only.

19

20    **SO ORDERED** this 12th day of January, 2009.

21

22

23    _____
      Hon. George H. Wu

24

25

26

27

28