FILED

2010 Apr-12  PM 04:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

1
2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

3

4   LAURA FAUGHT and STEVEN FAUGHT,   )
    on behalf of themselves and all   )
    others similarly situated,        )Case No.

5                                      )
            Plaintiffs,                )2:07-cv-01928-RDP

6                                      )
                                       )Birmingham, Alabama

7               vs.                    )
                                       )March 10, 2010

8   AMERICAN HOME SHIELD CORPORATION,  )
                                       )10:46 a.m.

9           Defendants.                )

10              *    *    *    *    *    *    *

11          TRANSCRIPT OF HEARING IN THE ABOVE CASE
         HELD BEFORE THE HONORABLE R. DAVID PROCTOR

12               UNITED STATES DISTRICT JUDGE

13

14  **APPEARANCES:**

15  FOR THE PLAINTIFFS:          D. Frank Davis, Esq.
    Laura and Steven Faught      John E. Norris, Esq.

16                               Tyler C. Vail, Esq.
                                 Wesley W. Barnett, Esq.

17                               Davis & Norris, LLP
                                 2151 Highland Avenue South

18                               Birmingham, AL  35203-2101

19  FOR THE INTERVENOR:          Frank H. Tomlinson, Esq.
    John Howe, et al.            Attorney at Law

20                               15 North 21st Street, Ste. 302
                                 Birmingham, AL 35203

21

22  FOR THE INTERVENOR:          John W. Davis, Esq.
    Miriam and John Chapon       Law Office of John W. Davis

23                               501 W. Broadway, Suite 800
                                 San Diego, CA 92101

24

25

```
 1   FOR THE DEFENDANT:            John E. Goodman, Esq.
     American Home Shield Corp.    Scott Smith, Esq.
 2                                 Bradley, Arant, Boult, Cummings
                                   One Federal Place
 3                                 1819 Fifth Avenue N.
                                   Birmingham, AL  35203
 4
                                   Rachel B. Niewoehner, Esq.
 5                                 Joel S. Feldman, Esq.
                                   Sidley Austin, LLP
 6                                 One South Dearborn Street
                                   Chicago, IL  60603
 7
                                   Brad Coffey
 8                                 Beck, Redden & Secrest
                                   1221 McKinney, Suite 4500
 9                                 Houston, TX 77010

10   FOR THE ATTORNEY GENERAL      Pat Tulinski, Esq.
     STATE OF TEXAS:               Assistant Attorney General
11                                 Consumer Protection & Public
                                   Health Division
12                                 300 W. 15th Street, 9th Floor
                                   Austin, TX 78701
13
     COURT REPORTER:               Anita M. McCorvey, RMR
14                                 Federal Official Reporter
                                   Hugo Black Courthouse
15                                 1729 5th Avenue North
                                   Birmingham, AL 35203
16

17

18

19

20

21

22

23

24

25
```

```
 1   March 10, 2010                              10:46 a.m.
 2                        (Open Court.)
 3             THE COURT:  Good morning.  I apologize for being so
 4   late.  I really thought I was going to be able to get to
 5   Tuscaloosa and back this morning and have breakfast with the
 6   Chief Justice, and a funny thing happened on planning on
 7   getting back on time; it didn't work.  He was enjoying our
 8   company much more than I thought he might, so it went longer.
 9   And then the rain didn't help on the way back.
10        Have a seat.  Again, I'm sorry I'm late.
11        All right.  Is that background from the phone?
12             MR. FELDMAN: (BY PHONE) I'm sorry, Your Honor.  I'll
13   put it on mute.
14             THE COURT:  All right.  Thank you.  We are here in
15   Laura and Steven Faught v. American Home Shield Corporation,
16   Case 2:07-cv-1928-RDP.  We're here for purposes of a hearing
17   on the request for approval of the settlement reached in this
18   class action and for a Fairness Hearing on that matter.
19        Let me just ask if counsel, at counsel table, will
20   identify yourselves for the record.
21             MR. NORRIS:  Johnny Norris, Your Honor, representing
22   the Faughts.
23             MR. DAVIS:  Frank Davis, Your Honor, representing
24   the plaintiffs.
25             MR. VAIL:  Tyler Vail representing the plaintiffs.
```

1          MR. BARNETT:  Wes Barnett representing the Faughts.

2          THE COURT:  All right.  Thank you.

3          MR. GOODMAN:  John Goodman for American Home Shield.

4          MS. NIEWOEHNER:  Good morning, Your Honor.  Rachel

5     Niewoehner for American Home Shield.

6          THE COURT:  Thank you.

7          MR. SMITH:  Scott Smith for American Home Shield.

8          THE COURT:  All right.  Thank you.  And what other

9     counsel are here who've indicated they wish to appear and are

10    planning to actually address the Court on matters today.

11         MR. TOMLINSON:  Frank Tomlinson, here, Your Honor,

12    for some objectors.

13         THE COURT:  Thank you.

14         MR. JOHN DAVIS:  Good morning, Your Honor.  John

15    Davis for intervenors Miriam and John Chapon.

16         THE COURT:  Thank you.

17         MS. TULINSKI:  Good morning, Judge.  Pat Tulinski

18    from the Texas Attorney General's Office on behalf of the

19    State of Texas.

20         THE COURT:  Thank you.  Appreciate that.  Anyone

21    else?

22        All right.  Here's the way I would like to proceed.  I do

23    think the parties have the burden of showing that it's a fair,

24    reasonable and adequate settlement.  So I want to hear from

25    the parties first at least on any presentation they would like

```
 1    to make.  I'll defer to plaintiffs or defendants depending
 2    upon who wants to go first there.
 3         After that is done, I'll be glad to hear with respect to
 4    objections.  And then I'll allow the parties an opportunity to
 5    respond to the objections.
 6         I think that's a fairly logical way to approach it.  Any
 7    concerns about that methodology?
 8                MR. GOODMAN:  No, Your Honor.
 9                MR. DAVIS:  No, Your Honor.
10                THE COURT:  All right.  Very well.  Who wants to go
11    first between the plaintiffs and the defendants?
12                MR. DAVIS:  Your Honor, Frank Davis, for the
13    plaintiffs.  Your Honor, I have practiced class action
14    litigation for more than 30 years and I've never been more
15    proud to recommend a settlement for approval in a court.
16         I recommend this settlement for approval on behalf of the
17    class representatives, Laura and Steven Faught, who I'll
18    introduce to the Court.  They are sitting right here, Your
19    Honor.
20                THE COURT:  All right.  Welcome.
21                MR. DAVIS:  And I recommend this settlement on
22    behalf of my law firm, Davis & Norris.
23         This is an important settlement.  It is not a coupon
24    settlement.  It is not a settlement where class members get
25    pennies.  It is a settlement with real and substantial relief.
```

1    Under the terms of this settlement, American Home Shield
2    is required to review any denied claim by any class members
3    who requested that they review it.

4    The procedure for such a review, under the terms of this
5    settlement, is very simple.  It starts with a plain English
6    postcard opening the claims procedure.  It has a simple claims
7    form.  The claims form requires only the most basic of
8    information.  To the extent it asks for anything else, it
9    makes it clear that the other things are purely optional.

10    For example, it says to "provide an e-mail address, if
11    any"; or a contract number -- "the AHS contract number, if
12    available."  It requires only the minimum amount of -- excuse
13    me -- only the minimum amount of information necessary for AHS
14    to identify the claim that it's being asked to review.

15    And there are severe penalties, Your Honor, attached to
16    the process of claims review to ensure that American Home
17    Shield acts in good faith on the review.  On every claim,
18    there is a penalty of at least a thousand dollars if American
19    Home Shield does not act in good faith.  And here's the way it
20    works:

21    If a $90 claim, for example, is asked to be reviewed by
22    American Home Shield, and American Home Shield offers some
23    amount of money as a resolution of the reviewed claim --
24    suppose they offer $89.  Then this claimant has the right to
25    reject that offer; to go into a small claims court.  And if

1   that plaintiff recovers even a penny more, even one cent

2   more than American Home Shield offered, to recover an

3   additional penalty of a thousand dollars.

4        And the thousand-dollar penalty is automatic.  The

5   plaintiff does not have to remember to ask it of its local

6   judge.  The plaintiff does not have to convince the local

7   judge that he's entitled to that penalty.  The penalty comes

8   automatically from American Home Shield.  And in some cases,

9   the penalties are higher; as high as $5,000, or three times

10  the amount of the claim.

11       The releases, Your Honor, in this settlement, are narrow.

12  They preserve the right for the plaintiff to bring a lawsuit,

13  an individual lawsuit, over denied claims.

14       An important part of this settlement also is its built-in

15  enforcement procedures.  There are mechanisms in this

16  settlement to be sure that the reviews by the review desk are

17  monitored by plaintiffs' counsel, and that enforcement

18  mechanisms can be used, if necessary.  The plaintiffs' counsel

19  receives quarterly reports of the operations of the review

20  desk in considerable detail.

21       Plaintiffs' counsel will also have the ability to track

22  claims from a large number of people.  We have already

23  received thousands of telephone calls.  I would estimate, as

24  of today, more than 15,000 telephone calls of class members

25  who have asked that we assist, or help them in terms of claims

1    reviews, or claims submissions sometime in the future; or some

2    people just had general questions about the settlement, which

3    we answered.

4         But having those people, who asked us to assist in the

5    claims process, will enable us, in addition to the reviews and

6    the quarterly reports, to actually review individual claims as

7    they progress and be sure that the review desk is acting in

8    good faith.

9         THE COURT:  What do you make of the concern

10   expressed by some of the objectors that a two-year period is

11   too long, and that the staffing on the claims desk could be

12   put in place such that we could get these claims addressed and

13   ruled upon more quickly?

14        MR. DAVIS:  Your Honor, I think there are several

15   responses to the question of the two-year time period.  One

16   is -- for example, one of the objections that was made to the

17   two-year time period was one, I think, by the Texas Attorney

18   General.

19        And I remind the Court that the Texas Attorney General's

20   own lawsuit has been pending now for more than four years, and

21   that they've recently requested an extension.  So it sort of

22   puts in question the two years related to a settlement that

23   they are now beginning the process in furtherance of that.

24        In addition to that, we have considered the question in

25   the settlement negotiations of what is a reasonable time

1    period.  Our conclusion, based on our experience in other
2    class settlements, is that two years considering the volume of
3    claims.  Here, there are 4.3 million people in the class.  The
4    volume of likely claims to be considered is enormous.  The
5    claims go back as long as eight years.  Some of the people
6    that have been waiting for a long time to have these claims
7    paid, but they go back as long as eight years.
8         Finally, we have asked an experienced claim settlement
9    administrator, Mr. Ed Gentle, who is well-known and handles a
10   lot of claims for class action settlements, including quite a
11   few out of this district, as to what is a reasonable time
12   period, and he's filed an affidavit with this Court saying
13   that he thinks that two years is reasonable.
14        I think, considering the volume of claims, that we
15   certainly would prefer that they could all be done overnight.
16   But considering the volume of claims, we want them handled
17   right, and we want them reviewed correctly, and we want the
18   claims paid that are supposed to be paid; and so, therefore,
19   we think the two-year time period is a reasonable time period,
20   Your Honor.
21        Your Honor, this settlement is so good that when 4.3
22   million class members were notified of the terms of the
23   settlement, only 23 people filed objections.  Now, that count
24   was done by the defendants a few weeks ago and I assume it's
25   still good, but if it's not exactly right, it's got to be

1  close, where they counted 23 individual objectors at the time

2  they filed their brief.

3      This settlement is so good that when 50 states were

4  notified of the settlement, only one, Texas, opposed it.

5      This settlement is so good that not a single consumer

6  rights group in the United States came in to oppose it.  And

7  now that is quite customary in the United States in consumer

8  settlements, for consumer rights groups, or public interest

9  groups, to oppose settlements where they think the settlements

10  are not fair; or where attorneys, they think, are getting a

11  lot of money for not achieving much results.  None of those

12  have appeared here.

13      I suggest, Your Honor, in looking at the 23 objectors

14  that have filed objections to this case that one might

15  consider that if one percent of the 4.3 million class members

16  were to file objections, there would be 43,000 objections in

17  this courtroom and that we have 23.

18      Many courts -- and the cases are cited in defendant

19  American Home Shield's brief -- have viewed so few objections

20  as being a major indication that a settlement is fair and

21  reasonable.

22          THE COURT:  Well, you look at two issues:  The

23  number of objections but also the substance of them, correct?

24          MR. DAVIS:  Yes, Your Honor.  I do think the

25  substance of the objections is important.  And, therefore, I

1    would like to make the additional point that of the few

2    objections filed, most of the objections are based on

3    incorrect facts, or a misunderstanding of the settlement terms

4    themselves.

5          Let me give you some examples of what I mean by that.

6    Some of these objectors suggest that the penalty provisions

7    are not sufficient to get lawyers to take cases that are

8    turned down by the review desk.  Now that's just simply

9    factually wrong.

10          We filed an affidavit by Tyler Vail, of our law firm,

11    that indicated that he had talked to lawyers all over the

12    United States, who indicated a willingness to take these cases

13    if they were turned down by the review desk and if people had

14    good claims.  Now, there is no contrary evidence to that in

15    this record.  But in order to leave no doubt --

16          THE COURT:  There's been a motion to strike that

17    aspect of the affidavit as hearsay.  Did you see that?

18          MR. DAVIS:  There has been.

19          THE COURT:  You want to respond to that?

20          MR. DAVIS:  Yes, Your Honor.  As originally stated,

21    the affidavit said that these attorneys are "willing" to take

22    the cases.  We filed an amended affidavit that says he has

23    been told -- they indicated to him -- that they would take the

24    cases.  That's the best evidence of that.  That is not a

25    hearsay statement.

1        But, Your Honor, so there be no doubt, I have in my hand

2    more than 30 letters from lawyers around the United States

3    that indicated an interest in taking cases turned down by the

4    review desk based on the terms of this settlement.

5        And, for example, the first one in my hand is from

6    Florida, one from Indiana, one from Connecticut, one from

7    California -- and I won't read them all.  One from Texas.  I

8    won't read them all, but I would mark them as an exhibit.

9            THE COURT:  All right.  We will mark that as

10   Plaintiffs' Exhibit 1.

11           MR. DAVIS:  And we would offer those letters.

12           THE COURT:  Any objection to Plaintiffs' Exhibit 1

13   being considered by the Court?

14           MR. GOODMAN:  No objection.

15           THE COURT:  Without objection, it's received.

16           MR. JOHN DAVIS:  I object, Your Honor.  John Davis

17   for --

18           THE COURT:  All right.  What's your basis?

19           MR. JOHN DAVIS:  I haven't been served with a copy

20   of it yet.

21           THE COURT:  Why don't you provide him a copy?  And,

22   Mr. Davis, that's exactly what I would like you to do, if you

23   have a concern, to speak up, and we'll deal with it as we go

24   here.

25           MR. JOHN DAVIS:  Thank you, Your Honor.

1            THE COURT:   Thank you.

2            MR. DAVIS:   Your Honor, and when I say that most of

3    the objections are based on a misunderstanding of something,

4    I'll give you, as another example, that the State of Texas

5    says that the release in this case, releases claims in the

6    *Rudd* case.  Now, that's another case that my law firm has

7    brought under RESPA.  It alleges kickbacks.

8            First, I want to say to the State of Texas that I

9    appreciate her comments about what a great case that was, and

10    we certainly think it's a good case, as well.

11           THE COURT:   You would like her to file an amicus

12    brief in that case.

13           MR. DAVIS:   Yes, Your Honor, we would actually very

14    much appreciate the State of Texas filing an amicus brief in

15    that case.  That would be very nice.

16           But the objection, based on the fact that the release

17    here, releases the *Rudd* case, is simply factually incorrect.

18    The terms of this settlement agreement specifically say that

19    the release is limited to claims alleged in the case, and are

20    reasonably related to those alleged in the case, and these are

21    not those kinds of claims.  It is a point so clear that we

22    have stated it in our briefs and the defendant, American Home

23    Shield, has said the same thing.

24           Texas also raised a question of a conflict.  And the

25    problem -- and Your Honor, I know, has read everything, so I'm

1    not going to go into the details on that.  But it relates to

2    the fact that they say that the firm that Mr. Norris and I

3    left some seven years ago, they say used to represent a sister

4    company to American Home Shield called Terminix.  I have no

5    recollection of that and neither did Mr. Norris.  I would not

6    deny it to be true because I do not know one way or the other.

7    That firm has a great number of lawyers.

8        But the ethical rule that governs the question of former

9    law firms is Rule 1.9.  There are two versions of that.

10   There's the Model Rules, and the Alabama Rule is slightly

11   different.  But both those rules very clearly say, that Mr.

12   Norris and I have no issue at all in that regard, with regard

13   to a former law firm unless we obtained, in that practice with

14   that former law firm, some information, some knowledge about

15   American Home Shield, probably knowledge about this very case.

16       But since Mr. Norris and I have filed a declaration

17   saying that we have never done any work for Terminix, then

18   there's no issue there at all.

19       And to the extent that the State of Texas suggests that

20   we were somehow or another -- or somehow or another have been

21   trying to hide our association with Burr & Forman, I might

22   point out that we did a really bad job of it, because my

23   declaration, the first one I filed with the Court, said in the

24   first paragraph -- Paragraph Number 1.  "For many years, I was

25   a partner with Burr & Forman, LLP."  So if I'm hiding it, I'm

 1   doing a very bad job of it, Your Honor.

 2        The State of Texas also says that the review procedure

 3   really doesn't work and the Texas case is needed.  Because the

 4   State of Texas says the contracts here don't require a causal

 5   connection between, say, rust, or damage by a pet, or chemical

 6   or sedimentary buildup.  They say the contracts permit, by the

 7   terms of the contracts, denial of those claims, even without

 8   causation, even if there's not a causal connection.

 9        The problem with that argument is that they're simply

10   wrong about it, Your Honor -- is that I have in front of me

11   the contract -- a couple of examples of the contracts.  I have

12   a false contract and I have a sample contract just generally

13   published by American Home Shield over the Internet.  It's a

14   sample contract.  The sample contract is dated way back in

15   2002, yet, still appears on their website.

16        And in both instances, in both these contracts in my

17   hand, there is an absolute requirement that the malfunction --

18   that in order to deny the claim, this rust -- on rust, it says

19   the malfunction has to be due to the rust.  On chemical or

20   sedimentary buildup or pet damage, it specifically says it's

21   got to be caused by it.

22        And so the concept that these claims won't get paid by

23   the review desk because they can be turned down again with no

24   causal connection is simply wrong under the terms of the

25   contract.

1    And I've marked these two contracts as Exhibit 2, Your

2  Honor.

3              THE COURT:  All right.  Any objection?

4              MR. GOODMAN:  None.

5              THE COURT:  Without objection, they are received.

6              MR. DAVIS:  Now, similarly odd to me is the claim by

7  the State of Texas about the CAFA notice.  And they say they

8  didn't get the CAFA notice until a few days before the

9  objections were due.

10     Well, apparently, under the law, the CAFA notice was sent

11  by the defendants to the right place.  But, in addition to

12  that, it appears to be much ado about nothing anyway because

13  the State of Texas admits, in its Footnote No. 2, that they

14  had a copy of the settlement agreement months in advance.

15     I filed a declaration that says I had a personal

16  discussion with the same lady who filed a brief here in this

17  court with her, and she told me, at the time, that she had

18  already seen the settlement agreement, and this was months

19  before.

20              THE COURT:  Well, I guess this is a better question

21  for Mr. Goodman and maybe the State of Texas; but who

22  regulates AHS in Texas?  Is it the Texas Real Estate

23  Commission?

24              MR. GOODMAN:  It's the Texas Real Estate Commission,

25  Judge.  When I get to my part of the presentation, I do have a

little evidence that would bear on that.

THE COURT:  Is that disputed by the State of Texas?

MS. TULINSKI:  No, Your Honor.  It's not disputed by the State of Texas.

However, we have a letter from the Texas Real Estate Commission saying that they are not -- expressly not taking a position on this settlement and are deferring to the Attorney General's amicus position.

THE COURT:  Well, the question I'm asking, though, is a little different; not whether there's an objection and who's making it from the State of Texas, but rather whether there's been compliance with 28 United States Code, Section 1715 (a)(2) and (b).

It seems to me that they are required to send notice to the state official who regulates them.  And (a)(2) defines who the appropriate state official is.  It means "the person in the state who has the primary regulatory or supervisory responsibility with respect to the defendant."

Any question that's not the Texas Real Estate Commission?

MS. TULINSKI:  Your Honor, no.  They are clearly the regulator.  However, I point to -- and I just served a paper copy of our brief, as opposed to an electronic brief, at the end of Footnote 2, which is on Page 2 --

THE COURT:  Of your submission?

MS. TULINSKI:  Yes, sir.

1          THE COURT:  Okay.

2          MS. TULINSKI:  There's authority at -- and I'll just

3     quote it:  "It remains unclear whether defendant must serve

4     the primary regulator and the AG; or whether one of the two

5     suffices."

6          THE COURT:  Well, in this case, wasn't there a

7     discussion with a lawyer in the Attorney General's Office

8     about the fact that a proposed settlement had been proffered

9     to the Court, and wasn't there fairly contemporaneous

10    indication to someone in the Attorney General's Office that

11    the Court had preliminarily approved that and provided a copy

12    of notice and the proposed settlement?

13         MS. TULINSKI:  Your Honor, we did receive a copy of

14    a proposed settlement, informally, through an e-mail.  I had

15    discussions --

16         THE COURT:  Well, informally.  Again, I'm trying to

17    figure out if there's an objection to the manner in which the

18    State of Texas was notified of the settlement.  Either there

19    is an objection or there isn't.  If there isn't, we don't have

20    to deal with it.  If there is, I'll be glad to deal with it.

21         MS. TULINSKI:  To the extent that our lack of an

22    objection -- I mean, we've received the document; however, I

23    view it as a jurisdictional requirement, and that's a judgment

24    that the Court can make.

25         THE COURT:  Is there an objection?  That's a yes or

1    no question.

2                    MS. TULINSKI:  Yes.

3                    THE COURT:  All right.  What's the basis of the

4    objection?

5                    MS. TULINSKI:  The basis of the objection is that

6    CAFA requires notice, in a very specific form.  And I think

7    it's unclear whether it's to the regulator and/or the Attorney

8    General.  To the extent that it affects the Court's

9    jurisdiction over Texas consumers, then we do object, Your

10   Honor.

11                   THE COURT:  Well, what is the State of Texas'

12   position on what Section 1715 requires?  Have you researched

13   it?

14                   MS. TULINSKI:  Yes, sir.

15                   THE COURT:  Okay.  What's your research indicating?

16                   MS. TULINSKI:  Our research indicates that it's

17   unclear whether both the State AG and the regulator needs to

18   be informed.

19                   THE COURT:  All right.  Point to me the language in

20   the statute that you would say suggests that notice also has

21   to be given formally to the Attorney General, in addition to

22   the appropriate state official with regulatory or supervisory

23   responsibility.

24                   MS. TULINSKI:  Your Honor, I don't have the section

25   in front of me.  I can point you to a Law Review article that

 1   discusses it in length.

 2           THE COURT:  A Law Review article?

 3           MS. TULINSKI:  Yes.  It discusses the question at

 4   length.

 5           THE COURT:  Well, I'd be more interested in --

 6           MS. TULINSKI:  I'll be more than happy to file a

 7   supplemental brief on that issue.

 8           THE COURT:  I'd be more interested in an order, what

 9   Congress has said, what a court with binding authority on me

10   has said, or on what a court that would be persuasive --

11           MS. TULINSKI:  Excuse me, Your Honor.  The issue

12   hasn't been addressed.  The authority I have is a Law Review

13   article pointing out the open question.

14           THE COURT:  All right.

15           MS. TULINSKI:  And that's cited in our brief.  I'll

16   be more than happy --

17           THE COURT:  But, in any event, the State of Texas

18   has had a full opportunity to object, and that's why you're

19   here, right?

20           MS. TULINSKI:  Correct.

21           THE COURT:  And that would be the purpose of the

22   provision in Section 1715 requiring notice to the appropriate

23   state official so that the state could decide whether it

24   wishes to object and on which grounds it wishes to object,

25   correct?

1          MS. TULINSKI:  Correct, Your Honor.  My concern is

2    that we don't have the ability to confer jurisdiction on this

3    Court if, in fact, there's a jurisdictional defect and that's

4    my only --

5          THE COURT:  I agree with that.  I agree with that.

6    You're not saying it's a jurisdictional defect, you're just

7    concerned it may be one.

8          MS. TULINSKI:  Absolutely.

9          THE COURT:  All right.  Fair enough.  I do think

10   that notice was provided to the appropriate state official.

11       Mr. Goodman, I'll be glad to receive your evidence, if

12   you wish to make a proffer on the record and put it in, but I

13   think the State of Texas is agreeing that the appropriate

14   state official referred to, in Section 1715, is the Texas Real

15   Estate Commission.  I don't think there's any dispute that

16   they were given notice.

17       I also don't think there's any dispute that Mr. Carmona

18   was informed of it, informally, both in a conversation with

19   Mr. David Beck, and in an e-mail followup to that

20   conversation.  I think the conversation occurred on September

21   22, 2009; and the e-mail on October 20, 2009.

22       And I don't think there's any question that both the

23   Attorney General and the Texas Real Estate Commission was

24   aware of, or actually received notice of the settlement, of

25   the preliminary approval, and of the preliminary

1    certification.

2        In that light, I find the principal reason that CAFA

3    requires notice to all states, is so that those states can

4    take a position on, for example, whether they agree with a

5    settlement and how it may affect consumers or citizens of that

6    state; that the State of Texas did receive CAFA notice through

7    the appropriate state official, and either informal or e-mail

8    notice -- however you want to characterize it -- of the

9    settlement to the Attorney General's Office, and that the

10   defendant certainly made sure the Attorney General's Office

11   was aware of the preliminary approval and proposed settlement.

12       I also find that Texas has had a full and fair

13   opportunity to object and has actually objected to the

14   settlement.  And I'm certainly going to be interested, at the

15   appropriate time, to hear directly from the State of Texas as

16   to what it has to say about the settlement, in addition to

17   what it's already indicated in both its submissions to the

18   Court and amicus brief.

19       All right.  Everyone think I've fully covered that

20   particular issue?

21           MR. GOODMAN:  I think you have, Judge.  Just for

22   purposes of having it in the record, I would offer -- I've got

23   two letters from TREC that demonstrate they, in fact, do

24   regulate us because it shows them responding to a complaint

25   about our practices in Texas.

```
 1              THE COURT:  That's fine.  You can put those in and

 2    that way we'll have a factual basis for the -- I won't call it

 3    a stipulation but maybe the agreement -- that Texas Real

 4    Estate Commission is the regulating or supervising authority

 5    over AHS.

 6              MR. GOODMAN:  Right.

 7              THE COURT:  And that's going to be Defendant's

 8    Exhibits 1 and 2?

 9              MR. GOODMAN:  Defendant's Exhibits 1 and 2, Judge.

10              THE COURT:  Any objection to receiving those?

11              MS. TULINSKI:  Your Honor, I would like to --

12              THE COURT:  Why don't you just show them to the

13    State of Texas and make sure they don't have an objection.

14              MR. GOODMAN:  I sure will.

15              MS. TULINSKI:  Also, Your Honor, I have a letter

16    from the Real Estate Commission deferring to us because I

17    understand that the proponents of this settlement today are

18    making an argument that the State doesn't have standing since

19    TREC hasn't come here and made its CAFA objection.  I have a

20    letter from TREC saying they defer to us --

21              THE COURT:  They've hired you.  You are here

22    representing them.

23              MS. TULINSKI:  Well, I'm not sure I would go quite

24    that far.

25              THE COURT:  All right.  I've read the Catpool, maybe
```

1   you shouldn't go that far.

2          MS. TULINSKI:  Nonetheless, they're deferring to our

3   appearance today as -- if the Court wants to determine that

4   TREC is the CAFA authority, then we are in their stead today.

5          THE COURT:  Yes.  And I don't think anyone -- I'm

6   certainly not interested in hearing any argument that there is

7   any waiver by you because the Attorney General rather than the

8   director of the Texas Real Estate Commission is here.

9       I think you can speak well for the -- representing the

10  same concerns that the Texas Real Estate Commission would

11  present, if they were here.

12         MS. TULINSKI:  Thank you, Your Honor.

13         THE COURT:  All right.

14         MR. GOODMAN:  Shall I go ahead and offer these at

15  this point?

16         THE COURT:  I've received them without objection.

17         MR. GOODMAN:  Thank you.

18         THE COURT:  All right.  And, folks, I may, from time

19  to time, exercise the privilege of the bench just to see if I

20  can clear an issue up like that as we go.  I know we can't do

21  that with all the issues, but I may just start asking people

22  to respond from various places in the courtroom, and I

23  appreciate you bearing with me on that.

24      Okay.  You may continue.

25         MR. DAVIS:  Thank you, Your Honor.  Your Honor, some

of the objections complained about the adequacy of the notice
that was sent to the class.

First, I would simply say that those objections, I
believe, are not well taken.  The notice was reviewed in
advance by the Court and approved before it went out.  There
was considerable discussion about the contents of the notice
and changes to it made.

Second, the notice, itself, is supposed to be a summary
document; that the more detailed documents were made available
on the website, both complete copies of the documents on the
website, and also there were -- you could get copies of that
by telephoning a toll free number and requesting additional
copies if you didn't have the ability to access the website.

And counsels' for the plaintiffs telephone number was
included in the notice.  And we certainly got, as I said,
perhaps as many as 15,000 calls, I know at the time we filed
the declaration earlier.  But my recollection is they then
exceeded 12,000 calls that we had gotten from class members.
So, certainly, if anybody had any questions or whatever, they
had the ability to get those answered in considerable detail.

Now, the State of Texas says, in part, I think, well,
just cut us out of the settlement; just leave Texas out of the
settlement and y'all do it without us.

THE COURT:  There is some historical basis for that.

MR. DAVIS:  Yes, Your Honor.  The State of Texas, I

1   believe, has taken that position on prior occasions; but

2   perhaps they will reconsider this time.

3        There's really no indication that the class members in

4   the State of Texas would be better off if they were taken out

5   of the settlement.  This is, as I stated earlier, is a good

6   and valuable settlement.  It is one that is in place now,

7   today.

8        The State of Texas, on the other hand, has been

9   litigating this case now for more than four years and has

10  recently moved for another continuance.

11            THE COURT:  What type of continuance was sought?  Do

12  we know that?  Continuance of discovery file date --

13            MS. TULINSKI:  Your Honor, we're set for trial in

14  July.  The parties, jointly, filed the motion for continuance

15  to November, and that was exclusively because we have been

16  spending an inordinate amount of time with American Home

17  Shield discussing settlement.

18            THE COURT:  All right.

19            MR. COFFEY:  Your Honor, Brad Coffey.  I represent

20  American Home Shield in the Texas matter and I agree with what

21  Ms. Tulinski has represented to the Court.

22            THE COURT:  Thank you.  Let me ask this question:  I

23  know that the State of Texas has objected and that's an

24  objection I need to address and hear from the State of Texas

25  on.

```
 1          Can you tell me whether -- there's been no objections
 2     from anyone else from Texas, am I correct there?
 3               MR. GOODMAN:  There are no Texas resident objectors,
 4     Judge.
 5               THE COURT:  Can you tell me, of the number of
 6     opt-outs that you've disclosed to me, how many opt-outs are
 7     from the State of Texas?
 8               MR. GOODMAN:  I can't give you that exact number.
 9               THE COURT:  But I'll bet you can in a post-hearing
10     filing.
11               MR. GOODMAN:  I'll bet I can.  And I'll bet I can
12     tell you how many of those 90 that had good things to say
13     about AHS are from Texas, also.
14               THE COURT:  All right.
15               MS. TULINSKI:  Your Honor, may I briefly add --
16               THE COURT:  Yes.
17               MS. TULINSKI:  -- that the notice to the class
18     members said nothing about our pending lawsuit, and that they
19     had interest involving that lawsuit.  So I think any ordinary
20     consumer of Texas receiving the notice would have no idea that
21     they are some way affected differently than the other class
22     members might be.
23               THE COURT:  All right.  Differently in that they
24     have a public Attorney General prosecuting claims for them
25     that may be foreclosed.  Everyone's going to have claims
```

1    foreclosed, if they don't opt-out of the class.

2           MS. TULINSKI:  Right.  We are vigorously seeking

3    money restitution for our consumers, and I think if the

4    consumers knew that, you might see an entirely different

5    result from that notice as far as opting out.

6           THE COURT:  But the question becomes, also, from a

7    base level, whether the consumers have a concern enough to

8    investigate an opt-out if they, themselves, think they have a

9    claim that is worth prosecuting, or they have a concern about

10   how they're being treated without the knowledge of your

11   office's prosecution of the action.  Am I wrong there?

12          MS. TULINSKI:  No, that's true, Your Honor.  But

13   under the DTPA, when the State brings an enforcement action on

14   behalf of a consumer, we are a de facto class action.

15          THE COURT:  You would still have -- even if I were

16   to approve this, and I haven't -- obviously, we're not even

17   close to deciding that yet -- but if I were to approve it,

18   there would still be claims that the Texas Attorney General

19   could assert against AHS in that case, they just wouldn't be

20   restitution claims, am I right there?

21          MS. TULINSKI:  Actually, Your Honor, I disagree with

22   that.  I think that we would pursue our restitution claims

23   because we're entitled to them under the DTPA.  Our State

24   Texas Court would submit the issue to a jury.

25          I think the issue might be better framed as, by

 1    participating in this settlement, would the Texas consumers be
 2    able to accept the restitution that we obtain on their behalf?
 3    And I think that's probably an issue for the Texas judge to
 4    deal with.
 5              THE COURT:  Maybe.  You may not have read our
 6    pleadings file fully before you made that statement because
 7    we've run into that problem before; people wanting to
 8    prosecute claims that were counter to the claims that we're
 9    deciding whether or not they're settled here.
10        And the Eleventh Circuit, I think, has spoken to that in
11    *Battle*, at least -- not maybe directly to that, but maybe a
12    parallel of that.  So I have a feeling that AHS may disagree
13    with you on that.  Am I wrong, Mr. Goodman?
14              MR. GOODMAN:  You're not wrong.  Seldom wrong.
15    Certainly not wrong here.
16              THE COURT:  I didn't catch the last part.
17              MR. GOODMAN:  I said seldom wrong.  Certainly not
18    wrong in this instance.
19              THE COURT:  I don't know about that.  I was wrong to
20    get here at 10:50 this morning.
21        All right.  Sorry to interrupt again.
22              MR. DAVIS:  No problem, Your Honor.  Your Honor, the
23    plaintiffs, with regard to your last question to Mr. Goodman,
24    states no position on that issue.  We think that's an issue
25    between the defendants and Texas.

1    But we do say this:  We do say that cutting Texas out of

2  the settlement would be inconsistent with the obligations to

3  the class representatives of the class and would be

4  inconsistent with the obligations of the class counsel to the

5  class; and, therefore, we oppose it.

6    Now, interrelated to that is the question of abstention.

7  We say that there is no substantive basis for an abstention

8  with regard to the State of Texas; there is no legal authority

9  for an abstention.  That has been briefed in more detail by

10  Mr. Goodman.  I'll let him address that in more detail.

11    Now, one or two of the objectors says that there's a

12  problem with this settlement because, after a claim is denied

13  by the review desk, the class members only have seven days

14  within which to file a lawsuit and that's bad and that's

15  wrong, it's not enough time, and that's a reason to reject

16  this settlement.

17    The problem with that is that is just not what the

18  settlement agreement says.  The seven-day provision relating

19  to filing lawsuits in the settlement agreement is a provision

20  that's relating to -- related to the tolling issue.  And it

21  goes something like this; is that we all know, under *American*

22  *Pipe*, that the filing of a class action tolls the Statute of

23  Limitations from the date the class action is filed.

24    It is less clear on exactly what date the Statute of

25  Limitations starts running again, particularly in a case like

1    this where we might have a settlement agreement approved, the

2    settlement agreement becomes final, but the administration of

3    the settlement agreement on the review desk would last some

4    period of time.

5        We wanted to be sure, in this settlement agreement, that

6    the tolling given to us initially by the *American Pipe* case,

7    lasts all the way through to the date on which final

8    determination is made by the review desk.  And we have

9    specific provisions in this agreement that says that the

10   tolling agreement continues.  It continues from the date of

11   the initial filing of the class action, until the final

12   decision by the review desk, and then seven more days.

13       So the seven-day provision is not a limitation on the

14   time period within which the suit can be brought.  It is an

15   extension and a maximization of the tolling principle of

16   *American Pipe*.

17            THE COURT:  Would that have been a concession by AHS

18   to agree that the Statute of Limitations would be tolled at

19   least that long, seven days beyond any denial?

20            MR. DAVIS:  The seven-day provision is American Home

21   Shield giving us something in the settlement agreement, yes.

22   The question of whether tolling of the limitations period

23   until the review desk made a final decision, I would say is an

24   open question of the law.

25            THE COURT:  But, I mean, the seven days is certainly

1    an agreement that -- at least seven days that they could argue

2    the Statute of Limitations runs the moment the decision

3    denying the claim becomes final.

4           MR. DAVIS:  Correct, Your Honor.

5           THE COURT:  And this gives everyone time to kind of

6    assess whether they want to go forward.

7           MR. DAVIS:  It does, Your Honor.  So, really, the

8    only way seven days would come into effect would be if perhaps

9    someone -- if our class action was filed on the very last day

10   of somebody's limitations period, and then this gives them

11   seven more days.  And so it's a beneficial provision.  It's

12   certainly not a reason to reject the settlement.  It is

13   something negotiated for the benefit of the class.

14       I will talk for a moment about fees.

15          THE COURT:  Well, let me stop you for a moment --

16          MR. DAVIS:  Yes, sir.

17          THE COURT:  -- and back up.

18          MR. DAVIS:  Yes.

19          THE COURT:  Texas indicated that one of the concerns

20   that they have is that, based upon the notice and the

21   information about this settlement, Texas consumers may not be

22   aware that they are prosecuting an action on their behalf in

23   the Texas State courts.

24       Another objector who I do not think is here, indicated

25   that there was misleading or incorrect or missing information

1  about the status of the *Edleson* matter in California, because

2  the notice indicated that the *Edleson* settlement had been

3  terminated.

4      Now, I understand your position that the notice also

5  referred to the website, and the website indicated that it had

6  been terminated by the Court.

7      But what do you say to the argument on the notice issue

8  that the notice is in some way deficient because it does not

9  supply Texas or California consumers information about cases

10  being prosecuted there?

11      And, actually, in the *Edleson* sense, I guess they were

12  pursuing a nationwide class, so they were trying to represent

13  the same people you're representing here.

14      MR. GOODMAN:  Judge, let me just speak to that, if I

15  might.

16      THE COURT:  Is that a confusing enough question for

17  you?

18      MR. GOODMAN:  I think I followed it.  I think in the

19  case of the Edlesons and that objection, which I do believe

20  came from Mr. Bottini.  First off, it's factually incorrect.

21  As Your Honor has pointed out, the frequently asked questions

22  available on the website reveal that it's been terminated.

23      Your Honor -- at least this is my memory, you may recall

24  differently -- suggested that it be put in the class notice.

25      THE COURT:  I do remember that.

1          MR. GOODMAN:  That this is different from the

2    *Edleson* case.  So, factually, Mr. Bottini's argument, as

3    regard to *Edleson*, is not well taken.

4          The answer to the Texas Attorney General and to

5    California is that, legally, those objections are not well

6    taken.  I note that neither objection cited any law for the

7    proposition that somehow a class notice, which as Mr. Davis

8    points out, is intended merely to be a summary of the

9    proceeding, cited no law for the proposition that you have to

10   report on developments in some type of parallel litigation.

11   In fact, to the contrary, the law is that you do not.  And we

12   cite the cases for that proposition at Page 49 of our brief.

13         So, we stand on the law on those points, and you just

14   don't have to report about any other lawsuit, any other

15   litigation that may be pending against --

16         THE COURT:  Well -- and I might have built a bit of

17   a straw man on the Texas argument.  I know that the

18   Johnson-Bottini firm has certainly argued that.  I think Texas

19   might just simply be saying that I shouldn't view too closely

20   the number of opt-outs and objections from Texas because those

21   may have been increased if the Texas consumers had been aware

22   of the Texas AG's action.  Am I stating that correctly on

23   Texas' behalf?

24         MS. TULINSKI:  Yes, Your Honor.  I think it's a

25   material term that the Texas class members needed to hear and

```
 1    I think it goes to their evaluation of whether this might be a
 2    fair and adequate settlement.
 3              THE COURT:  You're not suggesting that was required
 4    to be put in the notice, though?
 5              MS. TULINSKI:  Actually, yes, I am.  I think it's a
 6    material term.  I think to provide the class, especially Texas
 7    members, of probably the most important fact upon which
 8    whether they can determine whether to opt-in or --
 9              THE COURT:  Was that not something they could learn
10    through investigation if they were concerned about their
11    rights?
12              MS. TULINSKI:  You know, I don't know how you could
13    do that, Your Honor.  I mean, the ordinary consumer certainly
14    doesn't have the ability to search what lawsuits are pending
15    in different states.  They wouldn't even -- there was no hint
16    of it.  It wasn't even looked to the Texas Attorney --
17              THE COURT:  Let me ask you this -- and I thought
18    about this issue since seeing the briefing on it.  Would it
19    not make notices even more confusing if we're providing
20    information about other cases and procedural -- I mean, do we
21    have to tell them at what point, procedurally, that case
22    stands; whether there's a likelihood of success on the merits
23    in that case, how we evaluate the merits of that case, who the
24    lawyers are in that case, what discovery has been conducted in
25    that case?
```

```
1          By the time we get doing that, we're going to have that
2     Law Review article you were citing to me earlier.
3              MS. TULINSKI:  I understand that, Your Honor.  But I
4     don't think it's unreasonable to reference the Texas Attorney
5     General as representing your interest in current litigation in
6     Texas.  You will not be able to participate in benefits,
7     particularly monetary benefits of that litigation, if you stay
8     in this class.  That's probably one or two sentences that I
9     think would be incredibly important to Texas.
10             THE COURT:  And at this point, that's exactly the
11    interest you're championing though, right?
12             MS. TULINSKI:  I'm sorry?
13             THE COURT:  That's exactly the interest you're
14    championing by you being here.
15             MS. TULINSKI:  Yes.
16             THE COURT:  So I guess the question is why would
17    that make notice -- even if you're right -- and I'm not sure
18    you're right legally or factually, but let's assume, arguendo,
19    you are.  What is missed if you're here on their behalf, but
20    they're not?
21             MS. TULINSKI:  Because, Your Honor, they don't
22    realize that if they just opt-out, they're in our case --
23    they're in all likelihood going to receive monetary relief.
24    The last numbers we threw around with American Home Shield
25    were in excess of $90 million.  That's cash money to the
```

1    consumers.  And the fact that --

2              MS. NIEWOEHNER:  Excuse me, Your Honor.  I'd like to

3    just object.  Those discussions were confidential and really

4    have no place here, and I would like to ask that the Texas AG

5    not go into confidential settlement discussions between the

6    parties.

7              THE COURT:  Well, I'm not going to police that, but

8    that really has no bearing on the argument, I don't think,

9    either, what might happen.

10        The point is any -- that's exactly what occurs in a

11   settlement of an aggregate or class matter is that the

12   defendant gives up things it wishes it didn't have to give up;

13   but the class or the represented group gets things they may

14   not be able to get, and it's a compromise.  So I'm not going

15   to steer too far into that at all.

16        But my question is simply this:  If this is the bird in

17   the hand, and if the settlement gets approved, this is

18   definitive benefits that someone in Texas can obtain and they

19   take a look at it and say, am I willing to accept that or

20   would I rather opt-out and pursue a remedy on my own or have

21   someone else pursue a remedy for me.  All right?

22              MS. TULINSKI:  Your Honor, in our brief, we fully

23   discussed what we think is an absolute lack of merit to the

24   settlement to, frankly, probably all of the settlements.

25              THE COURT:  We'll get to that in a moment.  I'm

 1    talking about the notice issue.

 2              MS. TULINSKI:  Right.

 3              THE COURT:  They've been given notice -- you

 4    wouldn't argue that someone in Louisiana was given

 5    insufficient notice and information about whether to join the

 6    settlement, object, or opt-out, would you?

 7              MS. TULINSKI:  Yeah.  Honestly, I'm not going to

 8    quarrel with the Court.  I wouldn't take a position on what

 9    somebody in Louisiana has done because I'm really --

10              THE COURT:  Your argument is layered with the

11    special gloss of the fact that your office is prosecuting this

12    regulatory action.

13              MS. TULINSKI:  Correct.  And the relief under that

14    action is money to consumers.

15              THE COURT:  All right.  Well, if -- under this

16    settlement -- I guess I will take you up on your invitation to

17    debate that point.  On this settlement, why isn't it money to

18    consumers if they go to the claims desk and prevail; or if

19    they go to the claims desk, don't prevail, and then have the

20    right to file an individual action, with penalties, if they

21    prevail?

22              MS. TULINSKI:  Well, I think it would be important

23    for the consumers to know that for Texas, a claims desk

24    review, no matter how it goes, doesn't really matter because

25    there really is no need at this point for you to file your

1   claim in small claims court because we're bringing it on your

2   behalf.

3              THE COURT:  Yeah.  But, in this case, they have --

4   could you give them -- guarantee them that they're going to

5   get a review by the company and penalties, if they're entitled

6   to prevail, but don't?

7              MS. TULINSKI:  No.  We're not seeking a review at

8   all.  We're seeking restitution.  We're seeking payment for

9   wrongful denials of their claims, in addition to other claims

10  we have in our case.

11             THE COURT:  Other penalties and things like that.

12             MS. TULINSKI:  Other penalties.  Plus, we've got

13  issues of Evergreen clauses, we've got issues of payments

14  to -- kickbacks paid to real estate brokers --

15             THE COURT:  None of those issues are affected by

16  what we're dealing with today?

17             MS. TULINSKI:  Well, inadvertently they are.

18  Because it's our contention that the broad waiver here, and

19  certainly the waiver that was provided under the notice to the

20  class members, says, you can't participate in the class

21  action, you can't accept restitution.

22       And we think the plain language of that says you run the

23  risk of not being able to participate in the *Rudd* class action

24  which, from our perspective, looks like it has substantial

25  monetary damages in it.

1    Now if -- I hear counsel saying oh, well, no, no, no, we

2   don't intend that they should be compromised in their place in

3   the *Rudd* class; but that's not said anywhere.

4          MR. DAVIS:  Your Honor, of course it is.

5          MR. GOODMAN:  Of course it is.

6          MR. DAVIS:  The settlement agreement specifically

7   says that it releases only claims that are alleged in the case

8   or are related to those claims -- likely related to those

9   claims.  That's what it says.

10   That's the reason -- counsel on the other side of the

11  room, if we did not have an agreement like that, I suppose he

12  would love to take the position that the *Rudd* case, which we

13  also agree with the Texas Attorney General is a good case, I

14  suppose he would love to take the position that it was

15  released, but it simply isn't, under the plain language of the

16  agreement, which is the reason in his brief he has said he

17  agrees with us that it's not released, Your Honor.

18          MS. TULINSKI:  Your Honor, it also says in the class

19  notice that all the consumers know about this case, and it's

20  in Footnote 10 on Page 16 of our brief, it specifically says

21  you're waiving restitution, you're waiving restitution, you're

22  waiving the right to participate in state or federal consumer

23  protection laws or regulations.  And under Footnote 12, you're

24  agreeing not to file or participate in any suit with respect

25  to any released party for two years.

1      And if they are saying it doesn't -- well, it doesn't

2    really mean that -- and of course they tie it to this generic

3    term of "business practices" which is overbroad on its own,

4    you know, it's very difficult for us to stand here and say,

5    well, you're telling the consumers they can't be a member of

6    the class; but, oh, here, look in the fine print in the

7    settlement agreement, oh, well, maybe not.

8      Consumers, that's the only notice they're going to get.

9    They're going to think, oh, I can't participate.  I'm not a

10   member.

11     The interpretation counsel is so vigorously pushing today

12   ought to be given to the consumer so they can make an informed

13   decision.

14          MR. DAVIS:  But the informed decision, respectfully,

15   Your Honor, they would make by the language that is in the

16   notice would encourage them to be more likely to opt-out if

17   they were concerned about that issue of the release.

18     So, having that summary language in that way really sort

19   of supports Texas' position that I suppose they would say

20   people should have opted out.  I don't understand the

21   argument.

22          MS. TULINSKI:  Your Honor --

23          THE COURT:  Well, I guess the question I have about

24   Texas' position, also, is how do I square your position to

25   please let us go fight with the pretty black letter case law

1    that settlement of class actions like this are favored?

2         We want large claims settled.  I didn't make that up.

3    That's what the courts of appeals in every circuit; and

4    certainly the Eleventh Circuit, have said repeatedly, is that

5    settlement of class claims, such as this, are well-favored in

6    the law.

7         MS. TULINSKI:  And it expressly says that through

8    the Class Action Fairness Act which, in turn, gives states

9    like Texas the ability to come in here and say this is how it

10   affects our consumers; it's not fair.  And that's why we're

11   here.

12        The other instance -- referring to counsel's point here.

13        THE COURT:  What if I were a Texas consumer --

14        MS. TULINSKI:  Yes, sir.

15        THE COURT:  -- who did not opt-out, did not object,

16   and said that sounds pretty good to me.

17        And I think Mr. Goodman thinks he has one or two of your

18   consumers that opted out because they think AHS treated them

19   fairly; but that could be a statistical outlier.

20        Having said that, what if I were to find out that a

21   judge, approving this settlement, carved me out of the class

22   without my request or consent, so that my claims could be

23   asserted by the State of Texas, and then the State of Texas

24   didn't prevail for me?

25        MS. TULINSKI:  Well, Your Honor, it would have been

1    appropriate to give class members -- the Texas class members,

2    all the details they need to make an informed decision.

3        Then, for instance, the best way to handle Texas would

4    have been an opt-in.  I don't care what the Attorney

5    General --

6            THE COURT:  Well, that's not the way Rule 23 works.

7    That's one problem.  I mean, that's a great argument for

8    Congress.  It's not a very good argument for me.

9        But let's see if I can get an answer to the question I

10   asked.  What would you say if you're the Texas consumer who is

11   involuntary carved out, based upon the Texas Attorney

12   General's arguments and me agreeing with them, finds out that

13   I don't have a review desk right, I don't have any penalties

14   if my review desk claim is denied, I don't have any rights

15   under this settlement agreement; and then Texas goes and loses

16   on its Deceptive Trade Practices Act claim, and now I'm out of

17   luck.  I can't recover under the class; I wanted to be a

18   member of the class; somebody took me out without me opting

19   out or objecting, because Texas showed up and said we've got a

20   better way.

21           MS. TULINSKI:  Your Honor, two things.  First, I

22   think, and foremost, is the consumers you talked about who may

23   have been happy, a second claims desk review isn't going to

24   help them because you have to have a denied claim to have it

25   reviewed again.  It doesn't make any sense to have a second

1    claim reviewed again.

2        Secondly, I think a knowing opting out is fair, and the

3    class member should have been aware these are your choices.

4    The Texas Attorney General is suing on your behalf and is

5    seeking restitution, disgorgement, a litany of things, in

6    addition to some other claims.

7        THE COURT:  Well, what has the Texas Attorney

8    General done to inform its citizens that it is prosecuting

9    this claim on their behalf?

10        MS. TULINSKI:  It's interesting, Your Honor, because

11    we generally issue a press statement on a consumer lawsuit.

12    In this instance, we didn't because American Home Shield sued

13    us first.  We sent them a civil investigative demand and they

14    filed suit --

15        THE COURT:  Was it a declaratory judgment action?

16        MS. TULINSKI:  Pardon me?

17        THE COURT:  Was it a declaratory judgment action?

18        MS. TULINSKI:  No.  There's an authority under the

19    Texas law that if you get a consumer investigative demand from

20    the Attorney General's Office, you can file essentially a

21    motion to quash.

22        THE COURT:  So you essentially asserted

23    counterclaims.

24        MS. TULINSKI:  Right.  We asserted our case as

25    counterclaims.  Because of the nature of doing that, we

1    just -- we didn't issue a press release.

2              THE COURT:  That was something you had the option to

3    do.

4              MS. TULINSKI:  Pardon me?

5              THE COURT:  That was certainly something you had the

6    option to do.

7              MS. TULINSKI:  We do.  And we tend to tread lightly

8    on that because we certainly get plenty of criticism about

9    having full-blown press conferences about claims that we

10   haven't proved yet --

11             THE COURT:  Right.

12             MS. TULINSKI:  -- and that we filed in court and

13   sometimes --

14             THE COURT:  And your statement there drives home one

15   of my biggest concerns about your objection, in this sense;

16   you're hoping to get the relief, you certainly think you're

17   going to be entitled to the relief.  I haven't seen -- I've

18   not met many lawyers that walk in my courtroom saying, Judge,

19   I've got this case on your docket, but I really don't think

20   I'm going to win it.  All right?  So I understand that part.

21   But, at this point, you haven't proved anything, right?  You

22   have not had the opportunity to do so, but you have not proved

23   anything.

24             MS. TULINSKI:  Well, interestingly, in our brief, we

25   are in the unique position of being able to lay out five or

1   ten pages of facts, as well as our expert report, so this

2   Court can judge the merits of these consumers' claims.

3   Because since the Court didn't go through a certification

4   process here, the Court's unfortunately at a bit of an

5   informational disadvantage in not understanding the power and

6   the merits of the consumer claims.

7        And we went to some great detail, we did it up front so

8   the group would be sort of in context, but outlining what our

9   evidence is showing with our expert report to give the Court

10  some indication of how very strong the consumer claims are.

11       Now, I'm not a soothsayer.  I can't tell you what's going

12  to happen in court.  I can tell you that, as we're sitting

13  here today, we're going to trial in July.

14            THE COURT:  Or November.

15            MS. TULINSKI:  Well --

16            THE COURT:  If your motion is granted.  It hadn't

17  been ruled upon yet?

18            MS. TULINSKI:  No.  Brad?  I don't think so.

19            MR. COFFEY:  No, Your Honor.  I'm not aware of it

20  being ruled upon.

21            THE COURT:  All right.  Thank you for that.  That

22  was very helpful.  And by the way, I should have said this at

23  the start.  Please tell Paul I said hello.

24            MS. TULINSKI:  You know, he told me to say the same

25  thing.

```
 1              THE COURT:  The last time I saw him he was
 2   serenading me.
 3              MS. TULINSKI:  He was singing.  I asked him to come
 4   here and argue this in song but he declined.
 5              THE COURT:  Yeah, he probably knew I would play a
 6   song back to him.  All right.
 7              MR. DAVIS:  Your Honor, one last comment on that
 8   same point.  One of the things that troubles me a little bit
 9   about Texas' argument is that the notice should have said
10   something about the Texas case, is that Texas, I think, has
11   now admitted that they were aware of this settlement as early
12   as September.  The notices didn't go out until after the
13   middle of December.
14       If Texas -- Texas, of course, knew that their lawsuit was
15   pending.  It's been pending for four years, as of today, so
16   they knew that they had a pending lawsuit and have known that
17   a long time.
18       If Texas had a concern that the citizens of Texas should
19   have been informed of some special thing and the notices went
20   out, they had plenty of time to approach the Court and request
21   that the notice include some specific information about Texas
22   well before the notice went out, Your Honor.
23       Let me address --
24              THE COURT:  Let me ask this:  Anita, do you need a
25   break.
```

1    (Off the record discussion.)

2    MR. DAVIS:  Your Honor, let me address briefly the

3    question of the attorneys' fees because there have been some

4    objections addressed to the attorneys' fees.

5    The attorneys' fees are broken down to two parts.  One is

6    the 25 percent portion.  I assume, in regard to the 25 percent

7    portion, that first, that that is what the Eleventh Circuit

8    Court of Appeals before has said is a presumptively correct

9    number.

10   The Eleventh Circuit Court of Appeals believes that a

11   percentage of the amount of money recovered is very much a

12   good way to set an attorney's fee.

13   And this particular 25 percent calculation, meets sort of

14   the gold standard of awarding a percentage in a class action

15   case.  And what I mean by that is there's been a lot of

16   commentary in the country from public interest groups that say

17   when courts speculate, or form a judgment, or reach some

18   estimate as to what a pool of money is likely to be to be paid

19   out on the front end at the time of a class action settlement,

20   and then they say, well, 25 percent of that is "X" dollars,

21   that that disincentivizes lawyers to work hard after the

22   settlement agreement.

23   They say that that is, to some extent, a fictitious

24   number -- or could be a very fictitious number; that it really

25   ought to be 25 percent of the amount of money paid out.

1          And so when I say that this 25 percent calculation meets

2     the gold standard of the people who would normally criticize

3     how percentage calculations are done because, in this case,

4     it's 25 percent of the money actually paid out.  And it's not

5     paid out in advance, it's paid out as the money is paid out.

6          Now, the second component of this is the $1.5 million.

7     That provision of that component relates to things like the

8     injunctive portion of this agreement.

9          Under the provisions relating to the review desk, there

10    will be many claims where no money will be awarded even though

11    the claim is, in substance, paid.  Because if the work hasn't

12    been performed yet, then the review desk will direct that it's

13    the repair people that they normally hire to go out and do the

14    repair; and so there will be no 25 percent portion to be taken

15    out of that.

16         Also, with regard to the practice changes and things like

17    that, those are injunctive portions; and, therefore, the $1.5

18    million relates to that.

19         And in this circuit, lodestar is the correct method for

20    awarding attorneys fees based on injunctive relief, and which

21    that is what this is in the category of.

22         But I also say, Your Honor, that this $1.5 million is

23    part of the enforcement mechanism and review mechanism in this

24    settlement agreement.

25         It is an important piece that was negotiated by us, in

part, to assure us that the money was in place on the front

end to employ the counsel and the legal assistants necessary

to review the functions of the review desk, and to assure that

it operates as we expect it to do; that is, in good faith,

under the terms of this settlement agreement.

Now, to put the $1.5 million in proper perspective, we

have filed a declaration with the Court indicating that

usually national averages on attorneys, and reasonable numbers

on legal assistants in the firm, are the fair market value of

the services during the time period since the notice went out,

has been incurring actual time at normal rates in excess of

$300,000 a month.

We expect that that will go up substantially after the

postcard goes out and after claims can actually be filed.  We

have filed information with the Court indicating -- and I've

already talked about that some today -- the number of

telephone calls that we've already gotten.  We think that that

will pale by comparison with the number of calls that we will

get when the postcards actually go out, and the number of

people who will want real assistance with regard to how the

claims are presented, and want help in presenting their

claims, in addition to the work we will be doing in terms of

monitoring the review desk and the good faith actions of the

review desk.

I speak now briefly to the question of the Faughts' money

1  under what they get in terms of the settlement.  First, they
2  get $8,000.  And some people complained that that $8,000 is
3  too much money.  Well, we have filed affidavits with the Court
4  showing where the $8,000 comes from.  The $8,000 in this case
5  is no more money than it could reasonably be expected the
6  Faughts would be awarded, under the claims review procedure,
7  if their claims had been submitted to the review desk.  It is
8  composed of the actual cost of repair, plus the actual
9  out-of-pocket expenses incurred by them.
10        And as for the $5,000 incentive payments, we say to the
11  Court that incentive payments are customary and normal and
12  ordinary in class actions.  And we say, in addition to that,
13  with regard to $5,000, that that number pales by comparison to
14  the incentive numbers that we see typically in class action
15  cases.  Many times you see very large incentive payments.
16  This is a relatively nominal incentive payment of $5,000,
17  each, to them; that is fair and more than reasonable in light
18  of the hours and time and heartache and work that they have
19  done on this settlement; and also in light of the results
20  achieved by them as being the class representatives.
21        And it is particularly fair and reasonable considering
22  the fact that the payment of their own claim was delayed by a
23  long time because of the nature of class litigation and
24  because of the ongoing case which they brought.  They could
25  have received their money much quicker by a small claims court

1    -- by small claims case, or a simple case brought only on

2    their behalf and without all the complications of this class

3    action.  So we say that what they get under this settlement is

4    more than fair and reasonable.

5         Now, Your Honor, I have gone over a number of the

6    objections -- I think most of the objections that have been

7    filed by various objectors, by the total of 23 people who

8    objected to this settlement.

9         But I want to say this.  When you look at everything

10   together, it seems to me that the bottom line is, is that for

11   many of the objectors -- or many of these few objectors -- no

12   settlement would ever be good enough unless everyone who had

13   ever bought an American Home Shield contract got all their

14   money back.

15        And I say to you, Your Honor, that if we were to do that

16   that, of course, in the first place, we would have a bankrupt

17   company.  And if a company could only settle a case by putting

18   itself in bankruptcy, there would be no settlements.

19        But I also say to you that if American Home Shield, for

20   some unfathomable reason, were to agree that even though --

21   that to take all the money they had ever received from selling

22   service contracts, home warranties, and even though they had

23   spent a lot of money on paying claims, and even though they

24   spent other money on overhead, were to agree to refund all the

25   money that they had ever gotten -- which, of course, this in

1    itself is an impossibility -- the result we would have would

2    be that this would be a more typical class action settlement,

3    or at least the kind I get in the mail at the house.  It would

4    be a settlement where everybody got a few pennies on the

5    dollar.  And this is not the kind of settlement that the class

6    representative or class counsel want.  We do not want a

7    settlement where people get pennies on the dollar.

8        We want a settlement where the people who had legitimate

9    claims, who were entitled to be paid under the terms of their

10   contract, get their money paid.  We want a settlement where

11   they get 100 cents on the dollar with regard to the claims

12   that they were due to have paid.

13       This is a fair and reasonable settlement.  This is, in

14   fact, an excellent settlement with great value to this class.

15   We would ask again, Your Honor, that it be approved and that

16   the order be issued approving this settlement.  Thank you,

17   Your Honor.

18           THE COURT:  All right.  Thank you.  Mr. Goodman?

19           MR. GOODMAN:  May it please the Court.  I am going

20   to try to not be repetitive.  I hope I won't be.  I think I'm

21   going to hit on a few points that Mr. Davis didn't cover and

22   may address a little bit some of the colloquy that has gone on

23   so far with the State of Texas.

24       First, notice.  I don't think there's been a serious

25   contention made -- and I'll set aside for a moment the content

```
 1    of the notice question.  I do have a few little points to make
 2    on that.  That the notice that went out was not -- there's
 3    been no contention, it wasn't done properly, it wasn't done
 4    timely.
 5         The same thing with regard to the CAFA notice.  We have
 6    met the requirements of the Court and of due process on both
 7    those points.
 8         As to the content, I have pointed out to the Court what
 9    the very clear law is on this; that you don't have to notify
10    class members of parallel proceedings.
11         Your Honor asked a question about are there Texas
12    consumers who are happy.  It just so happens I flipped open
13    our brief and the attachments to it and, sure enough, attached
14    to the Singletary declaration is a letter from Mr. William
15    Rowe of Spring Branch, Texas who says, among other things, "I
16    would like to point out that I have had nothing but
17    outstanding service when I have had to use my AHS Protection
18    Package.  I have been extremely satisfied with the service
19    that was provided."
20         Another example of Texas -- and I do intend, with the
21    Court's leave, to submit something that details what other
22    information we have about Texas consumers.  But the attachment
23    to another of our declarations, giving the average cost of
24    repair and replacement of various items, gives a quote from
25    Joanne of Houston, is it, who says --
```

1          MS. NIEWOEHNER:  It's attached to the Sanderson

2     deposition.

3          MR. GOODMAN:  Which I believe is Exhibit-B in our

4     file.  In any event, more comments like that.

5          You know, I heard a few minutes ago, you know, that the

6     Texas Attorney General's representative is not a soothsayer.

7     But I think in the argument we're hearing a lot of

8     soothsaying.

9          We're not just hearing soothsaying about how their case

10     is going to come out -- and I intend to get to the strength of

11     their case in a minute -- but we're hearing a lot of

12     soothsaying about what Texas consumers might find to be

13     relevant information.

14          I think the courts have very well recognized that if you

15     start flyspecking notices to address every possible

16     contingency that might come up -- and Your Honor, I think, has

17     touched on this issue, too -- you not only -- you don't have

18     an 8-page notice, you have a 28-page notice, or a 58-page

19     notice.  Here's all the other litigation against the

20     defendant.  You need to know about this.

21          I think courts have quite rightly looked at the due

22     process requirements required for class notice and have

23     avoided that temptation.

24          And the Court should hear, too, both as to the Edlesons'

25     objection, which is based on, you know, you didn't tell people

 1    enough about Edleson, and the Texas Attorney General's

 2    comparable objection.

 3        Class certification wasn't really touched on by Mr.

 4    Davis.  I'll touch on it very briefly.  I don't think there's

 5    any real argument that the requirements of Rule 23(a) and

 6    23(b) --

 7            THE COURT:  The only one I noticed that was raised

 8    was adequacy of representation targeting the fees issue and

 9    the incentive pay issue, suggesting that perhaps that may skew

10    counsel or the class representatives toward favoring a

11    settlement that may not deliver the goods.

12        But, as I understand it, both the incentive pay and the

13    attorney's fee were separately negotiated, bifurcated in front

14    of the mediator; and in any event are not -- the settlement's

15    not contingent upon either one of those.

16            MR. GOODMAN:  You're correct on both those points,

17    Your Honor.  And I would further say that the method of

18    payment of the fee in this case, while it's not primarily my

19    issue -- it's certainly the Court's call -- for purposes of

20    looking at adequacy, the way class counsel would be paid in

21    this case if their fee application is approved is very common.

22    As Mr. Davis said, 25 percent is not a low number.  When cash

23    is being paid, that can be looked at as value that's being

24    created by their efforts in the case.

25        And, you know, the injunctive business practice change

```
 1   aspect of the settlement, together with the work that they're
 2   going to have to do going forward justifies the other.
 3        Certainly, there's no reason for the Court to conclude
 4   that there's somehow been inadequate representation here for
 5   purposes of Rule 23.
 6        The factors for the Court to consider in determining
 7   whether or not this is a fair --
 8             THE COURT:  Let me back you up to attorney fees
 9   because there's one question I probably should have asked
10   class counsel, and I'd be glad -- this is one I'm going to
11   throw out to the audience.
12        There's been an assertion in the Johnson objections --
13   Johnson, Tzendzalian, Urbanek, Lind, Leach and the Shepards --
14   Document 72 and 73 -- that 90 percent of the fees in this case
15   should go to the Johnson-Bottini firm.  Care to comment on
16   that?
17             MR. DAVIS:  Yes, Your Honor.  We, of course, have a
18   strongly different opinion on that.  The Bottini firm success
19   was that the settlement agreement they had was rejected.
20        I know Your Honor has looked at a comparison of the
21   settlement agreement there and the settlement agreement here.
22   There is really no comparison in terms of the scope of the
23   release, in terms of the benefits through the penalty
24   provisions, and so forth.
25        So I think there is no precedent for the concept that
```

someone who makes a settlement that is so -- let's just say is

rejected by a court -- is entitled to a fee based on his work

in an unapproved settlement, Your Honor.

MR. NORRIS:  Your Honor, this is Johnny Norris.  If

I could make one comment about their position, too.  It is

interesting -- and I don't really know what to make of it.  I

have never seen this in any class action.

But it's interesting in the comments that you read as to

what lawyers are making the comments and who it is they are

representing.  Because we have here the spectacle of attorneys

who right now, in this courtroom, are representing this set of

new people who have decided not to opt-out and to object to

the settlement.

The same attorneys who represent people who did opt-out

supposedly, I assume, at their recommendation, the Edlesons,

and somehow they are serving the interests of the clients that

are currently in the courtroom before Your Honor by advocating

that they should be paid fees as attorneys on work they did,

not on behalf of these clients, but on behalf of somebody that

presumably they don't even know.

So it's an odd situation we have with regard to where

that particular comment is coming from.

Now, the idea that we rode the coattails, as Mr. Davis

says, is simply ridiculous because the arguments that were

made -- and I will just flat say it on the record -- the

```
 1   arguments that have been made that this settlement here that's

 2   before Your Honor that provides illusory relief, we say that

 3   is absolutely not the case.  It was the case in regard to the

 4   Edleson settlement, and that's why that judge rejected the

 5   settlement.

 6        So the concept that we just added something is ridiculous

 7   when we added the only real benefits to the class.

 8            THE COURT:  Is there anyone here that would like to

 9   speak to that issue in the courtroom besides class counsel or

10   defense counsel?

11            MS. TULINSKI:  Your Honor, very briefly, I would

12   like to say the State of Texas has thought that Edleson, as

13   well as this case, involved illusory or no meaningful relief.

14   We're consistent on that issue.

15            THE COURT:  All right.

16            MR. GOODMAN:  I would just say as to that last

17   point, Judge, there would be some inconsistency with Texas'

18   position in that they didn't object to Edleson.

19            MS. TULINSKI:  Your Honor, that was in state court.

20   There was no CAFA notice.  We were unaware -- we had no

21   standing to necessarily go in and object.  It was a state

22   court proceeding.

23            MR. GOODMAN:  Edleson involved the same Texas

24   consumers that are involved in this case.  In any event --

25            THE COURT:  They may have been riding on the Shutts
```

1  problem with that.  I don't know.

2         MR. GOODMAN:  Could be.  Could be.

3         MR. DAVIS:  Your Honor, while you're on this subject

4  area, there was one objection that's related, and it related

5  to the adequacy of representation might be affected if there

6  had been some provision in the fee agreement that guaranteed

7  the plaintiffs, Faughts, some money on the front end if

8  settlement was achieved.  There is a case out there somewhere

9  that says something like that.

10         THE COURT:  Kind of an under the table incentive.

11         MR. DAVIS:  Yes, Your Honor.  And I represent to

12  Your Honor, as an Officer of the Court, there is no such

13  provision in this settlement agreement.  I'm speaking to this

14  fee agreement.

15     I also have a copy of the fee agreement here.  If

16  somebody insists on it, I will make it available to Your Honor

17  for an in camera review so you can assure yourself, it is

18  simply not there.

19         THE COURT:  All right.

20         MR. GOODMAN:  Just one -- it's not really my fight

21  -- but just one last observation on the Bottini fee request.

22  They can't, under the law, be paid a fee in a class action

23  without being class counsel.  And it just seems to me that

24  they --

25         THE COURT:  Maybe that has to do with them operating

1   under the illusion that they're still class counsel.

2           MR. GOODMAN:  Possibly so.  Possibly so.

3           THE COURT:  That was a slight problem we had before

4   in this case.

5           MR. GOODMAN:  Yes, sir.  I agree.  I do think they

6   can't both be class counsel and be objecting to the

7   settlement.  And, of course, they're trying to do both.  So, I

8   mean, they're in an insoluable conflict position.  I would

9   just say that about that.

10      The standards for consideration on approval of a class

11  action settlement, we set them forth at Page 25 of our brief,

12  Judge.  I won't go over all of them but I do want to hit on

13  one or two.

14      The range of recovery or comparisons -- range of possible

15  recovery in the actual settlement.

16          THE COURT:  I would like, since we're on this, let's

17  just start off with the first factor and let's discuss it.

18  "Existence of fraud or collusion behind the settlement."

19  Anybody want to speak to that?

20      And the reason I say that is because it's one of the

21  things that gave me confidence in preliminarily approving the

22  settlement, without being able to take a full look at the

23  settlement, was the fact that I knew that the Court's own

24  neutral was involved in the settlement and made certain

25  representations to the Court directly about the settlement,

1    including the number of mediation sessions, the

2    contentiousness and prolonged sessions and scope of the

3    discussions, the bifurcation of negotiating class relief along

4    with attorneys' fees and incentive pay only after class relief

5    had been agreed upon, and the fact that he largely supervised

6    the parties' negotiations.

7         Is there anyone here who wants to take any issue with any

8    of that?  Because I certainly want to hear it if anyone has a

9    concern about that.

10        MR. JOHN DAVIS:  Yes, Your Honor.  John Davis on

11   behalf of Miriam and John Chapon.  And I'd also like to add,

12   Your Honor, I'm specially appearing for Mr. Thompson today,

13   who regrets that he can't be here but asked me to be here to

14   respond to any questions that the Court may have.

15        THE COURT:  On behalf of the Thompson objections in

16   Documents 68 and 79?

17        MR. JOHN DAVIS:  That is correct, Your Honor.

18        THE COURT:  Thank you.

19        MR. JOHN DAVIS:  I would like to speak briefly to

20   this issue of collusion.  We don't have any evidence that

21   there's collusion.  We don't have evidence of a lot of things

22   in this case.  But the reason that I think the Court should

23   carefully consider the issue of collusion is because of this

24   payment going to the lead plaintiffs, among other things.

25        And I know Mr. Davis was up here saying the $8,000 is not

```
1    too much, it's supposed to represent their actual
2    out-of-pocket damages.  But that is simply not proper in a
3    class action.  The lead plaintiffs are not to make a separate
4    peace with the defendant.  If the lead plaintiffs have
5    damages --
6            THE COURT:  Well, how do you respond to the position
7    of the lead plaintiffs that's been indicated through their
8    counsel, that they support this settlement whether they get
9    that incentive award or not?  Doesn't that remove the issue of
10   collusion or inadequacy of representation right there?
11           MR. JOHN DAVIS:  Then why are they asking for it,
12   Judge?  Why don't they just submit to the claims process like
13   everyone else?  If it weren't an issue, then why isn't it in
14   the settlement agreement?
15           THE COURT:  Well, usually I get to ask the questions
16   in my court --
17           MR. JOHN DAVIS:  That was a rhetorical.
18           THE COURT:  -- but I'll make an exception and answer
19   that.  Perhaps they would say that if they can be paid an
20   incentive for their trouble and work as a class, and I know
21   that's a controversial issue that different courts have taken
22   different positions on.  Some have approved them, some have
23   not.
24           But the question I have is a little different than yours.
25   My question is, if they are still supporting the class relief
```

```
 1    regardless, treat us as you may, Judge, but we still think

 2    this is fair, adequate, and reasonable for the class, why is

 3    there any suggestion of collusion or impropriety there?

 4              MR. JOHN DAVIS:  The problem is, Judge, is that that

 5    concession was made after the fact.  They're asking for --

 6              THE COURT:  No.  The parties told me that at the

 7    time that I preliminarily approved this.  They specifically

 8    referenced to me and represented to me that, Judge, we are --

 9    we have negotiated fees and an incentive fee award, but those

10    are not contingent.  We want this settlement to go forward and

11    be considered by the Court regardless of what you do with

12    these other two things.

13         That was said to me in chambers at the hearing on

14    preliminary approval.

15              MR. JOHN DAVIS:  And I certainly appreciate that,

16    Your Honor.  And Your Honor is certainly in the best position

17    to make the call.  You've been with the case since the

18    beginning.

19         Objectors are really pointing out that this is something

20    that the Court should consider because, on the face of the

21    notice, it looked like it might be an issue.  That's why

22    objectors raised it.

23              MR. NORRIS:  Your Honor, on that point, if I could.

24    That's also in the settlement agreement itself.  The fact that

25    the settlement agreement is in no way contingent on getting an
```

 1    award or the Court's downward lowering or failure to award

 2    fees, that's in the agreement, and I just --

 3            THE COURT:  I know that's in the agreement, or that

 4    was part of the deal.  I'm just trying to figure out what

 5    effect that has on this whole suggestion or inference, or

 6    concern, may be a better word, about collusion or kind of a

 7    sweetheart deal.

 8            MR. JOHN DAVIS:  And the other concern, Your Honor,

 9    was with regard to counsels' fees.  It looked like, from the

10    notice, that there was going to be no restitution, there was

11    no monetary relief, and you have the lead plaintiffs getting

12    all of their compensatory damages, plus an incentive award,

13    1.5 million going to class counsel, totally divorced from the

14    money that ultimately gets paid out.  And just the totality of

15    circumstances raised a red flag that there might be something

16    going on here.

17            THE COURT:  But, again, the question I would put to

18    you is:  If that was separately negotiated, after all the

19    class relief is negotiated, as the mediator has suggested --

20    has told us it was; and if class counsel has told the Court

21    from day one -- and in the settlement agreement it indicates

22    that regardless of what I do with the reasonableness of the

23    fee -- which is my call -- they are still advocating the

24    settlement; and an upward, downward, sideways adjustment of

25    the fee will not affect the settlement in any way.

```
1         Why would there be any suggestion of collusion or
2    inadequacy of representation if that's the case?
3              MR. JOHN DAVIS:  If that is, in fact, the case, I
4    don't think that we would have the issue of collusion.  But I
5    think we need to be careful when we start to parse this issue
6    of class relief versus attorneys' fees.
7         And as Your Honor, I'm sure, knows, as you seem to be
8    very familiar with class action jurisprudence, several courts
9    have addressed this.  I think the Worsham (phonetic) court in
10   California addressed it.
11        Generally, there's a fixed amount that the defendant is
12   willing to pay.  And it doesn't care whether that goes to
13   attorneys' fees or whether it goes to the class; it simply
14   wants to settle the case.
15        So while I understand the point that Your Honor is
16   making, and while I would certainly hope that that is the way
17   things happen, I think that we need to be careful about
18   saying, well, these are going to be the attorneys' fees and
19   this is going to go to the class.  I think we should
20   conceptually think of it more as one settlement.
21              THE COURT:  Well, but I should address those -- and
22   if the parties have negotiated on two levels -- and it's
23   really two separate legal questions.  Is this fair, adequate
24   and reasonable for the class?  And is that a reasonable
25   attorney's fee to class counsel?  Those are two separate legal
```

1    issues, right?

2            MR. JOHN DAVIS:  That's right, Your Honor.

3            THE COURT:  No problem with me addressing one and

4    then the other, correct?

5            MR. JOHN DAVIS:  That is correct, yes.

6            THE COURT:  All right.  While I've got you up here,

7    I know you had some other objections.

8            MR. JOHN DAVIS:  Okay.

9            THE COURT:  Any problem with just letting Mr. Davis

10   go ahead and bide in on Mr. Goodman's time and present some of

11   his objections now?

12           MR. GOODMAN:  No, if he cares to speak, that's fine.

13           MS. TULINSKI:  Your Honor, may I just make one more

14   statement?

15           THE COURT:  Yes.  If you want to come up here,

16   you're welcome to.

17           MS. TULINSKI:  Your Honor, I'll wait my turn, Your

18   Honor.  I'm kind of posing in the back of the courtroom.

19           THE COURT:  All right.  You like your distance,

20   right?

21           MS. TULINSKI:  Yes, I do.  I don't think you can hit

22   me with anything from here.

23        Very briefly.  We briefed our perspective on the

24   conflicts issue on Pages 19 through 24 of our brief.  My only

25   question or issue I would like to bring before the Court is

         1    when the Court's mediator reported to the Court on these

         2    issues, I would like to know that the potential conflict

         3    issues and whatnot were known to the mediator at the time.

         4            THE COURT:  Define what you mean by that, that's a

         5    little less vague.

         6            MS. TULINSKI:  We brought up issues of the prior

         7    Terminix representation.

         8            THE COURT:  Well, do you have any -- they've just

         9    represented to me they never represented Terminix, themselves,

        10    and didn't even know their firm had represented Terminix

        11    themselves.  And that was before I was even on the bench,

        12    although that seems like decades ago in some ways.

        13            MS. TULINSKI:  Right.  Well, the fact of the matter

        14    is, Mr. Davis claimed to be chair of the litigation section

        15    for the firm.  And we cited a couple of actually published

        16    Terminix cases which I think date during the time that he was

        17    head of the litigation section.

        18            THE COURT:  But was he counsel in that case?

        19            MS. TULINSKI:  No.  Well, he doesn't appear on the

        20    reported opinion.

        21            THE COURT:  And he's indicated that Rule 1.9 is

        22    controlling.  I think, technically, Federal Common Law

        23    controls on this issue and 1.9 informs that.

        24        But what's your best argument on why, even if he was

        25    chair of Burr & Forman's litigation department, which is a

```
 1   fairly substantial department even back then --
 2              MS. TULINSKI:  Sure.
 3              THE COURT:  -- and some lawyers in there were
 4   representing Terminix say, not AHS, but a related company.  Is
 5   it a subsidiary?
 6              MS. TULINSKI:  It's a sister company to --
 7              THE COURT:  A sister company.  If I had been better
 8   at corporate law, I would make more money.  So I don't
 9   understand those distinctions as well as some others
10   sometimes; but it seems to me --
11              MS. TULINSKI:  They are both owned by ServiceMaster.
12              THE COURT:  Okay.  I just don't -- and, again, this
13   is an opportunity to inform me.  But, based upon that limited
14   information, I don't even see exactly what I'm supposed to be
15   struggling with.
16              MS. TULINSKI:  Well, I think it's appropriate, and
17   it goes back to general appearances of impropriety.  I think
18   it's appropriate that at least the client be at least informed
19   that, hey, the company we're getting ready to sue here, I --
20              THE COURT:  My partner that I left seven years ago
21   used to represent them?
22              MS. TULINSKI:  True.
23              THE COURT:  Okay.
24              MS. TULINSKI:  That's our position, Your Honor, on
25   that.  And then, of course, the question -- and I don't want
```

1    to get into rehashing --

2          THE COURT:  I mean, does 1.9 have an expiration

3    label date?  I mean, what if it was 20 years ago?  What if it

4    was when I practiced with my brother, he was also partners in

5    another firm and that firm?

6          MS. TULINSKI:  I'm sure there's a temporal standard

7    there.  I, personally, I'm not aware of that specific statute

8    and what the time frame may be, which I'll be happy to look at

9    and submit a letter brief on.

10          THE COURT:  I'll be glad to accept that if you want

11    to take a look at that.

12          MS. TULINSKI:  Thank you.

13          THE COURT:  All right.  And thank you for that.  Go

14    ahead, Mr. Davis.  Mr. Goodman, were you standing to address

15    me?

16          MR. GOODMAN:  No, sir.

17          THE COURT:  All right.

18          MR. JOHN DAVIS:  Your Honor, I would like to touch

19    on a few points that have come to mind after reading the

20    submission of the Texas Attorney General, which I just got a

21    day or two ago, and also the supplementary brief concerning

22    injunctive relief that was just served on me, literally, I

23    think, about 6:30 last night.  I've had a chance to go over

24    that.  And these issues involve largely the release in this

25    case.

1      My clients also objected in the *Edleson* matter in

2  California, and the release was a huge issue there.  And at

3  first blush, it didn't seem to be such an issue in this case.

4  And then I read the Attorney General's brief and read about

5  its investigation and found out all of this stuff about RESPA

6  violations, or alleged RESPA violations, and everything else;

7  and in light of all of that, I think the way that the release

8  is structured in this case is a problem.  And I think we need

9  to make a distinction that I haven't really heard made here

10 today.

11      It seems to me that this case is about marketing

12 practices as much as it is about failure to pay claims.  In

13 other words, it's not just as AHS would probably want us to

14 believe, well, we missed paying a few claims that we probably

15 should have.  I think it goes deeper than that.

16      What about all the people -- and, again, this is a

17 rhetorical question -- what about all the people who bought

18 the coverage or were forced to buy the coverage through terms

19 of the escrow agreement on their property but never got the

20 benefit of the bargain?

21      AHS makes all kinds of claims about what is going to be

22 covered and what benefits are going to be available, but it

23 turns out those aren't available.  In that instance, there

24 should be restitution to the purchasers of those plans and

25 there is none here.  And if the release is not, in fact, meant

1    to cover those claims, then it should be expressly spelled out

2    in the settlement agreement.  And I know Mr. Davis addressed

3    this earlier and he said, well, it only covers this narrow

4    universe of claims.  But it looks like from the release

5    language that it can be construed much more broadly.

6         So if the parties don't actually intend for those claims

7    to be released, I think it would be very easy for them to just

8    amend the settlement agreement and expressly exclude those

9    claims.

10             THE COURT:  All right.  Do you want to address that

11    from AHS's perspective?

12             MR. GOODMAN:  Sure, Judge.  If I understand what the

13    argument is -- and there's some looseness about what I think

14    I'm hearing -- the suggestion being somebody bought one of

15    these plans, didn't read it, I guess, didn't look to see that

16    there were exclusions, somehow those people are entitled to

17    all their money back.  Well, that's not the way these

18    contracts work, that's not the way insurance works, not the

19    way the law works.

20         I think that people have a -- if they're supposed to be

21    covered for a claim, then they're supposed to be covered for a

22    claim.  You know, the scope of the release is very clear.  It

23    says, claims asserted in this action are related to those

24    asserted in this action.  That's what it says.  And there's

25    not a claim in this case that somehow the --

1          THE COURT:  There's no marketing practices claimed

2     in the case?

3          MR. GOODMAN:  Right.  There's no RESPA violation

4     claimed in this case, there's no -- you know, the way you

5     compensate realtors or folks who sell these products.  I mean,

6     that's just not a part of the case.

7          And I don't see that the release is overbroad at all.  I

8     mean, it is commonplace to say, when you settle a case, that

9     the release is going to cover the claims asserted or those

10    related to the claims asserted in the case.  And that's where

11    we are with this.

12         I remain confused about someone's ability to get all

13    their money back because, after the fact, they decide to sit

14    down and read the contract and concluded, oh, well, that's not

15    what I thought I was getting.  There's an exclusion there.

16         So that's our view of it, Judge.

17         MR. JOHN DAVIS:  Well, if RESPA claims aren't part

18    of this case, then AHS should have no problem writing into the

19    release this specifically excludes RESPA claims, et cetera, et

20    cetera.

21         A couple other points I would like to hit on with regard

22    to the evidentiary objections.  I certainly appreciate class

23    counsel clearing up the hearsay problem, but I've reviewed

24    these letters, and they really -- I think the Court should

25    give them little weight because there are no terms as far as

1    representation.  They basically just say I'm a lawyer, I've

2    agreed to take a look at this case if I think it has merit, I

3    would be interested in taking it on.  That really doesn't say

4    anything.

5         And the argument that I hear being advanced is, well,

6    don't worry about it.  Trust us.  We're going to take another

7    look at your claim; and if we deny it, well, you can just

8    bring another lawsuit.  Well, that defeats the entire purpose

9    of the class action device.  If people are going to end up in

10   a position of having to bring another lawsuit, then --

11        THE COURT:  Well, wouldn't it create a pretty

12   powerful incentive for AHS to reasonably review claims if

13   they're looking at, on a $500 warranty claim, getting hit with

14   a minimum of a thousand dollar penalty if they unreasonably

15   deny that?

16        MR. JOHN DAVIS:  Yes.  Yes, it would, Judge.  But,

17   as you know, the claims rate in these cases tends to be

18   incredibly low.  And particularly when you have a claim that's

19   of little monetary value, I think -- and obviously I'm

20   speculating -- but this is also based on my experience with

21   other class action settlements -- the propensity, or the

22   likelihood, of a class member to actually pursue that and go

23   to the trouble of going to court in small claims or wherever

24   for $200 or $400 or $500 is probably going to be fairly low.

25   I think these are issues that need to be dealt with now.

1     We're looking at a nationwide class action and we should

2     not be quick to sign off on a deal where it looks like class

3     members are going to end up in another round of litigation.

4         And that brings me to my next point which is the status

5     report regarding the business practice changes.  This is

6     Document 97 which, as I said, I received it about 6:30 last

7     night.

8         I read through this.  I was pleasantly surprised to see

9     that it incorporated a lot of suggestions that objectors in

10    the *Edleson* case in San Diego had made.

11        But one of my major concerns is the way that it's

12    structured.  I note that a lot of these self-styled injunctive

13    relief provisions have time frames in which they're going to

14    occur.  Some of them are within 12 months; some of them are

15    within 24 months.

16        But then you get down to Paragraph 9 and it says:  "AHS's

17    obligation to continue any of the business practice changes

18    referenced herein shall conclude 24 months after the effective

19    date."  So, if it's going to occur within 24 months, but

20    conclude at 24 months, it seems to be a bit of a semantic game

21    to me, and there's a lot of wiggle room.

22        And this document seems to me to be, in large respect, in

23    response to the filing by the Texas Attorney General and

24    largely illusory based on the way that the time frames in the

25    document are structured.

 1              THE COURT:  All right.  Who wants to address that?

 2     Mr. Goodman?

 3              MR. GOODMAN:  I do, Judge.  I would also like to

 4     address some of the other points made by Mr. Davis, but I'll

 5     go first to the status report.

 6          Twenty-four months -- well, first off, there's proof in

 7     the record that some of these changes, for example, changes in

 8     the contracts, will take up to 24 months.  You have to get

 9     state approvals.  The process of converting someone from an

10     old contract to a new one, can only occur as people roll off

11     the old contracts and you put them on new ones.  It's going to

12     take that time to do.

13          More to the point, though, the 24 months is significant

14     because that's the standstill period in this case.  Two years.

15     After two years, it's wide open.  If it's not a claim that's

16     been released, if it's a claim about a business practice, if

17     it's a claim that arose beyond the class period, folks are

18     free to sue about that.

19          And 24 months is very purposeful in the sense that this

20     is the time that we think it's going to take to try to

21     straighten out some issues and work through some issues with

22     regard to claims handling.  And if, after 24 months, we

23     haven't done it to somebody's satisfaction, well, they can

24     take us to court about it.

25          So it makes perfect sense that not only are these changes

1      likely to take a good deal of time to implement; but, also, at

2      the end of that 24 months, throughout which the Court's going

3      to have continuing jurisdiction over the settlement, too, I

4      would add, they are free to say your practices aren't what

5      they ought to be.

6           So that's the answer to the timing question.

7                THE COURT:  All right.

8                MR. JOHN DAVIS:  I just had one last thing, Your

9      Honor.  Let's try to reach a final -- some finality here.  If

10     AHS wants to agree to these business practice changes, make it

11     a permanent thing; or make it at least a lot longer than 24

12     months.  Let's try to finally resolve these issues instead of

13     putting a Band-Aid on it, running everybody through a second

14     claims process, paying out a bunch of money to counsel, and

15     then possibly ending up in the same place two years from now.

16          It just seems to me, we're all here.  We're looking at a

17     nationwide class action.  Let's try to get a settlement that's

18     going to fully and finally resolve these claims.

19          And unless the Court has any questions?

20               THE COURT:  You didn't address the forum shopping

21     issues you raised.  Maybe perhaps that's because seeing the

22     submissions that were made about the timing of negotiations,

23     when they began, even before the *Edleson* matter, and the

24     parties' agreement to stand down to let the *Edleson* court

25     decide about approval of that.  And then the mediator's

1    affidavit about what happened after *Edleson* failed and the

2    fairly intense negotiations over a three-month period after

3    that.

4          I'm not trying to put words in your mouth, I'm just

5    trying to make a record and see if you still have any concerns

6    about that.

7          MR. JOHN DAVIS:  I have concerns.  That's certainly

8    part of it.  I generally don't like to stand up and tell a

9    Court that it doesn't have jurisdiction over something.

10         THE COURT:  Particularly when it does.

11         MR. JOHN DAVIS:  Yes.  So, if it's a concern, I

12   think it looks bad.  It kind of left a bad taste in my mouth.

13   Certainly after reading the submissions that Your Honor

14   referenced, that assuaged some of my concerns.

15         THE COURT:  A page of history is worth a few more

16   volumes of logic, I take it.

17         MR. JOHN DAVIS:  Certainly.  Certainly.  But, at

18   first glance, it definitely seemed like AHS was either going

19   from court to court to court.

20         THE COURT:  A "middle of the night slap jack

21   settlement" is I think what one of your fellow objectors

22   called it.

23         MR. JOHN DAVIS:  I don't know about that one.  I

24   don't think I read that one.  But, yes, it did allay some of

25   my concerns.

1       But, you know, the concern remains that this settlement

2    still looks a lot like the one in *Edleson*.  I think it's great

3    that improvements have been made.  That AHS and the plaintiffs

4    in this case seem to have taken to heart some of the

5    suggestions and comments made by objectors in *Edleson*.

6       So, to that extent, I think it was a positive thing.  But

7    I don't think we're finished yet.  I still think that there's

8    room for work that needs to be done here.  Thank you, Your

9    Honor.

10              THE COURT:  All right.  Thank you.

11              MR. DAVIS:  Your Honor, while we're still close to

12   this issue, there have been comments about the mediator that

13   have been involved and the time period of the mediations and

14   things like that.

15       I would point out, for the record, that as Your Honor

16   knows, Your Honor also was aware, to some extent, about the

17   time period involved in the negotiations because this Court

18   required a regular reporting as to the status of those

19   negotiations, through your law clerk, and we regularly

20   reported as to the -- as to what was going on in the

21   negotiations, whether we were still continuing and so forth

22   over, I think, the whole length of those negotiations.

23              MR. GOODMAN:  And I would just say about -- Your

24   Honor asked a question about the negotiator confirming there

25   being no negotiation of fees while the terms of the deal for

```
 1    the class were being set.  The proof of that is not only in
 2    Mr. Van Tassel's declaration but it's in mine and it's in Mr.
 3    Norris' and other places.  I think we --
 4              THE COURT:  I'm just proceeding on the assumption
 5    that they might, at this point, more value the neutral; not
 6    slighting you.
 7              MR. GOODMAN:  No, no.
 8              THE COURT:  I'm just saying the neutral supervisor.
 9              MR. GOODMAN:  I don't feel slighted.  I've got to
10    say that the scoreboard has got whatever it's got on our side
11    and zero on their's on the question.  Whatever weight you give
12    counsel for --
13              THE COURT:  And I interrupted your presentation.
14    You may proceed.
15              MR. GOODMAN:  Okay.  Judge, back to the legal
16    standards which are recited on Page 25 of the brief.  I think
17    we've talked about frauds and collusion.  I can skip through
18    some of these.  I think they're fairly self-evident.  The
19    complexity of the litigation; the time that it would take to
20    actually get to the finish line if we were to truly litigate
21    this case all the way through.  Obstacles to the plaintiffs'
22    recovery here, we dealt with at some substantial length in our
23    brief.
24         One point we made -- and I want to make sure there's no
25    misunderstanding about it.  We think there's an awful hard
```

road for the plaintiff, were this case to be a litigated case,

to get to a sustainable, certified class that would make it

all the way through trial.

That's because under the *Amchem* case, differences in

legal standards, differences in fact -- these kinds of

variations are viewed under the rubric of manageability.  And

if the case is being settled, of course, those manageability

concerns don't come into play.

THE COURT:  Like *Shutts* would also raise the same

concerns about the *Edleson* case proceeding in a state court on

a nationwide basis, as far as procedural due process issues

and so forth.

MR. GOODMAN:  I would agree with that, Judge.  As we

set forth in the brief, I think, there is a real hurdle here

that should impact the way the Court looks at the fairness and

the reasonableness of the settlement, not only involving the

merits but also involving procedural issues.

The one I wanted to spend a few minutes on is this range

of possible recovery versus the comparison of what's --

THE COURT:  Let me call a time out for us.  It's

12:46 and we've been going about an hour and forty-five

minutes.  I am going to have us take a break at this point.

The question is going to be whether we take a short break

or a longer break?  And I want to be sensitive particularly to

out of town counsel representing objectors who may have

```
 1   flights this afternoon -- and out of town counsel representing
 2   the defendant, too.  But anybody have a concern if we take
 3   about a half-hour break just to let Anita grab something if
 4   she needs it?
 5       I think we're making substantial progress.  There's some
 6   questions that I still have nagging in the back of my mind I
 7   want to ask, but I want to do that after I've heard from
 8   everyone and hear what you have to say.  Okay?
 9             MR. GOODMAN:  Yes, sir, Judge.
10             THE COURT:  All right.  We're going to break until,
11   let's say, 1:15.  Try to be back about 1:10 in case everybody
12   is ready to get going earlier.  All right.  Thank you.
13       Oh, Mr. Feldman?  You want to reach him and tell him
14   we'll call him back at the appropriate time?  He might have
15   stepped away.
16             THE CLERK:  No problem.
17             MR. DAVIS:  Your Honor, the Faughts have been ill
18   and kind of having flu-like symptoms, and I was wondering if
19   there was any need for them to be here this afternoon?
20             THE COURT:  Anybody want the Faughts to remain?  I
21   think they're excused, with the Court's blessings, if they
22   feel like they need to not contaminate anyone else.
23             MR. DAVIS:  That's another advantage, Your Honor.
24   Thank you.
25                      (Recess.)
```

1                     (Open Court.)

2          THE COURT:  All right.  Picking back up with you,

3     Mr. Goodman.  I think we were talking about factors for

4     determining fairness, adequacy and reasonableness.

5          MR. GOODMAN:  We were, Judge.  And I'm going to try

6     to shorten things up since I think a lot of these points have

7     been covered through colloquy of the Court and the

8     presentation of Mr. Davis.

9          In terms of the adequacy of relief here, it has already

10    been alluded to, but class members here have the opportunity

11    to not only recover what they could recover in court but to

12    recover more if AHS makes a mistake in reviewing a claim.

13         Another part of the relief that's been touched on that I

14    just want to make sure that we're clear about here is the

15    forward-looking business practice change relief which was

16    envisioned under 5.3(a) of the original stipulation.

17         Counsel for the class and me, we have continued to

18    negotiate about those points, including a mediation session

19    with Mr. Van Tassel, as recently as Monday of this week, to

20    try to hammer out what that status report looked like.

21         And while the Court has that, that's Document No. 97, and

22    you can look at it, there is real and meaningful business

23    practice change encompassed within that document.  And I think

24    when we get around to a final approval order, we're going to

25    be asking the Court to incorporate or memorialize that as part

1    of this, as well.

2        I want to talk about a couple of the points that the

3    Texas Attorney General argues that I don't think have been

4    covered a whole lot.  I view their objection, really, on the

5    merits.

6        And before I get to the merits, I think there are an

7    awful lot of procedural problems with the Texas Attorney

8    General's appearance in the case.  You know, we briefed the

9    issue of whether they had standing to come and object.

10   They're not a class member.  They're not our CAFA regulator.

11   They haven't cited any authority lacking that status to come

12   in and be able to object.

13       Of course, the brief they filed was ten days later than

14   the Court's deadline for any briefing on the subject.  They

15   purport to appear as an amicus but haven't asked for leave to

16   do that and haven't been granted that leave.

17       But setting aside all those procedural problems, just on

18   the merits, their objection ought to be overruled, and I want

19   to touch on just two parts that I don't think have been

20   discussed too much.

21       The first is, if you boil down their objection, an awful

22   lot of it falls into this category:  "We've got a good case."

23   "We've got a strong case against AHS in Texas."  "We think we

24   can do better in Texas."

25       Now, I think we've explained why we don't think they can

1  do better in Texas at all just in terms of the mechanism of

2  this settlement if people avail themselves of it.

3      But, you know, the first point about we've got a good

4  case, that's not the standard.  It's not even -- it's only

5  tangentially relevant to the standards.

6      The standards are whether or not this is a fair, adequate

7  and reasonable settlement.  The standards also incorporate, as

8  Your Honor had suggested, the strong policy in favor of

9  settlement, generally, and of class actions in particular,

10  whether the case that's being settled is a good case or not a

11  good case.  The standard is whether the deal is reasonable and

12  fair.  And we've shown on this record that this deal is both.

13      Second, we strongly dispute -- we absolutely reserve on

14  the merits as to how strong their case in Texas is.  And to

15  that end --

16          THE COURT:  Well, in that respect, hasn't the

17  Eleventh Circuit counseled against -- and the former Fifth

18  Circuit, counseled against a district court engaging in some

19  type of ultimate conclusion-making as to issues of fact or

20  questions of law on the merits of a dispute as it assesses

21  settlement?

22          MR. GOODMAN:  Absolutely.  That's one of the things

23  a settlement enables you to avoid.

24          THE COURT:  All right.  That was the softball.

25  Here's the curve ball.

1          MR. GOODMAN:  Okay.

2          THE COURT:  How is that to be reconciled, though,

3    with the need to look at the potential recovery and compare it

4    to what the class settlement relief is?

5          MR. GOODMAN:  I think they're fairly reconcilable,

6    Judge, if you consider that the people who have had a problem

7    with a claim have every ability, going back beyond the Statute

8    of Limitations, under this class period, to come in and have

9    the claim looked at again and get paid out on it.  And if they

10   don't like it, they've got affordable, quick relief that they

11   can go get with a significant penalty to AHS.

12        So, as I said before, I think the relief that's available

13   to the class members here is every bit as good, if not better,

14   than they could get in court.  So I think that's how you

15   reconcile it.

16        But just on the point of the strength of Texas' case, you

17   know, they say the relief here is illusory, and there's

18   nothing real about the relief here.  I've got and would like

19   to offer a declaration of an AHS employee, the underwriting

20   manager.  We have marked as Defendant's Exhibit 3.  I'll hand

21   some copies around to anybody who wants to see it.

22        It's a brief declaration, but the point it makes is

23   "during the class period".  In essence, the class period, I

24   think it's six months later and -- well, it's the same time

25   period.  It's just six months on either end, but it

encompasses basically the same amount of time.  Just on HVAC

and plumbing, alone, AHS has paid out over $300 million in

claims in Texas.  You know, if that's illusory, that's an

awful big and awful expensive illusion.

So I would offer Defendant's Exhibit 3.

THE COURT:  Any objection?

MR. NORRIS:  No objection.

THE COURT:  Without objection, it's received.

MR. GOODMAN:  The point of that being, the strength

of the case that I'm hearing touted is, AHS snookers people

into buying these contracts and then doesn't pay any claims.

Well, what about the people that got the 300 million

bucks?  How do they fair under the Texas Attorney General's

lawsuit as far as getting restitution?  They've already been

paid.

So, here again, we're not here to debate the merits, but

the gauntlet got thrown down about how strong their case is.

We say not so.  And Your Honor's point is ultimately the right

one.  It's not the job of the Court to get into making factual

findings on the strength of the case; the question is,

instead, whether this is a fair and reasonable outcome given

the dispute.

The second point, the no waiver of consumer rights point.

You know, as broadly as it's been stated in the papers by the

Texas AG, certainly can't be the case.  If there can't be a

1    waiver of rights without a signature of the class member

2    represented by their own counsel, whatever all is said in the

3    brief, there obviously could never be a consumer class action

4    to cover Texas residents; and we all know that can't be so.

5         As has been pointed out already, the release in this case

6    is confined.  It is not forward-looking at all.  It releases

7    very defined conduct within the class period.

8         And the last thing I would say about this waiver

9    question.  I'm not a Texas lawyer, but I think they've gotten

10   it wrong anyway.  They cite us to a Texas statute that says

11   there can't be a waiver.  But the *Ostrow* case -- and I'll give

12   you the citation for that.  It's *Ostrow versus United Business*

13   *Machines*, 982 S.W.2d 101, a Texas appellate court case from

14   1998.  There, settlement of a consumer claim with a full

15   release, the court held results in a waiver of the DTPA claim

16   that that consumer might have.  Which makes sense.  That's an

17   expressed written relief after -- it's a post-dispute

18   resolution.

19        And I think the suggestion being made here is, even after

20   the transaction's over and we're in the dispute mode, somehow

21   it's not possible for a consumer to release a Trade Practices

22   Act claim.  I think *Ostrow* is to the contrary.

23        So, here again, this is not a question of law that the

24   Court has to decide, mind you, but I think it just plays into

25   whether their case is as strong as they would have the Court

1  believe.

2       I can talk about abstention if Your Honor wants to.

3  Frankly, you know, in the original objection they raised

4  *Pullman* and they raised *Burford*.

5            THE COURT:  And *Younger*?

6            MR. GOODMAN:  Excuse me, *Younger*, yeah.  And now, in

7  the brief, we get *Burford* and *Colorado River* and I guess

8  whatever other ones they can think of that have ever been

9  recognized in court.

10      But the fact remains that none of those apply.  This is

11 not an abstention situation classically where there is some

12 confused area of state law that the parties are asking this

13 Court to weigh in on.

14      This is not criminal or quasi-criminal.  It simply

15 doesn't fit any of the abstention doctrines.

16      And if the Court has particular questions, I'll be happy

17 to try to field those, but I would submit you read those cases

18 and this is just not an abstention situation.

19      The Court's not being called on to decide a single

20 question of Texas law, nor does this case raise any kind of

21 Constitutional question that you could avoid by deferring to

22 Texas.

23      I would go back to what I think I mentioned near the

24 beginning, which, in a lot of ways the Texas AG's objection is

25 a lot like the Edlesons' objection.  The Texas AG wants to

1   continue to pursue a competing class action.  And I think I've

2   heard it in court this morning that their case is a de facto

3   class action.

4          THE COURT:  Or surety representative action.

5          MR. GOODMAN:  Surety representative action.  Much

6   like the 17-200 claim that the Edlesons made.  And they want

7   to do that without with regard to the parties' desire to

8   settle that.  They want to do that without regard to whether

9   Texas consumers want to participate in the settlement or not.

10      Now, keep in mind that they have every right, under this

11  settlement and otherwise, to pursue the State's own claims.

12  Section 10.5 of the stip expressly carves that out to say, if

13  you've got a claim for statutory penalties, or whatever else,

14  that's payable to you and collectable by you in your own name

15  and in your own right, have at it.

16      So they still have their case.  If they think AHS, you

17  know, has done wrong down in Texas, they're entitled to prove

18  that case.  They're entitled to get statutory penalties, quite

19  frankly, that swamp the restitutionary remedies if they can

20  prove them.

21      So the Texas AG can continue on with its case within

22  those confines.  Beyond that, though, what they're telling the

23  Court is, hey, these parties can't settle for anybody in

24  Texas.  We're the AG.  You have to listen to us.  We're the

25  authority for who decides whether Texas consumers can settle.

1      They don't cite you any authority for that proposition,

2   and I'd submit that there isn't any authority cited because

3   there isn't any for that.

4      A couple of other brief points.  We put in a declaration

5   that had to do with the opt-outs, Judge.  We now have a more

6   detailed declaration on that point updating it since the 26th

7   when our brief was filed.

8           THE COURT:  Any luck determining Texas opt-outs?

9           MR. GOODMAN:  Not over the break, Your Honor.

10          THE COURT:  Not in a whole half hour?

11          MR. GOODMAN:  But it is on my list to --

12          THE COURT:  I'll just look for a post-hearing

13   submission from you on that.

14          MR. GOODMAN:  Yes, Judge.  I marked as Defendant's

15   Exhibit 4 a second declaration of Lindsay Singletary who

16   helped us with coordinating what the Court had by way of

17   opt-outs versus what we received, if anybody wants a copy.

18      I would go ahead and offer this at this point.

19          THE COURT:  Any objection?

20          MR. NORRIS:  No objection.

21          THE COURT:  Defendant's 4?

22          MR. GOODMAN:  Defendant's 4.

23          THE COURT:  Without objection, it's received.

24          MR. GOODMAN:  Just briefly, by way of what's in it.

25   What Ms. Singletary, a law clerk for us did was basically

1  create three lists.  One is a list of the opt-outs as to which

2  there is no question.  They were timely received.  They either

3  used the provided exclusion form or otherwise indicated their

4  desire to be excluded.  That's Attachment 1.

5      Attachment 2 is a number totaling 36 people whose filing

6  or submission or piece of paper was received beyond the

7  Court's deadlines.

8      Just from talking with Ms. Waudby, before we began today,

9  I know that the Court has received at least one that is not

10  reflected on this list, but they continue to trickle into my

11  office, daily, I get some additional ones.  But there are 36

12  people that, as of yesterday, we had knowledge of were late.

13     And the third is what we're calling potential exclusion

14  requests.  These are people who got something in on time but

15  either did not use the exclusion request form or they did not

16  indicate that they wanted to be excluded.  There was no

17  statement requesting exclusion.

18         THE COURT:  Or expressly stated they wanted to be

19  included?

20         MR. GOODMAN:  No.  There are seven that are

21  asterisked here on this list that expressly indicated they

22  wanted to be included.

23         THE COURT:  All right.

24         MR. GOODMAN:  The rest of these tended to be, I've

25  moved, or I'm really unhappy with AHS, they didn't handle my

1    claim correctly.  Other things that stated no intention either

2    directly or by implication that they were asking for

3    exclusion.

4         I think, given the small number here, we'll be guided by

5    the Court's judgment and invite your comment on these, but

6    AHS's position is that those who are late are, in fact, late,

7    and should not be excluded, they should be class members.  And

8    those who gave no indication directly or implicitly that they

9    wanted to be excluded, should also be included.

10        In any event, on Table 3, those who said, I want to be

11   in, should certainly be in, and they shouldn't be excluded

12   just because they sent in a piece of paper.  So that's our

13   view on the opt-outs.

14        The last thing, Judge, I want to talk about is the final

15   order.  I know Your Honor has lots to consider.  We have a

16   proposed final order.  There was one obviously that was

17   submitted with the preliminary approval papers.  We've taken

18   that.  There have been some changes to it, in particular, to

19   reflect the status report that's been discussed here and was

20   filed yesterday.

21        One other issue that we want to be heard on, whether it's

22   now or at some other time in the near future, is the Edlesons,

23   and the --

24             THE COURT:  I had a feeling that might come up

25   today.

1          MR. GOODMAN:  Yes, Judge.  As you know, we are of

2    the view -- AHS is of the view that the Court properly

3    enjoined them under the All Writs Act back in October.

4       We believe that the filings made by the Edlesons since

5    that time have continued to give every indication that, if

6    allowed to do so, they will pursue their class claims and

7    17-200 representative claims in California.

8          THE COURT:  Is there anyone here today on behalf of

9    the Edlesons?  I didn't think so, but I just wanted -- I

10   hadn't specifically asked that today.  I haven't had the need

11   to ask that yet, but -- all right.  You may proceed.  I just

12   wanted to make sure.

13         MR. GOODMAN:  Yes, sir.

14         THE COURT:  Now, technically, they've opted out?

15         MR. GOODMAN:  They have.

16         THE COURT:  They're clearly one of the opt-outs,

17   timely received, told us from day one, even before day one,

18   that they were going to opt-out.

19         MR. GOODMAN:  They did.  They have.

20         THE COURT:  The same firm that represents them has

21   filed objections on behalf of seven other individuals, if I'm

22   counting correctly.

23         MR. GOODMAN:  That's right, Judge.  It's sometimes

24   hard to tell who is wearing the hats, you know.  But I believe

25   that there is an overlap of counsel there.

1          THE COURT:  They might put on different uniforms.

2          MR. GOODMAN:  That's right.

3          THE COURT:  But, in all seriousness, I do think I

4    owe it to them, even though they didn't come today, to explore

5    some of the objections that I've received from them that ask

6    me to revisit my findings on the side letter.  Okay?

7          As I read -- let me just tell you my current take on

8    this, and I'll throw it open for you or anyone else to

9    disabuse me of any misassumptions I've made.

10          In the *Edleson* settlement agreement that was filed in

11   with the California court, there was a termination provision.

12   That said, "In the event this settlement is terminated before

13   the effective date for any reason, all other paragraphs of

14   this agreement, and the settlement, itself, shall be deemed

15   null and void ab initio and without force or effect."

16          Skipping along in the same paragraph.  "In such event,

17   this agreement and all negotiations, statements, proceedings

18   and documents prepared in connection herewith, including all

19   legal briefs and exhibits thereto shall not be deemed or

20   construed to be an admission or confession by any party of any

21   fact, matter or proposition of law, and shall not be offered

22   by anyone adverse to the defendant for any purpose,

23   whatsoever, in any suit.

24          In the event of such termination, all parties to this

25   agreement, shall stand in the same position as if this

1   agreement had not been negotiated, signed or filed with the

2   court except as expressly provided in this paragraph."

3       My understanding is that that agreement was signed and

4   executed on September 30, 2008.  It's also my understanding

5   that's the same day that a letter memorializing our

6   understanding -- the understanding between counsel for AHS and

7   California, the Kirkland & Ellis firm; and Mr. Bottini was

8   executed -- or at least -- yeah, executed by Mr. Boles and Mr.

9   Bottini, that contains what the Johnson-Bottini firm claims is

10  the side agreement.  Am I right so far?

11          MR. GOODMAN:  Yes, sir.

12          THE COURT:  I know I'm kind of asking the choir

13  about the sermon, but why wasn't the side agreement terminated

14  along with the -- pursuant to the termination provision, if

15  you and the plaintiffs were to be put in the *Edleson* matter

16  back into the same position you had been before September

17  30th, 2008, if the settlement was terminated for any reason?

18          MR. GOODMAN:  I -- I can't answer that because, of

19  course, it did fall within what was terminated.  I mean, our

20  view is by its terms -- well, our view of it is, by its terms,

21  it never quickened into anything because the conditions

22  precedent to it -- it meaning the side letters operation, it

23  never came into being.  But, in any event, the settlement was

24  terminated.  It was formally terminated, if you will.

25          THE COURT:  What was the consideration for the side

1   agreement on each side?  What did each side offer as far as

2   consideration for a binding agreement?

3            MR. GOODMAN:  Right.  I think the promise was, in

4   the event it were necessary to -- in order to settle Faught to

5   have an Alabama-only class, they would consent to that if

6   class counsel, in a Faught settlement, agreed not to object to

7   the *Edleson* settlement and not to attempt to be class counsel

8   in the *Edleson* settlement, so I think --

9            THE COURT:  But that wasn't signed by -- that was

10  not signed by Faught putative class counsel at the time?

11           MR. GOODMAN:  Correct.  It wasn't signed by them but

12  I think that AHS was to -- was to commit to get that

13  understanding of that agreement if, in the event, that

14  eventuality ever occurred, which it didn't.

15           THE COURT:  So they were asking you to go secure

16  that agreement from these folks in Alabama you were

17  negotiating separately with --

18           MR. GOODMAN:  Yes.

19           THE COURT:  -- to see if they would be willing to

20  help out, with the California case, if they would be willing

21  to carve out Alabama?

22           MR. GOODMAN:  Well, no.  The agreement was not that

23  anyone was necessarily agreeing to carve out Alabama, the --

24           THE COURT:  It says here, "If the defendants choose

25  to settle or carve out the Alabama case."  I'm reading

1   directly from the September 30, 2008 letter.

2       "The defendants must obtain the agreement of the

3   plaintiffs in the Alabama case neither to; one, object to any

4   portion of the settlement in the California case; nor two,

5   seek to be appointed class counsel in the California case."

6       In other words, it's kind of anti-competitive, isn't it?

7   I mean, I'm just wondering why this is enforceable even if

8   there had not been a termination of the agreement.

9           MR. GOODMAN:  I have not given that any thought.  I

10  will say that in terms of the condition precedent, it was to

11  -- if it were necessary to effectuate a carve-out of an

12  Alabama-only putative class.

13          THE COURT:  And, of course, you're not who I need to

14  ask this question to but that creates, in my mind, the

15  pregnant question -- or raises in my mind, the pregnant

16  question of how can they represent a nationwide class if

17  they're willing to give away Alabama, presumably with slightly

18  different relief, favorably or unfavorably for Alabama; and

19  favorably and unfavorably for the rest of the nation, in

20  return for no one else trying to become class counsel and not

21  objecting to their settlement?

22      I mean, I wasn't kidding when I said this is the stuff

23  John Gresham wrote about.

24          MR. GOODMAN:  I'm not quite sure how to answer your

25  question other than the events contemplated in the side letter

1  never occurred, and the settlement that this was a part of was

2  not only terminated by AHS, it was months before that, flat

3  out terminated by Judge Bloom.  I mean, there's nothing to

4  enforce.

5          THE COURT:  All right.  Well, anybody want to speak

6  to that issue?

7          MR. DAVIS:  Your Honor, all I would say on behalf of

8  the plaintiffs is that we certainly never would have agreed to

9  an Alabama-only class.

10         MR. NORRIS:  And we were never aware of a letter

11  from a side agreement until this dispute arose,

12  post-settlement, after the final settlement in this case.  We

13  were not aware of the side letter and we weren't aware that

14  there was an agreement on that subject matter.

15         THE COURT:  Okay.

16         MR. HUTSLER:  Your Honor, may I speak?

17         THE COURT:  Yes, come on up.  Please identify

18  yourself for the record.

19         MR. HUTSLER:  Yes, sir.  May it please the Court, my

20  name is Kearney D. Hutsler, and I represent Thomas Arrington,

21  and I'm here also for Todd Pettitt, Sharon Lee, and John and

22  Connie Pentz.

23      On those issues, I think it would be interesting to find

24  out if the Faughts did either object or opt-out of the *Edleson*

25  settlement.

1          THE COURT:  Or if they received notice of it.

2          MR. HUTSLER:  Sure.

3          MR. NORRIS:  Judge, the answer to that is we did not

4    opt-out or object to it because the way -- at the time, the

5    way the settlements were structured, at that time, was that

6    there was the larger *Edleson* settlement, and then the Faughts

7    settlement was going to be administered at the same time as

8    the *Edleson* settlement; but the Faught class, which consisted

9    of, first year lack of maintenance claims, were going to get

10   superior relief in terms of attorneys' fees and penalties on

11   the back end that the rest of the *Edleson* class was not going

12   to receive.

13       So, since the two were dovetailing, we agreed,

14   originally, in the Faught settlement, not to object to the

15   *Edleson* settlement.

16          THE COURT:  All right.

17          MR. HUTSLER:  That's --

18          THE COURT:  Any argument you want to present

19   regarding that?

20          MR. HUTSLER:  Yes, sir.  We would certainly contend

21   that the Faughts did not look for the interest of the class in

22   that situation, the national class; that they were giving up

23   rights of the national class in the *Edleson* settlement.

24          THE COURT:  Well, if you were in the Faughts' shoes

25   at that point, and there had been a previously filed case that

```
 1    had proceeded to preliminary certification before they
 2    received notice?  Am I wrong there?
 3         It was already preliminarily approved by a separate
 4    judge, other than Judge Bloom, and there had been preliminary
 5    approval given to the settlement.  What should you do other
 6    than go out to California and watch it go down the tubes?
 7              MR. DAVIS:  Your Honor, in addition to that, the
 8    stated class in this case, at that time, was only first year
 9    lack of maintenance.
10              THE COURT:  Right.
11              MR. DAVIS:  And so the only obligation they had was
12    to that class, who they represented very well.
13              THE COURT:  All right.
14              MR. HUTSLER:  Thank you.
15              THE COURT:  All right.  Mr. Goodman?
16              MR. GOODMAN:  Back to the Edlesons and just the --
17    how we wish to proceed.  As I started to say, it's certainly
18    AHS' position that the prospect of continued interference with
19    the settlement that's been achieved here, should the Court
20    ultimately approve it, that prospect is very real from the
21    Edlesons and from their counsel.
22         We believe that the injunction that is in place should be
23    continued forward.  We do believe -- we're willing to concede,
24    as we discussed several months ago, that it can be narrowed.
25    It probably should be narrowed in terms of what they're able
```

1   to do going forward.

2        But the class aspects, the 17-200 aspects, the injunctive

3   aspects --

4            THE COURT:  Well, you mentioned filings.  Have there

5   been filings since the last one we took up with respect to the

6   preliminary injunction in the *Edleson* state case?

7            MR. GOODMAN:  No, there have not.  I just meant

8   filings in this court and at the Eleventh Circuit.

9            THE COURT:  I take it you would have brought that to

10  my attention if that had occurred.

11           MR. GOODMAN:  I would have.

12           MR. SMITH:  There is a reply brief, Your Honor.

13           MR. GOODMAN:  Yeah, they filed two briefs in the

14  Eleventh Circuit and some motions --

15           THE COURT:  No, I'm talking about, they have every

16  right to challenge my ruling in the Eleventh Circuit.  I just

17  wanted to make sure that there weren't additional efforts to

18  undermine the settlement in state court that had escaped my

19  notice at this point.

20           MR. GOODMAN:  No, there are none, Judge.

21           THE COURT:  I shouldn't say "undermine the

22  settlement".  I should say undermine my opportunity to

23  evaluate the settlement.

24           MR. GOODMAN:  Right.  What we would propose and we

25  have a proposed order -- final approval order that actually

1    deals with the *Edleson* question as part of that.  I can see
2    where Your Honor might say, all right, if you want to continue
3    the injunction that's in place, upon final approval, why don't
4    you file a motion and tell me what you want done.  That way
5    the Edlesons can respond --
6        THE COURT:  Well, the one issue I have, I guess, is
7    that the Edlesons' attorney who appeared in my court
8    represented to me that they were standing down and not doing
9    anything inconsistent with my order in terms of seeking
10   anything other than individual relief.
11       Now, as it turns out, I'm not sure that was wholly
12   consistent with -- that may be consistent with what he was
13   told by the Johnson-Bottini firm, but it may not be consistent
14   with what the Johnson-Bottini firm was, in fact, doing or
15   trying to do.
16       Likewise, it seems to me that I still have that motion
17   where they've asked me to reconsider that pending.  Not
18   entirely sure what to do with it because they seem almost to
19   have abandoned it.  But we all agreed, in a conference call, I
20   believe, that the best thing to do would be to not take any
21   action.  If they've abandoned it, fine.  If they've not
22   abandoned it, it's their responsibility to support it.
23       In light of all that, should we -- are we moved from an
24   issue of whether this is an All Writs Act injunction based
25   upon protecting this Court's power to evaluate the fairness,

```
 1   reasonableness and adequacy of the settlement.  That
 2   injunction is in place.  We don't believe it's being violated.
 3   We believe it's being challenged, but we don't believe it's
 4   been violated.
 5              MR. GOODMAN:  Correct.
 6              THE COURT:  Okay.  Let's assume I don't approve the
 7   settlement.  Then all bets are off.  Let's assume I do approve
 8   the settlement.  Then, if actions are taken thereafter, we're
 9   looking at a Battle issue, not the issue I've already dealt
10   with.
11              MR. GOODMAN:  Yes.
12              THE COURT:  So why should I attempt to do anything,
13   at this point, on that issue if, in fact, the Edlesons are
14   standing down and challenging the Eleventh Circuit and my
15   order, and not misbehaving out in California.  But if they do
16   misbehave out in California after approval -- assuming
17   approval -- then we're dealing with a wholly different issue
18   related to Battle.
19              MR. GOODMAN:  And I agree with you that we went from
20   a Bayshore Ford, ex parte Ford situation, to where if there is
21   final approval, which we hope there will be, we're going to be
22   in a Battle situation.  We're traveling still under the All
23   Writs Act but under different exceptions to the
24   Anti-Injunction Act.
25              THE COURT:  And somewhat different legal standards.
```

1            MR. GOODMAN:  Somewhat.

2            THE COURT:  Maybe not wildly different, but somewhat

3    different.

4            MR. GOODMAN:  Yeah.  Really, the only reason I bring

5    it up is because we acknowledge that any activity by them in

6    California, with regard to suing us, is probably overbroad.

7        Now we can wait until the Eleventh Circuit takes a look

8    at what's already up there then if they think it's overbroad

9    or whatever, we can deal with it later.  But there is a way

10   you can, if Your Honor wants to, take what's, in essence, a

11   preliminary injunction; albeit one based on the All Writs Act

12   that you entered in October, modify it, and make it either

13   part of or entered contemporaneously with the order of final

14   approval.

15           THE COURT:  I guess that goes back to the concern I

16   don't think I articulated very artfully; and that is, is there

17   a record for a basis for the Court, at this point, to be

18   concerned enough with that to do anything other than what's

19   already done?

20       I mean, I take it, in order for me to finalize an

21   injunction and make it permanent, there would have to be --

22   again the showings that you made on the preliminary injunction

23   motion, because there was an actual threat at that point.

24   What if there's not an actual threat at this point?

25           MR. GOODMAN:  We're content to let what Your Honor

1   has done bide the case, bide any appeals, and we take it from

2   there.  That's fine, too.

3       I just -- I don't want what Your Honor has done to

4   somehow go away in the event there's final approval.  We are

5   happy to attempt to modify but we certainly don't think that's

6   necessary.  That's really the only reason I raise the point.

7   And also --

8       THE COURT:  What happens to my preliminary

9   injunction as it relates to that; and specifically the

10   Edlesons, since they took conduct that violated the previous

11  order -- engaged in conduct that violated the prior order,

12  what becomes of that preliminary injunction once the final

13  approval -- if final approval occurs, who would take place?

14      MR. GOODMAN:  We take the view that it continues.

15  Although I think we'd ask the Court in a proposed order to

16  clarify that it continues, you know, biding their appeal.  It

17  actually would ripen --

18      THE COURT:  Definitely would continue to protect my

19  jurisdiction to consider the settlement.

20      MR. GOODMAN:  True, true.

21      THE COURT:  So it would have to be on some other

22  basis.  But if there's not a current threat and we're looking

23  at a different basis for the injunction, I'm just wondering

24  out loud here, if there's a basis for an injunction then; or

25  do we need to wait for some threat on that jurisdiction to

1    effectuate the settlement?

2          MR. GOODMAN:  Well, to me, Judge, for them to say --

3    and, true, they have every right to challenge Your Honor's

4    orders.  But they have made no bones about, throughout the

5    proceedings in this court, and in the Eleventh Circuit, that

6    they intend to pursue class-wide relief, 17-200 relief.

7    They've never varied from that.  They have never wavered from

8    that.

9          So I think the threat, if you were to just say, well,

10   there's no injunction anymore, you know, we would immediately

11   see what would happen.

12         THE COURT:  I think you would have an immediate

13   right to address that, right?  Wouldn't that be safer, so I

14   would have an actual record of what I'm dealing with?

15         MR. GOODMAN:  Well, I think Your Honor does have a

16   record in terms of --

17         THE COURT:  Well, we certainly have a record in that

18   sense, but I'm talking about a record dealing with the

19   separate issue under *Battle*?

20         MR. GOODMAN:  Yeah.  I think the Court is going to

21   have to make findings that continued prosecution of the class

22   claims, the 17-200 claims, the claims as to company-wide

23   business practice, would interfere with the settlement.

24         THE COURT:  And I take it that one of the arguments

25   you've made would be the context that's presently before us to

1   do that in light of Texas' position in this case, in two of

2   your arguments.

3            MR. GOODMAN:  Yes.

4            THE COURT:  I want to hear from Texas more about

5   that, but just want to make sure that that's on the surface

6   and we're dealing with it.

7            MR. GOODMAN:  Right.  I mean, Texas has not taken

8   any position in the Texas litigation that interferes with this

9   settlement.  I mean --

10            THE COURT:  Sounds like they think they might.

11            MR. GOODMAN:  Well, I'm not arguing that they have.

12            THE COURT:  And July will be here sooner than we

13   expect it, if they don't get their continuance.

14       And, again, that all presupposes something we haven't

15   decided yet; and, that is, whether or not we're going to

16   approve this settlement.

17            MR. GOODMAN:  That's true.  And I want to be very

18   clear that I'm making these arguments on that basis --

19            THE COURT:  Yes.

20            MR. GOODMAN:  -- that in the event the Court does

21   approve.  But I did want to get the issue out on the table.

22   We can get Your Honor now or whenever you want, a proposed

23   order.  We're happy to file a motion.

24            THE COURT:  What I may have you do is file a motion

25   brief and a proposal, and give everybody who has an interest

1    in responding to it, an opportunity to do that, may be the

2    better way of getting it.

3              MR. GOODMAN:  Okay.

4              THE COURT:  I don't want to get the cart too far in

5    front of the horse.  I understand why we would want to discuss

6    it today, but I think we've got it major on the majors for

7    today.

8              MR. GOODMAN:  I'm with you.

9              MR. DAVIS:  Your Honor, from the plaintiffs'

10   standpoint, that is the preferable course is to deal today

11   with the settlement approval.  It does seem to me that the

12   earlier injunction, the basis of that is preserving Your

13   Honor's ability to consider this settlement, and we're at that

14   point now.

15        And it also seems to us -- and I'm not sure I've got a

16   dog in the fight as to where the injunction should be issued

17   and, if so, how broad it should be.  I might have.  I haven't

18   fully considered that.

19        But it does seem to me, the appropriate thing to do is to

20   consider that separately and to give notice to everybody who's

21   interested in that.

22             THE COURT:  Well, your dog in the fight may be just

23   simply wanting to cut off confusion that could be created for

24   some of the class who are seeking to represent in California,

25   and perhaps Texas.

1    MR. DAVIS:  And the reason I say I haven't fully

2  thought that out yet, I certainly don't want confusion out

3  there that would interfere with people's ability to make an

4  informed decision about whether to file claims or not, that

5  sort of thing.  I don't want the settlement interfered with in

6  the sense of its ability to be implemented and to be

7  implemented efficiently and intelligently and clearly.

8    THE COURT:  All right.

9    MR. GOODMAN:  The only other thing I would say,

10  Judge, I neglected to say before.  Part of the Court's basis

11  for the injunction that's already in place, I think, carries

12  through, and that part is the Edlesons disregard of the

13  Court's prior orders.  So I think that that's something that

14  justified what Your Honor did before and I think would justify

15  continuing it.

16    THE COURT:  Well, the main thing that I recall, that

17  brought about it, was when they argued to the California

18  court, that my order didn't apply to the *Edleson* case; and the

19  California court basically indicated if my order did apply, it

20  seems like I would have said so.  So I took that opportunity

21  to say so.

22    MR. GOODMAN:  Yes, sir.

23    THE COURT:  And we had some other mischief going on,

24  perhaps.  But that was one of the major things I was concerned

25  about was that hearing that the parties reported to me that

```
 1   occurred after the preliminary approval order went out.
 2           MR. GOODMAN:  Right.  Unless you have any questions,
 3   I'll sit down, Judge.
 4           THE COURT:  All right.  Thank you.  Mr. Tomlinson,
 5   we have not heard from you yet.  You've been very patient with
 6   us.  Do you want to take your turn?
 7           MR. TOMLINSON:  Yes, sir.
 8           THE COURT:  And, Mr. Hutsler, you may have some
 9   other things you wanted to point out to me.  I welcome those
10   comments, too.
11           MR. TOMLINSON:  Thank you, Your Honor.
12           THE COURT:  Thank you.
13           MR. TOMLINSON:  May it please the Court.  My name is
14   Hilton Tomlinson.  And --
15           THE COURT:  You've had the benefit of hearing a lot
16   of the positions articulated that may inform some of your
17   arguments.
18           MR. TOMLINSON:  Let me, just for the record, if I
19   might.  I represent Kenneth and Pamela Behrend, Mike McKerley,
20   John Howe, Jenny Hill, Jennifer Deachin, Jeff Williams and
21   Sabrina Williams, and Janet Wood.
22           THE COURT:  How about -- you may have said this and
23   I missed it.  Brea (phonetic)?
24           MR. TOMLINSON:  Well, that's Sabrina Williams.
25           THE COURT:  Oh, okay.  That's all I was going to
```

1  ask.  Okay.

2          MR. TOMLINSON:  I differ with class counsel on this

3  matter in this regard, as far as *Edleson* is concerned and

4  whether this is an improvement or not.  And I say it this way,

5  Your Honor --

6          THE COURT:  Did you object in *Edleson*?

7          MR. TOMLINSON:  Yes, sir.

8          THE COURT:  All right.  Did you appear before the

9  California court?

10          MR. TOMLINSON:  I did not personally.

11          THE COURT:  Okay.

12          MR. TOMLINSON:  Class members who had warranty

13  claims that were rejected by American Home in the first place

14  are what I consider really the victims before this Court.

15  They are the plaintiffs because American Home -- and I'm going

16  to be a little liberal here -- breached its contract with them

17  in wrongfully rejecting certain claims under their warranty

18  agreement.

19      So what is the redress for the breach here?  It's okay,

20  let's try it again, and let's see if we get a different

21  result.  That is, we're going to set up this new claims review

22  board, or desk.  Not so much to say, like the Texas class

23  action that's seeking restitution, but they are going to give

24  you another bite at the apple.

25      And rather than having some third party come in and serve

1    in this capacity, American Home is going to serve as its own

2    arbiter.  Again, with this same situation.  And they say,

3    well, but it's different this time.  It's different this time.

4        Because you have this risk of having a -- I think the

5    example is a $500 claim ending up with a thousand dollar

6    surcharge added to the tab.

7                THE COURT:  Or more.

8                MR. TOMLINSON:  Or more.  I was just using that as

9    an example.

10               THE COURT:  Sure.

11               MR. TOMLINSON:  And I think that where I think that

12   if we all kind of step back and look at that, you see this:

13   That American Home Shield was under a contractual agreement to

14   provide this warranty, initially, to these class members, and

15   did they think twice back then, when they wrongfully denied

16   these claims, that they may eventually have to be the

17   defendant in a class action being added to their tab?  And I

18   think the answer is plainly no.

19       And just as they were not concerned, initially, I don't

20   think they're concerned about this claims review desk because

21   I think they are buying their peace in this case for next to

22   nothing.

23               THE COURT:  You haven't mentioned yet the fact that

24   the claims review process will be monitored by class counsel.

25               MR. TOMLINSON:  Right.

1          THE COURT:  It will employ some agreed language

2     that's been hammered out by class counsel and defense counsel

3     that will define terms that previously were subject to playing

4     the joint, shall we say.

5          MR. TOMLINSON:  Right.

6          THE COURT:  And the fact that, depending upon the

7     number of claims that go before the desk review process -- in

8     particular, I note particularly that class counsel believes

9     there will be any number of those based upon the utilization

10    they've already seen of their call-in number, faxes and

11    e-mails and so forth, that there should be an incentive for

12    American Homes -- AHS to really make sure they're not

13    unreasonable in denying these claims.  Because as plaintiffs'

14    counsel said earlier, a penny more recovery in a small claims

15    court, is going to engage these litigation kickers, these

16    penalties, as they call them.  What do you have to say about

17    that?

18         MR. TOMLINSON:  You know, Your Honor, I don't have

19    the numbers, but I was a little bit taken aback today by

20    counsel for the Texas AG's Office -- and she's rung the bell

21    so I guess we can talk -- that there's talk about $90 million.

22    Okay.

23         THE COURT:  Well, first of all, how am I to consider

24    that?

25         MR. TOMLINSON:  Well, I'm not going to ask you to

1  consider it.

2          THE COURT:  Second of all, I don't know whether that

3  was a violation of some agreement or not.  It's certainly been

4  alleged it was.

5      And third of all, the essence of a settlement is

6  compromise.

7          MR. TOMLINSON:  Right.

8          THE COURT:  Neither side gets everything they want

9  or gets to keep everything they have.  I'd rather you focus in

10  on what I've asked about there.

11          MR. TOMLINSON:  Well, that's where I was going.  And

12  that is this:  That I believe that the monetary restitution,

13  the potential or the range of recovery, which I was going to

14  get to a little bit later, is so great that this claims review

15  desk is just miniscule compared to what is out there, the

16  potential.

17      Now, I have nothing to back that up.  I will admit that.

18  This is only what I see, I hear, and the reaction.  What I was

19  interested to --

20          THE COURT:  Well, let me ask you this:  You said the

21  real victims in this case are those that have submitted their

22  claims under these warranties and had their claims denied.

23          MR. TOMLINSON:  Right.

24          THE COURT:  So if they go back and resubmit the

25  claim, and it gets granted, one of the things they've lost is

1     the time.

2               MR. TOMLINSON:  Right.

3               THE COURT:  It's now -- it's not going to happen

4     tomorrow.  You would argue it should have happened long before

5     tomorrow.  So you've lost the time.

6          But, on the other hand, based on compromise, why isn't

7     that a satisfactory resolution of the controversy here,

8     because they get their claim either granted or they now have

9     an extended Statute of Limitations with a quote, "litigation

10    kicker", end quote.  They can go to an attorney.  They can

11    prosecute it in small claims court themselves.

12         And the attorney realizes, if I take on this claim,

13    depending upon the type of claim and where I'm prosecuting, I

14    may get attorneys' fees, which reverses the American Rule.

15              MR. TOMLINSON:  And I would say this:  That that's

16    all fine and good, whoever does it.  I mean, as we all know,

17    class actions, the take rate is always something like 5 to 10

18    to 15 percent.  That's it.  And I suspect that will be the

19    same situation here.  So, yeah, those five percent people are

20    going to get what they need.

21              THE COURT:  Class counsel have told me they

22    expect maybe -- is it as high as a 25 percent rate among

23    the --

24              MR. DAVIS:  Your Honor, we do.  We expect that or

25    higher.  Particularly in the area of claims, when you start

1   getting up on any kind of HVAC claim or something like that,

2   the larger the claim is, in general, in the United States, the

3   larger participation rate you see.  If somebody's got a claim

4   over $5, you don't see the same participation as you see with

5   $5,000.

6         THE COURT:  Sure.

7         MR. DAVIS:  People who buy home warranties buy them,

8   generally, because they are concerned about their ability to

9   pay for those -- they are like the Faughts.  They are a nice

10   young couple that doesn't have a lot of money, they bought a

11   home warranty because they want something to protect them if

12   something goes wrong bad.

13         THE COURT:  Much of their cash has been used on the

14   down payment.  So they want something in that first year or

15   two to protect them in case there's a major failure or some

16   other problem they can't afford, they want the warranty to

17   step in.

18         MR. DAVIS:  Absolutely, Your Honor.  Particularly

19   with regard to the more significant claims that were made

20   against American Home Shield, those were important claims to

21   these class members.  These were substantial amounts of money

22   to these class members.  And so we think there's going to be a

23   very high participation rate among people who had the larger

24   claims.

25         I will tell you, frankly, that somebody who's got a $50

1   claim, I think there will be a much lower participation rate

2   on that.  But among the bigger claims, which is where most of

3   the money that was not paid out we say, in this case, we think

4   there's going to be a shockingly high participation rate based

5   upon what we know about the nature of the --

6           THE COURT:  All right.  Let me ask you this:  That's

7   what you think.  He thinks differently.  That's not a whole

8   lot for me to go on, other than just to assess whether it's

9   fair, adequate and reasonable, right?

10          MR. DAVIS:  I agree, Your Honor.  And it's not

11  anything else other than to assess whether it's fair, right,

12  and reasonable.  Although, I would say perhaps Your Honor can

13  do what we charge juries which is to look at the question of

14  what is logical and use your own experience in reaching that

15  conclusion.

16          MR. TOMLINSON:  May I take that a little further?

17  And that is this, when this Court is charged with trying to

18  find whether this settlement is fair, reasonable and adequate,

19  one of the things that it has to do is look at the range of

20  possible recovery.

21      And I was real interested because, right before the lunch

22  break, I thought Mr. Goodman was going to get into that, and

23  then we broke.  And then when he came back, I just didn't hear

24  it and I was hoping to hear it and that is this:  When these

25  gentlemen went to Marty Van Tassel to represent this class,

1    they had to have a number in their head, through discovery,

2    whatever, how potentially large this class was and what are

3    the potential damages.

4         And then under the authority of the case of *Synfuel*

5    *Technology versus DHL Express, 463 F.2d 646*, it's a Seventh

6    Circuit case, Judge Wood suggested this, he goes, you figure

7    out what the dollar is, the pot of gold is, and then you -- of

8    course, what is the potential you want to get the pot of gold

9    and you've got to reduce it by a percentage.

10        Well, I haven't heard what the pot of gold is today.  I

11   don't think this Court has either, as far as what is the range

12   of possible recovery.  Now I've heard that the range is that

13   you can go back and get your -- go back to the claims review

14   desk.  But I think that the Eleventh Circuit had something

15   else in mind; that is, don't tell me what your mediation is or

16   what your recovery -- or what's the better word -- your

17   settlement is, tell me where you started and then let's see if

18   this is fair.

19        That is, if the pot of gold is $100 million and there's

20   only a 50 percent chance of you recovering that, is this case

21   really worth $50 million?  I suggest it's not.  But that's a

22   number I've just pulled out of my hat.

23              THE COURT:  Well, isn't that the point, though, that

24   regardless of what Judge Wood at the Seventh Circuit said, the

25   Eleventh Circuit has said that I should avoid the temptation

1   to substitute my judgment for judgment of class counsel.

2       I should also resist the temptation of having a

3   mini-trial on the merits and trying to determine, you know, if

4   the cards all fall just right off the table, this is the

5   number.  Oh, but wait a minute, they may not even be able to

6   certify a class.  Oh, wait a minute, there may be issues in a

7   nationwide class with even being able to manage it because of

8   the different applications of the different state laws, a

9   (b)(3) issue.  There may be all sorts of other problems that I

10  think I've got to take into account.

11      So, in light of all that, it's not a matter of would

12  have, should have, could have.

13          MR. TOMLINSON:  Right.  But it reduces the

14  percentage of recovery, the chance of recovery.  And that's

15  what class counsel has got to look at, defendant's counsel has

16  got to look at and what Your Honor looks at.

17          THE COURT:  Well, wouldn't I look at the process,

18  too?

19          MR. TOMLINSON:  Absolutely.  And I think we talked

20  about that earlier.

21          THE COURT:  What do you make of 16 mediation

22  sessions with Marty Van Tassel -- who I think you know.

23          MR. TOMLINSON:  Right.

24          THE COURT:  And two or three occasions where class

25  counsel walked out, one of which they filed an adversarial

1   motion to certify a class, just to get their point across that

2   they were done negotiating.

3       Why wouldn't I say, you know, I don't know -- I can't

4   really judge whether they got 51 percent of the pot of gold,

5   or 46 percent of the pot of gold, or 37 percent of the pot of

6   gold, but they took 16 prolonged whacks at the pot of gold.

7           MR. TOMLINSON:  And what did they do when they

8   walked in there on the first mediation with Mr. Van Tassel?

9   They told him a number.

10          THE COURT:  I don't know if they did or not.  I

11  never did that.  In fact, I've got a story of a judge that was

12  visiting here had me come in for ex parte settlement

13  discussions and asked me to give him my number and I didn't

14  want to.  So I had three choices.  I could either misrepresent

15  what my number was, tell him I wasn't going to tell him what

16  my number was, or tell him my number.  So I told him my

17  number.  He told me he would take care of me.  He came back

18  ten minutes later and said that wasn't going to do it, but if

19  we got $10,000 more, the case would settle.

20      So I'm not going to assume they told the mediator what

21  their number was from day one.  Maybe if it was particularly

22  one of my colleagues or one of our magistrate judges, they

23  might have told him the number if they asked, but --

24          MR. TOMLINSON:  Well, my point being is, I know when

25  I represent a class, I have a number in mind.  And when I'm

1    forced to mediation of course there's a lot of horseplay with

2    that number, but you've got something in mind.  And you just

3    don't pull it out of the air.  You've got to do discovery and

4    figure out what your case is worth in order to adequately

5    represent the class.

6              THE COURT:  Any reason I shouldn't conclude on this

7    record there's been sufficient discovery to --

8              MR. TOMLINSON:  Not at all.

9              THE COURT:  And they've even gone to California and

10   participated, at least as an observer, in that case.

11             MR. TOMLINSON:  And I think that's part of the

12   homework, to figure out what that number is.  So I'm certainly

13   not implying that at all.  I hope the Court doesn't think

14   that.

15             THE COURT:  No.  I'm just exploring the boundaries

16   of your argument.

17             MR. TOMLINSON:  Okay.

18             THE COURT:  What do you make of this?  If -- you

19   know, I know Texas has a special spin on this issue, and I

20   want to think more about that.  But, in this case, the class

21   received notice of that *Edleson* settlement and there were

22   5,000 opt-outs, something along those lines?  I don't have the

23   exact number.  Maybe almost 5,000.

24        Then they received notice that that settlement had been

25   terminated and a new settlement was on the board; and they

1   were told about this new settlement.  And we've got somewhere

2   in the 14 to 1,500 range nationwide and a 4.7 million person

3   class of opt-outs.

4        What do I make of that?

5             MR. TOMLINSON:  You know, I wouldn't make anything

6   of it.  Because if you think of yourself as a consumer, and

7   you just keep getting notice, after notice, after notice from

8   American Home, and it's all this protracted litigation, you

9   just say forget it, man.  I'm not going to get anything out of

10  this anyway.  And so you don't do anything.

11       I think that's your typical reaction.

12            THE COURT:  Well, you have 6,500 cases between the

13  two -- 65 different situations between the cases where someone

14  did something.  They either opted out, they objected.  I mean,

15  you've got clients who chose not to just throw their hands in

16  the air.

17            MR. TOMLINSON:  Right.

18            THE COURT:  They stepped up to the plate and said

19  what they thought through you, I guess.

20            MR. TOMLINSON:  Right, and other counsel.

21            THE COURT:  And other counsel, sure.  But when I

22  look at this -- and I made this point right off the bat and

23  you probably made note of it -- that I don't think you can

24  just look at the quantity and percentage of opt-outs or

25  objections and draw any hard and fast conclusions.  That's a

1    factor.  You also have to look at the substance of the

2    objection.

3         But it is fairly remarkable, isn't it, that we've got so

4    few opt-outs and objections in a class of -- I mean, this is a

5    very divided country on a lot of issues.  You know, I don't

6    think you can get -- you get more than 1,500 people out of 4.7

7    million saying that day is night and night is day, it seems

8    like.

9              MR. TOMLINSON:  I can't speak for the opt-outs, but

10   I understand what you're saying.

11             THE COURT:  All right.  Anything else?

12             MR. TOMLINSON:  Yes, sir, Your Honor.  The only

13   other point I'm going to make -- I think everybody else has

14   pretty much gone over this stuff -- I would say this.

15   Unfortunately, two things about the class reps in this case.

16   Number one, I think that the -- and I think this was sort of

17   unique, and I kind of liked this idea, that you can adjust

18   that number and still accept the settlement, if that's what

19   I'm hearing today.

20             THE COURT:  Well, I think what you're hearing today

21   is that's not -- the settlement is not contingent upon what I

22   do with that number.

23             MR. TOMLINSON:  Exactly.

24             THE COURT:  I could give it to them, I could not

25   give it to them.  I could do something in the interim.

1          MR. TOMLINSON:  I think that it is entirely unfair

2     to the class that these class reps should receive as much

3     money as they are requesting in that I think it's way too

4     much.

5          And, number two, I think they're inadequate

6     representatives in that they should have objected to the

7     *Edleson* settlement when it was in California.

8          THE COURT:  Well, what do you make of class

9     counsel's point of saying that they really weren't -- that

10    wasn't their class at that point?  They were in a --

11         MR. TOMLINSON:  I didn't ask that the -- I mean, I

12    don't think the class representatives -- excuse me -- the

13    class counsel should have sought to object on behalf of their

14    putative class, because I don't think they had the right to

15    until it's certified; and this case had not been certified at

16    that point.

17         THE COURT:  You're just talking about the class

18    representatives.

19         MR. TOMLINSON:  Exactly.

20         THE COURT:  How many class representatives that

21    you've represented in the past that hauled off and filed

22    something in another court on a matter related to the class

23    without checking with you?

24         MR. TOMLINSON:  No. This is the point --

25         THE COURT:  Okay.  Maybe I'm missing your point.

1          MR. TOMLINSON:  Okay.  The Faughts were very aware

2    of the *Edleson* case, okay?  If they thought that that

3    settlement was not good enough for them, they should have

4    objected to it.

5          THE COURT:  I see what you're saying.

6          MR. TOMLINSON:  They didn't.

7          THE COURT:  But that's not -- that is not in their

8    capacity as a representative of a class --

9          MR. TOMLINSON:  Oh, no.  All I'm trying to say is

10   they are inadequate because they thought that was a good

11   settlement.

12         THE COURT:  Well, does that mean that of the 4.7

13   million class members, less than a tenth of a percent would

14   have been adequate representatives of that class?  Because

15   nobody else objected either.  I take it you're --

16         MR. TOMLINSON:  They had a case pending in this

17   court.

18         THE COURT:  I understand.

19         MR. TOMLINSON:  Yeah.  I don't think those other

20   people had cases pending.

21         THE COURT:  But that's not their case over in

22   California is what I'm saying.

23         MR. TOMLINSON:  Right.

24         THE COURT:  They are no differently situated than

25   anybody else that failed to object; except for having a

```
 1    separate case with different theories and a different scope of

 2    class, at that time, in this Court.

 3              MR. TOMLINSON:  Yeah, which has now turned into the

 4    same case, a nationwide class.

 5              THE COURT:  All right.  I guess -- did all your

 6    clients object?

 7              MR. TOMLINSON:  In the California case?  I think all

 8    but one.

 9              THE COURT:  All right.

10              MR. TOMLINSON:  Maybe -- excuse me, two, I think.

11              THE COURT:  All right.

12              MR. TOMLINSON:  Thank you, Your Honor.

13              THE COURT:  Thank you.

14              MR. NORRIS:  Judge, I'm a little bit confused about

15    what Mr. Tomlinson's points were there at the end about the

16    duty that the Faughts had to object, and I'm not really sure

17    what the point is.

18              THE COURT:  I think it goes to whether they have

19    sufficient acumen.  Is that a fair argument -- fair summary of

20    your argument?  That that just demonstrates a lack of

21    acumen --

22              MR. NORRIS:  Or a lack of zeal.

23              THE COURT:  -- because they didn't object to a

24    settlement that was so illusory, as almost everyone in this

25    case has characterized that settlement.
```

1          MR. NORRIS:  Let me just say this about that.  And

2     I'm still not entirely clear I follow the point, but let me

3     just say a couple of things that I think may clear up the

4     Court, if the Court has any concern about it.

5          THE COURT:  Let me just say first.  The reason I

6     asked the question I asked is I think that they may have been

7     deterring duties owed to the class they're trying to

8     represent, they go running off to California heading up as

9     objectors in another class, when those same objections were

10    already asserted and the judge was going to rule upon.

11         MR. NORRIS:  That's exactly right, Your Honor.  And

12    also, from class counsel's perspective, I think that there's

13    no one that would argue with me in the room on this, that

14    neither Mr. Davis, nor I, ever thought the *Edleson* settlement

15    was a good and adequate settlement.  And so, we were only

16    content with the Faught settlement because that was the class

17    we represented then and as to the Faught class --

18         THE COURT:  For the benefit of everyone who wasn't

19    in the case earlier -- and there's not a record of it -- I

20    remember, at least in the recesses of my mind, when I was

21    together with you and Mr. Goodman, you suggesting that we'll

22    see what the California court does.

23         MR. NORRIS:  I think that was --

24         THE COURT:  Mr. Goodman, I may be misstating that,

25    but -- and I'm not asking you to acquiesce --

```
 1              MR. GOODMAN:  I didn't say that.

 2              THE COURT:  I'm saying he said it.

 3              MR. GOODMAN:  I don't remember.

 4              MR. NORRIS:  I must have been feeling really politic

 5   that day, Judge.

 6              MR. TOMLINSON:  Mr. Goodman thought it was a good

 7   settlement, I think, out there, Your Honor.

 8              THE COURT:  I don't think Mr. Goodman was in that

 9   case.

10              MR. GOODMAN:  The only thing I want to say in

11   response to the arguments just made, is the pot of gold

12   theory, whether you go in to mediate, or what's your number

13   theory.  It's as if the contention is being made that you

14   can't settle a case like this without there being a defined

15   amount of cash.

16        And as you can tell from our brief, that's not the law.

17   These kinds of cases get settled with review processes of

18   previously denied claims all the time.  In fact, we cite one

19   where the --

20              THE COURT:  You cite a case where the Eleventh

21   Circuit enforced the settlement against collateral attack.

22              MR. GOODMAN:  Yes.  It upheld it.

23              MR. DAVIS:  Judge, I'm going to make everybody

24   happy.  I'm going to tell them the number.  The number is, for

25   every plaintiff in our class, I want to get 100 cents on the
```

```
 1    dollar.  I want to get their claim paid.  And that's the
 2    number I had in the beginning, and that's the number I've got
 3    right now, is I want a settlement, and we've got a settlement
 4    here that allows the members of this class to get all their
 5    money back if they believe the claim was wrongfully denied, to
 6    get it reviewed again, to get their money back.
 7         And, in fact, I want more than that.  I want, if they
 8    don't do it fairly the next time, then the penalty applies,
 9    Your Honor.
10              THE COURT:  Now you have your answer.
11              MR. TOMLINSON:  May I respond?
12              THE COURT:  Sure.  This is more what I thought today
13    would be like.
14              MR. TOMLINSON:  You didn't call on me earlier.
15              THE COURT:  You didn't volunteer earlier.
16              MR. TOMLINSON:  I'm sorry.  Now we have the number.
17    So what is that number?  He must know what that number is.
18    You've done the discovery.  What's that number?  What is the
19    number of claims that have been wrongfully rejected, in their
20    estimation, and what is that dollar number?
21         Now, I'm not saying that this Court should say, well,
22    then, that's the only settlement I'm going to be able to
23    approve.  I'm just saying what is the adequate settlement for
24    this class; and, that is, you've got to take into account is
25    this class certifiable?
```

1          THE COURT:  Well, I think you want to avoid the

2     definite article when you describe that.

3          MR. TOMLINSON:  The definite what?

4          THE COURT:  The definite article.  "The" adequate

5     settlement.

6          MR. TOMLINSON:  Okay.

7          THE COURT:  Because I think you would, in fairness,

8     concede, that there can be several different adequate

9     settlements depending upon how different people might assess

10    the merits, the procedural posture, the difficulty in maybe

11    even having the opportunity to represent a class.

12         That's the point I want to make is I think it's a little

13    more fluid than your analogy suggests, that there is some

14    quotient, some formula, some talismanic approach that I can

15    take in saying, this is the amount that they could have gotten

16    if they had just filed that extra motion, or if they had just

17    stayed the course and fought the good fight to the end.  I

18    don't think that's the law.

19         I think the law is look at the possibility of recovery,

20    certainly, but look at the uncertainty of litigation, look at

21    the delays that extra litigation would entail, look at the

22    cost on the class and others of protracted litigation, look at

23    all those factors; and then is this fair, reasonable and

24    adequate.

25         MR. TOMLINSON:  And, Your Honor, I've not said it as

```
 1    eloquently as you have, but that's what I've been trying to
 2    say, and that is this:  Mr. Davis has now stated that, yes, we
 3    should go after -- should have -- and I realize they're not
 4    going to get there --
 5            THE COURT:  I think they're saying should have and
 6    we are.  That's his point, is my goal was to get 100 cents on
 7    the dollar, that's still my goal.  And we now have -- what his
 8    position is -- and you can disagree with it and I'll be glad
 9    to hear it -- we now have a procedure in place that can
10    accomplish that goal.
11            MR. TOMLINSON:  Whereas --
12            THE COURT:  Am I putting words in your mouth?
13            MR. DAVIS:  No, Your Honor.  That's precisely what I
14    intended to say at least.
15            MR. TOMLINSON:  The --
16            THE COURT:  You would like to have said it from a
17    different angle in the courtroom.
18            MR. DAVIS:  However not as eloquently as you did.
19            THE COURT:  I don't know about that.
20            MR. TOMLINSON:  And my point being is that when
21    deciding the adequacy of this settlement, let's look at the
22    range of possible recoveries.
23            THE COURT:  Point well taken.
24            MR. TOMLINSON:  Okay.  I won't beat a dead horse.
25            THE COURT:  And well made.
```

1          MR. TOMLINSON:  Thank you, Your Honor.

2          THE COURT:  All right.  Mr. Hutsler?

3          MR. HUTSLER:  Yes, sir.

4          THE COURT:  Thank you again for your patience with

5     us.

6          MR. HUTSLER:  Yes, sir.  Thank you.  Rather than go

7     over a lot of our detailed objections, the main objection --

8     or the main part of this settlement we find hard to swallow is

9     that if you have a claim, you have to return to this service

10    claims desk.  And AHS has had a history and a culture of

11    denying claims and finding ways to deny claims and teaching

12    and coaching their contractors and authorizers to deny claims,

13    and --

14         THE COURT:  Well, you say in your objections, that

15    this review desk is virtually identical to that rejected in

16    *Edleson*.  That's not --

17         MR. HUTSLER:  No, that's not right.

18         THE COURT:  That may be a little overstated.

19         MR. HUTSLER:  That's a little overstated.  Yes, sir.

20    There is now an appeal process, I'll call it, where you can go

21    to court.  But that appeal process --

22         THE COURT:  Well, let me pick one more bone with

23    you.  You say there's unfettered discretion and that the

24    review desk is the sole arbiter.  That's not exactly correct

25    either, right?

```
 1              MR. HUTSLER:  Correct.
 2              THE COURT:  There is a review process now.
 3              MR. HUTSLER:  Yes.
 4              THE COURT:  There could be different review
 5    processes, no question about it.
 6              MR. HUTSLER:  Yes.
 7              THE COURT:  There could have been a settlement that
 8    a third party claims administrator comes in -- I'm not sure
 9    AHS would agree to that -- but at this point -- and there are
10    no consequential damages, as you pointed out.
11              MR. HUTSLER:  Right.
12              THE COURT:  But there are penalties and there are
13    attorneys' fees options reversing the American Rule.
14              MR. HUTSLER:  Right.
15              THE COURT:  I made no -- I certainly haven't cloaked
16    this fact, that I was impressed with that upon preliminary
17    approval.  Obviously a lot of information has come before me
18    and I've got to reassess that with more information.  That's
19    the way the process works.
20         But why should I change my mind about my initial
21    impression that those seem to be substantially different than
22    Edleson --
23              MR. HUTSLER:  Right.
24              THE COURT:  -- substantially different than what the
25    Edlesons' counsel negotiated in California?
```

1          MR. HUTSLER:  Because you're requiring people to

2    first go back to the defendants, and the first hurdle before

3    you get to the -- maybe the more fair address system is

4    unfair.  And that's --

5          THE COURT:  When you say the first hurdle, you're

6    talking about submitting this form?

7          MR. HUTSLER:  Submitting the form and going before

8    the service desk.

9          THE COURT:  You think people may be discouraged from

10   doing that in light of their experience?

11         MR. HUTSLER:  I would think that that's a --

12         THE COURT:  How should I legally speculate about

13   that argument, if I can borrow that term, in light of the fact

14   that the class is also being told that now we're more clearly

15   defining terms, we're educating, we're requiring a certain

16   level of experience at the help desk, or the review desk, and

17   there are incentives for AHS not to engage in that mischief

18   even if I suspected they engaged in that mischief before?

19         MR. HUTSLER:  Yes.  Well -- and, again, it just begs

20   the question, why not let Ed Gentle handle the claims process?

21   Why not let a third person, impartial, handle the claims

22   process?  Is it so complicated --

23         THE COURT:  Well, ultimately, if there's a denial or

24   if there's an inadequate offer of financial remuneration, Ed

25   Gentle with a robe handles the claims process, right?

1          MR. HUTSLER:  Sure.

2          THE COURT:  With the power of penalty.

3          MR. HUTSLER:  Well, yes, sir.  But --

4          THE COURT:  And by the way, I think very highly of

5    Ed Gentle.

6          MR. HUTSLER:  Sure.  Absolutely.

7          THE COURT:  I make no bones about that.  He's been a

8    tremendous asset for me in the MDL 926; although I notice his

9    curriculum vitae does not reflect that I'm currently the judge

10   in that.

11         MR. HUTSLER:  Yes, sir.  But if you're returning to

12   the scene of the crime to get relief now, the criminal has a

13   chance to build their case against the claimant in a way that

14   will not be challenged.

15       If it is challenged, sure.  But you can go to court and

16   not sue for fraud and not sue for Deceptive Trade Practice and

17   not sue more than one person at a time.  So that's our --

18         THE COURT:  Well, it's more than one person at a

19   time sued in this case, right?

20         MR. HUTSLER:  Yes, sir.

21         THE COURT:  Do you think if AHS was dealing with all

22   the individuals, not collectively, this relief would have been

23   achieved by individual counsel?

24         MR. HUTSLER:  No, my point is that when you go to

25   small claims court, you cannot bring two to three people

1    together in a case.

2            THE COURT:  You can have -- and, again, I must

3    confess, I didn't litigate much in small claims court, but

4    seems like you can still have (b)(2) evidence and

5    404(b)evidence.

6            MR. HUTSLER:  Yes, sir.

7            THE COURT:  404(b) type evidence.

8            MR. HUTSLER:  Yes, sir.  So that's our objection.

9            THE COURT:  All right.  Thank you.

10           MR. HUTSLER:  Thank you, sir.

11           THE COURT:  All right.  Texas want to be heard

12   again?

13           MS. TULINSKI:  Yes, sir.

14           THE COURT:  Come on up.  Just start off where you

15   think we are.

16           MS. TULINSKI:  Okay.  I'll try.  I'm going to try

17   and keep it fairly brief.  We've gone through several issues

18   and some of this really is housekeeping at the beginning.

19       First -- and I apologize -- I don't have extra copies of

20   this letter but I would like to admit into evidence, a letter

21   from the Texas Real Estate Commission.

22           THE COURT:  I think that was received without

23   objection earlier.  So why don't you just mark that as -- do

24   we have a Texas Exhibit 1?

25           MR. GOODMAN:  You don't have a spare copy?

```
1              MS. TULINSKI:  No, I don't.

2              THE COURT:  We'll be glad to make a copy for you.

3    You can look at the original until such time as we do that.

4    Let her mark it first.

5              MS. TULINSKI:  In the meantime, under Exhibit-C,

6    it's the e-mail that's referred to in that exhibit is set out

7    in full.  So it shouldn't be much of a surprise to anyone.

8              THE COURT:  And this is Exhibit-C to your amicus

9    brief?

10             MS. TULINSKI:  Yes, sir.

11             THE COURT:  All right.

12             MS. TULINSKI:  And then, these couple of documents

13   that were offered -- and I don't recall which counsel offered

14   it -- but the declaration of Christian Morgan where he says

15   "I'm an employee of American Home Shield Corporation.  My

16   current title is underwriting manager."  And then goes forth

17   with what they claim to have paid in Texas cases.

18        This person seems to be, you know, probably in an

19   appropriate position to further declare that American Home

20   Shield's performance is reviewed by their claims denial rate.

21   The higher the rate of denial, the better their performance

22   is, according to this company.

23        So I think that's something that is missing that might

24   have been helpful in that brief -- in that affidavit, and it

25   is included in our brief, Your Honor, references to that
```

1    issue.

2         The two documents that were filed, the letters from the

3    Real Estate Commission, saying basically that we think

4    American Home Shield hasn't committed a violation of the state

5    -- or the appropriate administrative law statute under TREC.

6    They both refer to RESPA claims which, although they're a part

7    of our case in Texas, they're not a part of this case here.

8    So I don't think those are relevant at all to what we're here

9    for today.

10        And then I wanted to clear up just a couple issues that I

11   sat back and heard that I thought were mischaracterizations.

12   Counsel said that the lack of causation between malfunction

13   and the limitation or exclusion under the contract was not an

14   issue because if there's rust on the coils that had to be the

15   cause of the malfunction.  That is explicitly not the case in

16   Texas.  That's not the discovery we've engaged in in our case.

17        And, in fact, in early discussions at a proposed

18   permanent injunction, American Home Shield agreed to change

19   that practice.

20        So I don't want the Court to be misled into thinking that

21   there is not a huge causation problem in applying the

22   limitations to the malfunction.

23             MS. NIEWOEHNER:  Your Honor, I'm just going to note

24   again -- I'm just going to ask counsel for Texas AG to please

25   stop reciting things that were based on discussions of

1    settlement in those matters.

2         MS. TULINSKI:  You know, I'm glad you brought that

3    up because there's a case -- and I don't have the whole cite

4    for it, *Game Tech versus The Texas Attorney General*.  It's out

5    of the Court of Appeals in Austin.  It's a 2009 opinion.  And

6    what it specifically says is that any settlement discussions,

7    particularly documents between the parties that occur outside

8    of formal mediation, are public records.  So anyone here could

9    make an open records request to the Texas Attorney General and

10   would receive those documents.

11       So I just don't want the Court to think that I'm acting

12   in any kind of bad faith in injecting those issues.  They are

13   public under Texas law.

14       THE COURT:  That would be documents, not

15   discussions, right?

16       MS. TULINSKI:  Right.  And I have documents, too, to

17   back up everything that was said.

18       MS. NIEWOEHNER:  In any event, I think they're not

19   germane here.

20       THE COURT:  Well -- and again, I'll give it the

21   consideration I think it's due, along with all the other

22   arguments and submissions I've received today.

23       MS. TULINSKI:  Thank you, Your Honor.  One other

24   issue.  Counsel stated the State should have objected to the

25   content of the class notice.

1          THE COURT:  Well, if you were concerned about it and

2   you received a copy of the preliminary approval order and the

3   proposed notice --

4          MS. TULINSKI:  You know --

5          THE COURT:  -- why not intervene at that point and

6   say, we want the notice to say this, as it relates to Texas

7   residents?

8          MS. TULINSKI:  For a couple of reasons, Your

9   Honor -- and I don't have it in front of me.  I'm just going

10  to take your word for it that we were provided with not only a

11  proposed settlement but the notice that was going to class.

12  At the same time --

13         THE COURT:  Well, don't take my word for it because

14  I'm not the one that provided it, but I have seen an e-mail --

15         MS. TULINSKI:  Okay.

16         THE COURT:  -- that referred to a meeting.

17         MS. TULINSKI:  Okay.

18         THE COURT:  And I think it was to Mr. Carmona.

19         MR. GOODMAN:  Yes.  It's the last exhibit to the

20  Defendant's 3 --

21         MS. NIEWOEHNER:  Exhibit-H.

22         MR. GOODMAN:  -- to Exhibit-H to Mr. Carmona, the

23  day that this Court preliminarily approved the settlement

24  October 20, 2009.

25         THE COURT:  "Attached is a copy of Judge Proctor's

1   order with a stipulation of settlement for your review."

2           MS. TULINSKI:  I don't believe the class notice was

3   sent to us at that time.

4           THE COURT:  No.  I think that was part of my order.

5           MR. NORRIS:  It was.

6           MR. GOODMAN:  It is.

7           MR. NORRIS:  It's all attached.

8           MS. TULINSKI:  It may have been an exhibit to it.  I

9   just don't want to misrepresent to the Court that we got that.

10  I'm not willing to make it an issue at this point.  You know,

11  fine.  Let's assume we got it.  I just don't know that as a

12  fact, and that's why I don't want to represent that I do.

13  However --

14          THE COURT:  On the other hand, counsel is saying

15  that you were provided it, so wouldn't that be sufficient for

16  me to conclude you were if you're not willing to make an issue

17  that you weren't?

18          MS. TULINSKI:  Fine, Your Honor.  I don't have an

19  objection with that.  The problem I have with is, as we stand

20  here today under CAFA, both having filed an objection and

21  appearing at this fairness hearing, we've heard from counsel

22  that we don't have standing to be here today; that we're not

23  the regulator.

24      So I don't -- there's an inherent conflict.  If we don't

25  have standing today, how in the world could we have had

1   standing however many months ago that was where we, you know,

2   supposedly got a copy of the class notice to come forward?

3        I think our standing today is under CAFA, and I don't

4   know that CAFA provides the ability for the State to come

5   forward and object to the form of a notice.  It certainly

6   tends to speak to an objection to a proposed class settlement.

7            THE COURT:  Well, I mean, logically, CAFA was

8   designed, at least as it relates to these provisions, to make

9   sure that the state regulatory agencies were aware of

10  settlements that might affect their citizens' interests.

11           MS. TULINSKI:  Right.

12           THE COURT:  I mean, there's no question about that.

13           MS. TULINSKI:  Right.

14           THE COURT:  So why -- I'm not sure I make anything

15  of their standing argument.  I think -- what I understand is

16  that TREC seeks legal advice from Texas AG to give advice

17  about what's in the best interest of Texas' citizens, and

18  you're here on behalf of TREC; and they're deferring to you

19  and your arguments.  Is that --

20           MS. TULINSKI:  Well, Your Honor, I have to parse

21  that carefully.  Because there have been issues in this case.

22  For instance, our issues with respect to the brokers accepting

23  these payments, that TREC may not be fully on board with our

24  position about whether that's a RESPA violation.

25           THE COURT:  Right.  Well, that's not this case.

1   That's another case I have.  And maybe you'll beat me to the

2   punch on that case.

3            MS. TULINSKI:  But what TREC has very clearly said

4   is as far as this settlement --

5            THE COURT:  Right.  And that's all I'm talking about

6   is this settlement.

7            MS. TULINSKI:  That's all I'm talking about as well.

8            THE COURT:  So far as I know, this Court didn't

9   authorize any communication with you about the RESPA case.

10           MS. TULINSKI:  Right.  Except that it's a part of

11   our current litigation.

12           THE COURT:  Sure.  Sure.  But I'm talking about --

13   it seems to me, trying to take what I will of your argument

14   and defendant's argument -- that if, in fact, you can appear

15   for TREC here -- and I think you can -- and if, in fact, you

16   and TREC really have no differentiation of interests, you're

17   both interested in protecting the citizens of Texas who could

18   be affected by the settlement --

19           MS. TULINSKI:  Yes, Your Honor.

20           THE COURT:  -- then, if that's true, then you have

21   standing.  But it does also raise the issue, if the notice was

22   deficient, why not raise the issue before the notice went out;

23   not after the notice went out?

24           MS. TULINSKI:  I don't know the timing of when the

25   notice went out.

1          THE COURT:  Oh, I -- it was in the order what date

2     it was going to go out.

3          MS. TULINSKI:  If we were aware -- like I said, Your

4     Honor, I can take fault for that.  I wasn't aware of when it

5     was going out and I certainly didn't think we had the ability

6     or the standing to get in and object to a notice.

7          THE COURT:  Okay.

8          MS. TULINSKI:  However, I will also say -- and it

9     backs up at least my mental thoughts at the time, is we spoke

10     -- we called counsel for the class and discussed the proposed

11     settlement and said, would you please consider removing Texas

12     residents from this class because of our pending litigations

13     and a lot of the issues you've already heard today, and they

14     said no.

15          THE COURT:  Well, they have a duty to represent

16     those people once I've told them they're representing those

17     people.

18          MS. TULINSKI:  Yeah.  Although when I tell them

19     that, from our particular knowledge under this case, we don't

20     think you're representing Texas consumers, it's in their best

21     interest.  It seems to me that would have been an argument

22     that they might have been receptive to.

23          THE COURT:  Unless they disagreed with it.

24          MS. TULINSKI:  Possibly.  I think we disagree on a

25     lot of things here today when it comes to the Texas --

1          THE COURT:  I don't think there's any question about

2     that.

3          MS. TULINSKI:  All right.  And then one thing I want

4     to bring to the Court's attention is the State's Enforcement

5     Action, under the DTPA against American Home Shield, it's

6     uniquely -- I hesitate to use the word strong, but it's -- our

7     portion of the DTPA that the State sues under, is much less

8     onerous than a private plaintiff would have.

9          And I'll give you just a few quick examples.  We don't

10     have to show producing cause; we don't have to show reliance;

11     we don't have to show immediate and irreparable harm in order

12     to get injunctive relief.

13          Our penalties are -- instead of -- I don't want to

14     misstate, but I think it's treble damages for the private

15     consumers.  Our remedies are up to $20,000 per violation of

16     the DTPA with no maximum cap.

17          THE COURT:  Now those penalties are still in play.

18          MS. TULINSKI:  They absolutely are.  But the point

19     I'm trying to make is, if I'm a Texas consumer, and I have the

20     ability to file my own lawsuit against American Home Shield;

21     and yet, at the same time, the Texas Attorney General is suing

22     under the DTPA, if I know enough about the law, which probably

23     is a big presumption, there is benefit for me holding back and

24     letting the State bring its action.  Because, for instance,

25     they don't have to show that I relied on any representations;

1    they don't have to show it's a producing cause.  Our burdens

2    are much lower, but yet we still get to seek full restitution

3    for that.

4            THE COURT:  Well, how is that different --

5    separating out the penalties, which are not in play here.

6            MS. TULINSKI:  Right.

7            THE COURT:  How is that different from this case

8    where now, because of plaintiffs' counsel's negotiation of

9    this settlement, they don't have to show reliance, cause.

10   They get to resubmit their claims.  They get their claims

11   either granted or not -- approved or denied.

12           MS. TULINSKI:  Right.

13           THE COURT:  And if they're denied, they've got

14   attorneys' fees that they can recover and a penalty, in

15   certain instances.

16           MS. TULINSKI:  Right.

17           THE COURT:  A penalty in every instance and

18   attorneys' fees in certain instances.

19           MS. TULINSKI:  Right.  But my understanding is --

20   and I didn't look at this issue closely, at least recently.

21   My understanding is there's also a provision in there that if

22   they don't get more than the claims desk awarded them, they

23   may be on the hook for the payment of American Home Shield's

24   attorney's fees.  That doesn't happen under the DTPA.

25           THE COURT:  I didn't see that in the settlement.

1          MS. NIEWOEHNER:  Your Honor, that's just for

2     frivolous -- a purely frivolous suit.  It's the exceptional

3     circumstance; it's not the rule.

4          MS. TULINSKI:  My question would be is, how is

5     frivolousness determined?  Is that under the state law?

6          THE COURT:  Would that be the judge?

7          MR. GOODMAN:  It's Ed Gentle with a robe, Judge.

8     That's only in the later suit, and the court decides that.  If

9     it's frivolous, yeah, they've got to pay our fee.

10          MS. TULINSKI:  Well, under Texas law --

11          MR. GOODMAN:  Which they would have to do anyway.

12          THE COURT:  For example, if there was some fraud

13     involved.  They were making a claim on an HVAC system that

14     they didn't own.  That would be frivolous, right?

15          MS. TULINSKI:  Oh, without a doubt.  However,

16     there's different standards for frivolousness.

17          THE COURT:  They are making a claim on an air

18     conditioner that they dropped on the way into the house?

19          MS. TULINSKI:  Your Honor, if it was tied to a

20     specific standard or even one state's rule as to a frivolous

21     lawsuit and the penalties that flow from that, that's one

22     thing.  But if a consumer brings a DTPA lawsuit that is not

23     under our, you know, Rule 13 or Rule 11, is not considered

24     frivolous, the consumer doesn't get hit with the attorneys'

25     fees.  I'm just pointing that out.

```
 1          THE COURT:  Sure.

 2          MS. TULINSKI:  That's just one other instance where

 3   -- and a lot of it, as we sit here and explain, well, what if,

 4   what if, it's not necessarily clear from the documents.  And

 5   that's my concern.  And I'm in the habit of reading it

 6   thinking, you know, how could the consumer get caught up in

 7   this.

 8          THE COURT:  Right.

 9          MS. TULINSKI:  That's the same way I read these

10   waivers to participate in the class action lawsuits, to seek

11   restitution, accept restitution.  I think you could even argue

12   the waiver saying that we may have difficulty having Texas

13   consumers, under this settlement, assist us in our litigation

14   against American Home Shield as witnesses, et cetera, because

15   they would arguably be participating, in some manner, in our

16   case.  That's probably an issue for another day.  But,

17   nonetheless, it does cause concerns for us.

18      One other issue I wanted to bring up is a statement was

19   made that no other states, no other consumer protection,

20   whether they be political interest groups or whatever, have

21   filed an objection today.  I can tell this Court, today,

22   Tennessee and Illinois is closely looking at our brief, and we

23   anticipate they will be joining.  I will also tell you that

24   Colorado and West Virginia has expressed significant interest.

25   Because of the timing -- and I'll take full blame for that --
```

 1            THE COURT:  Well, your objection was ten days late,

 2    which I am letting you present it.  Why should I even worry

 3    about an objection that's being presented after what they

 4    knew, from the time they received notice, was after the date

 5    of the Fairness Hearing?

 6            MS. TULINSKI:  Well, our confusion there was, when I

 7    received the CAFA notice from TREC, I saw the deadline of

 8    February 8th for class member objections.  Okay.  So the

 9    question is, okay, we're not a class member, and I'm not aware

10    that CAFA puts a deadline on when objections could be made,

11    so --

12            THE COURT:  Doesn't the Court have the inherent

13    authority to set some deadline so that we can move the case

14    along?

15            MS. TULINSKI:  Absolutely, Your Honor.  But,

16    frankly, I didn't see a deadline for State AG's CAFA,

17    whatever.  So what I did is, I put together -- and I think a

18    fair presentation of our objections, very quickly, with this

19    brief to follow.  And, unfortunately, you know, I wish the

20    brief had been here a week ago, but it just didn't happen.  I

21    can tell you I've been working on it round the clock since

22    then, but it just didn't happen.

23            THE COURT:  I'm not criticizing you.  What I'm

24    saying is, I'm not a gotcha judge.  And I think that's my

25    reputation in the Bar that practices before me.  You know,

1    I've been a lawyer, too.  I understand how that happens.

2        But I'm not overly impressed with the potential that

3    someone's going to come in here and recant some of your

4    concerns after the Fairness Hearing.

5            MS. TULINSKI:  I understand that, Your Honor.  And

6    all I would expect, as a practical matter, is perhaps a letter

7    from the State saying, "we join".  And they understand that.

8    I got on a conference call with them.  They understand that.

9    I would have loved to have had the commitments from them

10   earlier back, but, you know, it's got to run up the chain, and

11   most offices have to actually go to the AG before it gets a

12   blessing and that sort of thing.

13           THE COURT:  It wasn't like we had a tight schedule.

14   We gave a lot of time between notice and we purposely laid out

15   significant mileposts -- time mileposts, so that everyone

16   could get this analyzed, get substantive objections in.

17           MS. TULINSKI:  Right.

18           THE COURT:  So if they tell you they're interested

19   in filing something, you tell them I shook my head and

20   wondered why they were so late.

21           MS. TULINSKI:  I will do that, Your Honor.  But, at

22   the same time, I think that I place the blame on myself for

23   not getting some of those materials to them earlier.

24           THE COURT:  Well, no, they received the notice at

25   the same time you did.

1          MS. TULINSKI:  Well, now, that's interesting,

2     because we run into the same problem as Texas ran into in this

3     instance where the AG's weren't uniformly served with the CAFA

4     notice.  It went to --

5          THE COURT:  Well, I got a list of who got the CAFA

6     notice.

7          MS. TULINSKI:  And I'm sure you'll find that there

8     are instances where it went to a regulatory agency, and I

9     can't make any representations on --

10          THE COURT:  It depends on who the appropriate state

11     official is.  That's Congress' call.

12          MS. TULINSKI:  I understand that, Your Honor, but

13     I'm just telling you --

14          THE COURT:  Congress could have said send it to

15     every Attorney General.  They didn't say that.

16          MS. TULINSKI:  I know.  But the fact of the matter

17     is that a smaller regulatory agency, or someone regulating

18     home warranty contracts, may not necessarily have the

19     wherewithal to pass it on to the AG.  And, you know, I don't

20     want to be up here making excuses.  It is what it is.  But I

21     just wanted to inform the Court.

22          THE COURT:  We can deem them the appropriate state

23     official.  I can't make them the responsible state official,

24     if that's what happened.

25          MS. TULINSKI:  All right.

1       MR. GOODMAN:  Tennessee was one of the AG's that got

2   served with it.

3       MS. NIEWOEHNER:  As was West Virginia.

4       MR. GOODMAN:  As was West Virginia.

5       THE COURT:  Okay.

6       MS. TULINSKI:  All right.  Now, Your Honor, the only

7   thing I would like to say, I'm perfectly comfortable relying

8   on our brief, and I'm not here to read you our brief.  But I

9   do want to bring up some of the abstention arguments.

10      THE COURT:  Yeah.  Help me.  I was interested in

11  those.

12      MS. TULINSKI:  Okay.  Well, hopefully, I can help

13  you.

14      THE COURT:  All right.

15      MS. TULINSKI:  We cited in the initial objections

16  *Pullman* and *Younger*.  Those are -- you know, you almost don't

17  cite *Pullman*; you just say *Pullman*.  And you almost don't cite

18  *Younger*; you just say *Younger*.

19      But, in fact, *Pullman* and *Buford* (sic) are the same

20  principle.  And then *Younger* and *Colorado River* --

21      THE COURT:  You're talking about *Burford*?

22      MS. TULINSKI:  *Burford*.

23      THE COURT:  Yes.

24      MS. TULINSKI:  Did I say *Buford*?

25      THE COURT:  You did.

 1          MS. TULINSKI:   I apologize.   Under really both

 2   *Pullman* and *Buford* (sic), abstention requires avoidance of

 3   conflict when a state is applying its own laws.   In that

 4   instance, the state is asked to dismiss pending resolution of

 5   the state claims.

 6          In this instance -- and I outlined our claim specifically

 7   on Pages 27 through 28 of our brief -- that our unique DTPA

 8   issues that we intend to present to the Harris County Court --

 9   Texas court -- I won't reiterate those here.

10          And then, as far as *Colorado River* and *Younger,* that's

11   essentially the duplicative litigation exception.

12          And there's a Fifth Circuit case that actually fleshes it

13   out a little bit and puts four factors to it.   Control over

14   the property or regs of the litigation, which really doesn't

15   apply to this case.   So the first factor really doesn't apply.

16          The second is the federal forum being inconvenient.

17   Certainly we would say, as to Texas consumers, a state forum

18   would be more convenient.

19          The third is the presentation of a federal question of

20   law.   I think, clearly, from what I've seen from the briefs --

21   the pleadings in this case, it is actually attempting, at

22   least in the pleadings, to apply the law of each 50 states,

23   not a federal statute.

24          And then the fourth factor being that the parties'

25   interests are adequately protected in the state proceedings.

1    And in this case, I would point back to my comment earlier

2    that American Home Shield initiated our litigation in Texas

3    State Court, in which we counterclaimed with our DTPA claim.

4    So I think that's fairly good evidence that American Home

5    Shield certainly thinks it can receive a fair trial in Texas.

6         And then I would add one fifth factor, and that is simply

7    -- and actually this one belies -- I think it's *Colorado*

8    *River*, but I'll defer to our brief -- it brings out the fact

9    that our case was filed first by a substantial period of time.

10         As for -- like I said, we briefed abstention fairly

11    thoroughly.  I think we've given you a really good overview as

12    well as how it specifically applies to our case.  So there's

13    no need for me to reiterate that here.  It's contained in our

14    brief.

15         And what I would hope today is that the Texas -- that

16    this Court strongly considers removing the Texas consumers

17    from the class definition.  We think that if, in fact, the

18    Texas consumers were told you have this second claims desk

19    review -- in which case may not even be a second -- it very

20    well likely could have been a third or fourth because there is

21    some semblance of an appeal process within American Home

22    Shield -- you can go that route.  In which case -- my reading

23    of the settlement agreement is if American Home Shield comes

24    back and does not reverse one prior denial, it really -- it

25    arguably complies with the settlement agreement.

1            Given that choice, I believe that most, if not all, Texas

2    consumers would say, you know what, I'm going to stick with

3    the State's case file in which they're seeking, very

4    vigorously on my behalf, real money as restitution.

5            THE COURT:  Did you think about my question over

6    lunch that I asked you before lunch; and that is, what would

7    you say to the Texas consumer if you involuntarily opted them

8    out through your arguments and then lost their case and didn't

9    recover anything on their behalf?

10           MS. TULINSKI:  I think that's -- I think that would

11   be very unfortunate.  I think that's a risk.  It definitely is

12   a risk.  I think, given the very minimal relief afforded them

13   through the settlement, I think -- I can tell you, I would put

14   my money on the Texas State suit.

15           THE COURT:  On you.

16           MS. TULINSKI:  Yeah, I would.  I would.  And largely

17   because, you know, we have a very strong statute in our case.

18   We've had settlement discussions where we've discussed

19   injunctive relief, at length.  And we've, at least

20   temporarily, agreed to terms that change their business

21   practices in a significant way.

22           But, nonetheless, I think when you realize the hammer we

23   have in this case is literally hundreds of millions of dollars

24   in bounties.

25           THE COURT:  Well, you have that hammer on the

1   penalty side; but not on the restitution.

2          MS. TULINSKI:  Absolutely.  But if we go to trial,

3   or if we settle prior to trial, I will tell you --

4          THE COURT:  Well, you've had that hammer for four

5   years.  So why haven't you settled now?

6          MS. TULINSKI:  Frankly, Your Honor, we spent two

7   years working with American Home Shield going back and forth

8   over --

9          THE COURT:  They must not respect your hammer.

10         MS. TULINSKI:  No -- well, we're going to find out,

11  I think.  I really do think we're going to find out.

12         THE COURT:  I don't want to find out, but you'll let

13  me know, I'm sure.

14         MS. TULINSKI:  I will tell you that they've offered

15  us a substantial sum in attorneys' fees and zero restitution

16  and that was a non-starter.  Because the State of Texas will

17  not accept monies in any settlement without restitution going

18  to consumers.  That I can assure the Court.

19         MR. GOODMAN:  Note my objections to the --

20         THE COURT:  So noted.

21         MS. TULINSKI:  And, Your Honor, I believe that's all

22  I have unless you have questions for me.

23         THE COURT:  I do not.  I'm going to allow counsel an

24  opportunity to respond to you though.

25         MR. DAVIS:  Judge, I only have a couple of points.

1    And the first one I'll start off -- if I can have those

2    exhibits we put in earlier.

3        Your Honor, I have in my hand Plaintiffs' Exhibit No. 2

4    to this settlement hearing, and the State of Texas made the

5    clear statement that this contract does not require causation

6    with regard to the issue of rust.  And if we look at her

7    brief, we see, in particular, she's referring to the provision

8    relating to issues that come up within the first 30 days under

9    the contract.

10       Your Honor, I have in front of me the exhibit that I

11   offered earlier.  I have highlighted under Section G-1 the

12   following language -- I've highlighted "malfunction due to

13   rust" in that paragraph.  Here's what that paragraph says:

14   "The following are not covered for the home seller for the

15   first 30 days after the effective date for the buyer. (A)

16   malfunction or improper operation due to rust."

17       Your Honor, it is the view of the plaintiffs that if

18   American Home Shield, on reconsideration by the review desk,

19   were to turn down a plaintiff on the basis of rust, which --

20   and even though it did not -- turned it down on the basis of

21   rust, when the evidence was the rust did not cause the

22   malfunction, it is our view that the clear language of its

23   contract, under item G-1, says something different than that,

24   and that any fair-minded judge in the United States of America

25   -- Your Honor, with permission of the Court, I'll hand this to

1    Your Honor.

2              THE COURT:  You may.

3              MR. DAVIS:  It is our view that any fair-minded

4    judge in the United States of America would hold that against

5    American Home Shield and assess a $1,000 penalty.  Well, that

6    court wouldn't assess the penalty, they would hold it against

7    American Home Shield, and American Home Shield would

8    automatically send the plaintiff an extra check for a thousand

9    dollars.

10        Your Honor, I hear what Texas says, but it's not what the

11   contract says.  The contracts are in evidence.  The contract

12   of the plaintiffs, the Faughts, is in evidence; a form

13   contract off the internet is in evidence.  These contracts go

14   back to form dates as late as 2002.

15        Now, on the point that there is a provision of the

16   settlement agreement which says, at Page 18, if the claimants'

17   post-submission suit is deemed by the court to be frivolous --

18   and so forth, then some attorneys' fees may be owed.  The

19   complete sentence says:  "If it's deemed by the court to be

20   frivolous or otherwise in bad faith" -- therefore, there is a

21   definition within the terms of the settlement agreement -- "a

22   further clarification at least as to what frivolous means,

23   frivolous or otherwise in bad faith."

24        Now, the purpose of that language is not actually to harm

25   the defendants, although I have no quarrel with -- I mean,

1    excuse me.  The purpose of that language is not actually to be

2    detrimental to the plaintiffs or class members.  Although I

3    have no quarrel with the concept if someone acts in bad faith,

4    that they should be assessed an attorney's fee because that's

5    generally the law in the United States of America in every

6    court that I know of.

7         But the purpose of this provision is actually to benefit

8    the plaintiff class, and that is for the following reason:

9    There are states in this country that permit the recovery of

10   an attorney's fee in a simple breach of contract case.

11   Georgia is one of them, for example.  And the issue actually

12   also exists in Texas.

13        Texas law is not as clear as perhaps a couple of other

14   states who permit the recovery of attorneys' fees in class

15   actions.  But there are cases sort of going both ways in Texas

16   on the issue of whether if a plaintiff loses in a contract

17   case, the defendant might be able to assess an attorney's fee

18   against them.

19        The purpose of this language in the settlement is to

20   shift that standard and to prevent plaintiffs from having

21   attorneys' fees assessed against them just because they used

22   the procedures contemplated by this settlement agreement.

23        The purpose of that language is so that it will be

24   crystal clear that if they use the procedures that are

25   contemplated by this settlement agreement, for example, in

```
1   Georgia, and they go into a court in Georgia on a breach of
2   contract case, that they have no risk of having an attorney's
3   fee awarded against them, under any circumstances, other than
4   if the complaint was just simply brought in bad faith.
5        Your Honor, the language that Texas complains about, in
6   one instance, is contrary to the clear reading of the
7   contract; and, in the other case, it's a provision that is
8   favorable to the plaintiff class.
9             MR. GOODMAN:  Thirty seconds or less, Judge.  Two
10  points only.  Of the four states I heard where there's some
11  efforts being made to try to drum up some more states
12  to object --
13            THE COURT:  Colorado sent it to the Attorney
14  General.
15            MR. GOODMAN:  Yeah.
16            THE COURT:  Illinois to the Department of Insurance.
17            MR. GOODMAN:  Yeah.  Tennessee to the Attorney
18  General.
19            THE COURT:  Tennessee to the Attorney General.
20            MR. GOODMAN:  West Virginia to the Attorney General.
21            THE COURT:  West Virginia to the Attorney General.
22            MR. GOODMAN:  So the people where the drumming up is
23  going on, has had the notice since October.
24       The only other thing I wanted to say, Judge, is on these
25  abstention points.  In the original objection filed on the
```

26th, only *Pullman* and *Younger* were mentioned and we dealt with those in the brief. If Your Honor wants to hear about *Colorado River* or *Burford*, we're happy to write to it, given they've just wrote their brief. I just would submit I think abstention only applies in this case if we're in --

THE COURT: Well, I am going to be taking this under submission, so I wouldn't mind just getting your short response.

MR. GOODMAN: How about less than ten pages by Tuesday?

THE COURT: I think that would be perfect.

MR. GOODMAN: I just want to say abstention --

THE COURT: Because, again, I want to give it a fair reading and I want to give it a fair analysis --

MR. GOODMAN: Sure.

THE COURT: -- and we'll see where we are.

MR. GOODMAN: We'll be happy to put something in on that. Abstention -- I mean, only if this were an alternate universe, does abstention apply to this case. That's our opinion.

MR. DAVIS: Your Honor, I had forgotten just one last thing and that is with regard to the rust issue I was talking about a moment ago and the question of whether there has to be a causal connection or not. I believe we've shown Your Honor the clear language of the contract. But, if I was

1   wrong about that and it didn't have to be, you know,

2   malfunction due to that.  If I was wrong about that, then we

3   have done a remarkably good job of representing the class,

4   even better than I thought we had, with regard to this

5   settlement.  Because the status report regarding business

6   practice changes that has been filed with the Court and agreed

7   to by American Home Shield at Paragraph 1 obligates American

8   Home Shield to train its employees -- to retrain its employees

9   to be sure not to refuse to authorize a repair when there's no

10  causal connection in Paragraph 1, Your Honor.  And I will hand

11  that to the Court, with your permission.

12          And what that says is, even if the State of Texas were

13  correct, which it is not, then we have done a remarkably good

14  job because we have gotten from American Home Shield an

15  agreement to do in her case, if she were right, more than the

16  contract says.

17                  THE COURT:  All right.

18                  MS. TULINSKI:  May I, Your Honor?

19                  THE COURT:  You may.

20                  MS. TULINSKI:  Very briefly.  It really was quite

21  telling to have counsel come up here, and I think he handed --

22  and I didn't receive -- anything that was filed within the

23  last 24 hours, I don't have it because I was traveling.

24          But it's interesting they hand you the Faught contract

25  and they say that, oh, there's no causation.  What's missing

from this whole discussion is in Texas, alone, we must have 30
versions of American Home Shield's warranties, and they have
to be analyzed one by one.  Of course, the Statute of
Limitations doesn't apply in Texas, so we go back for wrongful
denials for whatever reason.

I'm happy to hear that American Home Shield seems to be
willing with them to also prevent a denial based on when there
is a lack of causation.

But, more importantly, Texas is seeking a permanent
injunction preventing them from ever using causation.  It's
not an agreement that they promised to -- and maybe they can
come back and file a breach of contract action.  I don't know
what the law is as applied to their agreement.

But we're seeking a permanent injunction that has teeth.
They violate our permanent injunction and they face
substantial fines, jail time -- and you can go down the list.
And then I used rust on the coils as just a simple example
because rust on the coils seems like something everybody
understands.

But just, very briefly, the limitations that they've
used -- which, in Texas, they've used them with no causal
relationship to malfunction, not normal wear and tear,
improper install, rust or corrosion during the first 30 days,
collapsed duct work, chemical or sedimentary build-up, failure
to clean and maintain, improperly sized HVAC systems, heat

1   pump systems, missing parts, pest damage, improper

2   installation, not within code.  And that one is real

3   interesting because if you bought a house ten years ago and

4   your AC unit was in code, it's not in code anymore, according

5   to American Home Shield, your repair or replacement is denied.

6   Improper previous repair design, improper modifications to

7   system.

8        The point I'm trying to make, Your Honor, is that when

9   you bring a nationwide class, you really have an obligation to

10  go state by state, and at least amass all the different

11  versions of contracts; not the least of which is some require

12  approval by the relevant state's Department of Insurance, if

13  there's insurance in that state.  Texas doesn't happen to be

14  one of those.

15       But I suspect that a full review of the contracts to

16  really figure out how they're going to best represent this

17  class would have been a relatively massive undertaking because

18  it was for us in just one state.

19       So I just want to bring that point to the Court that, you

20  know, this is not one uniform contract that American Home

21  Shield uses throughout the country, not by a long shot.  Thank

22  you.

23            THE COURT:  Thank you.

24            MR. NORRIS:  Judge, can I say one thing?

25            THE COURT:  Yes.

1          MR. NORRIS:  I'm sure that the State of Texas'

2     injunctions are mighty fearsome, but I'm also confident that

3     this Court is capable of enforcing a settlement that is

4     approved by this Court.

5          THE COURT:  All right.  Everybody had enough?  Can't

6     say I didn't set some time aside for you and let you have your

7     say.  So I am going to -- let's talk about post-hearing

8     briefing.

9          MR. NORRIS:  Judge, before you say anything, Frank

10    and I are getting on an airplane tomorrow to go overseas and

11    we will be gone a week so --

12         THE COURT:  All right.  I'll take that into account.

13    But, first, I want to figure out who wants to submit something

14    and whether we need to have replies to it.

15         I know that I've invited AHS to submit a brief on

16    abstention in response to the amicus curiae brief of the State

17    of Texas.  Any other briefing that anybody believes we need?

18         MS. TULINSKI:  Your Honor, just very briefly, in a

19    letter brief, I promise, one page, on the issue of prior

20    representation of a company with someone seeking to be class

21    counsel.

22         THE COURT:  Sure.  If you think that issue is still

23    alive after you go take a closer look at it.

24         MS. TULINSKI:  Oh, absolutely.

25         THE COURT:  Yes.

1          MS. TULINSKI:  Thank you.

2          THE COURT:  Okay.  All right.  Y'all are gone for a

3    week?

4          MR. DAVIS:  We are, Your Honor.  But if those are

5    the only two issues to be briefed, we are perfectly

6    comfortable relying upon the rule on the issue she talks

7    about, a letter brief on.

8          THE COURT:  Well, you may be more comfortable after

9    you see what she says.  So rely upon what you want to rely

10   upon then.

11         MR. DAVIS:  That could be possible.  But I suppose

12   if I saw something that she wrote, I might want to respond to

13   it.

14         THE COURT:  That's what I'm thinking.  Because you

15   may not like it.  She may take a closer look at it and realize

16   that that's just not something she needs to go, but she may

17   think there's something there.

18      Why don't we just say this:  Briefs from AHS on

19   abstention, and from Texas on the 1.9 issue -- if I could

20   shorthand it that way -- are due by Wednesday of next week.

21   We'll give you a full week.

22      And then any responses to those are due the following

23   Wednesday.

24         MR. NORRIS:  Thank you, Judge.

25         THE COURT:  Okay.  So that will put us having this

1    fully under submission no later than March 24.

2            MR. GOODMAN:  The only other question I had, Judge,

3    was about the Edlesons.  I suppose -- tell me if I'm wrong.

4    You might leave it to us if we wanted to file a motion or

5    whatever on that to file --

6            THE COURT:  Yeah, that's going to be something we'll

7    -- I've raised some questions just about trying to get my

8    hands around that issue now.  If you think the -- if you think

9    we need to have an injunction that's different from what

10   you've enjoyed for the last few months, then I think it would

11   be a good idea for you to submit that by the 24th of March.

12           I'll give you a little more time on that because I think

13   that's a little -- there's a little more thinking that needs

14   to be done on that perhaps.

15           MR. GOODMAN:  Yes, sir, Judge.  We will do that.

16   We'll think.

17           THE COURT:  All right.  Well, I appreciate

18   everyone's presentations.  They have been very helpful.  Very

19   good lawyering all the way around.

20           I'll again use the privilege of the bench and tell Paul

21   and Katie I said hello, and I really enjoyed them being in

22   Birmingham with us last year.

23           In case y'all are wondering what this is all about.  They

24   sang at the Eleventh Circuit Judicial Conference.  I'm the one

25   who's responsible for recruiting them here, and they did an

1  excellent job.  If you don't have a Bar & Grill's Singer CD,

2  you need to go and buy one.  I'll let you choose which one you

3  buy, but great music.

4       All right.  If there's nothing further, we will be

5  adjourned.

6            MR. NORRIS:  Thank you, Judge.

7            MR. GOODMAN:  Thank you, Your Honor.

8            MS. TULINSKI:  Thank you, Your Honor.

9            MR. DAVIS:  Thank you, Your Honor.

10                  (Proceedings concluded.)

C E R T I F I C A T E

STATE OF ALABAMA   )

JEFFERSON COUNTY   )

        I hereby certify that the foregoing is a true and
correct transcript of the record of proceedings in the
above-entitled matter.

_____
ANITA M. MCCORVEY, RMR
Official Federal Court Reporter
Date: 4-9-10