FILED

2010 Apr-27  PM 04:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **LAURA FAUGHT; STEVEN FAUGHT,** | } | |
| **on behalf of themselves and all others** | } | |
| **similarly situated,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:07-CV-1928-RDP** |
| | } | |
| **AMERICAN HOME SHIELD** | } | |
| **CORPORATION,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

This case is before the court on the parties' request for Final Approval of a class settlement. The court preliminarily approved the parties' Stipulation of Settlement filed October 9, 2009 (the "Settlement").[1]  (Doc. # 37, Ex. 1).  Also, on March 10, 2010, the court conducted a lengthy fairness hearing.  The evidentiary hearing was held pursuant to Federal Rule of Civil Procedure 23(e)(1)(A), which mandates judicial review of any "settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class."  The court has now thoroughly examined and considered (1) the parties' briefs and evidentiary submissions, (2) the objections by class members, (3) the arguments and evidence presented at the fairness hearing conducted on March 10, 2010, and (4) the court's own review of the case and procedural record.  For the following reasons, the court finds that the proposed Settlement is fair, reasonable and adequate and it is due to be approved.  Accordingly, the court enters this Final Judgment which approves the Settlement in full and the court also makes the findings of fact and conclusions of law set forth below.

---

[1] This Final Judgment incorporates by reference the definitions in the Settlement, and all applicable terms used herein shall have the same meaning as set forth in the Settlement.

I.      **Procedural Background**

A.      **The Claims**

Plaintiffs Laura Faught and Steven Faught filed their original Complaint against American Home Shield Corporation ("AHS") in this case on October 22, 2007, and amended the Complaint on October 6, 2009. AHS is engaged in the business of issuing, administering, and selling home service contracts. Home service contracts (sometimes called "home warranty contracts") are one-year service contracts for certain appliances and systems in residential homes. An AHS Home Service Contract obliges AHS, in exchange for a fee, to arrange for service technicians to provide repair and replacement services under circumstances explained in the particular contract.

The original and amended Complaints present broad challenges to AHS's policies and practices relating to the adjustment of claims submitted under AHS Home Services Contracts. Plaintiffs allege that AHS has engaged in a broad nationwide pattern of: (1) denying claims for coverage of appliances or their components that display signs of being inadequately maintained and/or cleaned; (2) deliberately breaching express provisions of its Home Service Contracts; and (3) relying upon a service diagnosis from service providers nationwide who stand to gain financially if the appliance at issue is denied coverage under the Home Service Contract, as they may then charge more to repair or replace the appliance than they could under the terms of their service agreements with AHS. Plaintiffs also asserted claims for breach of contract and bad faith, and seek money damages (both compensatory and punitive) for themselves and the proposed nationwide class, as well as declaratory and/or injunctive relief to require AHS to readjust claims that had been denied previously.

On October 20, 2009, the court preliminarily approved a nationwide settlement class defined as follows:

> All persons who have held a residential home warranty contract from AHS applicable to a house within the United States at any time from June 21, 2001 through October 19, 2009. Excluded from this class are the defendant, any subsidiary or affiliate of the defendant, and any judge, arbitrator, or mediator who may adjudicate, arbitrate, or mediate this action.

(Doc. # 37 at 2).

This case has been both vigorously contested and the subject of significant discovery. AHS filed and briefed a substantial motion to dismiss early in the case (Doc. # 4), which Plaintiffs opposed (Docs. #8 and 9) and the court denied by Order dated December 20, 2007 (Doc. # 12). AHS answered the Complaint on January 29, 2008, denying all material allegations. (Doc. # 16). The parties engaged in substantial written discovery, and AHS produced thousands of pages of responsive documents. (Doc. # 22). Additionally, Plaintiffs deposed four AHS employees, and those depositions addressed both class certification issues and the merits of Plaintiffs' claims. (*Id.*).

## B.  The Parties' Settlement Negotiations

On July 29, 2008, this court ordered the parties to mediate this case. (Doc. # 23). The parties promptly selected a mediator and participated in various mediation sessions. Apparently, after some number of these sessions, the parties' negotiations reached a temporary impasse, and Plaintiffs filed an adversarial motion for class certification on September 11, 2008 (Doc. # 24), supported by a voluminous evidentiary submission (Doc. # 24-1 through 24-12) and a brief (Doc. # 24-13). The court denied that motion without prejudice and encouraged the parties to continue their mediation efforts. (Order dated September 15, 2008). After further mediation sessions, Plaintiffs renewed their motion to certify the class on October 31, 2008.

On November 10, 2008, the court conducted a telephone conference with the parties in which they informed the court that, while their mediation efforts had been ongoing pursuant to the court's mediation order (Doc. # 23), Defendant had reached a nationwide settlement touching on the claims in this case in

3

a separate class action pending in the Superior Court of California for the County of San Diego.  *Karon and L.B. Chip Edleson v. American Home Shield of California, Inc., et al.*, Case No. 37-2007-00071725-CU-BT-CTL.  (*See* Doc. # 28 at 2).  Thereafter, with the agreement of the parties, this court essentially stayed this action so as not to interfere with the California court's opportunity to determine whether the *Edleson* settlement should be approved.  (Doc. # 29, Orders dated March 9, 2009, April 1, 2009, June 8, 2009).

The *Edleson* settlement was not approved.  The California court flatly refused to approve the settlement in *Edleson* because the:

> Plaintiffs [in the *Edleson* action], other than the two lead plaintiffs, really get nothing more than a right to submit or resubmit claims to a defendant that has allegedly not acted in good faith on prior occasions.  There are no guarantees claims will now be accepted or properly serviced, or that if improperly denied, plaintiffs have any realistic remedy.  They may have the right to sue in the future, but that is subject to the applicable statute of limitations in each jurisdiction in the United States.  The court has no information as to what the applicable limitations are or what other limits may exist to preclude filing of a lawsuit.
>
> The settlement also allows defendant to essentially sell more insurance to plaintiffs at an unspecified price.  This allows defendant to make additional money from the settlement rather than paying it out to plaintiffs.  The contractor relations initiative also does not provide plaintiffs with any realistic guarantees.  The entire settlement essentially asks plaintiffs to give up many viable and realistic rights in return for the hope that defendant will act in good faith.  Without more concrete guarantees, plaintiffs, other than the lead plaintiffs, have gotten very little in return for a waiver of claims against defendant.  In the face of this illusory result for plaintiffs, counsel receive $2.75 million and defendants substantially limit their liability for past conduct.  The court cannot accept this result.  Any settlement must give the plaintiff class some tangible benefits or an unfettered right to bring legal claims against defendant.

(Doc. # 39, Ex. 6).

After the California Superior Court rejected the *Edleson* settlement, the parties to this case reported that fact to this court, and promptly re-engaged their mediator and resumed negotiations.  (Orders dated July 27, 2010, July 30, 2010, September 8, 2010).

On October 6, 2010, almost four months after the *Edleson* settlement had been rejected by the California court, the parties to this case filed an Amended Complaint which reflected that the claims in this case were being asserted on behalf of a nationwide class (Doc. # 34) and filed a Notice of Settlement of Class Action (Doc. # 35).  On October 9, 2010, the parties filed a Joint Motion for Preliminary Approval of Proposed Settlement (Doc. # 36).

On October 19, 2009, AHS gave notice of the proposed class action settlement to the appropriate state and federal regulators.  (Doc. # 92-1 at ¶ 2 and Ex. A thereto).

After conducting a hearing on the matter (Doc. # 38) and carefully reviewing the proposed Settlement, on October 20, 2009, the court entered an Order preliminarily approving the parties' classwide Settlement in this action and providing for notice to the class.  (Doc. # 37).  In that Order, the court approved a form notice to be sent to Class Members and ordered that the notice be distributed under certain conditions and within certain deadlines.  (Doc. # 37, Ex. 2).

C.    Notice

In order to provide effective notice to the class, AHS compared the last known mailing addresses for the Class Members against the National Change of Address system to ensure it had the most current addresses available.  (Doc. # 85-1 at ¶ 2).   It thereafter provided its mailing list to Experian Marketing Services, a third-party vendor, to ensure the list included deliverable addresses and no other errors.  (*Id.* at ¶ 3).   AHS thereafter mailed the court-approved Notice of Class Action and Settlement ("Notice") to 4,731,250 class members.  An extremely low number of the Notices – approximately 192,942 – were returned as undeliverable.  (*Id.* at ¶ 4).  In addition, the Notice, along with the Settlement, the court's Order

5

Preliminarily Approving the Settlement, and other relevant materials were published on an internet website referenced in the Notice: www.faughtclassaction.com.  (Doc. # 37, Ex. 2 at 15).   The information on the website summarized the terms of the Settlement, the nature of the lawsuit, and how to obtain additional information.  (Doc. # 92-2).

### D.       Reaction to the Settlement from the Class

In response to the Notice, AHS received 1,506 exclusion requests and 37 additional potential exclusion requests for an opt out rate of .033 per cent.  (Doc. # 92-3).  Of the 1,543 potential exclusion requests, ninety expressed positive experiences with AHS as the reason for opting out. (*Id*.).  Also in response to the Notice, twenty-four class members (not counting the State of Texas, which is not a class member) objected to the settlement for a .00051 per cent objection rate.  (*See* Docs. # 68, 69, 71 - 79, 93, 95).

### E.       The Fairness Hearing

On March 10, 2010, the court conducted a fairness hearing.  Proper notice of the hearing was provided to all parties and the Class Members.  At the hearing, all intervenors, objectors, and parties who appeared and wished to be heard were given an opportunity to present their positions and arguments.  The objections raised at the fairness hearing are addressed fully below.

## II.     Structure of the Settlement

Although the court has already given its preliminary approval here, it still must undertake a rigorous analysis to ensure that the parties' settlement is fair, adequate, and reasonable.  Rule 23(e)(2), Fed.R.Civ.P.  If finally approved, the Settlement offers broad relief to class members, while at the same time preserving the right to pursue individual litigation against AHS if a class member is not satisfied with the relief provided under the Review Desk process set up by the Settlement.

A.      **The Mediations and Negotiations**

After being ordered to mediate, the parties selected George M. ("Marty") Van Tassel, Jr. to serve

as the mediator in this case. Mr. Van Tassel is a shareholder at Sirote & Permutt and a member of this

court's published Alternative Dispute Resolution Panel of Neutrals.[2] Mr. Van Tassel has been licensed

to practice law in Alabama since 1972. (Doc. # 66-1 at 11-13). During the twenty-seven years of his

career as a civil litigator, Mr. Van Tassel has handled many types of cases. (*Id.*). During the ten years

preceding the settlement of this matter, since 1999, Mr. Van Tassel limited his practice to alternative

dispute resolution, with mediation as his focus. (*Id.*).

With regard to the settlement of this case, Mr. Van Tassel conducted seventeen formal mediation

sessions over thirteen months, and also spoke with counsel on a number of other occasions. The court

commends Mr. Van Tassel for his efforts in this case. He effectively steered the parties through a lengthy

period of what were at times prolonged and contentious negotiations. (*Id.*).

B.      **Review Desk**

The Settlement requires AHS to retrospectively review denied claims which are re-submitted going

back for nearly nine years (significantly reviving claims which would otherwise be time-barred under

applicable statutes of limitations) and make offers on those claims. (Doc. # 37-1 at § 5.2). In addition,

AHS must establish a Review Desk which will be staffed with more experienced customer service

associates to re-review any class members' submissions. (Doc. # 37-1 at § 5.2(D) and (J)). Any class

member not satisfied with the relief offered by the Review Desk retains the right to bring an individual

---

[2] The court's Panel of Neutrals is comprised of persons who, based on their training or experience, are deemed by the judges of this court to possess the qualities necessary for performance as neutrals. Candidates may apply for a position on the Panel, and their applications are reviewed by a member of this court or one of the Magistrate Judges to determine whether they are deemed qualified to serve on the Panel. (*See* Northern District of Alabama's ADR Plan, http://www.alnd.uscourts.gov/Local/adr_plan.htm).

lawsuit against AHS for breach of contract.  (Doc. # 37-1 at § 5.2(Q)).  In fact, Class Members retain the

right to file an individual suit even if they elect not to participate in the Review Desk process.  (Doc. # 37-1

at § 5.2(P)).  However, AHS's Review Desk is incentivized to offer relief acceptable to class members

because, if a class member recovers more in a lawsuit than was offered by the review Desk, AHS will pay

three times the difference between the amount offered and recovered or $5,000, whichever is higher, or

a $1,000 lump sum payment if the original denial related to an HVAC system that was denied for lack of

maintenance during the first year of the Class Member's contract.  (Doc. # 37-1 at § 5.(R) and (S)).  Thus,

the combination of the Review Desk process and the Class Members' retention of the ability to file a

breach of contract suit if dissatisfied with that process, is designed to fully compensate class members for

wrongly denied claims.  Class Members retain the right to seek additional penalties from AHS for

unsatisfactory offers or improper claim denials.  (Doc. # 37, Ex. 1 at § 5.2).  Thus, Class Members stand

to receive full compensation for their claims if they put forth minimal effort to re-submit a claim to the

Review Desk rather than mere pennies on the dollar for a uniform cash payment.

In addition to establishing the Review Desk and the processes associated with the review of what

will in many cases be old claims, AHS will be required to provide employees staffing that Desk with

additional training.  (Doc. # 37-1 at § 5.2(D) and (J)).  Going forward, AHS must also implement certain

changes to its business practices, including distributing training materials to its Contractor Network which

specifically address honoring the terms of coverage of its Home Service Contracts.  (Doc. # 37, Ex. 1 at

§ 5.3).

Thus, the Settlement provides for compensation for past improperly denied claims, with additional

penalties, as well as prospective changes in AHS's business practices.  Among the many factors that the

court considered in preliminarily approving the settlement proposed in this matter were the facts that the

terms of this settlement were: (1) negotiated over an extended period of time with assistance from one of

the neutrals appointed to the court's ADR panel; and (2) substantially more advantageous to the Class Members than the settlement which was proposed and soundly rejected by the California state court in *Edleson*.  Many of the objections to this Settlement assert that this is another attempt to have the *Edleson* settlement approved.  However, that is simply not the case.  There are valuable aspects of this Settlement that simply were not present in the previously-rejected *Edleson* settlement.

Among the valuable improvements of this Settlement over the one rejected in *Edleson* are two key provisions.  First, this Settlement provides a concrete and pro-Class Member standard for the Review Desk in evaluating one of the most important groups of claims – first-year lack of maintenance HVAC claims.  (Doc. # 37-1 at § 5.2(J) and Ex. A thereto).  First year lack of maintenance HVAC claims were encompassed in the original *Faught* settlement before the expansion of that settlement in the wake of the California court's rejection of the *Edleson* settlement.  As to those claims, the Stipulation of Settlement provides: "AHS personnel manning the Review Desk shall be instructed as set forth as follows: Prior denials (in whole or in part) of claims relating to a failure of a covered heating or air conditioning system during the first year of a customer's contract with AHS *shall be overturned* if such claims were denied outright solely because of lack of annual maintenance . . ." (Doc. # 37-1 at § 5.2(J) and Ex. A) (emphasis supplied).[3]

Second, the Settlement contains a provision that allays concerns that the Review Desk will operate with unfettered discretion.  This provision, which has no analogous counterpart in the rejected *Edleson* settlement, allows Class Members who are dissatisfied with the Review Desk's decision, to sue and to

---

[3] The court readily acknowledges that this absolute language is tempered somewhat by subsequent language allowing AHS to consider "evidence (of any type) of lack of maintenance in any time period which, in AHS's good faith judgment, is such as to rise to the level of abuse by cumulative neglect." (Doc. # 37-1 at § 5.2(J) and Ex. A).  In turn, "abuse by cumulative neglect" is narrowly defined as "neglect of ordinary care, including, if applicable, maintenance, by the current or former homeowner (or combination of former homeowners) of sufficient gravity over a substantial period of time such that it actually caused the breakdown of the item." (*Id.*)

recover a lump sum penalty of $1,000 in most circumstances, or an attorneys' fee with generous caps in the case of first year lack of maintenance HVAC claims.

The court finds that each of these provisions gives real and valuable relief for the Class Members. Moreover, these provisions – among other things – distinguish the settlement reached in this case from the woefully inadequate and illusory relief which was "secured" by the Edleson's counsel in California.

## III.   <u>Analysis of the Fairness Adequacy and Reasonableness of the Proposed Settlement</u>

"The court must be exacting and thorough in analyzing whether the settlement is in the best interests of class members." *Turner v. Murphy Oil USA, Inc.*, 472 F.Supp.2d 830, 843 (E.D. La. 2007) (citing *Manual for Complex Litigation* (Fourth) § 21.61 (2004)). "The [c]ourt may not resolve contested issues of fact or law, but instead is concerned with the overall fairness, reasonableness, and adequacy of the proposed settlement as compared to the alternative of litigation." *Turner*, 472 F.Supp.2d at 843.

### A.   **Appropriate and Effective Notice Was Given**

The court's Order Preliminarily Approving Settlement and Providing for Notice (Doc. # 37) required the dissemination of a legal notice of the settlement to individual Class Members in a form approved by the court. "According to Rule 23(e), the notice must be given 'in a reasonable manner.' ... 'There are no rigid rules to determine whether a settlement notice to class members satisfies constitutional and Rule 23(e) requirements... .'" *Turner*, 472 F.Supp.2d at 839 (citing Fed.R.Civ.P. 23(e)(1)(B) and *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 114 (2d Cir. 2005), *cert. denied*, 544 U.S. 1044)). Here, there is no real contention made that notice was not directed in an appropriate and effective manner designed to reach Class Members. Two objections with regard to notice have been made: (1) the appropriate notice was not given to the State of Texas under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715, and (2) the notice did not notify class members of a lawsuit filed by the State of Texas under its Deceptive Trade Practice Act. The court will address these objections in turn.

At the fairness hearing, although Texas objected that its Attorney General did not receive formal notice of the proposed settlement, undisputed evidence was presented that formal notice was given to the appropriate regulatory authority, the Texas Real Estate Commission. (Doc. # 103 at 16-17; Doc. # 92-1). Furthermore, to the extent that the Attorney General's office did not receive a formal CAFA notice, it was certainly notified of the settlement months in advance of when the notice was sent to the class (Doc. # 92-8), and it had a full and fair opportunity to object and appear at the fairness hearing. Indeed, it actually objected and appeared at the hearing. Therefore, this objection is without merit and is due to be overruled.

To the extent that Texas argues that the Notice should have included information relating to Texas's pending litigation, it has cited no authority suggesting that information about other lawsuits is required in such a notice. On the other hand, AHS has cited authority for the proposition that a description of a parallel state court proceeding is not required. *See, e.g., Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1317-18 (3rd Cir. 1993); *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 224 (5th Cir.1981) (same), *cert. denied sub nom*, 456 U.S. 998 (1982). The court finds that including information about other lawsuits (and particularly lawsuits about which the Class Members had not received notice) and which only affected Class Members from one state would be confusing and turn the Notice here into an overly complex and technical document.

The Notice in this case appropriately informed Class Members of the nature of the litigation and the Settlement's general terms, provided a link to an internet site for further information and frequently asked questions, and explained how to opt out or otherwise object to the Settlement. Prior to preliminarily approving the Settlement, the court reviewed and made changes to the proposed Notice. There is nothing to suggest that the procedures used to disseminate the Notice were not proper and the objectors have not pointed the court to any law requiring the inclusion of such a description of parallel litigation in the notice. Therefore, the court finds that this objection is without merit and is also due to be overruled.

**B.      Class Certification Is Warranted**

The parties settled this action prior to certification. A class may be certified "solely for purposes

of settlement where a settlement is reached before a litigated determination of the class certification issue."

*Woodward v. NOR-AM Chem. Co.*, 1996 WL 1063670 *14 (S.D. Ala. 1996) (citing *In re Beef Indus.*

*Antitrust Litig.*, 607 F.2d 167, 173-78 (5th Cir. 1979), *cert. denied*, 452 U.S. 905 (1981)).[4]  In *Amchem*

*Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997), the Supreme Court held that because a settlement

class action obviates a trial, the district judge deciding whether to certify a settlement class action "need

not inquire whether the case, if tried, would present intractable management problems," under Rule

23(b)(3)(D). However, "the settlement context demands undiluted, even heightened attention to

unwarranted or overbroad class definitions." *Id*.

Federal Rule of Civil Procedure 23 governs the certification of class actions.  District courts are

required to conduct a "rigorous analysis" of that rule's requirements, even when presented with a request

for settlement-only class certification.  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

> The safeguards provided by Rule 23(a) and (b) class-qualifying
> criteria, we emphasize, are not impractical impediments – checks shorn of
> utility – in the settlement class context.  First, the standards set for the
> protection of absent class members serve to inhibit appraisals of the
> chancellor's foot kind-class certifications dependent upon the court's gestalt
> judgment or overarching impression of the settlement's fairness.
>
> Second, if a fairness inquiry under Rule 23(e) controlled
> certification, eclipsing Rule 23(a) and (b), and permitting class designation
> despite the impossibility of litigation, both class counsel and court would
> be disarmed.  Class counsel confined to settlement negotiations could not
> use the threat of litigation to press for a better offer, ... and the court would
> face a bargain proffered for its approval without benefit of adversarial
> investigation ....

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981)(*en banc*), the Eleventh
Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down
prior to October 1, 1981.

> Federal courts, in any case, lack authority to substitute for Rule 23's certification criteria a standard never adopted – that if a settlement is "fair," then certification is proper....

*Id.* at 621-22. This court has extensively analyzed the issue of whether Plaintiffs have satisfied the class certification criteria in the memorandum opinion entered on November 1, 2002, and concluded that the prerequisites of Rule 23(a) have been met and that the proposed class may be certified under subsection (b)(3).

### 1.    Analysis of the Rule 23(a) Factors

Regardless of whether a class is certified for settlement or for trial, the court must determine whether the prerequisites of Rule 23(a) are met: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a).  The proposed class must also meet the requirements of one of the three class types found in Rule 23(b). In this case, the parties sought certification under Rule 23(b)(3), on the basis that "the questions of law or fact common to the members of the class predominate" over individual issues of law or fact and that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed.R.Civ.P. 23(b). Because the undersigned found that the Rule 23(a) and (b) standards were satisfied, the settlement class was preliminarily certified, and notice to putative members of the proposed class was required.

A summary of the court's findings of fact on these issues is warranted on final approval.  The numerosity element requires that the members of the class must be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1).  Here there are 4,731,250 class members.  (Doc. # 85-1).  Therefore, the court concludes that the class is numerous.

The commonality requirement is satisfied when the claims of the prospective class present common questions of law or fact. *See Coleman v. Cannon Oil Co.*, 141 F.R.D. 516, 521 (M.D. Ala. 1992). The court finds that the class allegations in this case involve common issues of fact and law arising out of a common nucleus of operative fact, *i.e.*, the application of what Plaintiffs contend were "uniform" corporate policies designed to deny claims and which otherwise adversely affect policyholders. More specifically, the claims at issue focus on an alleged nationwide pattern of (1) denying certain claims; (2) deliberately breaching express provisions of contracts; and (3) relying upon a service diagnosis from service providers who operated under a possible conflict of interest. The parties agree (for purposes of certifying a settlement class) that this alleged nationwide pattern satisfies commonality, and no objector or third party has called that assertion into question. Therefore, the court finds the commonality element is satisfied.

Typicality is satisfied where the named plaintiff's claims are sufficiently similar to those of the absent Class Members to conclude that the representative will protect the interests of the class and that there are no antagonistic interests between the representative and the proposed class. *See Coleman*, 141 F.R.D. at 522. Because AHS's alleged practices adversely affected Plaintiffs and the other proposed class members "in the same general fashion," the court finds, for purposes of this Settlement, that their claims are indeed typical of the claims of the entire class. *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984); *see Dujanovic v. MortgageAmerica, Inc.*, 185 F.R.D. 660, 667 (N.D. Ala. 1999) (Putnam, J.) (finding that the typicality prerequisite was satisfied where the plaintiff alleged a harm that was caused by defendant's policies and practices). Moreover, no evidence has been brought to the court's attention which indicates that there are unusual circumstances or unique facts concerning the Faughts' claims that would render them atypical of the claims of Class Members. Therefore, the court finds that the typicality element is satisfied.

The only objections relating to certification of the class relate to the fourth factor – adequacy of representation.  The two objections raised in this regard are: (1) that Class Counsel are allegedly operating under a conflict of interest, and (2) the requested attorneys' fees and incentive payments to the Class Representatives are inappropriate.  For the following reasons, the court overrules both objections.

### a.    Class Counsel Are Not Operating Under a Conflict of Interest

The State of Texas argues that Class Counsel have a conflict of interest representing the Class because the firm which they left seven years ago represented a sister corporation to Defendant AHS. Texas's argument is off the mark.  First, the record evidence shows that Mr. Davis and Mr. Norris (1) were not aware that their firm had represented this sister corporation, and (2) did not obtain any information from (or about) the sister corporation while employed at their former firm.  Further, there is no evidence that their former firm had any relationship at all with the Defendant here, AHS.

Class Counsel's duties to their current clients (the class) arise under ABA Model Rule 1.7, "Conflict of Interest: Current Clients."  Rule 1.7 provides in relevant part:

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

ABA Model Rule 1.7.  The situation before the court simply does not implicate any conflict with Class Counsel's current clients, the Class, and any other current client.

Even the Rule initially identified by Texas as implicated by this situation clearly does not apply. Rule 1.9, "Duties To Former Clients" provides in relevant part:

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person *in the same or a substantially related matter* in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

(b) A lawyer shall not knowingly represent a person *in the same or a substantially related matter* in which a firm with which the lawyer formerly was associated had previously represented a client

> (1) whose interests are materially adverse to that person; and

> (2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(C)hat is material to the matter;

ABA Model Rule 1.9 (emphasis added). This rule is only implicated where the matters at issue are *the same or a substantially related.* Texas has presented absolutely no evidence that Class Counsel's former firm represented AHS's sister corporation in a matter which was the *same or substantially related* to this one.[5]

Apparently having come to the realization that there is no conflict, since the fairness hearing, the State of Texas has filed a letter brief expounding on its argument. Its subsequent argument indicates that it believes that the fact that Class Counsel's former firm represented a sister corporation to Defendant AHS raises the appearance of impropriety. This argument cuts no more ice than Texas's first contention. Properly viewed, Texas's characterization of the settlement in its letter brief to the court is nothing more than an attempt to manufacture a conflict or appearance of impropriety which simply does not exist. Texas repeatedly implies that Class Counsel had a relationship with AHS. The undisputed facts simply do not support this argument (or even lend any color to it). The only evidence before the court is that over seven

---

[5] Of course, it goes without saying that Rule 1.9's language would suggest that, to the extent that there was a client in a position to object to this situation (and to be clear there is not), it would be AHS. Ironically, at least with respect to this facet of Texas's concern, it is AHS whom the court would expect to raise the concern that Class Counsel could use information gleaned while employed at their former firm against it.

years ago Class Counsel's former firm[6] – without the knowledge of Class Counsel – represented a *sister* corporation of Defendant AHS in completely unrelated matters.

Similarly, the court rejects any suggestion that there is any relationship between AHS and Class Counsel that has (or could have) made Class Counsel inadequate or compromised.  The court agrees with Class Counsel that all of the cases cited by Texas for the proposition that they are inadequate class representatives are inapposite.  (Doc. # 100 at 6-7).  Texas has provided the court with no legal authority relevant to the facts before the court.  In addition, there are no facts (indeed, nothing at all) presented to the court that would even hint at the conclusion that Class Counsel are inadequate due to some hypothetical conflict of interest or appearance of impropriety, ostensibly related to a relationship between Class Counsel's now former firm and AHS's sister corporation – that existed seven years ago and about which Class Counsel was not even aware.  Moreover, any such concerns are allayed by the fact that, as this court has previously noted, the Settlement resulted from extensive arms-length negotiations and was concluded only after Class Counsel and AHS had conducted numerous and exhaustive mediation sessions under the supervision of a member of the court's Panel of Neutrals.  Thus, Texas's objection that Class Counsel's former firm's relationship with a corporation related to AHS is a conflict or an appearance of impropriety is without merit and overruled.

> **b.    Requests for Incentive Payments to Class Representatives are Customary and In Any Event the Requests in This Case Do Not Render These Class Representatives Inadequate**

Some objectors take issue with the separate compensatory damage award and the incentive payments to the Faughts.  The Settlement proposes that the Faughts receive $8,000, which is essentially the value of their claim, *i.e.*, the cost of their repair, plus out of pocket expenses.  (Doc. # 66-4, Ex. I).

---

[6] The court takes judicial notice that the 2002 edition of Martindale-Hubbell Law Directory indicates that in 2002, Class Counsel's former firm, Burr & Forman, had over 130 attorneys.

Moreover, it proposes that they each receive a $5,000 incentive payment.  The court will address whether the Faughts are entitled to receive these payments in a separate order.  However, for the reasons discussed below, the court finds that the fact that the payments have been requested as part of the Settlement does not in any manner indicate that the Faughts are rendered inadequate class representatives.

Requests for incentive payments to named class representatives are fairly customary.  These payments are intended to recognize the time and efforts a class representative spends on behalf of the class.  By prosecuting this action as a class action here, the Faughts significantly delayed resolution of their own claims.  They spent many hours meeting with Class Counsel and participating in the mediation process.  They also rejected offers that would have compensated them at the expense of the class.  (Doc. # 66-1, Ex. A; Doc. # 66-4, Ex. F).

Some courts have "approved incentive awards to compensate named plaintiffs for the services they provide and the risks they incurred during the course of the class action litigation ." *Ingram v. The Coca-Cola Company*, 200 F.R.D. 685, 694 (N.D. Ga. 2001) (internal quotations and citations omitted) (approving service awards of $300,000 to each named plaintiff in recognition of the services they provided to the class by responding to discovery, participating in the mediation process, and taking the risk of stepping forward on behalf of the class.).  Importantly, in this case, unlike in many class action settlements, these proposed payments to the Faughts do not lessen the recovery to the class as a whole.   Thus, even if the court does ultimately approve the payments, the Class Members may still obtain full relief on their claims under the Settlement.

Finally, nothing in the record suggests that AHS's agreement to pay an incentive award to the Faughts had any influence or effect on the decision to settle this case, the terms of the Settlement, or the Faughts' support of the Settlement.  Indeed, there is no *quid pro quo* involving the Settlement and the

18

incentive payments, and the Faughts have readily and candidly stated that they support the Class Settlement even if their incentive award is not approved.

### 2.     Analysis of the Rule 23(b) Requirements

"To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the rule 23(a) prerequisites: Common questions must 'predominate over any questions affecting only individual members'; and class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'" *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997). In the settlement context of this case, there are no disparate questions undermining class cohesion. The Class Members claim to have been harmed by a common course of conduct – Defendant's alleged "uniform" corporate policies designed to deny claims and which otherwise adversely affect policyholders. Plaintiffs allege that the Class Members all suffered harms in the same manner making it more economical – if not financially for the parties, at least in terms of judicial resources – to settle the claims in one suit. *See Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir.1975), *cert. denied*, 429 U.S. 816 (1976). Therefore, the court finds the predominance and superiority elements are satisfied in this case.   Additionally, "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, see Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial."  *Amchem Prods.*, 521 U.S. at 620.  Accordingly, certification is appropriate under Rule 23(b)(3).

### C.     Other Objections to the Proposed Settlement

Objections were filed by or on behalf of the following Class Members, groups of Class Members, or others: (1) Charles M. Thompson (Docs. # 68, 82); (2) Miriam and John Chapon ("the Chapons") (Doc. # 69); (3)  The State of Texas (as *amicus curiae*) (Doc. # 71); (4)  Robert and Luz Shepard, Vivian

Johnson, Janet Tzedzalian, Merlyn D. Lind, Rosalyn Urbanek, and Donald P. Leach ("the Shepard Objectors") (Docs. # 72, 73); (5) John Howe, Jenny Hill, and Jennifer Deachin ("the Howe Objectors") (Doc. # 74); (6) Michael McKerley, Kenneth R. Behrend, and Pamela Behrend ("the McKerley Objectors") (Doc. # 75); (7) Jeff Williams, Sabrina (Habib) Williams, and Janet K. Wood ("the Williams Objectors") (Docs. # 76, 93); (8) Todd Petitt, Sharon Lee, and John and Connie Pentz ("the Petitt Objectors") (Doc. # 77); and (9) Thomas Arrington (Doc. # 78). The court will, in turn, categorize each of the objectors' contentions and fully address those objections by category.

Mr. Thompson argues that the proposed settlement is not fair, adequate, and reasonable for the following reasons: There is no set settlement value and therefore no way to determine if it is fair and evaluate the attorneys' fee request; AHS is the sole claims reviewer; there are no appellate rights for a denied claim; and Class Members must exert more effort that they otherwise would to file a claim. Finally, Mr. Thompson argues that the proposed settlement is the same one previously rejected by the Superior Court of California, County of San Diego in the *Edleson* case. (Docs. # 68, 79). Mr. Thompson also argues that this case represents an effort at forum shopping by AHS because they expect the Eleventh Circuit to "affirm whatever this instant court does in this case ... the usual result by the 11th Circuit is class action settlements." (Docs. # 68, 79 at 3).

The Chapons object to the proposed settlement on the following grounds: They argue the parties are forum shopping and seeking "end run" around the California Superior Court's rejection of the *Edleson* settlement. They also make the following assertions: the settlement does not offer a set monetary amount and the injunctive relief has little or no value to the class; the interests of the lead Plaintiffs are not aligned with the class because of the separate payment of compensatory damages and an incentive payment; there is insufficient evidence for the court to conduct an independent fairness assessment; the result obtained

does not warrant a substantial fee award; and the right to request exclusion does not mitigate the alleged inadequate relief.[7]  (Doc. # 69).

The State of Texas is currently litigating in Texas state court over allegations that AHS violated the Texas Deceptive Trade Practices Act.  It argues that this court should abstain and defer to that case. It also objects to AHS running the review desk and complains that there is no pre-determined monetary payment to class members or other disgorgement of alleged "ill gotten gains."  Texas also takes issue with the release provisions under the proposed settlement, arguing that it is too broad.[8]

The Shepard Objectors parrot objections previously made by their counsel on behalf of the Edlesons in support of their argument that their class action in California should not have been enjoined when the settlement in this case was preliminarily approved.  They also argue as follows:  the settlement is essentially identical to the settlement their counsel agreed to in *Edleson*, but which was later rejected by the California court; the Notice in this case was insufficient; and an award of attorney's fees to Class Counsel would be improper.[9]  They also re-hash their argument, previously made and rejected by this court,

---

[7] Curiously, the Chapons and other objectors have sought to adopt all other *bona fide* objections filed by other objectors.  (*E.g.*, Doc. # 69).  Quite frankly, the court is not impressed with these attempts to bootstrap (or incorporate by reference) other arguments which apparently were not of sufficient concern that they were included in the objections actually made.  Nevertheless, the court will address each objection raised by all the objectors.

[8] The court has already addressed Texas's contention that Class Counsel have a conflict because the law firm that they left over seven years ago represented AHS's sister corporation, Terminex.  (Doc. # 71).

[9] Although the court must deal with only a small number of objections, without any doubt, the one that takes the prize is the objection made on behalf of the Shepard objectors (but is no doubt asserted directly by Johnson Bottini, LLP ("the Johnson Bottini firm")).  That objection essentially asserts that the Edleson's counsel, *i.e.*, the Johnson Bottini firm, should receive all or a substantial portion of the attorneys' fees in this case.  The court is astounded.  As should be obvious to anyone who would seek to undertake representation of any class, counsel who negotiated a wholly inadequate settlement for a competing class in one court cannot parade into a second court in a parallel case, point to their deficient advocacy, and claim entitlement to a fee based upon that

that the settlement is void and unenforceable because the Johnson Bottini firm claims to have had the exclusive right to negotiate any class settlement (despite the fact that the settlement they had agreed to had already been rejected by the California court).  (Docs. # 72, 73).

The Howe Objectors and the Williams Objectors claim that the settlement in this case should be rejected because it is substantially similar to the settlement rejected in *Edleson*.  They also contend that: the settlement is not adequate, fair and reasonable because it does not require anything of AHS other than what is required under the originally-issued contracts; there is no way to determine the value of the settlement; AHS has unfettered discretion in reviewing the re-submitted claims; there is no deterrence against further improper business practices; and the two-year window to review claims is unreasonable. These Objectors also assert that the Notice to the class was insufficient and attorney's fees are excessive. (Docs. # 74, 75, 76, 93).

The Williams Objectors also filed supplemental objections.  (Doc. # 93).  In that document, they assert that: the review desk procedures are really an attempt to re-write the underlying contracts; the business practices relief is of no real value to the class; the benefits to the named Plaintiffs are excessive; the settlement does not address conduct by contractors steering customers toward purchasing new equipment rather than repairing the old; and there is no recourse if a re-submitted claim is denied.

The McKerley Objectors argue that the agreement is void because its value cannot be determined and, therefore, it would be impossible to determine a fair attorneys' fee award.  They also argue that the

_____

inadequate representation. The Johnson Bottini firm's objection is not merely incredible; it represents nothing more – and nothing less – than a shallow attempt at a money grab.  The California court rejected the settlement in *Edleson* finding that while counsel in that case had negotiated a large fee for themselves, the deal delivered nothing of value for the class.  Here, the Johnson Bottini firm undertook no negotiations on behalf of this class, but still is seeking a fee.

settlement actually encourages individual litigation and the business practices relief is illusory.  (Doc. # 75).

The Petitt Objectors, like many other Objectors, take the position that this Settlement is no more than a re-submission of the *Edleson* settlement, that the business practices relief offered is illusory, and that the release language is overly broad.  They also argue that the requested incentive payments and attorneys' fee award are excessive and call into question the adequacy of representation.  (Doc. # 77).

Thomas Arrington also complains that the settlement is too similar to that rejected in *Edleson*.  He further objects that the benefits to the class are illusory, the claims review process does not address conduct by contractors, and that the attorneys' fee award is excessive and its reasonableness cannot be properly evaluated.  (Docs. # 77, 78).

The court addresses each of these objections by category.

### 1.    This Is Not a Repackaged Version of the Edleson Settlement

Many of the objections to this Settlement assert that this is simply another attempt to have the *Edleson* settlement approved.  That is not the case.  This court has previously addressed this issue and will not waste any more time doing so.  There are valuable aspects of this Settlement that were not present in the previously-rejected *Edleson* settlement.  (*See* Section II above; Doc. # 43 at 6).

### 2.    This Settlement Provides Real Benefits to the Class

Another objection to the Settlement asserts that it is impossible to place a value on the Settlement; therefore, (1) the settlement benefits are illusory and (2) the court is unable to evaluate the reasonableness of the attorneys' fee request in light of that.  This concern is misplaced.  The Settlement was negotiated separately from the attorneys' fee award and the approval of the Settlement is not in any way contingent

on the approval of a fee.  Indeed, Class Counsel have clearly indicated that they support this settlement regardless of whether the fee they have requested is awarded.

As to the value of the Settlement, at the fairness hearing, Class Counsel indicated that it was their intent, both during negotiations, and now, for each class member to receive 100 cents on the dollar for their wrongly denied claims.  (Doc. # 103 at 129-30).  Indeed, each Class Member has a realistic chance of receiving an award that compensates them for their entire loss suffered because of a previously denied claim.  The Review Desk process, and the penalty provisions making AHS liable for amounts over and above the value of an improperly denied claim, were designed to do just that – get 100 cents on the dollar for the Class Members.  But even if Class Members must settle for less than full compensation, that is not a basis for disapproving this Settlement.  "Any settlement typically offers far less than a full recovery. Indeed, settlements, by their nature, do not yield one hundred percent recovery for plaintiffs." *Hillis v. Equifax Consumer Services, Inc.*, 2007 WL 1953464, *10 (N.D. Ga. 2007) (citing *Isby v. Bayh*, 75 F.3d 1191, 1200 (7th Cir. 1996) (the essence of settlement is compromise)).  Although this settlement requires some action by Class Members to re-submit claims, the real prospect of complete recovery, as opposed to merely receiving pennies on the dollar via a check in the mail, represents a real and substantial value to the class.

### 3.    Class Counsel Had The Authority to Enter Into This Settlement

Certain objectors have re-asserted the argument, previously made by the Edlesons and rejected by this court, that this Settlement is void because it was done without the Edlesons' counsel's permission. At the time this Settlement was originally reached, there was no certified class or approved settlement in the *Edleson* case.  At that point in time, the Edlesons' counsel was neither Class Counsel, nor Lead Class

Counsel.  The Edlesons were, and remain, merely individual plaintiffs *seeking* to represent a class against AHS in the California court system.

In connection with the *Edleson* settlement, the parties to that case entered into a letter agreement which the *Edleson* counsel contends requires his consent before there could be any  settlement of the claims pending in Alabama.  (Doc. # 39, Ex. 4).  However, in the *Edleson* settlement agreement that was filed in with the California court, there was a termination provision. That provision said "in the event this settlement is terminated before the effective date for any reason all other paragraphs of this agreement and the settlement itself shall be deemed null and void ab initio and without force or effect."  (Doc. # 39-3 at ¶ 11.3).  In the same paragraph, the agreement provides that:

> In such event this agreement and all subject proceedings documents prepared including all legal briefs and exhibits thereto shall not be deemed or construed to be an admission or confession by any party of any fact, matter or proposition of law and shall not be offered by anyone adverse to the defendant for any purpose whatsoever in such. In the event of such termination shall stand in the same position as if this agreement had not been negotiated, signed or filed with the court  except as expressly provided in this.

(Doc. # 39-3 at ¶ 11.3).

The *Edleson* settlement agreement was signed and executed on September 30, 2008. On that same day, a letter which memorialized the parties understanding – that is, the understanding between counsel for AHS in California, the Kirkland and Ellis firm and Mr. Bottini – was executed.  This letter is the document that the Johnson Bottini firm claims constitutes the side agreement that was breached by this settlement.  The obvious point that the Johnson Bottini firm has missed (or, more likely, simply ignored) is that the side agreement was terminated along with the settlement agreement when the California court rejected the class settlement in *Edleson*.  And pursuant to the termination provision contained in the settlement agreement, the *Edleson* plaintiffs and AHS were to be put back in their same positions that they

occupied before September 30, 2008.  The letter agreement was also rendered null and void *ab initio*.

Thus, their arguments in this court that they alone could decide whether, and under what terms, a class

could settle these claims are wholly frivolous.[10]

Upon the California court's rejection of the *Edleson* settlement, the order preliminarily approving

the settlement, which appointed the Edlesons' counsel "Lead Class Counsel," was nullified.  The Edlesons'

counsel were simply no longer "Lead Counsel."  For all these reasons, the objection that this Settlement

is invalid for not having been accomplished with the Edlesons' counsel's approval is overruled.

### 4.      The Scope of the Release Language is Reasonable

To the extent objectors argue that the Settlement is not fair because the scope of the release is too

broad, and that the release language purports to release claims not pled in the Complaint or unknown to

Class Members, the court finds these objections without merit.  In class action settlements, releases may

include all claims that arise out of the same course of conduct alleged in the Complaint, known and

unknown claims, or even claims over which the court lacked jurisdiction.  *See In re Prudential Ins. Co.

Of America Sales Practice Litigation Agent Actions* ("*Prudential II*"), 148 F.3d 283, 326 (D. N.J. 1998);

*Grimes v. Vitalink Communications Corp.*, 17 F.3d 1553, 1563 (3d Cir. 1994); *Sandler Associates, L.P.

v. BellSouth Corp.*, 818 F.Supp. 695, 704-05 (D. Del. 1993), *aff'd*, 26 F.3d 123 (3d Cir. 1994); *Class

Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1287-88 (9th Cir. 1992); *TBK Partners Ltd. v. Western Union

Corp.*, 675 F.2d 456, 460 (2d Cir. 1982); *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221

---

[10] Although the ultimately-rejected *Edleson* Stipulation requires that it be terminated by the parties in writing, that point is of no benefit to the Johnson Bottini firm or their arguments here. First, the letter agreement in which AHS agreed to obtain consent of "Lead Class Counsel" before settling this matter contains no similar provision.  In any event, however, the *Edleson* settlement had already been rejected by the California court at the time this Settlement was reached.  Moreover, *by its own terms*, the *Edleson* settlement was "subject to the approval of the Court ..."  (Doc. # 39-3 at 3).  Thus, it was rendered null and void when the California court rejected it – and their side agreement with Kirkland & Ellis met the same fate.

(5th Cir.1981), *cert. denied sub nom. CFS Continental, Inc. v. Adams Extract Co.*, 456 U.S. 998 (1982). There is nothing unusual or unfair about Defendant's interest in finality and repose, nor in its desire to be released from Class Members' claims, and not be threatened with the prospect of potential double recoveries. Indeed, there would be no reason for a defendant to enter into a settlement of a class action that would leave it subject to additional class actions asserting the same or similar claims.

Certain objectors argue that the release improperly releases "future" claims. They are mistaken. The law allows a release to bar future claims for conduct that occurred in the past that are based on the same factual predicate as those claims in this action. That is all the release at hand precludes – claims based upon conduct during the Class Period. The Class Period is defined in the Settlement as July 24, 2001 through the date of preliminary approval – March 19, 2010. (Doc. # 37-1 at ¶¶ 2.11, 10.1).

### 5.     The Settlement Is Not Contingent On The Requested Attorneys' Fee

Class counsel has requested attorneys' fees in the amount of $1,500,000 to be paid directly by AHS, and 25% of any amounts paid to class members in connection with this case. (Doc. # 64). After the Settlement was negotiated by AHS and Class Counsel, they separately negotiated the fee issue and agreed that Class Counsel might request, and AHS would not object to, these amounts. However, the Settlement is in no way contingent upon the approval of any particular fee award. (Doc. # 37-1 at Section VIII). Many objectors contend the attorney's fee request is unreasonable in light of the fact that there is not a dollar value to this settlement against which the fee can be judged. The court has determined that it will take Class Counsel's Motion of Plaintiffs for Incentive Payments and Motion of Class Counsel for an Award of Attorneys' Fees under consideration and rule by separate order. However, because any specific fee award is not a part of the Settlement itself, nor is the settlement contingent on any particular award of

attorneys' fees, any concerns about fees do not impact the fairness of the Settlement itself.[11]  Therefore, this objection is overruled.

### 6.    The State of Texas's Other Objections Are Overruled

The State of Texas is currently litigating Deceptive Trade Practices Act and Real Estate Settlement Procedures Act ("RESPA") claims against AHS.  Texas objects to this settlement to the extent that the release would prohibit a Texas Class Member from participating in another class action or receiving monetary benefits in its case against AHS.  Texas also objects to the extent that the release would bar these claims, which it specifically does not.  As discussed above, the release contained in the Settlement is reasonable, designed to ensure certainty for the settling defendant, and prevent double recoveries by class members.  Again, the release would only bar claims that are similar to those in this case.[12]

Texas also asks that the citizens of Texas be excluded from this Settlement because it contends that it may be able to recover more for its citizens in its Deceptive Trade Practices Act case against AHS.  However, no evidence has been presented to the court that establishes that Class Members from Texas

---

[11] Future claims for conduct that has not yet occurred are simply not encompassed by the release.  Therefore, this objection is overruled.  This fact is made clear by the affidavit of the mediator. (Doc. # 66-1).  In his declaration, Mr. Van Tassel said that in the mediation sessions that led up to this Settlement, the subject of attorneys' fees was "off the table" and that fees were never discussed in his presence during the negotiations that led to this Settlement. (Doc. # 66-1 at ¶ 4).  Indeed, the parties acknowledged to the mediator at the time that this Settlement was reached that they had not yet discussed attorneys' fees and would only do so in future discussions.  (*Id*. at ¶¶ 4, 5).

In fact, the court notes that the parties in this same manner handled their negotiations which led to an earlier (but now superceded) settlement of a putative Alabama class. (Doc. # 66-1 at ¶¶ 2-3).  That settlement was never presented to the court because the *Edelson* court rejected the settlement there and the parties soon thereafter began negotiations regarding a broader, nationwide class.  It was those negotiations that led to this Settlement.

[12] That Class Counsel were careful in negotiating an appropriate release is evidenced by this point:  As noted at the fairness hearing, Class Counsel currently has pending against AHS a putative RESPA class action and Class Counsel have taken care not to negotiate a release of the RESPA claims in that case on behalf of their clients.

28

would be better off rolling the dice in a case not yet decided.  The Settlement, here, is both real and non-contingent.  It provides valuable benefits for Class Members.  There is certainty.  On the other hand, Texas has been litigating for over four years and to date has not yet obtained anything of value for its citizens.  In fact, the parties to the Texas case until recently had a summer trial date, which they have recently asked to continue until the fall.  In any event, it remains a possibility that Texas might lose its case.  In evaluating Texas's request, the court is compelled to note that a bird in the hand is worth two in the bush.  *See In re Shell Oil Refinery*, 155 F.R.D. 552, 560 (E.D. La. 1993).  Had the citizens of Texas wished to opt out, they were given that opportunity and were free to do so.  Very few have done so.

Texas has also argued that this court should abstain in this matter in light of the state court proceedings.  Although Texas made arguments with respect to a number of abstention doctrines, this issue is now moot.  Once it became clear at the Fairness Hearing that Texas was also asserting RESPA claims in its state court lawsuit against AHS, AHS removed the case and it is now pending in the United States District Court for the Southern District of Texas, Houston Division, Case No.10cv808.

For these reasons, Texas's objections to the Settlement are overruled.

### D.     Fairness of the Settlement Agreement

"Before approving a class settlement that binds members of the class, the Court must conduct a fairness hearing at which the parties proposing the settlement must present evidence that the settlement is 'fair, reasonable, and adequate.'"  *Turner*, 472 F.Supp.2d at 839 (citing  Fed.R.Civ.P. 23(e)(1)(C); *Newby v. Enron Corp*., 394 F.3d 296, 300-01 (5th Cir. 2004); *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982)).

Whether to approve a settlement in a class action lawsuit is a decision "left to the sound discretion of the trial court," and the court understands that its decision will not be overturned "absent a clear showing

of abuse of that discretion." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir.1984). This makes the court's task of examining this settlement and ensuring its fairness, adequacy and reasonableness all the more critical.

Federal Rule of Civil Procedure 23(e) provides that "[a] class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." While the Rule does not provide standards for the court to employ in considering a motion for approval, those standards have often been articulated in various reported decisions. When exercising its discretion, the court must consider the public and judicial policies that strongly favor the settlement of class action lawsuits. *In re U.S. Oil and Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992); *accord Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977). "[I]t has been repeatedly recognized that settlements are 'highly favored in the law and will be upheld whenever possible because they are means of amicably resolving doubts and preventing lawsuits.'" *Bennett v. Behring Corp.*, 96 F.R.D. 343, 348 (S.D. Fla. 1982) (quoting *Miller v. Republic Nat. Life Ins. Co.*, 559 F.2d 426, 428 (5th Cir.1977) *aff'd*, 737 F.2d 982 (11th Cir. 1984)). This is the case "particularly in an area where voluntary compliance by the parties over an extended period will contribute significantly toward ultimate achievement of statutory goals." *Patterson v. Newspaper & Mail Delivers' Union*, 514 F.2d 767, 771 (2d Cir. 1975) (citations omitted). Settlements in class action cases are also favored because they "conserve judicial resources by avoiding the expense of a complicated and protracted litigation process...." *In re Motorsports Merch. Antitrust Litig.*, 112 F.Supp.2d 1329, 1333 (N.D. Ga. 2000).

The Eleventh Circuit has instructed that, in examining the fairness, adequacy, and reasonableness of a settlement, a district court should examine several factors, including: "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which

30

a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved." *In re CP Ships Ltd. Securities Litigation*, 578 F.3d 1306, 1317-18 (11th Cir. 2009) (quoting *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir.1984)). "Thus, the issues that bear upon whether or not to grant final approval here are: a) whether the settlement was procured by collusion among the parties or was the result of arms-length and informed bargaining; and b) whether the proposed final settlement is fair, adequate and reasonable, applying the six *Bennett* factors." *Lipuma v. American Express Co.*, 406 F.Supp.2d 1298, 1315 (S.D. Fla. 2005). The court will address each of these issues in turn.

### 1.        This Settlement is the Product of Informed, Arms-Length Negotiations

The court has a duty to determine the possible existence of fraud or collusion. In assessing this factor, the words of Judge Lynwood Smith come to mind:

> There is not a scintilla of evidence suggesting that the proposed settlement is the product of fraud, collusion, or otherwise improper conduct. Instead, the record demonstrates that the settlement was negotiated by capable, experienced counsel, in good faith, and at arms' length, following an extensive, lengthy, and difficult process supervised by an experienced mediator. Substantial discovery had been completed in connection with the class certification motion, enabling the parties to fairly assess the risks and rewards of further litigation. ... The parties have represented to the court that the class action settlement was reached through arms' length negotiations over the course of several months, and that it was negotiated in an adversarial manner following substantial factual investigation, extensive legal analysis, expert investigation, and professional mediation. Accordingly, the court finds no evidence of fraud or collusion in the settlement negotiations, or the resulting proposed settlement.

*Carnegie v. Mutual Savings Life Ins. Co.*, 2004 WL 3715446, at *18 (N.D. Ala. 2004).

The Faughts filed this class action in 2007 claiming that AHS engaged in bad faith claims handling practices and routine breaches of the terms of its uniform written contracts with its customers. (Doc. # 1).

31

After a year of litigation, discovery, and motion practice, the parties began protracted and contentious negotiations that were supervised by a well-qualified mediator and  ultimately produced this Settlement. (*See, e.g.*, Docs. # 4, 8, 9, 11, 12, 21, 22, and 23).

The parties' settlement discussions began before the settlement in the *Edleson* case was reached. (Docs. # 23, 39-3).  The parties were ordered to mediation.  After several meetings Class Counsel on at least three occasions walked out of mediation sessions after concluding that further negotiations would be fruitless. (Doc. # 66, Ex. A).  On one of those occasions, after AHS took a position in mediation to which Plaintiffs objected, Plaintiffs formally terminated the mediation and the next day filed an adversarial motion for class certification.  (Doc. # 66, Exs. A and B; Doc. # 24). Class Counsel only withdrew its motion after AHS reversed its position, and it was that concession that effectively broke the logjam in the parties' negotiations.  (Doc. # 66, Exs. A and B).  The parties met in formal mediation sessions with one of the court's Panel of Neutrals on seventeen occasions.  (Doc. # 66, Exs. A and B). Class Counsel and AHS's attorneys also met in person and by telephone on numerous other occasions outside the presence of Mr. Van Tassel. (Doc. # 66, Exs. A and G).

An initial settlement of this matter was reached in January 2009, months before the July fairness hearing conducted by the California court in the *Edleson* matter.  However, the parties agreed, with the court's approval, to refrain from finalizing the settlement in this matter to allow the California court to assess the *Edleson* settlement.  (Doc. # 29, Orders dated March 9, 2009, April 1, 2009, June 8, 2009).

After the California court rejected the *Edleson* settlement, the parties to this case reported that fact to this court, promptly re-engaged their mediator, and resumed negotiations.  (Orders dated July 27, 2010, July 30, 2010, September 8, 2010).  On October 6, 2010, almost four months after the *Edleson* settlement had been rejected by the California court, the parties to this case filed an Amended Complaint which

reflected that the claims in this case were being asserted on behalf of a nationwide class (Doc. # 34) and filed a Notice of Settlement of Class Action (Doc. # 35).  On October 9, 2010, the parties filed a Joint Motion for Preliminary Approval of Proposed Settlement (Doc. # 36).

Thus, the Settlement that is before the court was not reached until over two years of contentious litigation had taken place and marathon mediation efforts and settlement negotiations were held.  In preliminarily approving the settlement, the court found that:

> The Settlement resulted from extensive arms-length negotiations and was concluded only after Class Counsel had (1) conducted numerous and exhaustive mediation sessions with a member of the court's Panel of Neutrals; (2) conducted an independent investigation before and throughout the litigation; and (3) satisfied themselves about the fairness, reasonableness, and adequacy of the Settlement.

(Doc. # 37 at 8).  No evidence has been presented to the court since that time that would tend to show any fraud or collusion.

Nor is this a case where the Settlement is tainted by a potential reverse auction.  A reverse auction is said to occur when "the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with the hope that the district court will approve a weak settlement that will preclude other claims against the defendant." *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 282 (7th Cir. 2002).  Courts have correctly observed that this type of scenario raises the question of whether a class settlement is the product of a collusive reverse auction.  *See e.g., Negrete v. Allianz Life Ins. Co. of North America*, 523 F.3d 1091, 1099-1100 (9th Cir. 2008);  *In re Community Bank of Northern Virginia*, 418 F.3d 277, 308 (3rd Cir. 2005);  *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180,1189 (10th Cir. 2002).  The court has dealt with Rule 23 class issues not only in a judicial capacity but also while in private practice and teaching Complex Civil Litigation at the University of Alabama

Law School. Based upon that experience the court is well aware of concerns that arise when a defendant is faced with competing class actions and negotiates a class settlement with one set of attorneys.

This Settlement is not sullied by the effects of a reverse auction. Certainly, there was a prior nationwide class settlement reached by the parties in the *Edleson* case, and that settlement was emphatically rejected in the California court. However, even before the *Edleson* settlement was reached and presented to the California court, the parties in this case had negotiated a settlement of smaller scope. (Doc. # 66-1 at ¶¶ 2-3). They stood down awaiting the outcome of the California court's ruling on the request to approve the *Edleson* settlement. The key point here is that AHS was not attempting to negotiate two different (and competing) class settlements with two sets of counsel. They were negotiating a broader class with the Johnson Bottini firm and a smaller class that was consistent with the previous class definition asserted by Class Counsel in their original complaint. Only when the *Edleson* settlement was rejected did AHS and Class Counsel begin discussing the Settlement of the class allegations reflected in the amended complaint in this case. Therefore, the court finds that this is not a case where AHS confronted with more than one class action believed Class Counsel to be the "most ineffectual class lawyers to negotiate a settlement with in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant." *Reynolds,* 288 F.3d at 282.[13]

Furthermore, the negotiations in this case resulted in a settlement which even certain objectors who appeared at the fairness hearing admitted took into account and remedied some of the deficiencies

---

[13] Ironically, if the court were inclined to believe that AHS engaged in the mischief of a reverse auction, that would at best be an attack on the *Edleson* settlement, not this one. That is, if any group of attorneys has earned the distinction of being branded "ineffectual class counsel" who negotiated a "weak settlement" for the class they sought to represent, it is the Johnson Bottini firm in the *Edleson* case – not Class Counsel. As the California judge correctly found, the settlement negotiated in that case was wholly inadequate.

that were prevalent in the *Edleson* settlement. (*See e.g.*, Doc. # 103 at 79).[14]   The court has discussed

---

[14] To be fair, John Davis, an attorney who represents some of the objectors in this case, said the following at the hearing:

> THE COURT: You didn't address the forum shopping issues you raised. Maybe perhaps that's because seeing the submissions that were made about the timing of negotiations, when they began, even before the Edleson matter, and the parties' agreement to stand down to let the Edleson court decide about approval of that. And then the mediator's affidavit about what happened after Edleson failed and the fairly intense negotiations over a three-month period after that. I'm not trying to put words in your mouth, I'm just trying to make a record and see if you still have any concerns about that.

> MR. JOHN DAVIS: I have concerns. That's certainly part of it. I generally don't like to stand up and tell a Court that it doesn't have jurisdiction over something.

> THE COURT: Particularly when it does.

> MR. JOHN DAVIS: Yes. So, if it's a concern, I think it looks bad. It kind of left a bad taste in my mouth. Certainly after reading the submissions that Your Honor referenced, that assuaged some of my concerns.

> THE COURT: A page of history is worth a few more volumes of logic, I take it.

> MR. JOHN DAVIS: Certainly. Certainly. But, at first glance, it definitely seemed like AHS was either going from court to court to court.

> THE COURT: A "middle of the night slap jack settlement" is I think what one of your fellow objectors called it.

> MR. JOHN DAVIS: I don't know about that one. I don't think I read that one. But, yes, it did allay some of my concerns. But, you know, the concern remains that this settlement still looks a lot like the one in Edleson. I think it's great that improvements have been made. That AHS and the plaintiffs in this case seem to have taken to heart some of the suggestions and comments made by objectors in Edleson. So, to that extent, I think it was a positive thing. But I don't think we're finished yet. I still think that there's room for work that needs to be

these improvements above and at the fairness hearing.

Moreover, the negotiations were supervised by a highly experienced mediator who has done an extraordinary job in this case. The mediator has guided the parties toward this Settlement by tenaciously encouraging them to stick to the task through seventeen separate mediation sessions and a number of other conferences with counsel. In light of all this, the court does not hesitate in finding that this Settlement is the product of informed, arms-length negotiations.

      **2.**      **The *Bennett* Factors**

           **a.**      **The Likelihood of Success at Trial**

"The likelihood of success on the merits is weighed against the amount and form of relief contained in the settlement." *Lipuma v. American Express Co.*, 406 F.Supp.2d 1298, 1319 (S.D. Fla. 2005). In evaluating this factor, the court should not reach any ultimate conclusions with respect to issues of fact or law involved in the case. "The very uncertainty of outcome in litigation, as well as the avoidance of wasteful litigation and expense, lay behind the Congressional infusion of a power to compromise.... [Settlements] could hardly be achieved if the test on hearing for approval mean establishing success or failure to a certainty." *Knight v. Alabama*, 469 F.Supp.2d 1016, 1033 (N.D. Ala. 2006) (quoting *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 212 (5th Cir. 1981)).

The only decision that has been made by this court relating to the merits of this action was to deny Defendant's initial motion to dismiss. However, that decision merely held that "the class claims

---

done here. Thank you, Your Honor.

The court was very impressed with Mr. Davis and fully appreciates both his candor and advocacy. Nevertheless, the court is mindful that this Settlement, although not perfect, provides valuable consideration and benefits for the Class Members, and does so with finality and certainty. That is, it can always be said by those acting as Monday Morning quarterbacks that a settlement could be improved with this tweak or that one. But the fact remains that while this settlement (like all others) is not perfect, it is fair, adequate, and reasonable.

are sufficiently pleaded to survive a motion to dismiss for failure to state a claim upon which relief may be granted." (Doc. # 12).  Thus the court has not previously weighed in on the merits, risks or likelihood of success at trial.  However, the court is familiar with the facts and law of this case, the legal standards that apply to it, and has been very involved in supervising this litigation.  Given this familiarity, the court believes that good cause exists for the parties to wish to resolve their disputes.

To be sure, risks are inherent in all litigation, particularly high stakes lawsuits like this one. This case is no exception.  Class Members face not only hurdles on the merits of their claims, but also as to class certification.  As to the merits, there is no guarantee that Plaintiffs would prevail even in an individual case.  Although Class Members are similarly situated in that they all had home warranty claims denied, it does not necessarily follow that all claims were improperly denied.  Even for those Class Members whose claims may have been properly denied, this Settlement will provide an opportunity to have AHS re-examine those claims with a different frame of reference, *i.e.* more clearly articulated standards and, in the event of a faulty denial, the threat of substantial penalties over and above the value of the initial claim.  Thus, they will have their claims re-examined by a Review Desk "incentivized" to approve possibly even questionable claims.

The court also notes that although the Rule 23(a) factors have been met, there are still substantial hurdles that Plaintiffs would have to negotiate in order to achieve an adversarial Rule 23 certification. Among the difficult obstacles confronting them would be the questions of whether certification of the class would be appropriate in light of the Rule 23(b) factors related to manageability.  *See e.g.*, *Knight*, 469 F.Supp.2d at 1033.

Moreover, conducting a class certification hearing, evaluating dispositive motions, and trying this case would not only involve uncertain outcomes at each one of those steps, but also would require a

lengthy time commitment from the court and counsel.  And, to say the least, a hearing or trial would not only be lengthy, but logistically complicated and tremendously expensive for all parties. For those reasons, the court concludes that the risks faced by the parties and the difficulty in managing a trial or hearing counsel in favor of accepting the proposed Settlement.

> **b.    The Range of Possible Recovery and The Point on or below the Range of Possible Recovery at Which a Settlement Is Fair, Adequate and Reasonable**

District courts often consider the next two factors together because they are related.  *See, e.g., Knight*, 469 F.Supp.2d at 1033; *Lipuma*, 406 F.Supp.2d at 1322; *Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. 534, 541 (S.D. Fla.1988).  Analysis of these factors requires the court to compare the settlement terms "'with the likely rewards the class would have received following a successful trial of the case.'"  *Knight*, 469 F.Supp.2d at 1033 (quoting *Cotton*, 559 F.2d at 1330). "When making this comparison, the Court should keep in mind that 'compromise is the essence of a settlement,' and 'should not make a proponent of a proposed settlement "justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes."'"  *Knight*, 469 F.Supp.2d at 1033 (citing *Cotton*, 559 F.2d at 1330 (quoting *Milstein v. Werner*, 57 F.R.D. 515, 524-25 (S.D. N.Y. 1972))).  Here, as in most class actions, it is not only monetary relief that is difficult to quantify, but the range of possible recovery "'spans from a finding of non-liability through varying levels of injunctive relief.'"  *Assoc. for Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 468 (S.D. Fla. 2002).

The court finds that the proposed relief contained in the proposed Settlement is reasonable and is within the range of possible remedies permitted by law. The proposed relief is designed to put Class Members in the position they would have been in, had their claims not been wrongly denied.  It provides

a practicable and efficient means of identifying wrongly denied claims and compensating Class Members for those claims, and further provides additional penalties if, during that process, AHS continues to wrongly deny claims. The Settlement provides far greater benefits than that negotiated by the *Edleson* Class Counsel. Furthermore, the proposed business practice changes will benefit even those consumers who are not Class Members. The court, therefore, finds that the proposed relief is fair, adequate, and reasonable as compared to the range of possible recovery in this action.

### c.   The Complexity, Expense and Duration of Litigation

This inquiry overlaps in some respects the first *Bennett* factor – likelihood of success on the merits. In assessing this factor, "[t]he Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation. In this respect, '[i]t has been held proper to take the bird in the hand instead of a prospective flock in the bush.'" *Lipuma*, 406 F.Supp.2d at 1323 (quoting *In re Shell Oil Refinery*, 155 F.R.D. 552, 560 (E.D. La. 1993)). "'Complex litigation ... "can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive."'" *Lipuma*, 406 F.Supp.2d at 1323-24 (quoting *Woodward v. NOR-AM Chem. Co.*, 1996 WL 1063670 *21 (S.D. Ala. 1996) (*quoting In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir.1992))).

As previously discussed, this is a complex case, which if litigated would have been expensive and time consuming. Further, to the extent that there would be a need to litigate individual damages claims, that process could take many more years to resolve, and would greatly increase the expense as well as the duration of this litigation. Therefore, this factor counsels in favor of approving the proposed Settlement.

### d.   The Substance and Amount of Opposition to the Settlement

In assessing whether a proposed settlement is fair, adequate, and reasonable, the court must "examine the settlement in light of the objections raised." *Cotton*, 559 F.2d at 1331. "In assessing the fairness of a proposed compromise, the number of objectors is a factor to be considered but is not controlling." *Id*. "Thus, a low percentage of objections points to the reasonableness of a proposed settlement and supports its approval." *Lipuma*, 406 F.Supp.2d at 1324 (citing *Bennett*, 737 F.2d at 986).

Despite the fact that notice was mailed to over 4.5 million Class Members, the record shows that only 1,506 exclusion requests have been received. There were an additional thirty-seven communications received which were unclear as to whether exclusion was sought. Even if those communications are included in the total, there has only been a .033 per cent opt out rate. (Doc. # 92-3). Of the 1,543 potential exclusion requests, ninety expressed positive experiences with AHS as the reason for opting out. (*Id*.). There were twenty-four class members (not counting the State of Texas, which is not a class member), who objected to the settlement, for a .00051 per cent objection rate. (*See* Docs. # 68, 69, 71 - 79, 93, 95). This "constitutes an infinitesimal number." *Lipuma*, 406 F.Supp.2d at 1324 (describing .00050% as an infinitesimal number). Moreover, as discussed in detail above, the objections to the settlement that were raised are simply not well taken. The small number of opt-outs and objectors, along with the absence of any objections that have merit, militates in favor of approval of the Settlement.

### e.   The Stage of Proceedings at Which the Settlement Was Achieved

As previously discussed, the parties to this case did not even begin settlement discussions until certain discovery had been completed and, through negotiation, they had obtained information they believed to be relevant to any settlement discussions. Specifically, AHS had produced several thousands of documents and presented four witnesses for Rule 30(b)(6) depositions. (Doc. # 22 at 3-4). However,

Class Counsel requested that AHS produce certain additional documents and run one or more database searches that could better ascertain the size of the purported class prior to engaging in settlement discussion. (*Id.*) Moreover, even though they were exploring resolution of this case, the parties deferred to the California court to consider the settlement in the *Edleson* case. It appears that the parties substantially improved upon that settlement, taking into consideration the objections to it and the reasons it was rejected by the court.

Given the circumstances described above, the court has no hesitation in finding that the parties and their counsel have sufficiently developed the facts and gained sufficient understanding of the merits of the case prior to entering into the proposed Settlement. Thus, this factor also counsels in favor of approving the proposed Settlement.

**IV.   Conclusion**

Based on the foregoing analysis, the court will enter a separate order which:

1.   Appoints Laura Faught and Steven Faught as Class Representatives;

2.   Appoints D. Frank Davis, John E. Norris, and the firm of Davis & Norris LLP as Class Counsel;

3.   Approves the proposed Settlement, attached as Exhibit A to the Order Preliminarily Approving Settlement and Providing for Notice (Doc. # 37) and finds that the Settlement is fair, adequate and reasonable, and not the product of collusion among the parties;

4.   Authorizes and directs the parties to consummate and to fully comply with the Settlement in accordance with its terms and provisions;

5.      Incorporates as part of this Final Judgment the Status Report Regarding Business Practice Changes (Doc. # 97), filed March 9, 2010, with such Report to be given effect according to its terms as part of the Settlement and being subject to the terms of the Settlement;

6.      Finds that the Named Plaintiffs and each of the Class Members shall be deemed to have, and by operation of this Final Judgment shall have, fully, finally and forever released the Released Claims in accordance with the terms of the Agreement;

7.      Enjoins the Named Plaintiffs, all Class Members, their counsel and anyone claiming through or for the benefit of any of them, from commencing, prosecuting, instituting, continuing, or in any way participating in the commencement or prosecution of any Suit asserting any of the Released Claims against the Released Parties, either directly, representatively, or in any other capacity;

8.      Overrules all objections to the Settlement filed herein (including those stated in Docs. # 68, 69, 71, 72, 73, 74, 75, 76, 77, 78 and 79); and notes that each Settlement Class Member covenants not to participate in any Suit against the Defendant unless such Settlement Class Member has first complied with the terms of the Agreement;

9.      Orders that this action shall be dismissed with prejudice;

10.     Finds that except as expressly provided in the Settlement, each of the parties, including each Class Member, shall bear his/her/its own costs, fees and expenses;

11.     Retains jurisdiction to enforce the terms of the settlement agreement, and reserves ruling on the issues of attorney's fees, incentive awards, and the outstanding motions regarding the court's All Writs Act Injunction (Doc. # 43); and

12.     Finds that all other motions are due to be moot.

**DONE** and **ORDERED** this _____27th_____ day of April, 2010.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE